

1  William C. Rooklidge (SBN 134483)
   Martha K. Gooding (SBN 101638)
2  Gregory S. Cordrey (SBN 190144)
   Ben M. Davidson (SBN 181464)
3  HOWREY LLP
   4 Park Plaza, Suite 1700
4  Irvine, California 92614
   Telephone: 949-721-6900
5  Facsimile: 949-721-6910
   E-mail: rooklidgew@howrey.com
6  E-mail: goodingm@howrey.com
   E-mail: cordreyg@howrey.com
7  E-mail: davidsonb@howrey.com

8  Attorneys for Plaintiff The Procter & Gamble Company

9

10                 UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13  THE PROCTER & GAMBLE COMPANY,    )    Case No.: 3:08-cv-00930 PJH
                                     )
14            Plaintiff,             )
                                     )
    v.                               )    THE PROCTER & GAMBLE
15                                   )    COMPANY'S OPPOSITION TO KRAFT'S
    KRAFT FOODS GLOBAL, INC.,        )    MOTION FOR A STAY
16                                   )
              Defendant.             )
17                                   )

18

19

20

21

22

23

24

25

26

27

28

HOWREY LLP

DM_US:21080019_6

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ..................................................................................................... 1

II.    PROCEDURAL HISTORY ...................................................................................... 4

    A.     P&G's Innovation of the Plastic Coffee Container ..................................... 4

    B.     P&G's Lawsuit Against Kraft For Infringing P&G's '418 Patent .............. 5

    C.     Kraft's Lack of Candor With the Court ....................................................... 6

        1.     Kraft Did Not Disclose That, As Soon As This Court
             Stayed the '418 Action, It Intended to File A New Case in
             Wisconsin Against P&G ...................................................................... 6

        2.     Kraft Did Not Promptly Pursue Its Appeal As It Said It
             Would ................................................................................................ 6

    D.     Kraft's Efforts To Derail P&G's Claims In The Wisconsin Action ............ 7

    E.     At the Time of the Transfer, Extensive Discovery Had Been
        Conducted on the '419 Patent Allegations, And The '419 Patent
        Action Had Been Scheduled for Trial ......................................................... 8

III.   A STAY OF THIS ACTION WOULD BE INCONSISTENT WITH THE
    PURPOSE OF TRANSFER, WHICH IS TO AVOID DELAY AND
    WASTE, NOT TO CREATE IT. ............................................................................ 9

IV.    THE LAW GOVERNING KRAFT'S REQUEST TO STAY THIS
    ACTION ................................................................................................................. 10

V.     A STAY WOULD PREJUDICE P&G AND GIVE KRAFT AN UNFAIR
    ADVANTAGE. ...................................................................................................... 11

    A.     A Stay Would Severely Prejudice P&G's Business ................................... 11

    B.     A Stay Would Impose Evidentiary Prejudice On P&G .............................. 12

VI.    A STAY WOULD NOT SIMPLIFY THE ISSUES IN THIS ACTION ................ 13

    A.     Kraft's Attack on the '418 Patent Will Not Affect The '419 Patent. ........ 14

    B.     Kraft Is Not Likely To Prevail On Its Second Reexamination Effort
        Or On Its Seriatim Appeals to the BPAI and the Federal Circuit. ............ 17

VII.   LITIGATING THE '419 PATENT NOW DOES NOT THREATEN
    DUPLICATIVE RECOVERY OR DISCOVERY .............................................. 18

VIII.  P&G'S ACTION TO ENFORCE ITS PROPERTY RIGHTS IN THE '419
    PATENT DOES NOT "DUPLICATE" ITS ACTION TO ENFORCE ITS
    SEPARATE PROPERTY RIGHTS IN THE '418 PATENT. ............................... 20

IX.    P&G'S ASSERTION OF THE '419 PATENT WAS PROPER ........................... 22

-i-

1  **TABLE OF CONTENTS (cont.)**

2                                                                                              **Page(s)**

3  XI. IF THE COURT CONCLUDES THAT A STAY SHOULD BE IMPOSED,
       ANY STAY SHOULD BE LIMITED AND CONDITIONED TO
4      MINIMIZE THE PREJUDICE TO P&G. ......................................................................... 23

5  CONCLUSION ............................................................................................................................... 25

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWREY LLP

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*ACS Hosp. Sys., Inc. v. Montefiore Hosp.,*
    732 F.2d 1572 (Fed. Cir. 1984) ................................................................................................. 18

*Adams v. California Department of Health Services,*
    487 F.3d 684 (9th Cir. 2007) ...................................................................................................... 25

*Adams v. Newell Rubbermaid Inc.,*
    2007 U.S. Dist. LEXIS 62512 (W.D. Wis. Aug. 21, 2007) ....................................................... 14

*Alltech, Inc. v. Cenzone Tech, Inc.,*
    2007 U.S. Dist. LEXIS 19989, at *9 (S.D. Cal. Mar. 21, 2007) ................................................ 14

*Anascape Ltd. v. Microsoft Corp.,*
    475 F. Supp. 2d 612 (E.D. Tex. 2007) ............................................................................... 11, 14

*ASCII Corp. v. Std. Entm't USA, Inc.,*
    844 F. Supp. 1378 (N.D. Cal. 1994) .......................................................................................... 20

*Biax Corp. v. Fujitsu Computer Sys. Corp.,*
    2007 U.S. Dist. LEXIS 12973 at *5 (E.D. Tex. Feb. 26, 2007) ................................................. 20

*Black & Decker, Inc. v. Robert Bosch Tool Corp.,*
    500 F. Supp. 2d 864 (N.D. Ill. 2007) ......................................................................................... 25

*Boston Sci. Corp. v. Micrus Corp.,*
    2006 U.S. Dist. LEXIS 16147, **3, 7 (N.D. Cal. Mar. 21, 2006) ............................................. 19

*Danner v. Himmelfarb,*
    858 F.2d 515 (9th Cir. 1988) ...................................................................................................... 11

*DataTreasury Corp. v. Well Fargo & Co.,*
    490 F. Supp. 2d 749 (E.D. Tex. 2006) ....................................................................................... 21

*E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.,*
    711 F. Supp. 1205 (D. Del. 1989) .............................................................................................. 20

*Ecolab, Inc. v. FMC Corp.,*
    2007 U.S. Dist. LEXIS 12973 at *5 (E.D. Tex. Feb. 26, 2007) ................................................. 12

*Ethicon, Inc. v. Quigg,*
    849 F.2d 1422 (Fed. Cir. 1988) ........................................................................................... 18, 20

*Fresenius Med. Care Holdings v. Baxter Int'l, Inc.,*
    2007 U.S. Dist. LEXIS 44107, at **10-11 (N.D. Cal. June 6, 2007) .................................. 12, 14

*Ginsburg v. Mutual Life Ins. Co.,*
    170 F. Supp. 212 (S.D.N.Y. 1958) ............................................................................................ 11

*Gladish v. Tyco Toys, Inc.,*
    1993 U.S. Dist. LEXIS 20211, at *5-6 (E.D. Cal. Sept. 16, 1993) ............................................ 14

1

**TABLE OF AUTHORITIES (cont.)**

2

**Page(s)**

3   *In re Yamamoto,*
       740 F.2d 1569 (Fed. Cir. 1984) .................................................................18
4
    *Kearns v. General Motors Corp.,*
5       94 F.3d 1553 (Fed. Cir. 1996) ..................................................................23

6   *KLA-Tencor Corp. v. Nanometrics, Inc.,*
       2006 WL 708661, at *2 (N.D. Cal. Mar. 16, 2006) ....................................10
7
    *M.C. Prods., Inc. v. AT&T Co.,*
8       205 F.3d 1351 (9th Cir. Dec. 2, 1999) .......................................................23

9   *Magnetic Eng'g & Mfg. Co. v. Dings Mfg. Co.,*
       178 F.2d 866 (2d Cir. 1950) .....................................................................11
10
    *Modine Mfg. Co. v. Delphi Automotive Sys., LLC,*
11      2000 WL 33989247 (E.D. Wis. Dec. 8, 2000) ...........................................21

12  *Nanometrics, Inc. v. Nova Measuring Instruments, Ltd.,*
       2007 WL 627920, at *2 (N.D. Cal. Feb. 26, 2007) ...............................10, 12
13
    *Pacesetter, Inc. v. Cardiac Pacemakers,*
14      2003 WL 23303473, at *2 (D. Minn. Nov. 19, 2003) .................................21

15  *Pegasus Development Corp. v. DirecTV, Inc.,*
       2003 WL 21105073 (D.Del. May 14, 2003) ...............................................21
16
    *Perricone v. Unimed Nutritional Servs., Inc.,*
17      2002 WL 31075868 at *3 n.1 (D.Conn. July 18, 2002) ..............................10

18  *Phillips v. AWH Corp.,*
       415 F.3d 1303 (Fed. Cir. 2005) .................................................................18
19
    *Polymer Tech. v. Bridwell,*
20      103 F. 3d 970 (Fed. Cir. 1996) ..................................................................13

21  *Purolite Int'l, Ltd. v. Rohm & Haas Co.,*
       1992 U.S. Dist. LEXIS 13235, at *5 (E.D. Pa. Sept. 3, 1992) ....................19
22
    *Ricoh Co., Ltd. v. Aeroflex, Inc.,*
23      2006 WL 3708069 (N.D. Cal. Dec. 14, 2006) ...........................................22

24  *Rohm & Haas Co. v. Brotech Corp.,*
       No. 90-109 (RRM) ..................................................................................19
25
    *SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc.,*
26      1999 U.S. Dist. LEXIS 21494, at *4(N.D. Cal. May 17, 1999).....................24

27  *Silicon Graphics, Inc. v. ATI Techs., Inc.,*
       2007 U.S. Dist. LEXIS 57960, at **4-5 (W.D. Wis. Aug. 8, 2007) ............12

28

1

# TABLE OF AUTHORITIES (cont.)

2                                                                            **Page(s)**

3  *Spa Syspatronic, AG v. Verifone Inc.*,
     2008 WL 1886020, at *2 (E.D. Tex. Apr. 25, 2008)......................12, 13, 20

4

   *Texas Mp3 Techs. v. Samsung Elecs. Co.*,
5    2007 U.S. Dist LEXIS 80392, at *5 (E.D. Tex. Oct. 30, 2007) .........................20

6  *Van Dusen v. Barrack*,
     376 U.S. 612 (1964) ...........................................................................9

7

   *Viskase Corp. v. Am. Nat'l Can Co.*,
8    261 F.3d 1316 (Fed. Cir. 2001) ...........................................................19

9  **STATUTES**

10  28 USC § 1404(a)...............................................................................9

11  Fed. R. Civ. P. 1 ...........................................................................11, 27

12  Fed. R. Civ. P. 11(b)........................................................................18

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOWREY LLP

1  **I.    INTRODUCTION**

2      Procter & Gamble ("P&G") and Kraft are head-to-head competitors in the U.S. market for

3  ground roast coffee.  Beginning in 2007, they sued each other for patent infringement.  P&G sued

4  Kraft for infringing two of its patents – the '418 and the '419 Patents – and Kraft sued P&G for

5  infringing its '443 patent.  All three patents relate to plastic containers for coffee.

6      Kraft recently threw in the towel on its lawsuit against P&G under the '443 patent.  Just four

7  days after P&G moved for summary judgment in that action, Kraft agreed to voluntarily *dismiss its*

8  *complaint with prejudice.*  Now Kraft is back in this Court, renewing its efforts to block P&G's ability

9  to enforce its patent rights by asking the Court to indefinitely stay this action, which seeks to enforce

10  the *'419 Patent*, while Kraft continues to challenge the validity of the *'418 Patent*.  The practical effect

11  of the stay would be to allow Kraft to (1) avoid facing P&G's infringement allegations for *at least 5-8*

12  *years* and (2) gain a business advantage in the market by continuing to sell its infringing products for

13  the duration of the stay.  Kraft's motion should be denied.

14      P&G's '418 and '419 Patents issued on the same day, January 30, 2007.  Kraft challenged the

15  validity of the '418 Patent by filing an *inter partes* reexamination request with the PTO the very next

16  day. *But Kraft elected not to seek reexamination of the '419 Patent.*

17      Kraft's *inter partes* attack on the '418 Patent did not succeed.  In June 2007, a unanimous panel

18  of senior examiners affirmed all 55 claims of the '418 Patent.  Kraft nevertheless began selling coffee

19  in its copycat plastic containers just two months later, and P&G immediately sued Kraft in this Court

20  for infringing the '418 Patent.  Kraft moved to stay P&G's action, assuring the Court that it would

21  promptly appeal the PTO decision and urging the Court to stay P&G's action until the '418 patent

22  appeals had run their course – a process that takes at least 5-8 years.  Kraft represented that a stay

23  pending conclusion of all of its intended appeals would minimize or eliminate litigation between the

24  parties.  In the face of these representations, the Court stayed the '418 Patent action.

25      It soon became clear that Kraft had not been completely forthcoming with the Court.  Kraft did

26  not disclose that, as soon as it obtained a stay, it intended to file its own lawsuit in the fast-track

27  Western District of Wisconsin, alleging that P&G was infringing Kraft's '443 Patent.  And, in fact, that

28  is exactly what Kraft did.  Kraft also did not live up to its sworn representation to the Court that it

1  would immediately appeal the PTO's determination. In fact, Kraft waited until the last possible day to
2  file its appeal, and then Kraft filed a *second* reexamination request on the '418 Patent. Thus, Kraft
3  managed to extend the already protracted reexamination process and manufacture even more delay.
4  The PTO granted Kraft's second reexamination request, but it has not yet issued its determination.

5      In the meantime, P&G responded to Kraft's Wisconsin action. It asserted that Kraft's '443
6  patent was invalid and not infringed, and it filed a counterclaim and a third party complaint alleging
7  that Kraft had infringed the '419 Patent. Kraft responded with another tactic to block P&G's
8  enforcement of that patent, too: it moved to dismiss P&G's claims for infringement of the '419 Patent;
9  to stay them until after the conclusion of Kraft's appeals of the PTO's affirmance of the '418 Patent; or
10 to transfer them to this Court. The Wisconsin court granted only the motion to transfer P&G's claims;
11 it expressly denied Kraft's motion to dismiss and its motion to stay this action.

12     On May 23, 2008, P&G filed motions for summary judgment in the Wisconsin action. P&G
13 sought summary judgment of non-infringement; of invalidity for obviousness; of invalidity based on
14 P&G's prior development of Kraft's alleged invention; and to limit any claim for damages to the
15 $70,000 cost of P&G's design-around. Just four days later, Kraft folded its tent, agreeing voluntarily
16 to dismiss all of its claims under the '443 Patent with prejudice.

17     Now that Kraft is back in this Court, it continues to pursue a strategy of delay by filing the
18 same motion to stay that the Wisconsin court already denied. Kraft again argues that P&G's action to
19 redress Kraft's infringement of the *'419 Patent* also should be stayed while Kraft continues its
20 challenges to the validity of *'418 Patent*, even though Kraft *never* challenged the '419 Patent, and the
21 '419 Patent is not (and never has been) in reexamination.

22     Kraft's Motion should be denied for at least four reasons:

23     First, Kraft's dilatory strategy is inconsistent with the purpose of a transfer, which is to *avoid*
24 delay, not to create it. The '419 Patent action was well under way at the time of the transfer: the court
25 had set a May 1, 2008 deadline for dispositive motions and a September 8, 2008 trial date. Extensive
26 written discovery, including discovery on all of the core issues of claim construction, validity,
27 infringement, willfulness and non-obviousness, had been conducted. Hundreds of thousands of pages
28 of documents had been produced. Staying the case now would squander – not conserve – resources.

1      Second, the stay Kraft seeks will unduly prejudice P&G. P&G would suffer prejudice to its

2  business if Kraft is permitted, during a 5-8 year stay, to continue to compete in the marketplace with its

3  infringing products. P&G also will suffer evidentiary prejudice. The events at issue occurred years

4  ago, and witness memories already have begun to fade. A 5-8 year stay of this action would virtually

5  guarantee that, by the time P&G finally is able to depose key witnesses years from now, memories will

6  have faded even further and key evidence will have been lost.

7      Third, the excuses Kraft offers for its "stay and delay" tactics do not withstand scrutiny.

8  Kraft's efforts to attack and appeal the PTO's issuance and affirmance of P&G's *'418 Patent* will have

9  no effect on the *'419 Patent*. Kraft points to similarities between the '418 and the '419 Patents, and

10  indeed, there are some. But they do not justify staying this action. The '419 Patent is not being

11  reexamined by the PTO; its validity has not been called into question; and Kraft's rationale for staying

12  the action on the '418 Patent therefore has no application here. The key issue is whether Kraft's attack

13  on the '418 Patent would streamline the litigation before this Court on the '419 Patent – and it will not.

14  No matter how the PTO (or the BPAI or the Federal Circuit) ultimately rules on Kraft's repeated

15  challenges to the '418 Patent, the result cannot (1) invalidate any claims of P&G's '419 patent;

16  (2) rewrite the claims of the '419 Patent; (3) distinguish the claims of the '419 Patent over the prior art

17  cited in Kraft's unsuccessful first reexamination request; (4) construe the claims of the '419 Patent; or

18  (5) preclude Kraft from challenging the validity of the '419 Patent in this action, if it believes it has a

19  good faith basis for doing so. In short, Kraft's appeals of '418 Patent reexamination proceedings will

20  not simplify the issues before this Court in this action on the '419 Patent.

21      Fourth, P&G's action to enforce its rights under the '419 Patent are not "duplicative" of its

22  action to enforce its rights under the '418 Patent, and P&G has not "split" a single cause of action by

23  bringing two different lawsuits to enforce two different patents. Further, allowing this action to

24  proceed while the '418 Patent claim is stayed will not – as Kraft suggests – lead to duplicative

25  damages recovery or to duplication of effort by the Court.

26      In sum, Kraft's motion is a tactic to delay for many years the day of reckoning for Kraft's

27  infringement of P&G's patent and to give Kraft more time to sell its infringing products and thereby

28  gain an economic advantage in the marketplace. The motion should be denied. If, however, the Court

1  were inclined to consider a stay, any delay should be conditioned to minimize the prejudice to P&G.

2  Specifically, P&G should be permitted during the stay to take limited deposition discovery to preserve

3  the testimony of important witnesses for trial, and the stay should last only until the PTO renders its

4  decision on Kraft's *ex parte* reexamination request on the '418 Patent.

5  **II.    PROCEDURAL HISTORY**

6      **A.    P&G's Innovation of the Plastic Coffee Container**

7         P&G and Kraft are the leading competitors in the U.S. market for ground, roast coffee.  In

8  2003, P&G revolutionized the market by selling its coffee in innovative plastic containers instead of

9  steel cans.  P&G's technology solved a number of challenges in storing and shipping ground coffee,

10  including the problem that freshly ground coffee generates carbon dioxide that can deform a sealed

11  container.  To address these challenges, P&G's inventors used a one-way valve, a flexible seal, and a

12  multi-layered laminate plastic container, all of which, in unique combination with other features, make

13  the resulting container light-weight, yet strong enough to withstand the internal and external forces that

14  act on the container.

15         P&G was granted two patents relating to its innovative technology:  the '418 Patent and the

16  '419 Patent.  Declaration of Ben Davidson ("Davidson Decl.") ¶ 2.  By the time the patents issued,

17  Kraft had recognized that P&G's innovative containers were winning over customers.  In a classic "if

18  you can't beat them, join them" concession, Kraft had scrutinized P&G's containers and decided to

19  develop its own copycat plastic containers.  But P&G's patents stood in the way of Kraft's plans.

20  Therefore, on January 31, 2007 – the day after both patents issued – Kraft challenged the validity of

21  the '418 Patent in an *inter partes* reexamination proceeding before the PTO.  *Id.*  ¶ 3 & Exh. 1.

22  Significantly, however, *Kraft elected not to challenge the issuance of the '419 patent. Id.*

23         On June 7, 2007, a unanimous panel of PTO examiners rejected all of Kraft's arguments,

24  confirmed the validity of *all 55 claims* of P&G's '418 Patent, and issued an "Action Closing

25  Prosecution" ("ACP").  Declaration of Evette Pennypacker (Dkt. No. 39) ("Pennypacker Decl.")  Exh.

26  E at 2.  Nevertheless, Kraft decided to continue with its plan to sell coffee in its infringing container

27  and deal with the consequences later.

28

DM_US:21080019_6

**B.    P&G's Lawsuit Against Kraft For Infringing P&G's '418 Patent**

P&G filed suit against Kraft in this Court on August 27, 2007 for infringement of P&G's '418 Patent and sought a preliminary injunction. Davidson Decl. ¶ 4. Kraft, however, persuaded the Court not to consider the merits of the injunction motion but, instead, to stay the entire case while Kraft exhausted its appeals of the PTO's decision, first to the Board of Patent Appeals and Interferences ("BPAI") and then to the Federal Circuit – a process that a recent study estimates takes at least 5-8 years.[1] Davidson Exh. 10 ("Despite a mandate for 'special dispatch', the time required to complete an *inter partes* reexamination is much longer than commonly believed"; "With an appeal, the pendency period for *inter partes* reexams is AT LEAST 60 to 97 months (5-8 years!) . . . and that doesn't include 'rework' after an appeal or secondary appeals"). Kraft's counsel submitted a sworn declaration stating that Kraft "fully intends to file an appeal of [the PTO decision] to the Board of Patent Appeals and Interferences once the PTO issues the Right to Appeal Notice." Declaration of Claude M. Stern In Support of Kraft's Motion to Stay ¶ 6 at 4 (emphasis added). Kraft repeated the assurance in its Memorandum in Support of Its Motion for a Stay in the '418 case. *See* Davidson Exh. 2, at 4:18-20.[2]

The Court indicated it was receptive to Kraft's request for a stay, in part because of its congested docket. Davidson Exh. 4 at 32:17 – 33:16. Kraft argued that a stay would ease the Court's burden since its appeal could eliminate some patent claims or "even obviate the need for this litigation entirely." Davidson Exh. 2 at 2:9-10. Kraft also argued a stay would save time and expense because this was *not* a situation in which there inevitably would be other litigation between the parties that would defeat the cost savings gained by staying the first case. *Id.* at 9:8-10. Indeed, Kraft argued that the situation before the Court was *distinguishable* from other cases in which courts had refused to impose (or lifted) a stay because there would be litigation between the parties anyway. Davidson Exh. 4 at 8:3-10. The Court issued the stay on October 11, 2007.

---

[1] P&G's appeal of the Court's order has been fully briefed and is awaiting a hearing date.

[2] Kraft also represented to the Wisconsin court that it "intends to appeal the ACP to the Board of Patent Appeals and Interference ("BPAI") *as soon as* the statutory period allows it to do so." *See* Davidson Exh. 3 at 3 (emphasis added).

DM_US:21080019_6

**C.    Kraft's Lack of Candor With the Court**

      **1.    Kraft Did Not Disclose That, As Soon As This Court Stayed the '418 Action, It Intended to File A New Case in Wisconsin Against P&G**

Kraft was less than candid when it represented to the Court that staying the '418 Patent action would minimize or eliminate litigation between the parties. On October 26, 2006 – just 15 days after the Court entered its stay order – Kraft filed a new lawsuit of its own against P&G, alleging that P&G was infringing Kraft's '443 Patent, which concerns the "stand off" in the overcap for plastic coffee containers.[3] Kraft did not file its lawsuit in this District and deem it related to P&G's stayed action on the '418 Patent. Instead, Kraft filed its new case in the Western District of Wisconsin, a forum that has *no* connection with the parties, the patents, or this dispute, but *does* have a very fast docket.

In other words, Kraft asked this Court to stay P&G's '418 Patent action without disclosing that it was holding back on its own patent just long enough to obtain the stay, and that it immediately intended to file its own lawsuit in another forum. Once it obtained the stay blocking P&G's effort to enforce its '418 Patent, Kraft capitalized on the delay it had engineered to move forward with its own claims in a fast-track jurisdiction. So much for Kraft's representation that staying P&G's action would avoid litigation between the parties. In truth, the stay only allowed Kraft to avoid P&G's litigation.

      **2.    Kraft Did Not Promptly Pursue Its Appeal As It Said It Would**

Kraft also did not follow through on its promise to promptly pursue an appeal of the PTO decision. The PTO affirmed the patentability of the '418 Patent and issued its ACP in June 2007. Pennypacker Decl. Exh. E at 2. Kraft waited nearly *five months* and then, on October 31, 2007 (just 20 days after it obtained the stay of this action), it submitted a supposedly "new" expert declaration on obviousness to the PTO and petitioned the PTO to include it in the record on appeal. Davidson Exh. 5 at 1, 2. The PTO rejected Kraft's request on December 18, 2007, finding that Kraft's petition was "untimely filed" (*id.* at 7) and that Kraft could not add its expert's declaration to the record. *Id.* at 6.

---

[3] As the Wisconsin court later explained, Kraft's '443 patent is "directed to a spacing structure placed in the overcap for a coffee container to prevent the vent valve in the flexible peel-off lid on the container from being closed due to contact with the overcap." Pennypacker Decl. Exh. L at 2. It also explained that P&G's '419 Patent discloses a "'stand-off [to] prevent blockage of a valve disposed on and/or within a flexible film . . . .'" *Id.* at 3.

1   The PTO further found that granting Kraft's request "would run counter to the statutory mandate that

2   *inter partes* reexamination proceedings are to be handled with *special dispatch*" and that inserting

3   Kraft's belated declaration into the record would have "the potential to significantly increase the

4   pendency of the [] *inter partes* reexamination proceeding by returning the proceeding to a pre-ACP

5   status . . . ." *Id.* at 7 (emphasis added).  Finally, the PTO found that "it is clear that [Kraft's]

6   declaration could have been filed with the request for *inter partes* reexamination" and that Kraft had no

7   excuse for why it failed to do so. *Id.* at 8-9.  The PTO concluded that accepting Kraft's belated

8   declaration would "require reopening of the prosecution to an earlier stage of prosecution and operate

9   against the special dispatch requirements of the *inter partes* reexamination statute and the

10   implementing regulations." *Id.* at 10.  In short, the PTO refused to countenance Kraft's delay tactics.

11       The PTO issued Kraft a "Right to Appeal Notice" on January 14, 2008.  Pennypacker Decl.

12   Exh. F.  But instead of filing an immediate appeal of the PTO's affirmance of the '418 Patent, Kraft

13   waited until the last possible date to file its appeal.  *Id.* Exh. G.  It also initiated yet another delay

14   tactic:  On January 18, Kraft filed *another* reexamination request with the PTO – this time an *ex parte*

15   request – and *again* asked the PTO to reconsider the patentability of the '418 Patent.  Kraft's second

16   request was based on a declaration from the same expert that was very similar to the declaration the

17   PTO had *just rejected.* Davidson Decl. ¶ 9.  Kraft asked the PTO to "consolidate" its second

18   reexamination request with its unsuccessful first request – the practical effect of which would be to

19   restart the clock on the reexamination process.  The PTO granted Kraft's second reexamination request

20   (i.e., it agreed to consider it), but has not yet issued its determination.

21       In short, rather than expedite its appeal of the '418 Patent – as it told the Court it would – Kraft

22   has pursued one strategy after another to slow it down, thereby extending the stay.

23       **D.    Kraft's Efforts To Derail P&G's Claims In The Wisconsin Action**

24       Meanwhile, P&G was required to respond to Kraft's complaint in Wisconsin.  P&G filed a

25   counterclaim alleging that Kraft's Patent was invalid because it was anticipated by the prior art,

26   including P&G's '419 Patent, which disclosed the use of a standoff that Kraft later claimed as its own

27   invention in the '443 Patent.  P&G also alleged that Kraft had infringed the '419 Patent.

28       Kraft was not happy with this turn of events.  It plainly thought it had succeeded in blocking

1  P&G's ability to pursue its allegations by obtaining the stay of P&G's '418 Patent action and

2  maneuvering itself into a position to obtain a fast track decision on its own patent. So Kraft devised

3  yet another strategy to derail P&G's new claims against it. It filed a motion in the Wisconsin action to

4  dismiss P&G's counterclaim and third party complaint; to stay P&G's claims for infringement of the

5  '419 Patent until Kraft had exhausted all appeals from the reexamination of the '418 Patent; and, in the

6  alternative, to transfer P&G's infringement claims – and *only P&G's* infringement claims – to this

7  Court. The Wisconsin court denied all but the transfer motion, and it transferred P&G's infringement

8  allegations under the '419 Patent to this Court. *See* Pennypacker Decl. Exh. L. Thus, Kraft's current

9  motion to stay is the *second time* Kraft has sought to stay P&G's claims under the '419 Patent pending

10  the appeals of Kraft's unsuccessful *inter partes* request for reexamination of the '418 Patent.

11    **E.    At the Time of the Transfer, Extensive Discovery Had Been Conducted on the '419**

12    **Patent Allegations, And The '419 Patent Action Had Been Scheduled for Trial**

13    P&G's infringement action under the '419 Patent was not transferred at the outset of the

14  Wisconsin action. Quite the contrary. At the time of the transfer, the Wisconsin court already had

15  conducted a preliminary pretrial conference and entered a scheduling order that set a May 1, 2008

16  deadline for dispositive motions, an August 1, 2008 discovery cutoff, an August 6, 2008 pretrial

17  conference, and a September 8, 2008 trial date. Davidson Decl. ¶ 10 and Exh. 6. To meet those

18  deadlines, the parties already had undertaken extensive written discovery. For example, P&G had

19  produced approximately 230,000 pages of documents; Kraft had produced about 95,000 pages. *Id.*

20  ¶ 11. In addition, Kraft had responded to approximately 160 requests for production, 17

21  interrogatories, and 88 requests for admission served by P&G. *Id.* Similarly, P&G had responded to

22  91 requests for production and 23 interrogatories from Kraft. *Id.* The parties' broad discovery had

23  included all of the core issues relating to the '419 Patent, including the parties' claim construction

24  contentions; the parties' respective infringement and non-infringement contentions; Kraft's invalidity

25  contentions; P&G's identification of evidence of non-obviousness; P&G's identification of evidence

26  showing that Kraft's infringement is willful; and P&G's evidence of the conception and reduction to

27  practice of the claimed inventions of the '419 Patent. *Id.* ¶ 11.

28    Shortly after the transfer motion was granted, Kraft took the depositions of two of the inventors

1  of the '419 Patent. *Id.* ¶12. The parties agreed – and the Wisconsin court's Protective Order provided

2  – that the discovery in the Wisconsin action can be used in any proceeding related to the '418 or '419

3  patents, so long as there is a protective order that governs the proceeding. *Id.* ¶ 13 and Exh. 7.

4      In other words, Kraft's motion to stay this action asks the Court to bring a halt to a case that

5  had been moving quickly toward resolution on the fast-track schedule set by the Wisconsin court. As

6  shown below, Kraft cannot show that this case meets the criteria for a stay.

7  **III.    A STAY OF THIS ACTION WOULD BE INCONSISTENT WITH THE PURPOSE OF**

8         **TRANSFER, WHICH IS TO AVOID DELAY AND WASTE, NOT TO CREATE IT.**

9      The Supreme Court has made clear that transfers under 28 USC § 1404(a) – the statute under

10  which Kraft obtained transfer of this action to this Court – are intended "to prevent the waste of time,

11  energy and money . . ." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (quotations omitted.).

12  Staying this action on the '419 Patent indefinitely – while Kraft seeks another "do over" on its failed

13  reexamination effort on the '418 Patent and drags its feet on repeated appeals – would *cause* delay,

14  not eliminate it. A stay therefore would fly in the face of the statutory purpose of transfer. This is

15  especially true where – as here – a stay would call a halt to on-going discovery and a scheduled trial

16  date. *See, e.g., KLA-Tencor Corp. v. Nanometrics, Inc.*, 2006 WL 708661, at *2 (N.D. Cal. Mar. 16,

17  2006) (fact that discovery had only just begun favors a stay); *Nanometrics, Inc. v. Nova Measuring*

18  *Instruments, Ltd.*, 2007 WL 627920, at *2 (N.D. Cal. Feb. 26, 2007) (whether discovery is complete

19  and whether a trial date has been set are relevant factors in evaluating request for stay).[4] Indeed, when

20  this Court granted Kraft's request to stay the '418 Patent action, it underscored the importance of this

21  factor, noting "that the pending litigation *is at its earliest stages*, thereby reducing the prejudice that

22  any party would suffer from a stay." 10/11/07 Order Granting Motion to Stay at 2 (emphasis added).

23      But this case is *not* in the earliest stages. At the time of the transfer, the case was proceeding

24  quickly toward trial. In fact, by the time the case was transferred to this Court, both parties had

25

26  _____

27  [4] It is possible to find cases where a discretionary stay was granted when cases were not in their infancy. But as the court noted in one of the cases cited by Kraft, "*[m]ost* often, a request for a stay has been denied due to the late stage of litigation, the fact that discovery was or would be almost completed, or trial had been set." *Perricone v. Unimed Nutritional Servs., Inc.*, ,2002 WL 31075868 at *3 n.1 (D.Conn. July 18, 2002) (emphasis added).

28

1   conducted extensive written discovery, including discovery on all of the core issues in this case. In

2   addition, depositions were soon to begin, with the parties preparing for the May 1, 2008 dispositive

3   motion deadline and the September 8, 2008 trial.  Plainly, Kraft's assertions that only a "certain

4   amount of limited discovery" has been done; that "P&G has not spent any significant time or resources

5   on discovery"; that "no trial date has been set" (Motion at 12, 14) do not comport with the facts.

6         Kraft's efforts to ignore the scheduling order and discovery on the '419 Patent that occurred

7   prior to the transfer is also contrary to law.  "'When an action is transferred, it remains what it was; all

8   further proceedings in it are merely referred to another tribunal, leaving untouched what has been

9   already done.'" *Danner v. Himmelfarb*, 858 F.2d 515, 521 (9th Cir. 1988) *citing Magnetic Eng'g &*

10  *Mfg. Co. v. Dings Mfg. Co.*, 178 F.2d 866, 868 (2d Cir. 1950).  *See also Ginsburg v. Mutual Life Ins.*

11  *Co.*, 170 F. Supp. 212, 214 (S.D.N.Y. 1958) ("A transfer of the cause from one district to another does

12  not vitiate orders made prior to the transfer.  All further proceedings in it are merely referred to another

13  tribunal, leaving untouched whatever has been already done.") (*citing Magnetic Eng'g & Mfg. Co. v.*

14  *Dings Mfg. Co.*, 178 F.2d 866, 868 (2d Cir. 1950)).  Thus, Kraft cannot disregard the extensive

15  discovery and case management deadlines that were in place prior to the transfer.

16        In short, imposing a stay now and bringing the case to a halt for 5-8 years would waste the

17  significant time and resources that have been devoted to it.  Such a result would be inconsistent with

18  sound judicial management and economy and with the law of Section 1404(a) transfers.

19  **IV.    THE LAW GOVERNING KRAFT'S REQUEST TO STAY THIS ACTION**

20        Courts know well that patent litigants often use reexaminations "as a tactical tool to delay a

21  case and impose costs, with no real expectation that any controversy will be resolved." *Anascape Ltd.*

22  *v. Microsoft Corp.*, 475 F. Supp. 2d 612, 615 (E.D. Tex. 2007); *see also* Davidson Exh. 10

23  ("Reexamination, particularly *inter partes* reexamination is not simply used as an alternative to

24  litigation, but an integral part of litigation strategy").  Kraft takes these tactics to a new level here by

25  seeking to stay this case, which seeks to enforce P&G's '419 Patent, based on Kraft's failed bid to

26  invalidate a different patent – the '418 Patent – that is *not* the subject of this action.  Kraft's motion is

27  governed by several overriding principles.

28        First, a district court has no "obligation to delay its own proceedings by yielding to ongoing

1  PTO patent reexaminations, regardless of their relevancy to infringement claims which the court must

2  analyze." *Fresenius Med. Care Holdings v. Baxter Int'l, Inc.*, 2007 U.S. Dist. LEXIS 44107, at **10-

3  11 (N.D. Cal. June 6, 2007) (citation omitted).[5]

4       Second, a stay cannot be granted where it would merely cause delay. *Ecolab, Inc. v. FMC*

5  *Corp.*, 2007 U.S. Dist. LEXIS 39189, at *4 (D. Minn. May 29, 2007).  Moreover, a stay pending

6  reexamination of a patent may be denied where – as here – the party seeking the stay has unduly

7  delayed seeking reexamination. *See, Spa Syspatronic, AG v. Verifone Inc.*, 2008 WL 1886020, at *2

8  (E.D. Tex. Apr. 25, 2008).

9       Third, in determining whether to stay litigation pending PTO reexamination, courts consider

10 (1) whether a stay will unduly prejudice or tactically disadvantage the non-moving party; (2) whether a

11 stay will simplify the issues in question and the trial of the case; and (3) the status of discovery and

12 whether a trial date has been set. *See, Nanometrics,* 2007 WL 627920, at *2.

13 **V.    A STAY WOULD PREJUDICE P&G AND GIVE KRAFT AN UNFAIR ADVANTAGE.**

14       Kraft's assertion that staying this case indefinitely would not prejudice P&G in any way

15 ignores the facts.  In truth, a stay of P&G's action to enforce its '419 Patent right would be very

16 prejudicial to P&G for several reasons, any one of which is sufficient to deny Kraft's proposed stay.

17       **A.    A Stay Would Severely Prejudice P&G's Business**

18       Kraft ignores the business prejudice that P&G would suffer if this case were stayed for years

19 while Kraft continues to compete in the market with its infringing products.  P&G will suffer serious

20 harm from having to compete with Kraft's improper use of P&G's patented technology, including the

21 loss of P&G's exclusive use of its patented technology, loss of market share, loss of customer loyalty

22 and goodwill, and losses from having to subsidize its main competitor's success in the market.

23       Kraft argues that P&G would not be prejudiced because it can just "seek damages" years from

24

25

26  [5] In *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 2007 U.S. Dist. LEXIS 57960, at **4-5 (W.D. Wis. Aug. 8, 2007), the court
refused to grant even a partial stay of litigation pending reexamination, even though it acknowledged that reexamination
might benefit the court in some respects.  It did so because of prejudice to the patentee, who was entitled to the benefit of

27  the court's efficient docket and fast trial track, as well as the court's own "keen interest in avoiding piecemeal litigation and
securing the just, speedy and inexpensive determination of every action." *Id.* (citing Fed. R. Civ. P. 1).

28

HOWREY LLP

Case No. 3:08-cv-00930 PJH
OPPOSITION TO MOTION TO STAY

DM_US:21080019_6

1 now, after Kraft exhausts its appeals.  Motion at 13.  The Federal Circuit has rejected this rationale

2 because "[c]ompetitors change the marketplace" such that "[y]ears after infringement has begun, it

3 may be impossible to restore a patentee's . . . exclusive position by an award of damages and a

4 permanent injunction." *Polymer Tech. v. Bridwell*, 103 F. 3d 970, 975-76 (Fed. Cir. 1996).  Courts

5 cannot unscramble the egg with damages because "[c]ustomers may have established relationships

6 with infringers" and even an injunction cannot make the market what it was before infringement

7 began.  *Id.* at 976.  In fact, one of the cases Kraft relies on, in which the court exercised its discretion to

8 stay litigation pending reexamination of the patent-in-suit, noted that the parties were *not* direct

9 competitors in the marketplace, "and therefore a stay is also unlikely to directly prejudice [Plaintiff's]

10 standing in the market . . . making any harm from delay even less acute." *Spa Syspatronic,* 2008 WL

11 1886020, at *2.  That, of course, is not the case here:  P&G and Kraft are direct.

12      Where – as here – a company is trying to enforce its patent rights against a competitor, prompt

13 resolution is especially important.  *See, e.g., Adams v. Newell Rubbermaid Inc.*, 2007 U.S. Dist. LEXIS

14 62512 (W.D. Wis. Aug. 21, 2007).  Indeed, Kraft's own conduct proves the point:  after obtaining a

15 stay of P&G's action on the '418 Patent, it chose to file its lawsuit to enforce its own patent not in this

16 Court, which has an impacted docket, but in the fast-track docket of the Western District of Wisconsin.

17 Plainly, Kraft appreciates the advantage of an early resolution.  P&G should not be denied the same

18 prompt resolution of its infringement action that Kraft sought for itself.

19      **B.    A Stay Would Impose Evidentiary Prejudice On P&G**

20      Kraft also ignores the evidentiary prejudice that P&G would suffer from a 5-8 year delay of

21 litigation on P&G's '419 Patent.  Much of the discovery P&G will take in this action relates to events

22 that occurred more than four years ago, when P&G introduced its new packaging, including Kraft's

23 initial skepticism that P&G's innovative technology would work and Kraft's subsequent adoption of

24 that same technology.  Delaying discovery on these issues would prejudice P&G because "[i]n the

25 lengthy delay that would inevitably ensue if a stay were granted, evidence could be lost and witnesses'

26

27

28

1   memories could fade." *Fresenius*, 2007 U.S. Dist. LEXIS 44107 at *19.[6]

2       The Court order that discovery taken in the Wisconsin Action may later be used in the

3   California action will not eliminate the evidentiary prejudice P&G will suffer from an indefinite delay

4   of its ability to enforce the '419 Patent.  P&G asserted in the Wisconsin Action that the development

5   work that led to the '419 Patent is among the prior art that invalidates Kraft's '443 Patent.  But the

6   evidence that is relevant to the status of the '419 Patent development as invalidating prior art will be

7   much narrower than that needed to show that Kraft's copycat entry into the plastic coffee container

8   market willfully infringes P&G's '419 Patent.  As to all of the additional evidence that P&G will need

9   here, the passage of time during a 5-8 year stay can only erode witnesses' memory and prejudice

10   P&G's ability to obtain the complete discovery it needs to prove its infringement claims here.

11   Moreover, now that Kraft has voluntarily dismissed its '443 action in Wisconsin, there will be no

12   further discovery in that action, and evidence that had not yet been preserved in the discovery taken to

13   date will likely be lost through the passage of time and fading of memories.

14   **VI.    A STAY WOULD NOT SIMPLIFY THE ISSUES IN THIS ACTION**

15       Another relevant factor is whether staying this case on the '419 Patent pending the

16   reexamination and appeals of the '418 Patent would simplify the issues before the Court.  It would not.

17       Kraft speculates that having the results of the reexamination of the '418 Patent in this action

18   *might* simplify the issues this Court will have to decide under the '419 Patent.  But this assumes both

19   that (1) Kraft's efforts to undermine the *'418 Patent* would affect the validity of the claims of the *'419*

20   *Patent*; and (2) Kraft's reexamination efforts are likely to succeed.  Neither assumption is valid.  In

21   fact, staying this action will only prejudice P&G and needlessly delay P&G's ability to enforce its

22   patent rights; it will not simplify the issues before this Court.

23

24

---

25   [6] *See also Alltech, Inc. v. Cenzone Tech, Inc.*, 2007 U.S. Dist. LEXIS 19989, at *9 (S.D. Cal. Mar. 21, 2007) (denying stay in part because "the risk that witness memories could fade while waiting for reexamination is not insubstantial.");

26   *Anascape*, 475 F. Supp. 2d at 617 ("It does seem that crucial witnesses are more likely to be located if discovery is allowed to proceed now, rather than later.  Anascape would be at a severe tactical disadvantage if the entire case were stayed.")

27   *Gladish v. Tyco Toys, Inc.*, 1993 U.S. Dist. LEXIS 20211, at *5-6 (E.D. Cal. Sept. 16, 1993) (denying stay pending reexamination because "witnesses may become unavailable, their memories may fade, and evidence may be lost while the PTO proceeding takes place.")

28

**A.     Kraft's Attack on the '418 Patent Will Not Affect The '419 Patent.**

The centerpiece of Kraft's argument is its assertion that the outcome of the '418 Patent reexamination "necessarily" will affect the validity of the '419 Patent. *E.g.*, Motion at 11:20-26. Not true. Because Kraft never sought reexamination of the '419 Patent, the '419 Patent is not being reexamined by the PTO. Kraft's multiple reexamination attempts on '418 Patent cannot (1) invalidate any claims of P&G's '419 Patent; (2) rewrite the claims of the '419 Patent; (3) distinguish the claims of the '419 Patent over the prior art cited in the reexamination; (4) construe the claims of the '419 Patent; or (5) preclude Kraft from challenging the validity of the '419 Patent. In short, Kraft's appeals of the '418 Patent reexamination will not determine the "validity and scope" of the '419 Patent, as Kraft claims. Motion at 13. There is no reason to delay the '419 Patent action until after Kraft has exhausted its multiple, baseless appeals regarding the '418 Patent.

Kraft tries to avoid this conclusion by insisting that the reexamination of the '418 Patent will affect this litigation because the '418 Patent and '419 Patent are "virtually identical" or "nearly identical." *See, e.g.*, Motion at 1, 4-5, 15-17. Indeed, Kraft even argues that the Wisconsin court "already has found" that "the '418 patent is nearly identical to the '419 patent" (*id.* at 5) and that this Court is bound by that determination. *Id.* 11. This argument is wrong for at least three reasons.

First, the Wisconsin court made no such finding. The phrases "virtually identical" and "nearly identical" – which Kraft repeats at least a dozen times – come from Kraft's counsel: they do not appear *once* in the Wisconsin court's order. To be sure, the court found enough similarities between the two patents to conclude that a Section 1404(a) transfer would be the interest of justice. But it also found that "[a]lthough the '419 patent mirrors the '418 patent in many ways *it also has its differences*." Pennypacker Decl., Exh. L at 2. One of the differences cited by the court is the reference in the '419 Patent to "'a stand-off [to] prevent blockage of a valve disposed on and/or within a flexible film . . . .'" – the very feature Kraft later claimed as its own invention in its '443 Patent. *Id.* at 2-3.[7]

---

[7] There are other differences, too. For example:

- Claims 1 and 17 of the '419 Patent—the two independent claims of the patent—require a particular type of container ("blow-molded container") with a "protuberance" having a surface "substantially perpendicular to [the] longitudinal axis" of the container. Pennypacker Decl., Exh. J ('419 Patent) at col. 18, lines 14-34, col. 19, line 19-
(Continued...)

1  As the Wisconsin court explained, the '419 Patent "was applied for as a 'continuation-in-part' of the

2  '338 application [which gave rise to the '418 patent], which means that it repeats *portions* of the '338

3  application *and adds new disclosures*." Pennypacker Decl., Exh. L at 2.

4      Second, Kraft's suggestion that there are no meaningful differences between the two patents

5  flies in the face of basic patent law. If the claimed technology in the two patents truly were identical,

6  the PTO could not have issued two separate patents. Moreover, Kraft's own conduct belies its

7  argument: if Kraft genuinely believed the two patents are only "nominally" different (Motion at 9), it

8  surely would have challenged the validity of both patents, instead of challenging only the '418 Patent.

9      Third, the fact that the Wisconsin court transferred the case means only that it concluded that

10  the standards for a Section 1404(a) were met. But the test for a stay is different – and the Wisconsin

11  court *denied* Kraft's request that it stay the '419 Patent action until after the '418 Patent reexamination

12  had concluded. Thus, Kraft's invocation of the law of the case doctrine does not help its motion. To

13  the contrary. Under Kraft's argument, the Wisconsin court's denial of Kraft's first motion to stay the

14  action is law of the case that requires that Kraft's second motion, for the same relief, be denied.

15      Kraft also insists that its attack on the '418 Patent will "necessarily" affect this action because

16  the reexaminations will construe claims terms that appear in both patents, and this Court must interpret

17  the terms "consistently." Motion at 11. This, too, is wrong for at least three reasons.

18      First, Kraft's reexaminations are based on Kraft's argument that the claimed invention of

19  P&G's '418 Patent was obvious. But Kraft has not, in any of the papers it has filed with *either* of its

20  _____

21  (...Continued)

22      col. 20, line 19. The '418 Patent does not have any corresponding claims requiring the combination of these
       features. Pennypacker Decl., Exh. B ('418 Patent) at col. 16, lines 45-col. 20, line56.

23  • Claims 13 of the '419 Patent requires that the "overcap" of the plastic container use a protuberance disposed on
      one surface, and that the protuberance be "Mattingly engageable with a second protuberance" on the body of the

24    container. Pennypacker Decl., Exh. J ('419 Patent) at col. 19, lines 4-10. The '418 Patent claims do not mention
      this feature. Pennypacker Decl., Exh. B ('418 Patent) at col. 16, line 45-col. 20, line 56.

25  • Claim 14 of the '419 Patent also requires a protuberance on the overcap. Pennypacker Decl., Exh. J ('419 Patent)
      at col. 19, lines 11-14. The '418 Patent does not.

26

27  • Claim 16 of the '419 Patent requires that the bottom of the container be "concave inwardly." Pennypacker Decl.,
      Exh. J ('419 Patent) at col. 19, lines 17-19. The '418 Patent claims do not. Pennypacker Decl., Exh. B ('418
      Patent) at col. 16, line 45-col. 20, line 56.

28

DM_US:21080019_6

1  reexamination requests urged the PTO to adopt any claim constructions at all, much less constructions

2  of claim terms that might affect the '419 Patent, which is not the subject of the reexaminations and

3  cannot be the subject of Kraft's appeals. Thus, there is no reason to expect Kraft's reexaminations and

4  appeals to result in claim constructions.   Moreover, if the '419 case proceeds in this Court, any claims

5  this Court may construe that would be relevant to the claims of the '418 Patent could be applied, if the

6  Court deemed it appropriate to do so, when and if the validity of the '418 Patent is affirmed.   The

7  Court would not – as Kraft suggests – have to construe the same terms twice.

8          Second, even if that were not the case, Kraft's argument proceeds from another false premise.

9  Contrary to Kraft's assertion, this Court's claim constructions do not have to be "consistent" with those

10  reached in a reexamination proceeding.  Claim construction during reexamination proceeds under

11  different rules than must be followed by district courts in patent litigation.  Claims in reexamination

12  are given their "broadest reasonable interpretation…" *In re Yamamoto*, 740 F.2d 1569, 1571 (Fed. Cir.

13  1984) (*citing ACS Hosp. Sys., Inc. v. Montefiore Hosp.*, 732 F.2d 1572, 1577 (Fed. Cir. 1984)); 37

14  CFR § 1.555(b)(2)(ii).  District Courts, however, are charged with finding the correct construction.

15  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005) (*en banc*).  Thus, any "awkwardness

16  presumed to result if the PTO [or the Federal Circuit] and [district] court reached different conclusions

17  is more apparent than real." *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1428 (Fed. Cir. 1988).[8]

18          Finally, even if, years from now, the Federal Circuit were to interpret claim terms in the '418

19  Patent differently from the way this Court were to interpret them in the '419 Patent, that possibility

20  would not justify bringing P&G's effort to enforce its '419 Patent to a standstill now.  The possibility

21  that the Federal Circuit might reach a different conclusion from those of a district court exists in every

22  case.  As a district court recognized in an analogous situation – in which it refused to stay its

23  proceedings pending reexamination – "[i]n the event the PTO invalidates some or all of the patents so

24

25

_____

26  [8] One reason the court denied a stay in *Silicon Graphics* was the recognition that there is nothing wrong with allowing a reexamination to proceed at the same time that a district court proceeds with litigation. *Silicon Graphics*, 2007 U.S. Dist. LEXIS 57960, at *5 (citing *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1427-29 (Fed. Cir. 1988)). Such concurrent proceedings

27  are routine because "[t]he two forums take different approaches in determining invalidity and on the same evidence could quite correctly come to different conclusions." *Ethicon*, 849 F.2d at 1428.

28

1  as to contradict the jury's verdict, . . . the parties will be able to raise that issue with the Federal Circuit

2  on appeal." *Ecolab,* 2007 U.S. Dist. LEXIS 39189, at *7.

3      In sum, Kraft cannot show that its reexamination efforts will streamline litigation on the '419

4  Patent or otherwise promote judicial economy.

5      **B.    Kraft Is Not Likely To Prevail On Its Second Reexamination Effort Or On Its**

6      **Seriatim Appeals to the BPAI and the Federal Circuit.**

7      Even if the reexamination of the '418 Patent were relevant to P&G's efforts to enforce the '419

8  Patent, Kraft's proposed stay of this action should be denied because there is no serious likelihood that

9  Kraft's appeal of the validity of the '418 Patent will succeed.

10     A stay sought for the sake of delay should be denied. *See, e.g.,* Fed. R. Civ. P. 11(b) (attorney

11  may not file motion to "cause unnecessary delay"). Where it appears that claims will likely survive

12  reexamination, courts generally do *not* stay litigation. *See, Viskase Corp. v. Am. Nat'l Can Co.,* 261

13  F.3d 1316, 1328 & n.2 (Fed. Cir. 2001) (stay properly denied where PTO indicated one of two families

14  of asserted patents would survive reexamination); *Purolite Int'l, Ltd. v. Rohm & Haas Co.,* 1992 U.S.

15  Dist. LEXIS 13235, at *5 (E.D. Pa. Sept. 3, 1992) (lifting stay when PTO indicated some claims would

16  survive reexamination); *Rohm & Haas Co. v. Brotech Corp.,* 1992 U.S. Dist. LEXIS 21721, at **7, 13

17  (D. Del. July 16, 1992) (same); *Boston Sci. Corp. v. Micrus Corp.,* 2006 U.S. Dist. LEXIS 16147, at

18  **3, 7 (N.D. Cal. Mar. 21, 2006) (lifting stay as to claims confirmed by the PTO).[9]

19     That is the case here. A three-examiner panel of the PTO unanimously rejected Kraft's

20  arguments on reexamination and affirmed all 55 claims in the '418 Patent. There is no reason to

21  believe Kraft's appeals of that decision will prevail. Kraft's arguments to the contrary have no merit.

22     Kraft suggests that a stay of litigation pending reexamination will give the Court the benefit of

23

24

_____

25  [9] *See also Texas Mp3 Techs. v. Samsung Elecs. Co.,* 2007 U.S. Dist LEXIS 80392, at *5 (E.D. Tex. Oct. 30, 2007)
   (refusing to stay litigation because of speculative possibility that claims would be cancelled or significantly narrowed on
   reexamination); *E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 711 F. Supp. 1205, 1208 (D. Del. 1989)

26  (declining "to stay the ordinary course of its proceedings simply because the outcome of the Patent Office proceedings *may*
   moot the issues remanded.") *Biax Corp. v. Fujitsu Computer Sys. Corp.,* 2007 U.S. Dist. LEXIS 12973 at *5 (E.D. Tex.

27  Feb. 26, 2007) (denying stay in part based on fact that "some claims and issues will likely remain after the reexamination
   has been completed.")

28

1    "the opinion of the USPTO." Motion at 10. But the expertise and opinion of the PTO on the pending

2    reexamination is irrelevant here, since the PTO was asked only to consider the '418 Patent, not the

3    '419 Patent at issue in this case. Even as to the '418 Patent, the PTO's expertise refutes Kraft's

4    argument because the PTO already provided its expert analysis of the validity of the '418 Patent, and

5    its expertise led it to conclude that all 55 claims of the '418 Patent claims are valid.

6         Finally, Kraft disregards all of the cases cited above that stand for the proposition that courts

7    will not stay cases pending PTO reexamination where (as here) it appears the claims will survive

8    reexamination. Instead, Kraft relies on cases that are easily distinguishable. For example, Kraft's

9    reliance on *Gould v. Control Laser Corp.*, 705 F.2d 1340 (Fed. Cir. 1983), *Ethicon, Inc. v. Quigg*, 849

10   F.2d 1422 (Fed. Cir. 1988), *Spa Syspatronic, AG v. Verifone, Inc.*, 2008 WL 1886020 (E.D. Tex. Apr.

11   25, 2008), and *ASCII Corp. v. Std. Entm't USA, Inc.*, 844 F. Supp. 1378 (N.D. Cal. 1994) is misplaced

12   because in each action, the patent(s) in reexamination were asserted in the litigation.[10] That, is not the

13   case here. Moreover, in *Pacesetter, Inc. v. Cardiac Pacemakers*, 2003 WL 23303473, at *2 (D. Minn.

14   Nov. 19, 2003), the court stayed the action after the *plaintiff* called two of its four patents into question

15   by seeking reexamination, which is hardly the case here. In sum, there is no reason to believe a stay of

16   this action is likely to streamline this case for trial or conserve judicial resources; it will only delay

17   P&G's ability to seek redress for Kraft's infringement and give Kraft an unfair market advantage.

18   **VII.    LITIGATING THE '419 PATENT NOW DOES NOT THREATEN DUPLICATIVE**

19   **         RECOVERY OR DISCOVERY**

20        Kraft argues that litigating the '419 Patent while the '418 Patent action is stayed would compel

21   the Court to "twice consider the exact same issues." Motion at 17. Kraft even argues that litigating

22   the '419 Patent action first would lead to "inconsistent or duplicative damages awards" because both

23   cases seek to enjoin Kraft from selling the infringing 38 oz. Maxwell House coffee container and seek

24

25   ───────────────

     [10] The same is true of *KLA-Tencor*, 2006 WL 708661, *Pegasus Development Corp. v. DirecTV, Inc.*, 2003 WL 21105073

26   (D.Del. May 14, 2003) and *DataTreasury Corp. v. Well Fargo & Co.*, 490 F. Supp. 2d 749 (E.D. Tex. 2006). In each of
     those cases, the patent or patents in reexamination were also at issue in the litigation. In *Modine Mfg. Co. v. Delphi*

27   *Automotive Sys., LLC*, 2000 WL 33989247 (E.D. Wis. Dec. 8, 2000), the court stayed the action on one patent pending the
     plaintiff's appeal of the PTO's denial of its application for another, similar patent. But that is not the case here. Here, the

28   PTO unequivocally *affirmed* all of the claims in the '419 Patent.

1  damages for the sales of that container. *See, e.g.*, Motion at 2, 6.  These arguments have no merit.

2         First, there is no specter of "duplicative" recovery here.  If the Court here enjoins Kraft from

3  continuing to sell the Maxwell House containers because they infringe the '419 Patent, that would

4  moot any request for the same injunction in the '418 Patent action.  There would be no "duplication."

5  Likewise, if the jury here awards P&G lost profit damages for Kraft's sales of the Maxwell House

6  container because it infringes the '419 Patent, that would not lead to a duplicative award of the same

7  lost profits later, if the container is found to also infringe the '418 Patent.  Lost profit damages in the

8  later-tried '418 Patent action would be rendered moot by the lost profit damages awarded in the '419

9  Patent action.  And if a jury were to compel Kraft to pay a reasonable royalty to P&G for its infringing

10 use of the technology of the '419 Patent (e.g., on any sales not addressed through lost profit damages),

11 that would not "duplicate" any reasonable royalty that would be owed for Kraft's use of the technology

12 of the '418 Patent.  Patent owners are entitled to a royalty on each of their patents, as each patent

13 covers a different patented technology, and Kraft will be free to argue that whatever royalty it pays for

14 its use of the technology in the '418 Patent should be offset by the royalty paid for the '419 Patent.  In

15 sum, Kraft's dramatic threat of "duplicative recovery" has no basis in fact or law.

16        Nor does allowing the '419 Patent action to proceed to trial before the '418 Patent action pose a

17 risk of inconsistent results or conflicting decisions. *E.g.*, Motion at 12, 17.  If the validity of the '418

18 Patent is again reaffirmed, it would have no impact on this case, which asserts only infringement of the

19 '419 Patent.  And if it were not, there is still no impact on the validity of the '419 Patent, because it is a

20 separate patent and is not the subject of the reexamination.  In other words, this Court can determine

21 the validity and infringement of the '419 Patent claims asserted here without waiting for the results of

22 the '418 Patent reexamination precisely *because they are two separate patents*.  Because this Court is

23 not being asked to make any determination about the '418 Patent, the results in this action cannot

24 conflict with the results of the appeals of the '418 Patent reexamination.

25        *Ricoh Co., Ltd. v. Aeroflex, Inc.*, No. C03-04669 MJJ, C03-02289 MJJ, 2006 WL 3708069

26 (N.D. Cal. Dec. 14, 2006) – cited by Kraft – refutes Kraft's argument.  In *Ricoh*, the district court

27 stayed litigation of a patent because the PTO had *rejected* every one of the claims in that patent during

28 reexamination.  Because the reexamination involved the patent in suit, the court concluded there was a

1   possibility the court and the PTO could reach different conclusions *on the same patent. Id.* at \*5. That

2   cannot happen here, because the patent in suit here is not the subject of Kraft's reexaminations.

3         Finally, allowing the '419 Patent action to be litigated while the '418 Patent action is stayed

4   does not mean there will be "duplicative discovery." Motion at 2. Any discovery taken in this action

5   or in Wisconsin relating to the '419 Patent can – to the extent it also applies to the '418 Patent – be

6   used in the '418 Action. There will be no need to take the same discovery twice.

7   **VIII.  P&G'S ACTION TO ENFORCE THE '419 PATENT DOES NOT "DUPLICATE" ITS**

8         **ACTION TO ENFORCE THE '418 PATENT.**

9         Kraft argues that the Court should stay – or even dismiss altogether – this action by P&G to

10  enforce its rights under the '419 Patent because, in Kraft's view, it is "duplicative" of P&G's separate

11  action to enforce its '418 Patent. *See* Motion at 7, 8 n. 5, 14-18. Kraft argues that P&G could only

12  seek to enforce its '418 and '419 Patents in a single lawsuit, and that by seeking to enforce them in

13  separate actions P&G has violated the rule against "splitting" a single cause of action. *Id.* at 7.

14        Kraft lost this argument in its Wisconsin motion for a stay. As well it should: the Federal

15  Circuit rejected Kraft's argument in *Kearns v. General Motors Corp.,* 94 F.3d 1553 (Fed. Cir. 1996),

16  when it held that a lawsuit on one patent cannot be dismissed as "duplicative" of an *unlitigated* lawsuit

17  on a *different* patent. *Kearns* makes clear that P&G owns two separate patents, representing two

18  separate and distinct property rights, and it is entitled to pursue separate litigation to enforce each.

19        In *Kearns,* the Federal Circuit held that "[e]ach patent asserted raises an independent and

20  distinct cause of action." *Id.* at 1555. That is because, by law, each patent "establishes an independent

21  and distinct property right." *Id.* The plaintiff in *Kearns* had filed a first complaint for infringement of

22  five of his patents. 94 F.3d at 1554. After that complaint was dismissed on procedural grounds, the

23  plaintiff filed a second complaint against the same defendants based on the same five dismissed

24  patents, as well as sixteen other patents. *Id.* Applying the same logic that Kraft urges here, the district

25  court held that "all twenty-one patents 'should have been litigated in the [first] litigation and they're

26  barred by not having been so.'" *Id.* at 1554. The Federal Circuit affirmed the district court with

27  respect to the five patents that were asserted in both cases. But it reversed with respect to the other

28  sixteen patents. *Id.* The court explained that a defendant who obtains dismissal of one patent cannot

1   seek dismissal of different patents that the plaintiff did not assert. *Id.*  Claim preclusion can only bar a

2   lawsuit on a second patent where the first patent "*was fully litigated on its merits and the same issues*

3   *were raised in the second case.*" *Id.* at 1556 (emphasis added).  Under *Kearns*, an accused infringer

4   cannot argue (as Kraft does here) that "a subsequent suit on a different patent can be precluded by a

5   failure to assert that patent in a prior suit." *SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc.*,

6   No. C99-0112 MJJ, 1999 U.S. Dist. LEXIS 21494, at *4 (N.D. Cal. May 17, 1999).

7       Kraft tries to brush aside this fatal legal flaw in its argument by asserting that "[i]t makes no

8   difference that distinct patents give rise to separately enforceable property rights" (Motion at 16 n. 6)

9   and that the fact that the '418 and '419 Patents are separate property rights is a "distinction without a

10  difference." *Id.* at 9.  But the Federal Circuit held in *Kearns* that the fact that separate patents

11  constitute separate property rights makes a huge difference; indeed, it is dispositive.  There is no basis

12  on which this Court (or Kraft) could ignore the controlling Federal Circuit holding in *Kearns*.[11]

13      The cases cited by Kraft do not support a different result.  *Adams v. California Department of*

14  *Health Services*, 487 F.3d 684 (9th Cir. 2007), is an employment case.  The plaintiff sued the California

15  Department of Health Services ("CDHS") and three of its employees on a string of legal theories, all

16  arising out of the CDHS's refusal to hire her.  The trial court denied plaintiff's motion to amend her

17  complaint to name five new defendants – all employees or agents of the CDHS – on causes of action

18  related to the same refusal to hire.  Plaintiff lost at trial and refiled the same claims against the same

19  five defendants in a new lawsuit.  The Ninth Circuit found the second lawsuit was properly dismissed

20  as duplicative of the first because it involved the same cause of action and the same parties or privies.

21

22

[11]  When Kraft unsuccessfully sought the same stay in Wisconsin, it tried to distinguish *Kearns* as "not applicable" on the
23  theory that only regional circuit law governs claim splitting as it relates to patent causes of action.  But *Kearns* shows this is
    wrong.  The issue before this Court turns squarely on an issue of patent law – and that is the issue addressed in *Kearns*:
24  whether a patent owner is precluded from bringing suit on a patent that he could have asserted in an earlier patent
    infringement lawsuit.  That issue *does* have special application to patent cases because – as *Kearns* recognized – it involves
25  the fundamental patent law principle that infringement of each patent creates a separate cause of action. *See Kearns*, 94
    F.3d at 1555.  Kraft also tried unsuccessfully to distinguish *Kearns* on the grounds that there was no "evidence that the
26  patents at issue in *Kearns* were nearly identical," as it contends they are here.  But that, too, misses the point.  The Federal
    Circuit did not consider similarities or differences between Kearn's asserted and non-asserted patents because, as it
27  expressly held, "*[e]ach patent asserted* raises an independent and distinct cause of action." *Kearns*, 94 F.3d at 1555-56
    (emphasis added).  The fact that two patents are similar because, e.g., they derive from the same parent application, is
28  irrelevant to that basic, controlling principle of patent law.

1    Nothing in *Adams* undermines the Federal Circuit holding in *Kearns* that, under patent law, a patentee

2    may maintain two different suits against the same party to enforce two different patents.

3        *Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 58 F.3d 616, 618 (Fed. Cir. 1995), also does not

4    help Kraft.  In that action, Mars sued Conlux USA for infringing its '565 patent by selling coin

5    selection machines.  Mars tried the case and won.  It then tried to sue Conlux's parent company, which

6    made the coin selection machines, for infringing the same patent.  The Federal Circuit affirmed the

7    district court's finding that the two complaints pleaded the same cause of action and that claim

8    preclusion barred Mars from twice litigating the same claim, under the same patent, against the

9    corporate parent of the defendant.  *Mars* does not support Kraft's assertion that P&G may not bring

10   two different lawsuits to enforce two different patents.

11       Kraft's reliance on *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 500 F. Supp. 2d 864

12   (N.D. Ill. 2007), is also misplaced.  Black & Decker alleged that Bosch's power boxes infringed two of

13   its patents.  Black & Decker obtained a verdict of infringement and then tried to sue Bosch again for

14   infringement based on a variation of the same power box.  Noting Black & Decker's admission that the

15   second case involved the "same property, i.e., [the same] patents-in-suit" and "the same accused

16   product," the court held that res judicata precluded the second lawsuit.  *Id.* at 868.  Like Kraft's other

17   cases, *Black & Decker* does not support Kraft's argument that P&G cannot bring one action to enforce

18   one patent (the '418 Patent) and another action to enforce a different patent (the '419 Patent).[12]

19   **IX.    P&G'S ASSERTION OF THE '419 PATENT WAS PROPER.**

20       Unable to meet the standards for a stay, Kraft suggests that P&G acted improperly by asserting

21   its '419 Patent.  Kraft accuses P&G of pursuing a "gaming strategy" and attempting to "avoid" the

22   _____

23   [12] The other cases cited by Kraft are equally inapposite.  In *Civix-DDI v. Expedia, Inc.*, the plaintiff tried to assert the
     "*identical patents* against the identical accused technology" twice.  No. 04 C8031, 2005 WL 1126906, at *4 (N.D. Ill.

24   May 2, 2005) (emphasis added).  Not so here.  *Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 223 (7th Cir. 1993), had
     nothing to do with patents or patent law; it involved two identical age-discrimination claims.  And *American Stock

25   Exchange, LLC v. Mopex, Inc.*, 215 F.R.D. 87, 92 (S.D.N.Y. 2002), involved the irrelevant issue of whether a plaintiff
     should be precluded in a *single* lawsuit involving a *single* patent from asserting a patent claim that it failed to timely

26   identify during fact discovery.  The district court's suggestion in *American Stock Exchange* that "Courts have consistently
     held that a plaintiff is barred from asserting a patent in a subsequent action against products or processes if that patent could

27   have been asserted in the prior action" contravenes the Federal Circuit's holding in *Kearns* and, of course, cannot control.
     *Id.*

28

1    Court's stay of the action on the '418 Patent. *Id.* at 7. There is no truth to any of this.

2    For example, Kraft argues that P&G asserted its '419 Patent in the Wisconsin action "*despite*

3    this Court's October 11 stay order." Motion at 1 (emphasis added). But this Court only stayed the

4    '418 Patent litigation, it did not enjoin P&G from seeking to enforce the '419 Patent or responding to

5    Kraft's Wisconsin lawsuit by asserting that the '419 Patent disclosures constitute prior art that

6    invalidates Kraft's patent. Nor could it, since only the '418 Patent was before the Court, and the rights

7    conferred by the two patents are, distinct property rights. *See Kearns, supra.* P&G's response to

8    Kraft's Wisconsin action on the '443 Patent plainly did not contravene this Court's stay order.

9    Kraft's suggestion that P&G engaged in forum shopping by responding to Kraft's Wisconsin

10    lawsuit defies logic. Kraft effectively argues that it is fair for Kraft to rush to Wisconsin to take

11    advantage of its fast-track docket, but unfair for P&G, having been sued in Wisconsin, to respond in

12    the same forum. Kraft made this argument when it unsuccessfully asked the Wisconsin court for the

13    same stay order it now seeks here. The argument failed then and should fail now, too.[13]

14    # X. IF THE COURT CONCLUDES THAT A STAY SHOULD BE IMPOSED, ANY STAY

15    # SHOULD BE LIMITED AND CONDITIONED TO MINIMIZE THE PREJUDICE TO P&G.

16    As shown, no stay of this action is appropriate, given that the patent-in-suit here is not and

17    never has been in reexamination. If this Court were inclined to consider a stay, however, any such stay

18    be limited and conditioned to minimize the prejudice P&G would suffer.

19    First, to ameliorate the evidentiary prejudice P&G would suffer by reason of a stay, P&G

20

21

---

[13] Finally, Kraft suggests that P&G's counterclaim on its '419 Patent was part of a scheme by P&G – supposedly hatched

22    *in August 2007,* when P&G filed its action to enforce the '418 Patent – to avoid the Court's order staying that action, which was entered *three months later on October 11, 2007.* *E.g.,* Motion at 4, 7-8. Of course, this is absurd. Kraft asks the Court

23    to accept that, at the time P&G filed the '418 action in August 2007, (1) P&G knew Kraft would ignore the unanimous PTO decision reaffirming the validity of all 55 claims of the '418 patent and persist in its efforts to invalidate the '418 patent;

24    *and* (2) P&G knew Kraft would move to stay the '418 action; *and* (3) P&G knew the Court would grant Kraft's motion to stay the '418 action; *and* (4) P&G knew Kraft would then rush to another jurisdiction to assert one of its own patents

25    against P&G; *and* (5) P&G intended from the beginning that all four of these things would happen, so that P&G could have an "excuse" to file a counterclaim on the '419 Patent in some other jurisdiction of Kraft's choosing. This is beyond

26    preposterous. In truth, Kraft's accusations are just an effort to put an old adage into practice, namely that the best way for Kraft to try to defend its own gamesmanship and lack of candor is to launch an aggressive (but unfounded) attack on its

27    opponent, including a fanciful argument that P&G intended from day one to get itself sued in Wisconsin so that it could file a counterclaim there.

28

DM_US:21080019_6

1  should be permitted during the stay to take limited deposition discovery, in the form of a 30(b)(6)

2  deposition directed to the development of Kraft's products, including the extent to which Kraft copied

3  information from P&G's patents, patent applications, products, vendors, or other sources to develop its

4  infringing products; Kraft's analysis of the value of the technology developed by P&G, including

5  consumer testing regarding the technology, technical challenges overcome by the technology, and

6  other benefits associated with the technology; and the identities of former Kraft employees (and third

7  parties working with Kraft) involved in developing Kraft's accused product, including through studies

8  and analyses of P&G's patented container.  Discovery in the now-dismissed Wisconsin lawsuit showed

9  that some Kraft witnesses already have diminished memories regarding their investigation of P&G's

10  patented technology.  Davidson Decl. ¶ 15.  A further 5-8 year delay would virtually guarantee loss of

11  additional evidence. Allowing P&G to take limited deposition discovery during the pendency of a stay

12  to preserve the evidence for trial would help reduce the evidentiary prejudice to P&G.

13      Kraft cannot fairly object to the preservation of relevant testimony or assert that P&G would

14  not be prejudiced by the loss of relevant evidence.   Reexaminations rarely result in cancellation of all

15  claims of the patent under reexamination; one court has noted this happens in only about 12% of all

16  reexaminations. *Soverain Software LLC v. Amazon.com*, 356 F. Supp. 2d 660, 662 (E.D. Tex. 2005).

17  Such a result is even less likely here, where the PTO has already reexamined the '418 Patent once and

18  reaffirmed every claim. Thus, even if some of the 55 claims in the '418 Patent were affected by the

19  reexamination (and even if that were relevant to the '419 Patent), this litigation will continue and P&G

20  will still need to preserve testimony from Kraft's personnel about the development of the infringing

21  product.  It is more than fair for the Court to condition any stay on the preservation of key testimony.

22      Second, to ameliorate the business prejudice P&G would suffer from a stay, the Court should

23  order that any stay would last only until the PTO renders its decision on Kraft's pending *ex partes*

24  reexamination of the '418 Patent.  Given the affirmance of all 55 claims of the '418 Patent in the first

25  reexamination, it is highly unlikely that Kraft's second bite at the reexamination apple will succeed.

26  And if the PTO again affirms all (or even most) of the claims of the '418 Patent, it is highly unlikely

27  that the BPAI or the Federal Circuit will overturn that determination.

28      Thus, even if the Court were to conclude that the reexamination of the '418 Patent might bear

1    on the '419 Patent, there is no need for an indefinite stay. When the PTO decides Kraft's second

2    reexamination request, the PTO will have twice ruled on the validity of the '418 Patent – including all

3    of the additional argument and "new" evidence that Kraft included in its second reexamination. This

4    Court will have twice received the expert opinion of the PTO. And Kraft will have no right to appeal

5    the PTO's determination of the *ex parte* reexamination. *See* 35 U.S.C. §§ 141, 145; MPEP § 2279;

6    *Boeing Co v. Commissioner of Patents & Trademarks*, 853 F.2d 878 (Fed. Cir. 1988) (party that

7    requested reexamination "was not entitled by statute to seek judicial review of the reexamination

8    because that procedural route is available under 35 U.S.C. §§ 145 and 302 only to applicants and

9    patent owners dissatisfied with decisions of the board").

10    After the PTO issues its decision on Kraft's *ex parte* reexamination, the Court should hold a

11    further status conference, evaluate the results that reexamination, and determine how this case should

12    continue, taking into account the rights of the parties, the Court's interest in judicial economy, and the

13    need to ensure the "just, speedy and inexpensive determination" of this action. *See* Fed. R. Civ. P. 1.

### CONCLUSION

15    Kraft's effort to delay P&G's ability to enforce its patent rights is unfair, prejudicial, and

16    contrary to law. Kraft should not be permitted to delay this action for 5-8 years and thwart P&G's

17    ability to enforce its patent rights to the innovative technology it pioneered. Kraft's Motion to stay this

18    action to enforce '419 Patent pending Kraft's appeals of the '418 Patent should be denied.

19    Alternatively, any stay should be conditioned on P&G being permitted to conduct limited deposition

20    discovery to preserve testimony for trial, and should be limited in duration, so that the stay does not

21    extend past the date when the PTO issues its decision on Kraft's *ex parte* reexamination request.

22

23    Dated: June 6, 2008                          HOWREY LLP

24

25                                                 By: _____
                                                        MARTHA K. GOODING
26                                                      Attorneys for Defendant
                                                        The Procter & Gamble Company
27

28