1  William C. Rooklidge (SBN 134483)
   Martha K. Gooding (SBN 101638)
2  Gregory S. Cordrey (SBN 190144)
   Ben M. Davidson (SBN 181464)
3  HOWREY LLP
   4 Park Plaza, Suite 1700
4  Irvine, California 92614
   949-721-6900
5  949-721-6910
   E-mail:  rooklidgew@howrey.com
6  E-mail:  goodingm@howrey.com
   E-mail:  cordreyg@howrey.com
7  E-mail:  davidsonb@howrey.com

8  Attorneys for Plaintiff The Procter & Gamble Company

9

10                  **UNITED STATES DISTRICT COURT**

11                  **NORTHERN DISTRICT OF CALIFORNIA**

12                     **SAN FRANCISCO DIVISION**

13  THE PROCTER & GAMBLE COMPANY,          )    Case No.:  3:08-cv-00930 PJH
                                           )
14                         Plaintiff,      )
                                           )
15  v.                                     )    **DECLARATION OF BEN M. DAVIDSON**
                                           )    **IN SUPPORT OF THE PROCTER &**
16  KRAFT FOODS GLOBAL, INC.,              )    **GAMBLE COMPANY'S OPPOSITION TO**
                                           )    **KRAFT'S MOTION TO STAY**
17                         Defendant.      )
                                           )

18

19

20

21

22

23

24

25

26

27

28

1   I, Ben M. Davidson, hereby declare:

2       1.     I am an attorney licensed to practice before all of the courts in the State of California.  I

3 am a partner in the firm of Howrey LLP, counsel for plaintiff The Procter and Gamble Company

4 ("P&G") in this action.  Except as stated herein, the matters stated below are of my personal

5 knowledge.  If called as a witness, I could and would testify competently thereto.

6       2.     P&G was granted two patents related to coffee packaging.  Those patents issued as

7 United States Patent Nos. 7,169,418, ("'418 Patent") and 7,169,419 ("'419 Patent") on January 30,

8 2007.  Copies of those patents are attached to the Declaration of Evette Pennypacker.

9       3.     Attached hereto as **Exhibit 1** is a true and correct copy of Kraft's Request for

10 Reexamination of the '418 Patent, dated January 31, 2007.  Kraft filed the *inter partes* Request for

11 Reexamination one day after the '418 Patent was issued.  The '419 Patent was not challenged by Kraft

12 in the Reexamination Request or, to my knowledge, in any other reexamination request.

13      4.     P&G filed suit in this district against Kraft for infringement of the '418 on August 27,

14 2007.  P&G also moved for a preliminary injunction against Kraft shortly after filing the complaint.

15      5.     Attached hereto as **Exhibit 2** is a true and correct copy of Kraft's Motion for Stay, filed

16 in September 20, 2007 in Case No. 07-4413 in this court.

17      6.     Attached hereto as **Exhibit 3** is a true and correct copy of Kraft's Motion to Dismiss, or

18 in the Alternative, Transfer or Stay, filed November 29, 2007 in the now-dismissed Case No. 07-0613

19 in the Western District of Wisconsin.

20      7.     Attached hereto as **Exhibit 4** is a true and correct copy of the transcript from the

21 October 3, 2007 Hearing on Kraft's Motion to Dismiss, or in the Alternative, Transfer or Stay.

22      8.     Attached hereto as **Exhibit 5** is a true and correct copy of the Decision Dismissing

23 Petition from the United States Patent and Trademark Office, dated December 18, 2007.

24      9.     On January 18, 2008 Kraft filed an *ex parte* re-examination request with the PTO,

25 asking the PTO to reconsider the patentability of the '418 patent.  This request was based on the

26 declaration of Samuel Belcher that was very similar to the declaration that was previously rejected by

27 the PTO.

28

-1-           Case No.  3:08-cv-00930 PJH
DAVIDSON DECL. ISO
OPPOSITION TO MOTION TO STAY

DM_US:21273521_2

10.     Attached hereto as **Exhibit 6** is a true and correct copy of the Scheduling Order entered by the court in the now-dismissed case no. 07-0613 in the Western District of Wisconsin.  Included in that Order was a May 1, 2008 deadline for dispositive motions, an August 1, 2008 discovery cutoff, an August 6, 2008 pretrial conference, and a September 8, 2008 trial date.

11.     At the time of the transfer of the '418 claims to this Court, the parties had already engaged in extensive discovery.  In particular:

- P&G had produced approximately 230,000 pages of documents

- Kraft had produced about 95,000 pages.

- P&G had served (and Kraft had responded to) approximately 160 requests for production, 17 interrogatories, and 88 requests for admission.

- Kraft had served (and P&G had responded to) 91 requests for production and 23 interrogatories.

In addition, the discovery included all of the core issues relating to the '419 Patent, including:

- the parties' respective infringement and non-infringement contentions;

- Kraft's invalidity contentions;

- P&G's identification of evidence of non-obviousness;

- P&G's identification of evidence showing that Kraft's infringement is willful; and

- P&G's evidence of the conception and reduction to practice of the claimed inventions of the '419 Patent.

12.     Shortly after the transfer motion was granted, Kraft noticed the depositions of David Dalton and Thomas Manske, two of the three named inventors of the '419 Patent, and it later took these depositions.

13.     Attached hereto as **Exhibit 7** is a true and correct copy of the Stipulated Protective Order entered in the now-dismissed case no. 07-0613 in the Western District of Wisconsin.  Paragraph 8 of that Order allows that confidential information and documents produced in that action may also be used in "any other proceeding involving P&G and KFG … and P&G's United States Patent Nos.

1  7,169,418 or 7,169,419, provided that a protective order is provided in that proceeding to protect the

2  confidentiality of that information."

3      14.    In the now-dismissed lawsuit brought by Kraft in Wisconsin, a Kraft employee testified

4  regarding difficulty he had remembering events regarding Kraft's investigation of P&G's development

5  of Folgers plastic coffee containers.  Attached as **Exhibit 8** is a true and correct copy of excerpts

6  (pages 151-183) from the transcript of the deposition of a Kraft employee, Mete Bruncaj.  I took Mr.

7  Bruncaj's deposition.  During the deposition I asked Mr. Bruncaj regarding his conversations with

8  P&G vendors in 2002 to obtain information regarding P&G's development of its plastic Folgers

9  container.  Mr. Bruncaj testified that he did not know whether he had a conversation—even though one

10 of his emails showed that he had—because he did not remember the conversation and it was a

11 "complete blank" in his memory.  *See* Exhibit 8 at 152-53.  Mr. Bruncaj also was asked whether he

12 talked to additional vendors about Folgers and he testified, "[t]his e-mail says that, but I don't recall."

13 *See* Exhibit 8 at 156-157.  He was asked:  "Why would you say something in this e-mail . . . on July 3,

14 2002, 'I have spoken to additional vendors', if that wasn't true?"  Exhibit 8 at 182.  He responded:

15 "Typically I wouldn't, but I don't remember if I spoke to additional vendors."  *Id*.  Mr. Bruncaj was not

16 the only Kraft witness whose memory of relevant events had begun to fade.

17     15.    On May 30, 2008, the District Court for the Western District of Wisconsin entered an

18 order granting the stipulated dismissal with prejudice of Kraft's patent infringement claims against

19 P&G.  A true and correct copy of that docket text order and the Stipulated Dismissal is attached hereto

20 as **Exhibit 9.**

21     16.    **Exhibit 10** is a true and correct copy of a report entitled "Reexamining Inter Partes

22 Reexam," dated April 8, 2008.  The report was issued by the Institute For Progress, which I am

23 informed and believed is a think tank providing statistics and analysis regarding patent law issues.

24

25     I declare under penalty of perjury under the laws of the United States of America that the

   foregoing is true and correct.

26

27     Executed this day on June 6, 2008, at Los Angeles, California.

28

1    The electronic filer hereby attests that the individual whose name appears below has signed this

2  document.  See General Order 45, Section X.

3

4

5                                          _____/s/ Ben M. Davidson_____
                                           Ben M. Davidson
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

PTO/SB/58 (04-05)
Approved for use through 04/30/2007. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.
(Also referred to as FORM PTO-1465)

# REQUEST FOR *INTER PARTES* REEXAMINATION TRANSMITTAL FORM

Address to:
**Mail Stop *Inter Partes* Reexam
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450**

**Attorney Docket No.:** G-1165

**Date:** January 31, 2007

1. [x] This is a request for *inter partes* reexamination pursuant to 37 CFR 1.913 of patent number 7,169,418 issued Jan. 30, 2007 . The request is made by a third party requester, identified herein below.

2. [x] a. The name and address of the person requesting reexamination is:

   Marvin Petry, Esq. - Stites & Harbison PLLC

   1199 North Fairfax Street, Suite 900

   Alexandria, Virginia  22314

   KRAFT FOODS GLOBAL, INC.
   b. The real party in interest (37 CFR 1.915(b)(8)) is:  Three Lakes Drive, Northfield, Illinois  60093

3. [ ] a. A check in the amount of $ _____ is enclosed to cover the reexamination fee, 37 CFR 1.20(c)(2);

   [ ] b. The Director is hereby authorized to charge the fee as set forth in 37 CFR 1.20(c)(2)
   to Deposit Account No. _____ (submit duplicative copy for fee processing); or
   [x] c. Payment by credit card. Form PTO-2038 is attached.

4. [x] Any refund should be made by [ ] check or [ ] credit to Deposit Account No. _____.
   37 CFR 1.26(c). If payment is made by credit card, refund must be made to credit card account.
   The Director is authorized to charge any additional fee due in connection herewith to Deposit Account No. 12-0555.

5. [x] A copy of the patent to be reexamined having a double column format on one side of a separate paper is enclosed. 37 CFR 1.915(b)(5)

6. [ ] CD-ROM or CD-R in duplicate, Computer Program (Appendix) or large table
   [ ] Landscape Table on CD

7. [ ] Nucleotide and/or Amino Acid Sequence Submission
   *If applicable, items a. – c. are required.*

   a. [ ] Computer Readable Form (CRF)
   b. Specification Sequence Listing on:
      i [ ] CD-ROM (2 copies) or CD-R (2 copies); or
      ii [ ] paper
   c. [ ] Statements verifying identity of above copies

8. [ ] A copy of any disclaimer, certificate of correction or reexamination certificate issued in the patent is included.

9. [x] Reexamination of claim(s) 1-55 (all) is requested.

10. [x] A copy of every patent or printed publication relied upon is submitted herewith including a listing thereof on Form PTO/SB/08, PTO-1449, or equivalent.

11. [ ] An English language translation of all necessary and pertinent non-English language patents and/or printed publications is included.

[Page 1 of 2]

This collection of information is required by 37 CFR 1.915. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Mail Stop *Inter Partes* Reexam, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/SB/58 (04-05)
Approved for use through 04/30/2007. OMB 0651-0033
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

12. [x] The attached detailed request includes at least the following items:

    a.   A statement identifying each substantial new question of patentability based on prior patents and printed publications. 37 CFR 1.915(b)(3)

    b.   An identification of every claim for which reexamination is requested, and a detailed explanation of the pertinency and manner of applying the cited art to every claim for which reexamination is requested. 37 CFR 1.915(b)(1) and (3)

13. [x] It is certified that the estoppel provisions of 37 CFR 1.907 do not prohibit this reexamination. 37 CFR 1.915(b)(7)

14. [x] a. It is certified that a copy of this request has been served in its entirety on the patent owner as provided in 37 CFR 1.33(c).
    The name and address of the party served and the date of service are:

    THE PROCTER & GAMBLE COMPANY

    Intellectual Property Division - Winton Hill Technical Center
    6110 Center Hill Avenue
    Cincinnati, Ohio  45224

    Date of Service:   January 31, 2007           ; or

    [ ] b. A duplicate copy is enclosed since service on patent owner was not possible.

15. Correspondence Address: Direct all communications about the application to:

    [x] The address associated with Customer Number:     | 00881 |

    ***OR***

| Firm or Individual Name | |
| Address | |
| City | State | Zip |
| Country | |
| Telephone | Email |

16. [ ] The patent is currently the subject of the following concurrent proceeding(s):
    [ ] a. Copending reissue Application No. _____.
    [ ] b. Copending reexamination Control No. _____.
    [ ] c. Copending Interference No. _____.
    [ ] d. Copending litigation styled:

    _____

    _____

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

| *Marvin Petry* (signature) | January 31, 2007 |
| Authorized Signature For Third Party Requester | Date |
| Marvin Petry | 22752 |
| Typed/Printed Name | Registration Number, if applicable |

United States Patent and Trademark Office
- Sales Receipt -

02/02/2007 JPREDDIE 00000002 95000219

01 FC:1813                          8800.00 OP

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

# REQUEST FOR REEXAMINATION of U.S. Patent No. 7,169,418

Identification of Claims for Which Reexamination is Requested.

In accordance with 35 USC 311 and 37 CFR 1.913, reexamination of (all) claims 1-55 of USP 7,169,418 is requested in view of the following references (primary references are bolded). It will be noted that various secondary references are combinable with the five basic primary combinations of references identified below.  Therefore two or more alternate ways of combining the basic combination of references with other secondary references are detailed in some instances.

NEW APPLIED REFERENCES (Not cited in the Prosecution).

| | |
|---|---|
| **Melrose** | USP 6,763,969 |
| **Newcomb** | USP 3,082,904 |
| **Lane** | USP 6,837,390 |
| Goglio | USP 5,515,994 [hereafter referred to as "Goglio", as opposed to "Old Goglio" noted below.] |

OLD APPLIED REFERENCES (Cited in the Prosecution).

| | |
|---|---|
| **Hargraves** | USP 4,966,780 |
| **Vidkjaer** | USP 6,733,803 |
| Goglio | USP 5,285,954 [hereafter "Old Goglio".] |

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

Bruke          USP 3,944,127

Haas           USP 5,085,034

Ota            USP 4,890,752

The Encyclopedia of Polymer Science and Technology, Volume 6, 1967 [hereafter

"Old Encyclopedia" – as printed from PAIR in the file of USP

7,169,418]

Marks' Standard Handbook for Mechanical Engineers, 10th Edition, 1996 [hereafter

"Old Marks' Handbook" – as printed from PAIR in the file of

USP 7,169,418]

BACKGROUND REFERENCES

Alberghini     USP 5,060,453 (Not Cited in the Prosecution)

Darr           USP 5,690,244 (Cited in the 133 reference IDS by Applicant)

Lown          USP D389,067 (Not Cited in the Prosecution)

Weaver       USP 5,261,544 (Not Cited in the Prosecution)

Platte         USP 3,708,082 (Not Cited in the Prosecution)

"Main coffee packaging concern: freshness", Tea & Coffee Trade Journal, Author:

Fader, Liz, 8/1/1989. (Not Cited in the Prosecution)

"Unique venting keeps coffee fresh", Packaging World Magazine, October 1996 , p.

10. (Not Cited in the Prosecution)

"New container lets you wake up and smell the 'fresher' coffee", Food & Drug

Packaging, Stagnito Communications, 11/1/1996. (Not Cited in the Prosecution)

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

a.  Reexamination of:

Claims **1**, 8-10, 14-15, 19, 22-23, 26, 31-32, **33**-35, **37**-43, **44**-49, and **50**-55 is requested in view of the combination of Melrose in view of Goglio.

Claims 2-7, 11-13, 20-21, and 36 is requested in view of the combination of Melrose in view of Goglio, and further in view of Old Vidkjaer.

Claims 3-4 is additionally requested in view of the combination of Melrose in view of Goglio, and further in view of Old Bruke.

Claims 9, 11-13, 20-21, and **33**-36 is additionally requested in view of the combination of Melrose in view of Goglio, and further in view of Old Haas.

Claims 9, 20-21, and **33**-36 is additionally requested in view of the combination of Melrose in view of Goglio, and further in view of Old Encyclopedia.

Claims 16-18 is requested in view of the combination of Melrose in view of Goglio, and further in view of Old Goglio.

Claim 18 is additionally requested in view of the combination of Melrose in view of Goglio, and further in view of Old Goglio and Old Encyclopedia.

Claims 24-25, 27, and 29-30 is requested in view of the combination of Melrose in view of Goglio, and further in view of Old Hargraves.

Claim 28 is requested in view of the combination of Melrose in view of Goglio, and further in view of Old Hargraves and Old Goglio.


b.  Reexamination of:

Claims **1**-3, 8-10, 14-15, 19-23, 26, 31-32, **33**-35, **37**-43, **44**-49, and **50**-55 is requested in view of the combination of Newcomb in view of Melrose.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

Claims 2-7, 11-13, 20-21, and 36 is requested in view of the combination of Newcomb in view of Melrose, and further in view of Old Vidkjaer.

Claims 3-4 is additionally requested in view of the combination of Newcomb in view of Melrose, and further in view of Old Bruke.

Claims 9, 11-13, 20-21, and 33-36 is additionally requested in view of the combination of Newcomb in view of Melrose, and further in view of Old Haas.

Claims 9, 20-21, and 33-36 is additionally requested in view of the combination of Newcomb in view of Melrose, and further in view of Old Encyclopedia.

Claims 16-18 is requested in view of the combination of Newcomb in view of Melrose, and further in view of Old Goglio.

Claim 18 is additionally requested in view of the combination of Newcomb in view of Melrose, and further in view of Old Goglio and Old Encyclopedia.

Claims 24-25, 27, 29 and 30 is requested in view of the combination of Newcomb in view of Melrose, and further in view of Old Hargraves.

Claim 28 is requested in view of the combination of Newcomb in view of Melrose, and further in view of Old Hargraves and Old Goglio.


c. Reexamination of:

Claims 1, 8-10, 14-15, 19-23, 26, 31-32, 33-35, 37-43, 44-49, and 50-55 is requested in view of the combination of Lane in view of Goglio.

Claims 2-7, 11-13, and 36 is requested in view of the combination of Lane in view of Goglio, and further in view of Old Vidkjaer.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

Claims 3-4 is additionally requested in view of the combination of Lane in view of Goglio, and further in view of Old Bruke.

Claims 9, 11-13, 20-21, and **33**-36 is additionally requested in view of the combination of Lane in view of Goglio, and further in view of Old Haas.

Claims 9, 20-21, and **33**-36 is additionally requested in view of the combination of Lane in view of Goglio, and further in view of Old Encyclopedia.

Claims 16-18 is requested in view of the combination of Lane in view of Goglio, and further in view of Old Goglio.

Claim 18 is additionally requested in view of the combination of Lane in view of Goglio, and further in view of Old Goglio and Old Encyclopedia.

Claims 24-25, 27 and 29-30 is requested in view of the combination of Lane in view of Goglio, and further in view of Old Hargraves.

Claim 28 is requested in view of the combination of Lane in view of Goglio, and further in view of Old Hargraves and Old Goglio.


d.  Reexamination of:

Claims **1**, 8-10, 14, 19, 22-27, 30, **33**-35, **37**-39, 41-43, **44**-46, 48-49, and **50**-52, 54-55 is requested in view of the combination of Old Hargraves in view of Goglio.

Claims 2-7, 11-13, 20-21, 29, 31-32, and 36 is requested in view of the combination of Old Hargraves in view of Goglio, and further in view of Old Vidkjaer.

Claims 33-36 is additionally requested in view of the combination of Old Hargraves in view of Goglio, and further in view of Old Haas.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

Claims 33-36 is additionally requested in view of the combination of Old Hargraves in view of Goglio, and further in view of Old Encyclopedia.

Claims 15, 40, 47, and 53 is requested in view of the combination of Old Hargraves in view of Goglio, and further in view of Melrose.

Claims 16-18 and 28 is requested in view of the combination of Old Hargraves in view of Goglio, and further in view of Old Goglio.

Claims **1**, 8, 10, 14-15, 19, 22-27, 30, **37**-43, **44**-49, and **50**-55 is additionally requested in view of the combination of Old Hargraves in view of Goglio, and further in view of Old Ota.

Claims 2, 5-7, 29, and 31-32 is additionally requested in view of the combination of Old Hargraves in view of Goglio, and further in view of Old Ota and Old Vidkjaer.

Claims 3-4 is additionally requested in view of the combination of Old Hargraves in view of Goglio, and further in view of Old Ota and Old Bruke.

Claims 9, 11-13, and 20-21 is additionally requested in view of the combination of Old Hargraves in view of Goglio, and further in view of Old Ota and Old Haas.

Claims 9 and 20-21 is additionally requested in view of the combination of Old Hargraves in view of Goglio, and further in view of Old Ota and Old Encyclopedia.

Claims 16-17 and 28 is additionally requested in view of the combination of Old Hargraves in view of Goglio, and further in view of Old Ota and Old Goglio.

Claim 18 is additionally requested in view of the combination of Old Hargraves in view of Goglio, and further in view of Old Ota, Old Goglio and Old Encyclopedia.

e.  Reexamination of:

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

Claims **1**-15, 19-21, 26 and 31-32 is requested in view of the combination of Old Vidkjaer in view of Melrose.

Claims 3-4 is additionally requested in view of the combination of Old Vidkjaer in view of Melrose, and further in view of Old Bruke.

Claims 11-13, and 20-21 is additionally requested in view of the combination of Old Vidkjaer in view of Melrose, and further in view of Old Haas.

Claims 20-21 is additionally requested in view of the combination of Old Vidkjaer in view of Melrose, and further in view of Old Encyclopedia.

Claims 16-18 is requested in view of the combination of Old Vidkjaer in view of Melrose, and further in view of Old Goglio.

Claim 18 is additionally requested in view of the combination of Old Vidkjaer in view of Melrose, and further in view of Old Goglio and Old Encyclopedia.

Claims 22-25, 27, 29-30, **33**-36, **37**-43, **44**-49, and **50**-55 is requested in view of the combination of Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

Claim 28 is requested in view of the combination of Old Vidkjaer in view of Melrose, and further in view of Old Hargraves and Old Goglio.

Statement Pointing Out Each Substantial New Question Of Patentability.

Every one of the claims of USP 7,169,418 was allowed based on the addition, to the element "at least one region of deflection" disposed on the container contained in each independent claim, of the limitation that this region of deflection "allows flexion and thereby has less resistance to flexing than the body of said container proximate to said region of deflection."

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

As described in more detail below, however, the new Melrose and Lane references each teach at least one region of deflection on the container body that allows flexion and thereby has less resistance to flexing than the body of the container proximate to the region of deflection. Because these teachings provide subject matter of the USP 7,169,418 claims that was not considered during prosecution of USP 7,169,418, the teachings of each of these references raise a substantial new question of patentability.

The old Hargraves and old Vidkjaer references also each teach at least one region of deflection on the container body that allows flexion and thereby has less resistance to flexing than the body of the container proximate to the region of deflection. As described in more detail below, these teachings were overlooked or forgotten during the course of the prosecution of USP 7,169,418. The teachings of the Hargraves and Vidkjaer references are being presented in a new light and a different way compared with their use in the earlier examination and thus raise substantial new questions of patentability and with material new arguments that also raise substantial new questions of patentability.

In the claims as originally filed, the region of deflection element appeared only in dependent claim 21. Original claim 21 recited a "region of deflection disposed" on the container body, but did not include the additional limitation that the region of deflection "allows flexion and thereby has less resistance to flexing than the body of said container proximate to said region of deflection." The examiner rejected original claim 21 as anticipated by Hargraves, correctly observing (at p. 5) that in Hargraves "the body has at least one region of deflection disposed thereon responsive to at least one force internal or external to said container (see p. 5, lines 61-68)." August 24, 2004 Office Action at p. 5.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007                                                By Dalton et al.
                                                                  SN 10/155,338

The applicant did not dispute that Hargraves discloses at least one region of deflection disposed on the container body. Instead, the applicant amended the claims that had been rejected as anticipated by Hargraves by adding a new "one-way valve" element and arguing that Hargraves did not teach the newly claimed one-way valve. *See* Dec. 22, 2004 Response at p. 3, line 11. The applicant also added new claims that were distinguished from Hargraves based on the recitation of a handle. *See* March 4, 2005 Supplemental Amendment at p. 11. Dependent claim 21 continued to be the only claim of the then 37 pending claims reciting a "region of deflection."

In response to the amended claims, the examiner acknowledged that Hargraves does not disclose a one-way valve and therefore withdrew the rejections based on Hargraves. *See* June 15, 2005 Office Action at p. 8. The examiner rejected the claims based on other art, however, including rejecting dependent claim 21 as anticipated by Vidkjaer, in part because

> The container of Vidkjaer has regions of deflection on it (see Figure 1, Reference number 3 and Column 4, lines 56-60). Vidkjaer discloses that the ribs on the container are for reinforcement and it is interpreted that they would be responsive to an internal or external force on the container. (*Id.* at p. 3.)

With respect to Hargraves, it should be noted that at this point in the prosecution the region of deflection was recited only in then-pending dependent claim 21, which was not separately argued for patentability. The applicant did not make any arguments for patentability based on the region of deflection in its next response either. Only later in the prosecution did the applicant submit an amendment adding the "region of deflection" to all of the independent claims and arguing for patentability based primarily on the recited region of deflection. At that point, a different examiner was handling the application and did not mention Hargraves. It thus appears that Hargraves' teaching of a region of deflection was later either forgotten or overlooked. In the new light of the primacy of the region of deflection to applicant's arguments

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

for patentability, Hargraves' teaching of a region of deflection creates a substantial new question of patentability.

With respect to Vidkjaer, it should be noted that the examiner identified only the ribs indicated by reference number 3 as the regions of deflection reading on the added claim language (evidently because ribs 3 are regions which are deflected). The examiner thus failed to observe that the panels of the Vidkjaer container located between the ribs are "regions of deflection." As described below, the successive examiners in later office actions continued to focus their attention solely on the reinforcement ribs of Vidkjaer, and thus overlooked that the panels of Vidkjaer are regions of deflection that allow flexion and thereby have less resistance to flexing than the proximate ribs. The current focus on the deflection panels presents Vidkjaer in a new light and different way compared with its use in the earlier examination and raises material new arguments, all of which raise substantial new questions of patentability in this request for reexamination.

In response to the June 15, 2005 Office Action, the applicant amended the independent claim that had been rejected as anticipated by Vidkjaer by adding a handle element (from canceled dependent claim 15). The applicant's arguments to overcome the rejection based on Vidkjaer relied solely on the addition of the handle element, and the applicant did not discuss regions of deflection. *See* Oct. 12, 2005 Amendment and Reply at p. 2, line 14. Dependent claim 21 continued to be the only claim reciting a region of deflection.

A new examiner then issued a final rejection of the amended claims, observing, among other things, that Ota teaches a handle disposed on the body of a plastic container. The examiner rejected dependent claim 21 as obvious over Vidkjaer in view of Ota, reciting again that:

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

> [t]he container of Vidkjaer has regions of deflection on it (see Figure 1, Reference
> number 3 and Column 4, lines 56-60). Vidkjaer discloses that the ribs on the
> container are for reinforcement and it is interpreted that they would be responsive
> to an internal or external force on the container. (See Nov. 29, 2005 Final Office
> Action at p.3.)

The examiner thus again focused solely on the ribs of Vidkjaer, and disregarded the panels

between the ribs.

In a Request for Continued Examination, the applicant next amended the claims to add

the region of deflection element to all of the pending independent claims. The applicants'

arguments that Vidkjaer did not disclose a region of deflection – like the examiners' discussions

of Vidkjaer – focused only on the ribs of the Vidkjaer container, and not on the flexible panels

between the ribs. The applicant argued that the claimed regions of deflection "allow flexion

within the body portion of the container such that the body portion can deform uniformly without

catastrophic failure or other defects, such as denting" and distinguished regions of deflection

from ribs by arguing that regions of deflection "are designed to have *less resistance to deflection*

than the regions of the container proximate to the regions of deflection," whereas ribs "are

designed to provide structural stability and further restrict movement of the container to the

regions of deflection." Feb. 28, 2006 Response and Amendment with RCE at p. 11-12.

The examiner then rejected a number of the newly amended claims as obvious over

Vidkjaer in view of Ota "for the reasons set forth in the previous Office Action." April 4, 2006

Office Action at p. 2. In responding to the applicant's arguments about Vidkjaer, the examiner

also focused solely on Vidkjaer's reinforcement ribs, and ignored the panels between the ribs,

stating (at 3):

> Applicant argues that the reinforcement ribs in Vidkjaer cannot be deemed to
> serve as both a reinforcement means and a region of deflection. Applicant states
> that the reinforcement ribs of Vidkjaer cannot both reinforce the container and
> allow flexibility. However, the claim language only requires a "region of

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

deflection" and has no flexibility requirement. As the prior art teaches ribs, which reinforce the container, and these areas, being reinforced, are stronger, it would have been expected that they would deflect forces on the container.

The applicant responded by filing an amendment in which each claim was amended to add the limitation "said region of deflection having less resistance to flexing than the body of said container proximate to said region of deflection." The applicant's arguments focused solely on this new limitation, and the applicant continued to capitalize on the examiner's sole focus on the ribs of the Vidkjaer container and the examiner's failure to notice that the panels are the true regions of deflection:

> In a nutshell, Applicants' position is that none of the cited documents suggests the "region of deflection" employed in the present containers. In response, the Examiner (Office Action, page 3) surmises that the "region of deflection" could encompass reinforcing "ribs", since no flexibility requirement is given. In response to that position, the claims have now been amended to recite that the region of deflection has less resistance to flexing that [sic] does the proximate region of the container, i.e., is more flexible. This, of course, is the exact opposite of a reinforcing rib. (See June 28, 2006 Amendment at 14.)

Another new examiner then allowed the claims without further comment, subject to an examiner's amendment making the final form of the region of deflection element:

> wherein said body comprises at least one region of deflection disposed thereon, and wherein said region of deflection allows flexion and thereby has less resistance to flexing than the body of said container proximate to said region of deflection.

As this review of the prosecution history demonstrates, a region of deflection that allows flexion and thereby has less resistance to flexing than the body of the container proximate to the region of deflection is the sole element of the allowed claims that the office thought was not taught by the prior art. That element *is* taught, however, both in the Melrose and Lane references that the office did not consider and in the Hargraves and Vidkjaer references that are part of the prosecution record, but that the office did not consider in the proper light and with the benefit of

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

the arguments asserted below. Each claim of USP 7,169,418 is obvious over each of those references in combination with other references as discussed in detail below.

It will be appreciated that **Old Goglio** has been applied below in view of its having been referenced in Goglio. Actually, Goglio references the container to be used for the invention disclosed as being, "for example of the type described in Italian patent application MI-91A001770" (see column 2, lines 25-26). This IT patent application was the priority application for Old Goglio (as evident from the front page thereof), and Old Goglio has the same disclosure thereof (as evident from the IT application, which is now IT patent 01248568).

### a. Melrose v. Goglio

Neither Melrose nor Goglio were of record in the file of USP 7,169,418. With respect to regions of deflection, Melrose teaches "smooth-surfaced flex panels 22 . . . on the [container] sidewall" that "provide zones of expansion and vacuum absorption" and that are adjacent to and "merge directly into the side edges of" the "vertically elongate columns 24" that "provide structural reinforcement zones" (column 4, lines 1-8 and 28-35, see also Figures 1-4). The flex panels 22 are thus regions of deflection that allow flexion and thereby have less resistance to flexing than the adjacent structural reinforcement columns 24. Melrose (figures 1-2) also teaches a packaging system having a container made of plastic (e.g., PET) with an interior volume, a handle (column 4, lines 64-67 and column 5, lines 25-39), a tensile modulus number between 35 and 650 ksi (Melrose discloses use of PET – column 1, lines 17-18 – which has a tensile modulus of 358-435 ksi), and a top load capacity in the recited range (inherent). Goglio (figure

REQUEST for Reexamination of 7,169,418                    By Dalton et al.
Issued:  01/30/2007                                         SN 10/155,338

2) discloses a top closure for a container holding coffee including a one-way valve (column 2, lines 27-34) on a flexible closure (column 2, lines 28-30) attached to a protuberance (column 2, lines 27-31) of the open top.  Thus, as it would be obvious to use the container of Melrose for coffee, and as Goglio explicitly teaches use of the described top closure to package ground coffee (column 1, lines 8-11), it would be obvious to use the top closure of Goglio on the package of Melrose and all of the limitations of claim 1 are thus met.

As noted above, once a "region of deflection" with "less resistance to flexing" was claimed as a critical feature in all of the independent claims, the examiner failed to apply or consider any principal reference having all of the above noted features of Melrose.  More importantly, the examiner failed to consider any reference having all of the teachings of Goglio in combination with any reference having all of the teachings of Melrose.  Therefore, the combined teachings of Melrose and Goglio constitute a prior art container not considered by the examiner, and a substantial new question of patentability is raised by the combination of Melrose in view of Goglio for independent claim 1.

As noted above, this combination of Melrose in view of Goglio also raises a substantial new question of patentability with respect to:

- independent claim 33 which has most (but not all) of the same limitations as independent claim 1, the additional limitations being:  i) that roast and ground coffee is contained, which is taught by Goglio, ii) the use of polyolefin for the container, which is also taught in Melrose, and iii) an aroma value of the recited range, which is inherent with such a material.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

- independent claim 37, which has most (but not all) of the same limitations as independent claim 1, the additional limitation being that coffee is being contained, which is taught by Goglio.

- independent claim 44, which has most (but not all) of the same limitations as independent claim 1, the additional limitations being:  i) that coffee is being contained, which is taught by Goglio and ii) use of one of a group of materials including polyethylene terephthalate (PET), which is taught by Melrose.

- independent claim 50, which has most (but not all) of the same limitations as independent claim 1, the additional limitations being:  i) that coffee is being contained, which is taught by Goglio, and ii) use of one of a group of materials including polyethylene terephthalate (PET), which is taught by Melrose.

Thus, for the same reasons as for independent claim 1, a substantial new question of patentability for the other independent claims 33, 37, 44 and 50 is also raised.


Melrose additionally teaches that the material is blow-molded polyethylene terephthalate (PET) (column 1, lines 10-18) (claims 8-10); that the handle is integral with the body, and parallel to the longitudinal (vertical) axis of the container (column 4, lines 64-67 and column 5, lines 25-39) (claims 14-15); that the region of deflection is responsive to a force (column 2, lines 50-55 and column 4, lines 1-8) (claim 19); that the top load strength/capacity could be of the recited value (inherent – claim 26); and that a rib parallel to the longitudinal axis and proximate to a region of deflection in the form of a rectangular panel is provided (elements 22 and 24 in figures 1 and 2) (claims 31-32).  Goglio teaches ground coffee, which could obviously be roasted as a design (column 1, lines 8-11) (claims 22-23).  Thus, a substantial new question of

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

patentability is raised for <u>dependent claims 8-10, 14-15, 19, 22-23, 26, and 31-32</u> dependent from independent claim 1.

The respective higher coffee aroma values (claims 34-35) are also likewise inherent in Melrose. Thus, a substantial new question of patentability is raised for <u>dependent claims 34-35</u> dependent from independent claim 33.

Melrose teaches the handle is integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 64-67 and column 5, lines 25-39) (claims 38-40) and a PET material (column 1, lines 17-18) (claim 41). Goglio teaches the use of coffee (recited positively now – claim 42) which is ground (column 1, lines 8-11) and which could obviously be roasted as a design choice (claim 43). Thus, a substantial new question of patentability is raised for <u>dependent claims 38-43</u> dependent from independent claim 37.

Melrose teaches the handle is integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 64-67 and column 5, lines 25-39) (claims 45-47). Goglio teaches the use of coffee (recited positively now – claim 48) which is ground (column 1, lines 8-11) and which could obviously be roasted as a design choice (claim 49). Thus, a substantial new question of patentability is raised for <u>dependent claims 45-49</u> dependent from independent claim 44.

Melrose teaches the handle is integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 64-67 and column 5, lines 25-39) (claims 51-53). Goglio teaches the use of coffee (recited positively now – claim 54) which is ground (column 1, lines 8-11) and which could obviously be roasted as a design choice (claim 55). Thus, a substantial new question of patentability is raised for <u>dependent claims 51-55</u> dependent from independent claim 50.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

a.i.  Melrose v. Goglio + Old Vidkjaer

Old Vidkjaer teaches the use of a foil-polyolefin-barrier layer laminate (column 2, lines

39-49) as a flexible closure which could be used in the prior art container (claims 2-4); and a

polyolefin and oxygen barrier multi-layer container which could be used in the prior art container

as a design choice (claims 11-13, 36), and which polyolefin would have the tensile modulus

values in the range of 90,000-150,000 psi (claims 20-21).  Goglio and Old Vidkjaer both

inherently teach the valve opening values in claims 5-7.  Old Vidkjaer teaches a one-way valve

that responds when the pressure of the container reaches 3-7 mbar (column 5, lines 1-4), which

means that the valve would also be inherently responsive to pressures of 10 mbar, 20 mbar, and

30 mbar.  Goglio teaches use of the disclosed one-way valve in containers filled with ground

coffee (column 1, lines 7-11), which would inherently be responsive to the pressures described in

claims 5-7.  It would have been obvious to one of ordinary skill in the art to use the materials and

valve values taught by Old Vidkjaer in combination with the Melrose container with the top

closure of Goglio because Old Vidkjaer is also a rigid, gas-impermeable container for food

products that produce off gasses.  Thus, a substantial new question of patentability is raised for

dependent claims 2-7, and 11-13, dependent from independent claim 1; and for dependent claim

36 dependent from independent claim 33.


a.ii.  Melrose v. Goglio + Old Bruke

Old Bruke teaches a multilayered flexible closure comprising outer layers of

polyethylene (which is a polyolefin) and an inner barrier layer of polyvinylidene chloride

(column 4, lines 48-65) (claims 3-4).  It would have been obvious to one of ordinary skill in the

REQUEST for Reexamination of 7,169,418
Issued:  01/30/2007

By Dalton et al.
SN 10/155,338

art to use the foil material disclosed in Old Bruke with the Melrose container with the top closure

of Goglio in order to make an impermeable foil.  Thus, a new question of patentability is raised

for underline{dependent claims 3-4}, dependent from independent claim 1.


### a.iii.  Melrose v. Goglio + Old Haas

Old Haas teaches a container made of high density polyethylene (column 1, lines 39-47)

(claim 36), which is a polyolefin (claims 9, 33), and which has a tensile modulus of 155,000 psi

(*see, e.g.,* Old Marks' Handbook, page 17, line 68, column 3) (claims 20-21).  Old Haas further

discloses a multi-layered container material with an internal (to the container) polyolefin layer

made of high density polyethylene coated by an external oxygen-barrier layer (column 1, line 39

through column 2, line 2) (claims 11-13).  It would have been obvious to one of ordinary skill in

the art to use the materials of Old Haas in combination with the Melrose container with the top

closure of Goglio to package ground coffee because Old Haas teaches these materials as a way to

extend the shelf life of an oxygen-sensitive product (column 1, lines 22-31).  Because the

container of Melrose in view of Goglio and further in view of Old Haas meets all the claimed

structural limitations, the overall aroma values recited in claims 33-36 are inherent.  Thus, a

substantial new question of patentability is raised for underline{independent claim 33}, and for underline{dependent

claims 9, 11-13 and 20-21}, dependent from independent claim 1, and underline{dependent claims 34-36},

dependent from independent claim 33.


### a.iv.  Melrose v. Goglio + Old Encyclopedia

Old Encyclopedia teaches the use of polyolefins for food packaging applications and

applications involving blow molding (page 328, table 20 and page 323) (claims 9, 33, 36); and

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

specifically the use of high density polyethylene, which has a tensile modulus of 60,000-150,000 psi (page 305 and page 328, table 20) (claims 20-21, 36). It would have been obvious to one of ordinary skill in the art to use the high density polyethylene material of Old Encyclopedia in combination with the Melrose container with the top closure of Goglio to package ground coffee because high density polyethylene is a widely used, inexpensive and chemically resistant material and an ordinarily-skilled artisan would have referred to teachings of known plastics in the art such as those in Old Encyclopedia. Because the container of Melrose in view of Goglio and further in view of Old Encyclopedia meets all the structural claimed limitations, the overall aroma values recited in claims 33-36 are inherent. Thus, a substantial new question of patentability is raised for <u>independent claim 33</u>, and for <u>dependent claims 9 and 20-21</u>, dependent from independent claim 1, and <u>dependent claims 34-36</u>, dependent from independent claim 33.

### a.v.  Melrose v. Goglio + Old Goglio

Old Goglio teaches an overcap (lid 6, figures 8-11), for use with the flexible closure of Goglio, having a rib with a height greater than the maximum displacement of the dome, a dome, and a skirt made of PET material (claims 16-18). It would have been obvious to use Old Goglio's overcap in conjunction with Goglio's closure in light of Goglio's specifying such use. Thus, a substantial new question of patentability is raised for <u>dependent claims 16-18</u> dependent from independent claim 1.

### a.vi.  Melrose v. Goglio + Old Goglio + Old Encyclopedia

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

Old Encyclopedia teaches the use of polyolefins including high density polyethylene for food packaging applications and applications involving blow molding (page 328, table 20 and pages 305, 323) (claim 18). It would have been obvious to one of ordinary skill in the art to use the high density polyethylene material of Old Encyclopedia in the overcap of Old Goglio in combination with the Melrose container with the top closure of Goglio to package ground coffee because high density polyethylene is a widely used, inexpensive and chemically resistant material and an ordinarily-skilled artisan would have referred to teachings of known plastics in the art such as those in Old Encyclopedia. Thus, a substantial new question of patentability is raised for <u>dependent claim 18</u>, dependent from independent claim 1.


### a.vii. Melrose v. Goglio + Old Hargraves

Old Hargraves teaches the flushing of a coffee container with an inert gas, including the inert gasses nitrogen and carbon dioxide, and then sealing the container (column 17, lines 59-63) (claims 24-25, 27), which could be used with the prior art container as a design choice. Goglio inherently teaches the valve opening value, as this would be a design choice (claim 29). Melrose teaches an integral handle (column 4, lines 64-67 and column 5, lines 25-39) (claim 30). Thus, a substantial new question of patentability is raised for <u>dependent claims 24-25, 27 and 29-30</u> dependent from independent claim 1.


### a.viii. Melrose v. Goglio + Old Hargraves + Old Goglio

Old Goglio teaches an overcap (lid 6, figures 8-11), for use with the flexible closure of Goglio, having a rib, dome, and skirt (claim 28). Thus, a substantial new question of patentability is raised for <u>dependent claim 28</u> dependent from independent claim 1.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

### b. Newcomb v. Melrose

Neither Newcomb nor Melrose were of record in the file of USP 7,169,418. Newcomb (figures 1-3) teaches a packaging system for ground coffee (column 1, lines 13-18) which could be made of plastic (column 3, lines 15-17) and which includes a container 2 with an interior volume and open top, a protuberance including lip 4 at the top end, a closure 10 which could be laminated paper aluminum foil stock (column 3, lines 16-17), a tensile modulus number in the recited range (inherent as the plastic chosen in a design choice), and a top load capacity in the recited range (inherent and a design choice).

With respect to regions of deflection, Melrose, as noted above, teaches "smooth-surfaced flex panels 22 . . . on the [container] sidewall" that "provide zones of expansion and vacuum absorption" and that are adjacent to and "merge directly into the side edges of" the "vertically elongate columns 24" that "provide structural reinforcement zones" (column 4, lines 1-8 and 28-35, see also Figures 1-4). The flex panels 22 are thus regions of deflection that allow flexion and thereby have less resistance to flexing than the adjacent structural reinforcement columns 24. Melrose (figures 1-2) also teaches a packaging system having a container made of plastic (e.g., PET) with an interior volume, a handle (column 4, lines 64-67 and column 5, lines 25-39), a tensile modulus number between 35 and 650 ksi (Melrose discloses use of PET – column 1, lines 17-18 – which has a tensile modulus of 358-435 ksi), and a top load capacity in the recited range (inherent). Thus, as it would be obvious to include in the Newcomb container a region of deflection to accommodate the pressure changes as well known to be desired in the container art to prevent buckling or the like and a handle for ease of handling particularly for a larger

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

container both as taught by Melrose, such a prior art container would meet all of the limitations of claim 1.

As noted above, once a "region of deflection with less resistance to flexing" was claimed as a critical feature in all of the independent claims, the examiner failed to apply or consider any principal reference for containing coffee or the like to which it would be obvious to add a region of deflection. More importantly, the examiner failed to consider any reference having all of the teachings of Melrose in combination with any reference having all of the teachings of Newcomb, particularly for being adapted to have a region of deflection and for the use of a handle therewith. Therefore, because the combined teachings of Newcomb and Melrose constitute a prior art container not considered by the examiner, a substantial new question of patentability is raised by the combination of Newcomb in view of Melrose for <u>independent claim 1</u>.

As noted above, this combination of Newcomb in view of Melrose also raises the same issue with respect to:

- <u>independent claim 33</u> which has most (but not all) of the same limitations as independent claim 1, the additional limitations being that: i) roast and ground coffee is contained, with ground coffee taught by Newcomb and roasting being a design choice, ii) the use of polyolefin for the container which is also specifically taught in Melrose by the container being made of PET (or other plastics which would be a design choice, see Old Encyclopedia), and iii) an aroma value of the recited range, which is inherent with the design chosen plastic material of the container.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

- <u>independent claim 37</u>, which has most (but not all) of the same limitations as independent claim 1, the additional limitation being that coffee is being contained, which is taught in Newcomb.

- <u>independent claim 44</u>, which has most (but not all) of the same limitations as independent claim 1, the additional limitations being that: i) coffee is being contained, which is taught in Newcomb, and ii) PET as one material of the container, which is specifically taught by Melrose.

- <u>independent claim 50</u>, which has most (but not all) of the same limitations as independent claim 1, the additional limitations being that: i) coffee is being contained, , which is taught in Newcomb, and ii) PET as one material of the container, which is specifically taught by Melrose.

Thus, for the same reasons as for independent claim 1, a substantial new question of patentability for the remaining independent claims is also raised.


As noted above, Newcomb teaches a flexible closure of paper/aluminum foil stock (column 3, lines 16-17) (claims 2-3); the containing of ground coffee which could obviously be roasted as a design choice (claims 22-23); and a top load strength which inherently or as a design choice would be of the recited value (claim 26). Melrose additionally teaches that the material is blow-molded (Title, and column 1, lines 10-18) (claims 8-10); that the handle is integral and parallel to the longitudinal (vertical) axis (column 4, lines 64-67 and column 5, lines 25-39) (claims 14-15); that the region of deflection is responsive to a force (column 2, lines 50-55 and column 4, lines 1-8) (claim 19); that the material PET which could also be PE would inherently have the designated modulus values (claims 20-21); and that a rib parallel to the longitudinal axis

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

and proximate to a region of deflection in the form of a rectangular panel is provided (elements 22 and 24 in figures 1 and 2) (claims 31-32). Thus, a substantial new question of patentability is raised for <u>dependent claims 2-3, 8-10, 14-15, 19-23, 26, 31-32</u> dependent from independent claim 1.

The respective higher coffee aroma values (claims 34-35) are also inherent in Melrose. Thus, a substantial new question of patentability is raised for <u>dependent claims 34-35</u> dependent from independent claim 33.

Melrose teaches the handle is integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 64-67 and column 5, lines 25-39) (claims 38-40) and a PET material (column 1, lines 17-18) (claim 41). Newcomb teaches the use of coffee (column 1, lines 13-18) (recited positively now – claim 42) which is ground and which could obviously be roasted as a design choice (claim 43). Thus, a substantial new question of patentability is raised for <u>dependent claims 38-43</u> dependent from independent claim 37.

Melrose teaches the handle is integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 64-67 and column 5, lines 25-39) (claims 45-47). Newcomb teaches the use of coffee (column 1, lines 13-18) (recited positively now – claim 48) which is ground and which could obviously be roasted as a design choice (claim 49). Thus, a substantial new question of patentability is raised for <u>dependent claims 45-49</u> dependent from independent claim 44.

Melrose teaches the handle is integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 64-67 and column 5, lines 25-39) (claims 51-53). Newcomb teaches the use of coffee (column 1, lines 13-18) (recited positively now – claim 54) which is ground and which could obviously be roasted as a design choice (claim 55). Thus, a

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

substantial new question of patentability is raised for <u>dependent claims 51-55</u> dependent from

independent claim 50.


### b.i.  Newcomb v. Melrose + Old Vidkjaer

Old Vidkjaer teaches the use of a foil-polyolefin-barrier layer laminate (column 2, lines

39-49) as a flexible closure which could be used in the prior art container (claims 2-4); and a

polyolefin and oxygen barrier multi-layer container which could be used in the prior art container

as a design choice (claims 11-13, 36) and which would have tensile modulus numbers in the

recited ranges of claims 20-21.  Newcomb (as well as Vidkjaer) inherently teaches the respective

valve opening values, as these would be mere design choices (claims 5-7).  It would have been

obvious to one of ordinary skill in the art to use the materials, top closure and valve values taught

by Old Vidkjaer in combination with the Newcomb container because Old Vidkjaer is also a

rigid, gas-impermeable container for food products that produce off gasses similar to that of

Newcomb.  Thus, a substantial new question of patentability is raised for <u>dependent claims 2-7,</u>

<u>11-13, and 20-21,</u> dependent from independent claim 1; and for <u>dependent claim 36</u> dependent

from independent claim 33.


### b.ii.  Newcomb v. Melrose + Old Bruke

Old Bruke teaches a multilayered flexible closure comprising outer layers of

polyethylene (which is a polyolefin) and an inner barrier layer of polyvinylidene chloride

(column 4, lines 48-65) (claims 3-4).  It would have been obvious to one of ordinary skill in the

art to use the foil material disclosed in Old Bruke with the Newcomb container made of a plastic

in order to make an impermeable foil in lieu of the old and cumbersome top closure of

REQUEST for Reexamination of 7,169,418          By Dalton et al.
Issued: 01/30/2007                                SN 10/155,338

Newcomb. Thus, a new question of patentability is raised for <u>dependent claims 3-4</u>, dependent from independent claim 1.


b.iii.  Newcomb v. Melrose+ Old Haas

Old Haas teaches a container made of high density polyethylene (column 1, lines 39-47) (claim 36), which is a polyolefin (claims 9, 33), and which has a tensile modulus of 155,000 psi (*see, e.g.,* Old Marks' Handbook , page 17, line 68, column 3) (claims 20-21).  Old Haas further discloses a multi-layered container material with an internal (to the container) polyolefin layer made of high density polyethylene coated by an external oxygen-barrier layer (column 1, line 39 through column 2, line 2) (claims 11-13).  It would have been obvious to one of ordinary skill in the art to use the materials of Old Haas with the Newcomb container including the top closure to package ground coffee because Old Haas teaches these materials as a way to extend the shelf life of an oxygen-sensitive product (column 1, lines 22-31).  Because the container of Newcomb in view of Melrose and further in view of Old Haas meets all the claimed structural limitations, the overall aroma values recited in claims 33-36 are inherent.  Thus, a substantial new question of patentability is raised for <u>independent claim 33</u>, and for <u>dependent claims 9, 11-13 and 20-21</u>, dependent from independent claim 1, and <u>dependent claims 34-36</u>, dependent from independent claim 33.


b.iv.  Newcomb v. Melrose + Old Encyclopedia

Old Encyclopedia teaches the use of polyolefins for food packaging applications and applications involving blow molding (page 328, table 20 and page 323) (claims 9, 33, 36); and specifically the use of high density polyethylene, which has a tensile modulus of 60,000-150,000

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

psi (page 305 and page 328, table 20) (claims 20-21, 36).  It would have been obvious to one of ordinary skill in the art to use the high density polyethylene material of Old Encyclopedia in combination with the Newcomb container and top closure thereof to package the ground coffee because high density polyethylene is a widely used, inexpensive and chemically resistant material and an ordinarily-skilled artisan would have referred to teachings of known plastics in the art such as those in Old Encyclopedia.  Because the container of Newcomb in view of Melrose and further in view of Old Encyclopedia meets all the structural claimed limitations, the overall aroma values recited in claims 33-36 are inherent.  Thus, a substantial new question of patentability is raised for <u>independent claim 33</u>, and for <u>dependent claims 9 and 20-21</u>, dependent from independent claim 1, and <u>dependent claims 34-36</u>, dependent from independent claim 33.


### b.v.  Newcomb v. Melrose + Old Goglio

Old Goglio teaches an overcap (lid 6, figures 8-11), for use after a flexible closure is removed, and thus could be used after the flexible closure of a plastic Newcomb container is removed by a design choice and in view of the common use of overcaps in the coffee art.  This overcap has a rib with a height greater than the maximum displacement of the dome (especially upwards, as there would be a one-way valve to keep the upwards movement to a small amount), a dome, and a skirt made of PET material (claims 16-18).  Thus, a substantial new question of patentability is raised for <u>dependent claims 16-18</u> dependent from independent claim 1.


### b.vi.  Newcomb v. Melrose + Old Goglio + Old Encyclopedia

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

Old Encyclopedia teaches the use of polyolefins including high density polyethylene for food packaging applications and applications involving blow molding (page 328, table 20 and pages 305, 323) (claim 18). It would have been obvious to one of ordinary skill in the art to use the high density polyethylene material of Old Encyclopedia in the overcap of Old Goglio in combination with the Newcomb container and the top closure thereof to package the ground coffee because high density polyethylene is a widely used, inexpensive and chemically resistant material and an ordinarily-skilled artisan would have referred to teachings of known plastics in the art such as those in Old Encyclopedia. Thus, a substantial new question of patentability is raised for <u>dependent claim 18</u>, dependent from independent claim 1.


### b.vii  Newcomb v. Melrose + Old Hargraves

Old Hargraves teaches the flushing of a coffee container with an inert gas, including the inert gasses nitrogen and carbon dioxide, and then sealing the container (column 17, lines 59-63) (claims 24-25, 27), which could be used with the prior art container as a design choice. Newcomb (and Goglio) inherently teaches the valve opening value, as this would be a design choice (claim 29). Melrose teaches an integral handle (column 4, lines 64-67 and column 5, lines 25-39) (claim 30), and such would be an obvious expedient for the Newcomb container if it were made larger to hold more coffee. Thus, a substantial new question of patentability is raised for <u>dependent claims 24-25, 27, 29 and 30</u> dependent from independent claim 1.


### b.viii  Newcomb v. Melrose + Old Hargraves + Old Goglio

Old Goglio teaches an overcap (lid 6, figures 8-11), for use with the flexible closure of Goglio, having a rib with a height greater than the maximum displacement of the dome, a dome,

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

and a skirt made of PET material (claim 28). It would have been obvious to use Old Goglio's

overcap in conjunction with Goglio's closure in light of Goglio's specifying such use. Thus, a

substantial new question of patentability is raised for <u>dependent claim 28</u> dependent from

independent claim 1.


### c. Lane v. Goglio

Neither Lane nor Goglio were of record in the file of USP 7,169,418. With respect to

regions of deflection, Lane teaches "front and rear panels 24 and 26" that "controllably

accommodate . . . pressure reduction by being capable of pulling inward, under the influence of

the reduced pressure" and that adjoin "more rigid column portions 30" (column 5, line 52

through column 6, line 4). The panels 24 and 26 are thus regions of deflection that allow flexion

and thereby have less resistance to flexing than the adjacent more rigid column portions 30.

Lane (figures 1-2) also teaches a packaging system having a container made of PET or other

materials with an interior volume, a handle (column 4, lines 21-29), a tensile modulus between

35 and 650 ksi (Lane discloses use of PET (column 3, lines 38-41), which has a tensile modulus

of 358-435 ksi), and a top load capacity in the recited range (inherent – see column 6, lines 6-

11). Goglio (figure 2) discloses a top closure for a container holding coffee including a one-way

valve (column 2, lines 27-34) on a flexible closure (column 2, lines 28-30) attached to a

protuberance (column 2, lines 27-31) of the open top. Thus, as it would be obvious to use the

container of Lane for coffee, and as Goglio explicitly teaches use of the described top closure to

package ground coffee (column 1, lines 8-11), it would be obvious to use the top closure of

Goglio on the package of Lane and all of the limitations of claim 1 are thus met.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

As noted above, once a "region of deflection" with "less resistance to flexing" was claimed as a critical feature in all of the independent claims, the examiner failed to apply or consider any principal reference having all of the above noted features of Lane. More importantly, the examiner failed to consider any reference having all of the teachings of Goglio in combination with any reference having all of the teachings of Lane. Therefore, the combined teachings of Lane and Goglio constitute a prior art container not considered by the examiner, and a substantial new question of patentability is raised by the combination of Lane in view of Goglio for <u>independent claim 1</u>.

As noted above, this combination of Lane in view of Goglio also raises a substantial new question of patentability with respect to:

- <u>independent claim 33</u> which has most (but not all) of the same limitations as independent claim 1, the additional limitations being that: i) roast and ground coffee is contained, which is taught by Goglio, ii) the use of polyolefin for the container, which is also taught in Lane, and iii) an aroma value of the recited range, which is inherent with such a material.

- <u>independent claim 37</u>, which has most (but not all) of the same limitations as independent claim 1, the additional limitation being that coffee is being contained, which is taught by Goglio.

- <u>independent claim 44</u>, which has most (but not all) of the same limitations as independent claim 1, the additional limitations being: i) that coffee is being contained, which is taught by Goglio, and ii) use of one of a group of materials including polyethylene terephthalate (PET), which is taught by Lane.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

- independent claim 50, which has most (but not all) of the same limitations as independent claim 1, the additional limitations being: i) that coffee is being contained, which is taught by Goglio, and ii) use of one of a group of materials including polyethylene terephthalate (PET), which is taught by Lane.

Thus, for the same reasons as for independent claim 1, a substantial new question of patentability for the remaining independent claims is also raised.

Lane additionally teaches use of blow-molded materials including polyethylene terephthalate (PET) (column 3, lines 27-41) (claims 8-10); that the handle is integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 21-29 and element 28 in Figure 2) (claims 14-15); that the region of deflection is responsive to a force (column 5, line 52 through column 6, line 6) (claim 19); that the material PET which could also be other plastics would inherently have the designated modulus values (claims 20-21); the recited top load strength/capacity (inherent – claim 26); and that a rib parallel to the longitudinal axis and proximate to a region of deflection in the form of a rectangular panel is provided (elements 30, 24 and 26 in Figures 1-3 and column 6, lines 1-11) (claims 31-32). Goglio teaches ground coffee, which could obviously be roasted as a design choice (column 1, lines 8-11) (claims 22-23). Thus, a substantial new question of patentability is raised for dependent claims 8-10, 14-15, 19-23, 26, and 31-32 dependent from independent claim 1.

The respective higher coffee aroma values (claims 34-35) are also inherent in Lane. Thus, a substantial new question of patentability is raised for dependent claims 34-35 dependent from independent claim 33.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

Lane teaches the handle is integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 21-29 and element 28 in Figure 2) (claims 38-40) and a PET material (column 3, lines 38-41) (claim 41). Goglio teaches the use of coffee (recited positively now – claim 42) which is ground (column 1, lines 8-11) and which could obviously be roasted as a design choice (claim 43). Thus, a substantial new question of patentability is raised for dependent claims 38-43 dependent from independent claim 37.

Lane teaches the handle is integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 21-29 and element 28 in Figure 2) (claims 45-47). Goglio teaches the use of coffee (recited positively now – claim 48) which is ground (column 1, lines 8-11) and which could obviously be roasted as a design choice (claim 49). Thus, a substantial new question of patentability is raised for dependent claims 45-49 dependent from independent claim 44.

Lane teaches the handle is integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 21-29 and element 28 in Figure 2) (claims 51-53). Goglio teaches the use of coffee (recited positively now – claim 54) which is ground (column 1, lines 8-11) and which could obviously be roasted as a design choice(claim 55). Thus, a substantial new question of patentability is raised for dependent claims 51-55 dependent from independent claim 50.

c.i.  Lane v. Goglio + Old Vidkjaer

Old Vidkjaer teaches the use of a foil-polyolefin-barrier layer laminate (column 2, lines 39-49) as a flexible closure which could be used in the prior art Lane container (claims 2-4); and a polyolefin and oxygen barrier multi-layer container which could be used in the prior art Lane

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

container (claims 11-13, 36). Goglio and Old Vidkjaer both inherently teach the valve opening values in claims 5-7. Old Vidkjaer teaches a one-way valve that responds when the pressure of the container reaches 3-7 mbar (column 5, lines 1-4), which means that the valve would also be inherently responsive to pressures of 10 mbar, 20 mbar, and 30 mbar. Goglio teaches use of the disclosed one-way valve in containers filled with ground coffee (column 1, lines 7-11), which would inherently be responsive to the pressures described in claims 5-7. It would have been obvious to one of ordinary skill in the art to use the materials and valve values taught by Old Vidkjaer in combination with the Lane container with the top closure of Goglio because Old Vidkjaer is also a rigid, gas-impermeable container for food products that produce off gasses. Thus, a substantial new question of patentability is raised for <u>dependent claims 2-7, and 11-13</u>, dependent from independent claim 1; and for <u>dependent claim 36</u> dependent from independent claim 33.

### c.ii.  Lane v. Goglio + Old Bruke

Old Bruke teaches a multilayered flexible closure comprising outer layers of polyethylene (which is a polyolefin) and an inner barrier layer of polyvinylidene chloride (column 4, lines 48-65) (claims 3-4). It would have been obvious to one of ordinary skill in the art to use the foil material disclosed in Old Bruke with the Lane container with the top closure of Goglio in order to make an impermeable foil. Thus, a new question of patentability is raised for <u>dependent claims 3-4</u>, dependent from independent claim 1.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

c.iii.  Lane v. Goglio + Old Haas

Old Haas teaches a container made of high density polyethylene (column 1, lines 39-47)

(claim 36), which is a polyolefin (claims 9, 33), and which has a tensile modulus of 155,000 psi

(see, e.g., Old Mark's Handbook , page 17, line 68, column 3) (claims 20-21).  Old Haas further

discloses a multi-layered container material with an internal (to the container) polyolefin layer

made of high density polyethylene coated by an external oxygen-barrier layer (column 1, line 39

through column 2, line 2) (claims 11-13).  It would have been obvious to one of ordinary skill in

the art to use the materials of Old Haas in combination with the Lane container with the top

closure of Goglio to package ground coffee because Old Haas teaches these materials as a way to

extend the shelf life of an oxygen-sensitive product (column 1, lines 22-31).  Because the

container of Lane in view of Goglio and further in view of Old Haas meets all the claimed

structural limitations, the overall aroma values recited in claims 33-36 are inherent.  Thus, a

substantial new question of patentability is raised for <u>independent claim 33</u>, and for <u>dependent</u>

<u>claims 9, 11-13 and 20-21</u>, dependent from independent claim 1, and <u>dependent claims 34-36</u>,

dependent from independent claim 33.


c.iv.  Lane v. Goglio + Old Encyclopedia

Old Encyclopedia teaches the use of polyolefins for food packaging applications and

applications involving blow molding (page 328, table 20 and page 323) (claims 9, 33); and

specifically the use of high density polyethylene, which has a tensile modulus of 60,000-150,000

psi (page 305 and page 328, table 20) (claims 20-21, 36).  It would have been obvious to one of

ordinary skill in the art to use the high density polyethylene material of Old Encyclopedia in

combination with the Lane container with the top closure of Goglio to package ground coffee

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

because high density polyethylene is a widely used, inexpensive and chemically resistant material and an ordinarily-skilled artisan would have referred to teachings of known plastics in the art such as those in Old Encyclopedia. Because the container of Lane in view of Goglio and further in view of Old Encyclopedia meets all the structural claimed limitations, the overall aroma values recited in claims 33-36 are inherent. Thus, a substantial new question of patentability is raised for <u>independent claim 33</u>, and for <u>dependent claims 9 and 20-21</u>, dependent from independent claim 1, and <u>dependent claims 34-36</u>, dependent from independent claim 33.

### c.v.  Lane v. Goglio + Old Goglio

Old Goglio teaches an overcap (lid 6, figures 8-11), for use with the flexible closure of Goglio, having a rib with a height greater than the maximum displacement of the dome, a dome, and a skirt and made of PET material (claims 16-18). It would have been obvious to use Old Goglio's overcap in conjunction with Goglio's closure in light of Goglio specifying such use. Thus, a substantial new question of patentability is raised for <u>dependent claims 16-18</u>, dependent from independent claim 1.

### c.vi.  Lane v. Goglio + Old Goglio + Old Encyclopedia

Old Encyclopedia teaches the use of polyolefins including high density polyethylene for food packaging applications and applications involving blow molding (page 328, table 20 and pages 305, 323) (claim 18). It would have been obvious to one of ordinary skill in the art to use the high density polyethylene material of Old Encyclopedia in the overcap of Old Goglio in combination with the Lane container with the top closure of Goglio to package ground coffee

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

because high density polyethylene is a widely used, inexpensive and chemically resistant

material and an ordinarily-skilled artisan would have referred to teachings of known plastics in

the art such as those in Old Encyclopedia. Thus, a substantial new question of patentability is

raised for <u>dependent claim 18</u>, dependent from independent claim 1.


### c.vii.  Lane v. Goglio + Old Hargraves

Old Hargraves teaches the flushing of a coffee container with an inert gas, including the

inert gasses nitrogen and carbon dioxide, and then sealing the container (column 17, lines 59-63)

(claims 24-25, 27), which could be used with the prior art container as a design choice. Goglio

inherently teaches the valve opening value, as this would be a design choice (claim 29). Lane

has an integral handle (column 4, lines 21-29 and element 28 in Figure 2) (claim 30). Thus, a

substantial new question of patentability is raised for <u>dependent claims 24-25, 27 and 29-30,</u>

dependent from independent claim 1.


### c.viii.  Lane v. Goglio + Old Hargraves + Old Goglio

Old Goglio teaches an overcap (lid 6, figures 8-11), for use with the flexible closure of

Goglio, having a rib, dome, and skirt (claim 28). Thus, a substantial new question of

patentability is raised for <u>dependent claim 28</u>, dependent from independent claim 1.


### d.  Hargraves v. Goglio

Hargraves was of record in the file USP 7,169,418 – though as noted above, its teaching

of a region of deflection having less resistance to flexing than the body proximate to the region

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

of deflection was not considered after that element was added to all of the independent claims. Goglio was not of record in the file of USP 7,169,418. Hargraves (figures 1-2) teaches a packaging system for roast and ground coffee (column 1, lines 9-18), having a container made of PET (column 16, lines 45-46) or other materials, with an interior volume, a region of deflection (column 2, lines 33-39 and element 339 in Figures 1 and 4, which allows flexion and has less resistance to flexing than proximate elements 334), a handle (column 16, lines 51-53), a tensile modulus number between 35 and 650 ksi (Hargraves discloses use of PET, which has a tensile modulus in the claimed range), and a top load capacity in the recited range (inherent – see column 15, lines 29-30). Goglio (figure 2) discloses a top closure for a container holding coffee including a one-way valve (element 4, column 2, lines 27-34) on a flexible closure (element 2, column 2, lines 28-30) attached to a protuberance (column 2, lines 27-31) of the open top. Thus, as the container of Hargraves is used for coffee, it would be obvious to use a top closure like that of Goglio in combination with Hargraves especially if a larger container with a scoopable top opening was desired and all of the limitations of claim 1 are thus met.

As noted above, once a "region of deflection" with "less resistance to flexing" was claimed as a critical feature in all of the independent claims, the examiner failed to apply or consider any principal reference having all of the above noted features of Hargraves. More importantly, the examiner failed to consider any reference having all of the teachings of Goglio in combination with any reference having all of the teachings of Hargraves. Therefore, the combined teachings of Hargraves and Goglio constitute a prior art container not considered by the examiner, and a substantial new question of patentability is raised by the combination of Hargraves in view of Goglio for <u>independent claim 1</u>.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

As noted above, this combination of Hargraves in view of Goglio also raises a substantial new question of patentability with respect to:

- independent claim 33 which has most (but not all) of the same limitations as independent claim 1, the additional limitations being that: i) roast and ground coffee is contained, which is taught by Hargraves, ii) the use of polyolefin for the container, which is also taught in Hargraves, and iii) an aroma value of the recited range which is inherent with such a material and the aroma retention thereof is noted in Hargraves.

- independent claim 37, which has most (but not all) of the same limitations as independent claim 1, the additional limitation being that coffee is being contained which is disclosed in Hargraves and Goglio.

- independent claim 44, which has most (but not all) of the same limitations as independent claim 1, the additional limitations being: i) that coffee is being contained, which is taught by Hargraves and Goglio, and ii) use of one of a group of materials including polyethylene terephthalate (PET), which is taught by Hargraves.

- independent claim 50, which has most (but not all) of the same limitations as independent claim 1, the additional limitations being: i) that coffee is being contained, which is taught by Goglio, and ii) use of one of a group of materials including polyethylene terephthalate (PET), which is taught by Hargraves.

Thus, for the same reasons as for independent claim 1, a substantial new question of patentability for the remaining independent claims is also raised.

Hargraves additionally teaches use of blow-molded polyethylene terephthalate (PET) (column 16, lines 45-46) (claims 8-10); that the handle is integral (claim 14); that the region of

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

deflection is responsive to a force (column 2, lines 33-37) (claim 19); that the coffee contained is roast and ground (column 5, lines 53-55) (claims 22-23); that the coffee is flushed with an inert gas such as nitrogen prior to sealing (column 17, lines 59-63) (claims 24-25 and 27); the recited top load strength/capacity (inherent – claim 26); and that the handle (bead 304) is integral (claim 30). Thus, a substantial new question of patentability is raised for <u>dependent claims 8-10, 14, 19, 22-27, and 30</u>, dependent from independent claim 1.

The respective higher coffee aroma values (claims 34-35) are also inherent in Hargraves. Thus, a substantial new question of patentability is raised for <u>dependent claims 34-35</u>, dependent from independent claim 33.

Hargraves teaches the handle is integral (claims 38-39) and use of polyethylene terephthalate (PET) (column 16, lines 45-46) (claim 41). Goglio teaches the use of coffee (recited positively now – claim 42) which is ground (column 1, lines 8-11) and which could obviously be roasted as a design choice (claim 43). Thus, a substantial new question of patentability is raised for <u>dependent claims 38-39 and 41-43</u>, dependent from independent claim 37.

Hargraves teaches the handle is integral (claims 45-46) and the use of roast and ground coffee (column 5, lines 53-57) (claims 48-49). Thus, a substantial new question of patentability is raised for <u>dependent claims 45-46 and 48-49</u>, dependent from independent claim 44.

Hargraves teaches the handle is integral (claims 51-52) and the use of roast and ground coffee (column 5, lines 53-57) (claims 54-55). Thus, a substantial new question of patentability is raised for <u>dependent claims 51-52 and 54-55</u>, dependent from independent claim 50.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

### d.i.  Hargraves v. Goglio + Old Vidkjaer

Old Vidkjaer teaches the use of a foil-polyolefin-barrier layer laminate (column 2, lines 39-49) as a flexible closure which could be used in the prior art container (claims 2-4); and a polyolefin and oxygen barrier multi-layer container which could be used in the prior art container (claims 11-13, 36), and which polyolefin would have the tensile modulus values in the range of 90,000-150,000 psi (claims 20-21).  Goglio and Old Vidkjaer both inherently teach the valve opening values in claims 5-7 and 29.  Old Vidkjaer teaches a one-way valve that responds when the pressure of the container reaches 3-7 mbar (column 5, lines 1-4), which means that the valve would also be inherently responsive to pressures of 10 mbar, 20 mbar, and 30 mbar.  Goglio teaches use of the disclosed one-way valve in containers filled with ground coffee (column 1, lines 7-11), which would inherently be responsive to the pressures described in claims 5-7 and 29.  Old Vidkjaer teaches a rib parallel to the longitudinal axis and proximate to a region of deflection in the form of a rectangular panel (Figure 1, structural elements 3 and the adjacent rectangular panels) (claims 31-32).  It would have been obvious to one of ordinary skill in the art to use the materials and valve values taught by Old Vidkjaer in combination with the Melrose container with the top closure of Goglio because Old Vidkjaer is also a rigid, gas-impermeable container for food products that produce off gasses.  Thus, a substantial new question of patentability is raised for <u>dependent claims 2-7, 11-13, 20-21, 29 and 31-32</u>, dependent from independent claim 1; and for <u>dependent claim 36</u>, dependent from independent claim 33.

### d.ii.  Hargraves v. Goglio + Old Haas

Old Haas teaches a container made of high density polyethylene (column 1, lines 39-47) (claim 36), which is a polyolefin (claim 33).  It would have been obvious to one of ordinary skill

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

in the art to use the materials of Old Haas in combination with the Hargraves container with the top closure of Goglio to package ground coffee because Old Haas teaches these materials as a way to extend the shelf life of an oxygen-sensitive product (column 1, lines 22-31). Because the container of Hargraves in view of Goglio and further in view of Old Haas meets all the claimed structural limitations, the overall aroma values recited in claims 33-36 are inherent. Thus, a substantial new question of patentability is raised for <u>independent claim 33</u>, and for <u>dependent claims 34-36</u>, dependent from independent claim 33.

### d.iii.  Hargraves v. Goglio + Old Encyclopedia

Old Encyclopedia teaches the use of polyolefins for food packaging applications and applications involving blow molding (page 328, table 20 and page 323) (claims 33) and specifically the use of high density polyethylene (claim 36). It would have been obvious to one of ordinary skill in the art to use the high density polyethylene material of Old Encyclopedia in combination with the Hargraves container with the top closure of Goglio to package ground coffee because high density polyethylene is a widely used, inexpensive and chemically resistant material and an ordinarily-skilled artisan would have referred to teachings of known plastics in the art such as those in Old Encyclopedia. Because the container of Hargraves in view of Goglio and further in view of Old Encyclopedia meets all the structural claimed limitations, the overall aroma values recited in claims 33-36 are inherent. Thus, a substantial new question of patentability is raised for <u>independent claim 33</u>, and for <u>dependent claims 34-36</u>, dependent from independent claim 33.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

d.iv.  Hargraves v. Goglio + Melrose

Melrose teaches a handle parallel to the longitudinal (vertical) axis of the container

(claims 15, 40, 47, 53) which could be used with the container of Hargraves especially if the

Hargraves container is made larger to hold more.  Thus, a substantial new question of

patentability is raised for:  dependent claim 15, dependent from independent claim 1; dependent

claim 40, dependent from independent claim 33; dependent claim 47, dependent from

independent claim 37; and dependent claim 53, dependent from independent claim 50.


d.v.  Hargraves v. Goglio + Old Goglio

Old Goglio teaches an overcap (lid 6, figures 8-11), for use with the flexible closure of

Goglio, having a rib with a height greater than the maximum displacement of the dome, a dome,

and a skirt and made of PET material (claims 16-18, 28).  It would have been obvious to use Old

Goglio's overcap in conjunction with Goglio's closure in light of Goglio specifying such use.

Thus, a substantial new question of patentability is raised for dependent claims 16-18 and 28

dependent from independent claim 1.


d.vi.  Hargraves v. Goglio + Old Ota

Old Ota teaches a plastic container with a handle disposed on the body integral with the

body and substantially parallel to the longitudinal (vertical) axis of the container (Figures 1-5,

column 2, lines 35-56 and column 3, lines 13-16 and 29-38) (claims **1**, 8, 10, 14-15, 19, 22-27,

30, **37**-43, **44**-49, **50**-55).  It would have been obvious to one of ordinary skill in the art to put a

handle as taught by Ota on the container disclosed by Hargraves since both are directed to

containers for food and since the handle of Ota aids in holding the container without deforming

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

the container (see Ota, column 1, lines 36-68 and column 2, lines 1-2). Thus, a substantial new question of patentability is raised for: <u>independent claims 1, 37, 44 and 50</u>, and for <u>dependent claims 8, 10, 14-15, 19, 22-27, and 30</u>, dependent from independent claim 1, <u>dependent claims 38-43</u>, dependent from independent claim 37, <u>dependent claims 45-49</u>, dependent from independent claim 44, and <u>dependent claims 51-55</u>, dependent from independent claim 50.

### d.vii.  Hargraves v. Goglio + Old Ota + Old Vidkjaer

Old Vidkjaer teaches the use of a foil-polyolefin-barrier layer laminate (column 2, lines 39-49) as a flexible closure (claim 2), and a rib parallel to the longitudinal axis and proximate to a region of deflection in the form of a rectangular panel (Figure 1, structural elements 3 and the adjacent rectangular panels) (claims 31-32).  Goglio and Old Vidkjaer both inherently teach the valve opening values in claims 5-7 and 29.  Old Vidkjaer teaches a one-way valve that responds when the pressure of the container reaches 3-7 mbar (column 5, lines 1-4), which means that the valve would also be inherently responsive to pressures of 10 mbar, 20 mbar, and 30 mbar. Goglio teaches use of the disclosed one-way valve in containers filled with ground coffee (column 1, lines 7-11), which would inherently be responsive to the pressures described in claims 5-7 and 29.  It would have been obvious to one of ordinary skill in the art to use the materials and valve values taught by Old Vidkjaer in combination with the Hargraves container with the top closure of Goglio because Old Vidkjaer is also a rigid, gas-impermeable container for food products that produce off gasses.  Thus, a substantial new question of patentability is raised for <u>dependent claims 2, 5-7, 29 and 31-32</u>, dependent from independent claim 1.

### d.viii.  Hargraves v. Goglio + Old Ota + Old Bruke

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

Old Bruke teaches a multilayered flexible closure comprising outer layers of polyethylene (which is a polyolefin) and an inner barrier layer of polyvinylidene chloride (column 4, lines 48-65) (claims 3-4). It would have been obvious to one of ordinary skill in the art to use the foil material disclosed in Old Bruke with the Hargraves container with the top closure of Goglio in order to make an impermeable foil. Thus, a new question of patentability is raised for <u>dependent claims 3-4</u>, dependent from independent claim 1.

### d.ix.  Hargraves v. Goglio + Old Ota + Old Haas

Old Haas teaches a container made of high density polyethylene (column 1, lines 39-47), which is a polyolefin (claim 9), and which has a tensile modulus of 155,000 psi (*see, e.g.,* Old Mark's Handbook , page 17, line 68, column 3) (claims 20-21). Old Haas further discloses a multi-layered container material with an internal (to the container) polyolefin layer made of high density polyethylene coated by an external oxygen-barrier layer (column 1, line 39 through column 2, line 2) (claims 11-13). It would have been obvious to one of ordinary skill in the art to use the materials of Old Haas in combination with the Hargraves container with the top closure of Goglio to package ground coffee because Old Haas teaches these materials as a way to extend the shelf life of an oxygen-sensitive product (column 1, lines 22-31). Thus, a substantial new question of patentability is raised for <u>dependent claims 9, 11-13 and 20-21</u>, dependent from independent claim 1.

### d.x.  Hargraves v. Goglio + Old Ota + Old Encyclopedia

Old Encyclopedia teaches the use of polyolefins for food packaging applications and applications involving blow molding (page 328, table 20 and page 323) (claim 9); and

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

specifically the use of high density polyethylene, which has a tensile modulus of 60,000-150,000

psi (page 305 and page 328, table 20) (claims 20-21). It would have been obvious to one of

ordinary skill in the art to use the high density polyethylene material of Old Encyclopedia in

combination with the Hargraves container with the top closure of Goglio to package ground

coffee because high density polyethylene is a widely used, inexpensive and chemically resistant

material and an ordinarily-skilled artisan would have referred to teachings of known plastics in

the art such as those in Old Encyclopedia. Thus, a substantial new question of patentability is

raised for <u>dependent claims 9 and 20-21</u>, dependent from independent claim 1.


### d.xi. Hargraves v. Goglio + Old Ota + Old Goglio

Old Goglio teaches an overcap (lid 6, figures 8-11), for use with the flexible closure of

Goglio, having a rib with a height greater than the maximum displacement of the dome, a dome,

and a skirt (claims 16-17, 28). It would have been obvious to use Old Goglio's overcap in

conjunction with Goglio's closure in light of Goglio specifying such use. Thus, a substantial

new question of patentability is raised for <u>dependent claims 16-17 and 28</u>, dependent from

independent claim 1.


### d.xii. Hargraves v. Goglio + Old Ota + Old Goglio + Old Encyclopedia

Old Encyclopedia teaches the use of polyolefins including high density polyethylene for

food packaging applications and applications involving blow molding (page 328, table 20 and

pages 305, 323) (claim 18). It would have been obvious to one of ordinary skill in the art to use

the high density polyethylene material of Old Encyclopedia in the overcap of Old Goglio in

combination with the Hargraves container with the top closure of Goglio to package ground

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

coffee because high density polyethylene is a widely used, inexpensive and chemically resistant material and an ordinarily-skilled artisan would have referred to teachings of known plastics in the art such as those in Old Encyclopedia. Thus, a substantial new question of patentability is raised for <u>dependent claim 18</u>, dependent from independent claim 1.


### e. Vidkjaer v. Melrose

Vidkjaer was of record in the file USP 7,169,418 – though as noted above, the examiner considered only whether the support ribs (element 3) of Old Vidkjaer are regions of deflection, and failed to notice that the panels between and adjacent to the support ribs are regions of deflection that allow flexion and have less resistance to flexing than the proximate ribs. Melrose was not of record in the file of USP 7,169,418.

With respect to regions of deflection, the panels located between the support ribs of the Old Vidkjaer container are regions of deflection that allow flexion and have less resistance to flexing than the ribs, which are the part of the body of the container proximate to the panels. Old Vidjaer describes the ribs (3) as "reinforcement ribs (3), permitting therefore to reduce further the thickness of the used material." (column 4, lines 58-60). One of ordinary skill in the art would understand that these ribs reinforce the structure by having more resistance to flexing than the proximate panels, and that the panels are therefore regions of deflection. Indeed, other prior art specifically taught that panels adjacent to ribs allow flexion to accommodate pressure changes. Old Darr, USP 5,690,244, taught a cylindrical container as follows:

> The side wall of the container has at least three vertically spaced horizontal ribs of an annular shape extending around the extent thereof and also has at least twelve vertical ribs spaced circumferentially and extending between the horizontal ribs

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

thereof to cooperate therewith to <u>define at least twelve generally rectangular panels</u> spaced around the container between each adjacent pair of horizontal ribs, and the <u>rectangular panels being capable of flexing inwardly</u> to accommodate shrinkage upon cooling after hot filling of the container.  [See column 1, line 62 to column 2, line 4 – emphasis added.]

That such regions of deflection are well known in the art is further evidenced by

Alberghini, USP 5,060453:

The paneling of a sealed container due to a cooling of the product within the container often makes the container appear misshapened, . . . [column 1, lines 48-50]

To diminish this consumer resistance to paneled containers, and to provide enhanced side wall symmetry so as to permit stacking, some containers have been designed to incorporate special features called <u>vacuum deflection panels</u> intended to be displaced inwardly in response to product shrinkage and cooling.  [Column 1, line 66 to column 2, line 3, emphasis added]

Generally, the side structure has consisted of inwardly indented panels <u>adapted to flex still further inwardly</u> into the container to offset the decrease in volume due to the cooling of the liquid product as well as the cooling of the gas within the head space.  [Column 2, lines 22-27, emphasis added]

Vidkjaer (figures 1-4) teaches a packaging system for dough or other products which give off gas and which is made of PET or any of various other plastics and laminates (column 2, lines 33-38); and which includes a container 2 with an interior volume and open top, rectangular regions of deflection (between reinforcement ribs 3), a protuberance or flange 6 at the open top end, a foil laminate flexible closure 7 (column 2, lines 40-49), a tensile modulus number in the recited range (inherent), a top load capacity in the recited range (inherent), and a one-way valve 8 in the flexible closure.  Melrose, as noted above has a handle (column 4, lines 64-67 and column 5, lines 25-39).  Thus, as it would be obvious to include a handle as taught by Melrose on the Vidkjaer container, especially if the container were made larger and more vertical to hold more coffee, all of the limitations of claim 1 are met.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

As noted above, the examiner failed to consider whether Old Vidkjaer's panels are regions of deflection. Additionally, the examiner failed to consider any reference having all of the teachings of Vidkjaer in combination with any reference having all of the teachings of Melorse, particularly for being adapted to have a region of deflection and for the use of a handle therewith. Therefore, because the combined teachings of Vidkjaer and Melrose constitute a prior art container not considered by the examiner, a substantial new question of patentability is raised by the combination of Vidkjaer in view of Melrose for <u>independent claim 1</u>.

As noted above, Vidkjaer teaches a foil-polyolefin-barrier layer laminate flexible closure (column 2, lines 39-49) (claims 2-4); the respective valve opening values recited in claims 5-7 (Vidkjaer teaches a one-way valve that responds when the pressure of the container reaches 3-7 mbar (column 5, lines 1-4)); blow-moldable materials, including polypropylene, which can be multi-layered (column 2, lines 32-38) (claims 8-13); a region of deflection (inherently) responsive to a force (claim 19); the material PET which could also be PE would inherently have the designated modulus values (claims 20-21); a top load strength of the recited value (inherent – claim 26); and a rib parallel to the longitudinal axis and proximate to a region of deflection in the form of a rectangular panel (Figure 1, structural elements 3 and the adjacent rectangular panels) (claims 31-32). Melrose additionally teaches a handle integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 64-67 and column 5, lines 25-39) (claims 14-15). Thus, a substantial new question of patentability is raised for <u>dependent claims 2-15, 19-21, 26 and 31-32</u> dependent from independent claim 1.

e.i.  Vidkjaer v. Melrose + Old Bruke

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

Old Bruke teaches a multilayered flexible closure comprising outer layers of polyethylene (which is a polyolefin) and an inner barrier layer of polyvinylidene chloride (column 4, lines 48-65) (claims 3-4).  It would have been obvious to one of ordinary skill in the art to use the foil material disclosed in Old Bruke with the Vidkjaer container in order to make an impermeable foil.  Thus, a new question of patentability is raised for <u>dependent claims 3-4</u>, dependent from independent claim 1.


### e.ii.  Vidkjaer v. Melrose + Old Haas

Old Haas teaches a container made of high density polyethylene, which has a tensile modulus of 155,000 psi (*see, e.g.,* Old Mark's Handbook , page 17, line 68, column 3) (claims 20-21).  Old Haas further discloses a multi-layered container material with an internal (to the container) polyolefin layer made of high density polyethylene coated by an external oxygen-barrier layer (column 1, line 39 through column 2, line 2) (claims 11-13).  It would have been obvious to one of ordinary skill in the art to use the materials of Old Haas in combination with the Vidkjaer and Melrose containers to package ground coffee because Old Haas teaches these materials as a way to extend the shelf life of an oxygen-sensitive product (column 1, lines 22-31).  Thus, a substantial new question of patentability is raised for <u>dependent claims 11-13 and 20-21</u>, dependent from independent claim 1.


### e.iii.  Vidkjaer v. Melrose + Old Encyclopedia

Old Encyclopedia teaches the use of high density polyethylene, which has a tensile modulus of 60,000-150,000 psi (page 305 and page 328, table 20), for food packaging applications and applications involving blow molding (page 328, table 20 and page 323) (claims

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

20-21).  It would have been obvious to one of ordinary skill in the art to use the high density

polyethylene material of Old Encyclopedia in combination with the Vidkjaer and Melrose

containers to package ground coffee because high density polyethylene is a widely used,

inexpensive and chemically resistant material and an ordinarily-skilled artisan would have

referred to teachings of known plastics in the art such as those in Old Encyclopedia.  Thus, a

substantial new question of patentability is raised for <u>dependent claims 20-21</u>, dependent from

independent claim 1.


### e.iv.  Vidkjaer v. Melrose + Old Goglio

Old Goglio teaches an overcap (lid 6, figures 8-11) for use with a flexible closure, having

a rib with a height greater than the maximum displacement of the dome, a dome, and a skirt, and

made of PET material (claims 16-18).  It would have been obvious to use such an overcap with

the wide mouth of the Vidkjaer container.  Thus, a substantial new question of patentability is

raised for <u>dependent claims 16-18</u> dependent from independent claim 1.


### e.v.  Vidkjaer v. Melrose + Old Goglio + Old Encyclopedia

Old Encyclopedia teaches the use of polyolefins including high density polyethylene for

food packaging applications and applications involving blow molding (page 328, table 20 and

pages 305, 323) (claim 18).  It would have been obvious to one of ordinary skill in the art to use

the high density polyethylene material of Old Encyclopedia in the overcap of Old Goglio in

combination with the Vidkjaer and Melrose containers to package ground coffee because high

density polyethylene is a widely used, inexpensive and chemically resistant material and an

ordinarily-skilled artisan would have referred to teachings of known plastics in the art such as

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

those in Old Encyclopedia.  Thus, a substantial new question of patentability is raised for

dependent claim 18, dependent from independent claim 1.


e.vi.  Vidkjaer v. Melrose + Old Hargraves

Old Hargraves teaches containing roast and ground coffee, the flushing the coffee with an

inert gas such as nitrogen, and then sealing the container with a flexible closure (column 17, lines

59-63) (claims 22-25, 27), all of which would have been obvious to do with the Vidkjaer

container as a design choice and especially if coffee were container in the Vidkjaer container.

Vidkjaer inherently teaches the valve opening value in claim 29, as it teaches a one-way valve

that responds when the pressure of the container reaches 3-7 mbar (column 5, lines 1-4), which

means that the valve would also be inherently responsive to pressures of 10 mbar.  Melrose has

an integral handle (column 4, lines 64-67 and column 5, lines 25-39) (claim 30).  Thus, a

substantial new question of patentability is raised for dependent claims 22-25, 27 and 29-30

dependent from independent claim 1.

Independent claim 33 has most (but not all) of the same limitations as independent claim

1, the additional limitations being that:  i) roast and ground coffee is contained, which is taught

by Old Hargraves, ii) the use of polyolefin for the container, which is taught in Vidkjaer, and iii)

an aroma value of the recited range, which is inherent with such a material.  The respective

higher aroma values (dependent claims 34-35) are also inherent with such material; and Vidkjaer

discloses the use of polyethylene and polypropylene (column 2, lines 32-38) (dependent claim

36).  Thus, a substantial new question of patentability is raised for independent claim 33 as well

as for claims 34-36 dependent therefrom.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

Independent claim 37 has most (but not all) of the same limitations as independent claim 1, the additional limitation being that coffee is contained, which is taught in Old Hargraves. Old Hargraves further discloses that the coffee can be roast and ground (column 5, lines 53-57) (dependent claims 42-43). Vidkjaer teaches use of polyethylene, polyethylene terephthalate (PET) and polypropylene (column 2, lines 32-38) (dependent claim 41). Melrose teaches a handle integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 64-67 and column 5, lines 25-39) (claims 38-40). Thus, a substantial new question of patentability is raised for independent claim 37 as well as for claims 38-43 dependent therefrom.

Independent claim 44, has most (but not all) of the same limitations as independent claim 1, the additional limitations being that: i) coffee is being contained, which Old Hargraves teaches, and ii) use of one of a group of materials including polyethylene terephthalate (PET), which Vidkjaer teaches. Melrose teaches a handle integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 64-67 and column 5, lines 25-39) (dependent claims 45-47). Old Hargraves teaches the use of coffee (recited positively now – claim 48) which is roasted and ground (column 5, lines 53-57) (claim 49). Thus, a substantial new question of patentability is raised for independent claim 44 as well as for claims 45-49 dependent therefrom.

Independent claim 50, has most (but not all) of the same limitations as independent claim 1, the additional limitations being that: i) coffee is being contained, which Old Hargraves teaches, and ii) use of one of a group of materials including polyethylene terephthalate (PET), which Vidkjaer teaches. Melrose teaches a handle integral with the body and parallel to the longitudinal (vertical) axis of the container (column 4, lines 64-67 and column 5, lines 25-39)

REQUEST for Reexamination of 7,169,418                    By Dalton et al.
Issued: 01/30/2007                                          SN 10/155,338

(claims 51-53). Old Hargraves teaches the use of coffee (recited positively now – claim 54)

which is ground and roasted (claim 55). Thus, a substantial new question of patentability is

raised for <u>independent claim 50</u> as well as <u>for claims 51-55</u> dependent therefrom.


<u>e.vii. Vidkjaer v. Melrose + Old Hargraves + Old Goglio</u>

Old Goglio teaches an overcap (lid 6, figures 8-11) for use with a flexible closure, having

a rib, dome, and skirt (claim 28). It would have been obvious to use such an overcap with the

wide mouth of the Vidkjaer container. Thus, a substantial new question of patentability is raised

for <u>dependent claim 28</u> dependent from independent claim 1.


<u>Note on Interpretations of Claim Language.</u>

The flexible closure is attached to a protuberance, which is depicted as element 17 in the

figures of USP 7,169,418 (no other such protuberance to which the flexible closure is attached is

depicted). The term "external" thus applies to this protuberance 17, and as the protuberance is

inwardly directed relative to the longitudinal axis of the container, the term "external" must be

used in the sense that the protuberance is located outwardly or externally of the container

volume, where the flexible closure can be used to seal the container volume. This interpretation

of external is thus used hereafter.


<u>Note on Detailed Explanation.</u>

A.  As there are five separate combinations alleged to show obviousness of each of the claims, and alternative and/or additional combinations for four basic combinations of references, for convenience, each of the combinations will be discussed after the recitation of the claim limitation.

B.  As there are five independent claims with many limitations which are the same in all or most of the independent claims, the explanation of the teaching of such a limitation once made in one independent claim will, for simplicity, be referred to in a subsequent independent claim only by reference to the limitation discussion in the previous claim.  For that purpose, each of the limitations in the claims is referenced by the number of the claim and then by a further number as evident hereafter.  Similarly, dependent claims which have similar recitations to previously discussed dependent claims will also be referenced to that previous dependent claim.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

## DETAILED EXPLANATION UNDER 37 CFR 1.915(b)

### Knowledge of those of Ordinary Skill.

Before discussing the detailed art rejections, some of the knowledge of those of ordinary skill at the time of the filing of the USP 7,169,418 should be considered. For example, as shown by Platte, it has been well known in the art since 1973 that there is a trade off in a blow molded container between the wall thickness needed for strength and the costs of the material associated with the wall thickness chosen. See column 1, lines 13-30, reproduced as relevant below.

> In the blow molding of plastic bottles and jugs, one of the significant cost factors is the amount of resin that is required to provide a bottle or jug of sufficient strength .... It is conventional practice for operators of blow molding machinery to select a wall thickness for the extruded parison which will produce a finished product having the desired physical properties. By reducing the wall thickness of the extruded parison, a savings in cost of the raw material will be realized, .... It is essential that he select a wall thickness for the parison which will assure a finished product having a wall that is sufficient in structure to enable the bottle or jug to perform satisfactorily.

As also shown by Platte, the use of regions of deflection or collapse panels to accommodate changes in pressure, with adjacent reinforcement ribs, especially where thin walled containers are desired, are also old in the art. See column 2, line 44 to column 3, line 7, reproduced as relevant below.

> The container ... is also constructed so that the wall-panels are connected at their edges by flat corner-panels .... A rib also is provided in the side wall portion of the container which circumscribes the container in a region below the handle and serves to rigidify the side wall-panels in a circumferential direction while acting as a hinge to allow limited inward collapsing of the container along selected regions. The rib is an inwardly rounded groove which has relatively greater depth in the side wall-panels than in the corner-panels to encourage inward collapsing in the wall-panels rather than in the corner-panels when the container is subject to a partial vacuum. ... When partial vacuum conditions do occur in the container the wall-panels bow inwardly without harmful collapsing or inward buckling in other localized regions of the container. In effect, the structural features of the container

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

are such that the stresses are dispersed in the walls so as to prevent such stresses from being concentrated in any local region.

It has also been long known in the coffee art to use tear off foil closures, and later with one-way valves on a plastic coffee container to maintain freshness during shipping, and after removal of the foil closure to close the coffee container with an overcap. See: "Main coffee packaging concern: freshness", Tea & Coffee Trade Journal; Author: Fader, Liz, 8/1/1989, reproduced as relevant below.

> New to Cameron Coffee's already innovative use of PET containers to package whole beans is a unique lightweight, tabbed and tear-off foil lid on the container. The new pullback-style foil lid is easy-open, …. And, most importantly the new lid holds the vacuum very well, collaborating in the maintenance of freshness provided by the new see-through PET packaging containers. …
> The Pet container has a plastic overcap to recover the container once the foil lid has been removed.

See also: "Unique venting keeps coffee fresh", Packaging World Magazine, October 1996, p. 10, reproduced as relevant below.

> The paperboard canister … has a conventional peelable foil lid with a proprietary multilayer valve in the center. … The $CO_2$ produced as a gas by the freshly ground coffee pushes open the valve, and the capillary action of the oil closes the valve as soon as the pressure inside the canister is relieved.

See further (discussing the same product): "New container lets you wake up and smell the 'fresher' coffee", Food & Drug Packaging, Stagnito Communications, 11/1/1996, reproduced as relevant below.

> In sync with consumers' growing taste for fresh ground coffee, … a new packaging - composite cans … that features an innovative opening system with a pressure-release valve for optimum freshness.
> Unlike the options of the past for fresh ground coffee, like polybags and tin cans, … composite paperboard canisters, … include a new one-way valve that allows carbon dioxide to escape without letting oxygen in, maintaining an optimum level of internal and external pressure. After the carbon dioxide is eliminated, the pressure sensitive adhesive patch reseals itself.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

The valve rests levelly on Sonoco's consumer-friendly Ultra-Seal opening feature, a peelable foil laminate membrane with smooth edges and a metal rim for added body strength. A snap-on overcap offers resealing convenience and further product protection.

The above coffee containers did not include a handle, but they were relatively small (12-16 oz. size).  However, as discussed in Weaver and as is self-evident, handles become important "for relatively large containers" (column 4, lines 17-18); as is also evident from the numerous juice containers in the prior art where the larger the container, the more likely that a handle will be provided.  Thus, for containers in the range of USP 7,169,418, evidently about 36 oz. (or three pounds, judging by the disclosed test), the use of a handle on such a container would be expected and is routinely shown in the art.

The above background knowledge of those of ordinary skill should thus be appreciated when considering the combinations of references discussed below and the obviousness of combining the noted features.

**Combinations of References**

**Claim 1** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a. Melrose in view of Goglio;

b. Newcomb in view of Melrose;

c. Lane in view of Goglio;

d. Old Hargraves in view of Goglio;

e. Old Hargraves in view of Goglio, and further in view of Old Ota; and

f. Old Vidkjaer in view of Melrose.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

## INDEPENDENT CLAIM 1.

*1.0    A packaging system comprising:*

*1.1    a **container** having a longitudinal axis and comprising a closed bottom, an open top, and a body having an enclosed perimeter between said bottom and said top;*

*wherein said bottom, top, and body together define an interior volume;*

a.   [Melrose v. Goglio] **Melrose** teaches a container 10 having a longitudinal axis 28 with a closed bottom 14a, an open top 18a, and a body 12-14-16; which together define an interior volume.

b.   [Newcomb v. Melrose] **Newcomb** teaches a cylindrical container 2 having a longitudinal axis with a closed bottom, an open top, and a body; which together define an interior volume.

c.   [Lane v. Goglio] **Lane** teaches a broadly cylindrical container 10 having a longitudinal axis with a closed bottom 18, an open top 14 (closed by a lid 8), and a body 22; which together define an interior volume.

d.   [Old Hargraves v. Goglio] **Hargraves** teaches a cylindrical container 300 having a longitudinal axis with a closed bottom 344, an open top 340, and a body 325+339; which together define an interior volume. [As noted during prosecution.]

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as noted above in 1.1.d.

    f.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches a container 1 having a longitudinal axis with a closed bottom, an open top, and a body 2; which together define an interior volume. [As noted during prosecution.]


*1.2   wherein said body comprises at least one **region of deflection** disposed thereon, and wherein said region of deflection allows flexion and thereby has less resistance to flexing than the body of said container proximate to said region of deflection;*

[Note: it is this limitation which was added to the independent claims to make them <u>allowable</u>.]

    a.  [Melrose v. Goglio] **Melrose** teaches "panels 22 provide zones of expansion and vacuum absorption, and the columns 24 provide structural reinforcement zones" (column 4, lines 4-6).

    b.  [Newcomb v. Melrose] **Newcomb** teaches that "Although the description ... has been made in connection with a metal can construction, ... containers formed of various materials .... For example, certain plastic compositions ... may be used to form the container ends or body or both" (see column 3, lines 10-17). Thus, it would be obvious to make the Newcomb container out of a plastic; such as PET or other such plastics found suitable for blow molding and accepted by the FDA as became popular in the decades which followed, and to include as taught in **Melrose** "panels 22 [that] provide zones of expansion and vacuum absorption, and the columns 24 [that] provide structural reinforcement zones" (column 4, lines 4-6).

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

c.  [Lane v. Goglio] **Lane** teaches "front and rear panels 24 and 26 … [which] controllably accommodate this pressure reduction by being capable of being pulled inward" (see column 5, lines 55-58).

d.  [Old Hargraves v. Goglio] **Hargraves** teaches that "the semi-rigid container is allowed to undergo limited, but predetermined deformation …, said changes being confined to predetermined portions of the semi-rigid container" (see column 2, lines 34-39).  This deformation portion is evidently recessed label panel 339, as it is un-reinforced relative to the remainder of the container; note the reinforcement of the base and neck portion.  If this disclosure is not considered adequate to meet the claim language, then any number of other prior art references disclose the well-known use of deformation panels, such as Melrose and Lane noted above and as discussed in the Background sections thereof as well as numerous other prior art of record.

e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as noted above in 1.2.d.

f.  [Old Vidkjaer v. Melrose] **Vidkjaer** (Figure 1) shows flat panels located between and adjacent to "reinforcement ribs (3)" (see column 4, lines 58-60).  As the ribs reinforce the resistance of the container where they are located, the areas adjacent to and between the reinforcing ribs <u>are</u> regions of deflection that having less resistance to flexing as would be obvious to those of ordinary skill (and if it were considered necessary, as specifically taught in Old Darr, USP 5,690,244 – ribs defining flex panels in between).

*1.3   a **protuberance** continuously disposed around the perimeter of said body proximate to said*

*top wherein said protuberance forms a ridge external to said body;*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
DETAILED EXPLANATION

By Dalton et al.
SN 10/155,338

[Note interpretation to be given to "external" (as noted in the above "Note on Interpretations of

Claim Language" above) is outside of the container volume.]

    a.  [Melrose v. Goglio] **Goglio** teaches the use of a large top opening with a

protuberance or ridge external to the body of the container disposed around the perimeter thereof

at the top of the body (see column 2, lines 27-31 and figures 2 and 3) when coffee is stored

therein. It would be obvious to use the container of Melrose to store coffee, and if coffee were

stored it would be obvious to construct a top of the Melrose container to have a large opening for

scooping out of coffee or the like as taught in Goglio.

    b.  [Newcomb v. Melrose] **Newcomb** discloses protuberances 6, 7 and 14.

    c.  [Lane v. Goglio] **Goglio** teaches as noted above in 1.3.a., which teachings likewise

apply to Lane.

    d.  [Old Hargraves v. Goglio] **Goglio** teaches as noted above in 1.3.a., which teachings

likewise apply to Hargraves which it will be noted already has coffee therein.

    e.  [Old Hargraves v. Goglio + Old Ota] **Goglio** teaches as noted above in 1.3.a., which

teachings likewise apply to Hargraves which it will be noted already has coffee therein.

    f.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches flange 6. [As noted by the examiner

during prosecution.]


*1.4*  *a **handle** disposed on said body; and*

    a.  [Melrose v. Goglio] **Melrose** teaches "finger grip protrusions 132 [or 32] …

providing better grip-ability" (column 4, lines 64-66).

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

b.  [Newcomb v. Melrose] As noted above, **Melrose** teaches "finger grip protrusions 132 [or 32] … providing better grip-ability" (column 4, lines 64-66); so it would be obvious to provide the container of Newcomb made out of plastic as suggested with such finger grip protrusions for better grip-ability, particularly where the container is made larger to hold more coffee.

c.  [Lane v. Goglio] **Lane** teaches "ribbings 28 provide a grip surface" (see column 4, line 22).

d.  [Old Hargraves v. Goglio] **Hargraves** teaches "finger support bead 304 … located at the top of the tapered grip area 325 to improve handling and prevent slipping" (see column 16, lines 51-53).  Alternatively, if the grip area of Hargraves is not considered to broadly constitute a "handle", such would be obvious for a container such as shown in Hargraves from any of the prior art noted above as having a more traditional "handle" (see Melrose or Lane, or any of various others, or the combination discussed in e. immediately below); and even a handle more like that disclosed in USP 7,169,418 would be obvious from the handle of the design patent to Lown.

e.  [Old Hargraves v. Goglio + Old Ota] **Ota** teaches "A pair of the recesses 24" formed "on the opposite cylindrical surface portions to thereby cause the rear parts of the container body 22 to become a grip 27 of an axial strip shape" (column 3, lines 29-32, see also Figures 1-5, column 2, lines 35-56, and column 3, lines 13-16 and 32-38).  It would have been obvious to put a handle as taught by Ota on the Hargraves container since both inventions are directed to containers for food and Ota discloses that the handle aids in holding a container without deforming the container (column 1, lines 36-68 and column 2, lines 1-2).

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

f.   [Old Vidkjaer v. Melrose] As the term "handle" could be broadly interpreted to include the flange 6 by which the container of **Vidkjaer** would most likely be picked up, no prior art combination is necessary with such a broad interpretation.  However, **Melrose** teaches finger grip protrusions as noted above in 1.4.a., which could be applied to the walls of the container of Vidkjaer if desired to provide a more distinct handle for better or more secure gripping.  [As noted by the first examiner, use of a handle with the container of Vidkjaer would be an obvious modification, but the examiner based this assertion on a different secondary reference.]


*1.5   a **flexible closure** removably attached and sealed to said protuberance;*

a.   [Melrose v. Goglio] **Goglio** discloses, a "peelable diaphragm 2 that is removed on opening the container" (column 2, lines 28-30) for use where the product produces an off-gas (like coffee) and the container is desired to be "air-tight" (column 1, lines 8-11); which container includes a protuberance as noted in 1.3.a above.  Since (see 1.3.a. above) it would be obvious to have a large opening and associated protuberance in Melrose if a larger opening for scooping out of coffee or the like were desired, and it would likewise be obvious to use the peelable diaphragm (and one-way valve, see 1.8 below) for convenience of removal as also taught in Goglio.

b.   [Newcomb v. Melrose] **Newcomb** teaches "laminated paper aluminum foil stock may be used to form the container ends" (column 3, lines 16-17), which would obviously be applied to one of the protuberances, and most easily by glue to (protuberance) lip 4 as notoriously known in the art.  If such is not considered obvious, then Goglio can be added to positively show the attachment of a flexible closure to a protuberance is old in the art and a design choice.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

c.  [Lane v. Goglio] **Goglio** teaches as stated in 1.5.a. above.

d.  [Old Hargraves v. Goglio] Hargraves teaches that a one-way valve is not necessary. However, Hargraves also teaches that if a larger opening is desired, the forces on the closure would be increased (as the square of the distance, or as the area increases) (see column 16, lines 9-16) making it harder for the screw-on top to be maintained in place.  Thus, if an opening large enough for scooping were desired as taught in **Goglio**, it would be obvious (and necessary) to use a flexible closure (<u>with</u> a one-way valve) such as also taught in Goglio as stated in 1.5.a. above.

e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** and **Goglio** teach as stated in 1.5.d. above.

f.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches a flexible closure 7.  [As noted by the examiner.]

1.6    *wherein said bottom and said body are constructed from a material having a **tensile modulus number** ranging from at least about 35,000 pounds per square inch (2,381 atm) to at least about 650,000 pounds per square inch (44,230 atm);*

a.  [Melrose v. Goglio] **Melrose** teaches a container made of PET, which is a polyester. Thus, as noted by the examiner during prosecution of the present patent (see Office Action of 06/15/2005, middle of page 3), Old <u>Mark's Handbook</u>, it is a well known <u>property</u> of polyester that it has a tensile modulus of 400-600 ksi (or 400,000 to 600,000 psi) so this limitation is met by the use of polyester in the container of Melrose.  Such a known tensile modulus value is also shown by tables 1 and 2 of USP 7,169,418.

REQUEST for Reexamination of 7,169,418
Issued:  01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

b.  [Newcomb v. Melrose] **Melrose** teaches as stated above in 1.6.a.

c.  [Lane v. Goglio] **Lane** teaches a container made of PET, so the same discussion with respect to Melrose in 1.6.a. above applies.

d.  [Old Hargraves v. Goglio] **Hargraves** teaches a container made of oriented polyester, so the same discussion with respect to Melrose in 1.6.a. above applies.

e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches a container made of oriented polyester, so the same discussion with respect to Melrose in 1.6.a. above applies.

f.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches a container made of PET/PE, whose property of tensile modulus is expected to be in the noted range.  [As noted by the examiner, using the Old Mark's Handbook referred to above in 1.6.a.]


*1.7    wherein said container has a **top load capacity** of at least about 16 pounds (7.3 kg); and*

a.  [Melrose v. Goglio] **Melrose** teaches a container with "post strength to improve container top loading capability" (column 3, lines 61-63) as well as all of the structural claimed limitations.  Thus, as similarly noted by the examiner during prosecution of the present patent (see Office Action of 06/15/2005, 2nd paragraph of page 4), where a reference "meets all of the structural claimed limitations, therefore the top load capacity ... would be considered inherent to the container of Vidkjaer absent convincing evidence or arguments to the contrary".  This assertion by the examiner was not challenged by applicant, and in view of the additional statement made in Melrose, it must be considered that Melrose also inherently has this limitation, or alternatively it would be a **mere design choice**.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

b.  [Newcomb v. Melrose] This top load capacity is considered a **mere design choice**, but with the use of **Melrose**, the discussion in 1.7.a. above also applies with this prior art combination as well.

c.  [Lane v. Goglio] **Lane** teaches that the container is designed to have "resistance to top loadings" (see column 2, line 52) and how that force is dissipated (see column 6, lines 6-11). Thus, like Melrose above, Lane teaches all of the structural claimed limitations and the discussion of Melrose in 1.7.a. above also applies to this teaching; as well as top load capacity being a **mere design choice**.

d.  [Old Hargraves v. Goglio] **Hargraves** teaches a container which withstands substantial internal pressure increases and which "will not dent or break under normal shipping and handling conditions" (column 15, lines 29-30), which conditions inherently include top loadings. This top load capacity is considered a **mere design choice**, which is additionally obvious in view of the need for the container to withstand "conditions" as specifically disclosed in Hargraves. In addition, like Melrose above, Hargraves teaches all of the structural claimed limitations and the discussion of Melrose in 1.7.a. above also applies to this teaching.

e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as noted above in 1.7.d.

f.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches the base web of the container "is more or less rigid"; and thus inherently that a top load capacity is provided. This top load capacity is thus considered a **mere design choice**; and in view of the various materials suggested for the base web, the range of thicknesses suggested (200-1000 microns), and the use of reinforcing ribs 3 for the walls, it is evident that top load capacity could be varied many different ways further showing that it is a mere design choice.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

*1.8    wherein said closure has a **one-way valve** disposed therein.*

    a.   [Melrose v. Goglio] As noted above, **Goglio** teaches not only the protuberance and associated flexible closure attached thereto, but also the use of a "degassing valve ... 4, this valve being heat-welded or glued to sheet 2" (or "peelable diaphragm 2" – see column 2, lines 27-34). Thus, as it is obvious to use the other features of Goglio in combination with Melrose, the use of the one-way or de-gassing valve is likewise obvious for the same reasons and as a design choice.

    b.   [Newcomb v. Melrose] **Newcomb** teaches a vent 22 which "acts a one-way valve permitting gases to escape from the container" (see column 2, lines 29-31).

    c.   [Lane v. Goglio] **Goglio** teaches as noted above in 1.8.a.

    d.   [Old Hargraves v. Goglio] **Goglio** teaches as noted above in 1.8.a.

    e.   [Old Hargraves v. Goglio + Old Ota] **Goglio** teaches as noted above in 1.8.a.

    f.   [Old Vidkjaer v. Melrose] **Vidkjaer** teaches one-way valve 8 in flexible closure 7.

**Claim 2** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

    a.  Melrose in view of Goglio, and further in view of Old Vidkjaer;

    b.  Newcomb in view of Melrose;

    c.  Newcomb in view of Melrose, and further in view of Old Vidkjaer;

    d.  Lane in view of Goglio, and further in view of Old Vidkjaer;

    e.  Old Hargraves in view of Goglio, and further in view of Old Vidkjaer;

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

    f.   Old Hargraves in view of Goglio, and further in view of Old Ota and Old Vidkjaer; and

    g.   Old Vidkjaer in view of Melrose.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.


**Claim 2.**

2.0   *The packaging system as claimed in claim 1 wherein said flexible closure comprises a foil.*

    a.   [Melrose v. Goglio + Old Vidkjaer] While Goglio has not identified the material of the peelable diaphragm 2, making such diaphragms of foil is notoriously old, as evidenced by **Vidkjaer** which teaches the use of a metal layer for flexible closure 7 – which has been interpreted in the prosecution to be a foil (see Office Action of 06/15/2005, page 3, middle of last paragraph).

    b.   [Newcomb v. Melrose] As noted above in 1.5.b., **Newcomb** teaches "laminated paper aluminum foil stock may be used to form the container ends" (column 3, lines 16-17), which thus meets this claim limitation.

    c.   [Newcomb v. Melrose + Old Vidkjaer] **Newcomb** teaches as noted above in 2.0.b.

    d.   [Lane v. Goglio + Old Vidkjaer] **Vidkjaer** teaches as noted above in 2.0.a.

    e.   [Old Hargraves v. Goglio + Old Vidkjaer] **Vidkjaer** teaches as noted above in 2.0.a.

    f.   [Old Hargraves v. Goglio + Old Ota + Old Vidkjaer] **Vidkjaer** teaches as noted above in 2.0.a.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    g.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches as noted above in 2.0.a.

    **Claim 3** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

    a.  Melrose in view of Goglio, and further in view of Old Vidkjaer;

    b.  Melrose in view of Goglio, and further in view of Old Bruke;

    c.  Newcomb in view of Melrose;

    d.  Newcomb in view of Melrose, and further in view of Old Vidkjaer;

    e.  Newcomb in view of Melrose, and further in view of Old Bruke;

    f.  Lane in view of Goglio, and further in view of Old Vidkjaer;

    g.  Lane in view of Goglio, and further in view of Old Bruke;

    h.  Old Hargraves in view of Goglio, and further in view of Old Vidkjaer;

    i.  Old Hargraves in view of Goglio, and further in view of Old Ota and Old Bruke;

    j.  Old Vidkjaer in view of Melrose; and

    k.  Old Vidkjaer in view of Melrose, and further in view of Old Bruke.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 3.**

3.0    *The packaging system as claimed in claim 1 wherein said flexible closure is a laminate comprising a **first layer**, a **second layer**, and a **barrier layer** disposed therebetween.*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

a. [Melrose v. Goglio + Old Vidkjaer] **Vidkjaer** teaches the use of a metal layer as a barrier layer together with a PET/PE layer for a flexible closure; so the use of the metal layer between the PET and PE layers is only a **design choice**.

b. [Melrose v. Goglio + Old Bruke] **Bruke** teaches a multilayered flexible closure comprising outer layers of polyethylene (which is a polyolefin) and an inner barrier layer of polyvinylidene chloride (column 4, lines 48-65). It would have been obvious to use this material with the Melrose container with the top closure of Goglio in order to make an impermeable foil.

c. [Newcomb v. Melrose] As noted above, **Newcomb** teaches "laminated paper aluminum foil stock may be used to form the container ends" (column 3, lines 16-17), which ends would be a flexible closure. Thus, the aluminum foil would be a barrier layer, and the addition of another paper layer on the other side of the metal layer is only a **design choice**.

d. [Newcomb v. Melrose + Old Vidkjaer] Newcomb teaches as noted above in 3.0.c., and **Vidkjaer** teaches another foil which could be substituted therefor as a design choice and which teaches as noted in 3.0.a. above.

e. [Newcomb v. Melrose + Old Bruke] Newcomb teaches as noted above in 3.0.c., and **Bruke** teaches as noted above in 3.0.b; and it would be obvious to use the taught material of Bruke for that of Newcomb.

f. [Lane v. Goglio + Old Vidkjaer] **Vidkjaer** teaches as noted above in 3.0.a.

g. [Lane v. Goglio + Old Bruke] **Bruke** teaches as noted above in 3.0.b.

h. [Old Hargraves v. Goglio + Old Vidkjaer] **Vidkjaer** teaches as noted above in 3.0.a.

i. [Old Hargraves v. Goglio + Old Ota + Old Bruke] **Bruke** teaches as noted above in 3.0.b.

REQUEST for Reexamination of 7,169,418
Issued:  01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

j.   [Old Vidkjaer v. Melrose] **Vidkjaer** teaches as noted above in 3.0.a.

k.   [Old Vidkjaer v. Melrose + Old Bruke] **Bruke** teaches as noted above in 3.0.b.


**Claim 4** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.   Melrose in view of Goglio, and further in view of Old Vidkjaer;

b.   Melrose in view of Goglio, and further in view of Old Bruke;

c.   Newcomb in view of Melrose, and further in view of Old Vidkjaer;

d.   Newcomb in view of Melrose, and further in view of Old Bruke;

e.   Lane in view of Goglio, and further in view of Old Vidkjaer;

f.   Lane in view of Goglio, and further in view of Old Bruke;

g.   Old Hargraves in view of Goglio, and further in view of Old Vidkjaer;

h.   Old Hargraves in view of Goglio, and further in view of Old Ota and Old Bruke;

i.   Old Vidkjaer in view of Melrose; and

j.   Old Vidkjaer in view of Melrose, and further in view of Old Bruke.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.


**Claim 4.**

*4.0    The packaging system as claimed in claim 3 wherein said first layer* [of said flexible closure] *is a polyolefin.*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

[Note:  polyethylene or PE is a polyolefin.]

    a.   [Melrose v. Goglio + Old Vidkjaer] **Vidkjaer** teaches polyethylene (PE) for a flexible closure, so it would be an obvious design choice to include a polyethylene first layer in the flexible closure.

    b.   [Melrose v. Goglio + Old Bruke] **Bruke** teaches as noted above in 3.0.b.

    c.   [Newcomb v. Melrose + Old Vidkjaer] **Vidkjaer** teaches as noted above in 4.0.a., which would be a mere design choice substitution for the laminated paper layer of Newcomb.

    d.   [Newcomb v. Melrose + Old Bruke] **Bruke** teaches as noted above in 4.0.b., which would be a mere design choice substitution for the laminated paper layer of Newcomb.

    e.   [Lane v. Goglio + Old Vidkjaer] **Vidkjaer** teaches as noted above in 4.0.a.

    f.   [Lane v. Goglio + Old Bruke] **Bruke** teaches as noted above in 3.0.b.

    g.   [Old Hargraves v. Goglio + Old Vidkjaer] **Vidkjaer** teaches as noted above in 4.0.a.

    h.   [Old Hargraves v. Goglio + Old Ota + Old Bruke] **Bruke** teaches as noted above in 3.0.b.

    i.   [Old Vidkjaer v. Melrose] **Vidkjaer** teaches as noted above in 4.0.a.

    j.   [Old Vidkjaer v. Melrose + Old Bruke] **Bruke** teaches as noted above in 3.0.b.


**Claims 5-7** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious over the following combinations of references:

    a.  Melrose in view of Goglio, and further in view of Old Vidkjaer;

    b.  Newcomb in view of Melrose, and further in view of Old Vidkjaer;

    c.  Lane in view of Goglio, and further in view of Old Vidkjaer;

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    d.  Old Hargraves in view of Goglio, and further in view of Old Vidkjaer;

    e.  Old Hargraves in view of Goglio, and further in view of Old Ota and Old Vidkjaer; and

    f.  Old Vidkjaer in view of Melrose.

Obviousness is shown by the following comparison in which the claim elements are recited in

italics for easier identification, and each prior art combination used for rejection identified by the

same letter and abbreviated identification of the prior art combination as shown above.


**Claim 5.**

5.0    *The packaging system as claimed in claim 4 wherein said valve is responsive to internal*

    *pressures within said container **exceeding 10 millibars**.*

    a.  [Melrose v. Goglio + Old Vidkjaer] **Goglio** teaches that the valve opens when a

"slight" (column 1, line 27) overpressure occurs.  **Vidkjaer** teaches that the "valve operates as

soon as the inside pressure reaches between 3 to 7 mbar above the atmospheric pressure"

(column 5, lines 2-4).

    b.  [Newcomb v. Melrose + Old Vidkjaer] **Vidkjaer** teaches as noted above in 5.0.a.

    c.  [Lane v. Goglio + Old Vidkjaer] **Goglio** and **Vidkjaer** teach as noted above in 5.0.a.

    d.  [Old Hargraves v. Goglio + Old Vidkjaer] **Goglio** and **Vidkjaer** teach as noted above

in 5.0.a.

    e.  [Old Hargraves v. Goglio + Old Ota + Old Vidkjaer] **Goglio** and **Vidkjaer** teach as

noted above in 5.0.a.

    f.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches as noted above in 5.0.a.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

## Claim 6.

6.0    *The packaging system as claimed in claim 5 wherein said valve is responsive to internal pressures within said container exceeding 20 millibars.*

   a.  [Melrose v. Goglio + Old Vidkjaer] **Goglio** and **Vidkjaer** teach as noted in 5.0.a. above.

   b.  [Newcomb v. Melrose + Old Vidkjaer] **Vidkjaer** teaches as noted in 5.0.a. above.

   c.  [Lane v. Goglio + Old Vidkjaer] **Goglio** and **Vidkjaer** teach as noted in 5.0.a. above.

   d.  [Old Hargraves v. Goglio + Old Vidkjaer] **Goglio** and **Vidkjaer** teach as noted in 5.0.a. above.

   e.  [Old Hargraves v. Goglio + Old Ota + Old Vidkjaer] **Goglio** and **Vidkjaer** teach as noted above in 5.0.a.

   f.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches as noted above in 5.0.a.

## Claim 7.

7.0    *The packaging system as claimed in claim 6 wherein said valve is responsive to internal pressures within said container exceeding **30 millibars**.*

   a.  [Melrose v. Goglio + Old Vidkjaer] **Goglio** and **Vidkjaer** teach as noted in 5.0.a. above.

   b.  [Newcomb v. Melrose + Old Vidkjaer] **Vidkjaer** teaches as noted in 5.0.a. above.

   c.  [Lane v. Goglio + Old Vidkjaer] **Goglio** and **Vidkjaer** teach as noted in 5.0.a. above.

   d.  [Old Hargraves v. Goglio + Old Vidkjaer] **Goglio** and **Vidkjaer** teach as noted in 5.0.a. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    e.  [Old Hargraves v. Goglio + Old Ota + Old Vidkjaer] **Goglio** and **Vidkjaer** teach as noted above in 5.0.a.

    f.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches as noted above in 5.0.a.

    **Claim 8** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.  Melrose in view of Goglio;

b.  Newcomb in view of Melrose;

c.  Lane in view of Goglio;

d.  Old Hargraves in view of Goglio;

e.  Old Hargraves in view of Goglio, and further in view of Old Ota; and

f.  Old Vidkjaer in view of Melrose.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 8.**

8.0   *The packaging system as claimed in claim 1 wherein said bottom and said body are formed from **a blow-moldable** material.*

    a.  [Melrose v. Goglio] **Melrose** teaches a blow molded (see the Title) "plastic" container, such as made of PET.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
                    DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

b. [Newcomb v. Melrose] Newcomb broadly teaches that the container could be made of "certain plastic compositions" (column 3, lines 15-17), so the choice of a blow-moldable material would be a mere **design choice**. Additionally, it would be obvious to use the blow molded material of **Melrose** (as stated above in 8.0.a.) for the plastic composition suggested in Newcomb.

c. [Lane v. Goglio] **Lane** teaches a blow-molded container (see the Title) made of a plastic material such as PET.

d. [Old Hargraves v. Goglio] **Hargraves** teaches that container 300 is a blow molded container made of oriented PET, disclosing that "support ring 318 required for the blow molding process to produce oriented PET containers 300 is sized with a minimum diameter . . ." (column 16, lines 45-47).

e. [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as noted in 8.0.d. above.

f. [Old Vidkjaer v. Melrose] **Vidkjaer** teaches that the bottom and body can be formed from a variety of blow-moldable materials, including PET/PE, PP/EVOH/PE, or PVC/PE (column 2, lines 32-38).


**Claim 9** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a. Melrose in view of Goglio;

b. Melrose in view of Goglio, and further in view of Old Haas;

c. Melrose in view of Goglio, and further in view of Old Encyclopedia;

d. Newcomb in view of Melrose;

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

e.  Newcomb in view of Melrose, and further in view of Old Encyclopedia;

f.  Newcomb in view of Melrose, and further in view of Old Haas;

g.  Lane in view of Goglio;

h.  Lane in view of Goglio, and further in view of Old Haas;

i.  Lane in view of Goglio, and further in view of Old Encyclopedia;

j.  Old Hargraves in view of Goglio;

k.  Old Hargraves in view of Goglio, and further in view of Old Ota and Old Haas;

l.  Old Hargraves in view of Goglio, and further in view of Old Ota and Old Encyclopedia; and

m.  Old Vidkjaer in view of Melrose.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 9.**

9.0    *The packaging system as claimed in claim 8 wherein said material* [of said bottom and said body] *is a polyolefin.*

[Note:  polyolefins would include PE as well PET.]

a.  [Melrose v. Goglio] **Melrose** teaches a blow molded container made of PET.

b.  [Melrose v. Goglio + Old Haas] **Haas** teaches a container made of high density polyethylene (column 1, lines 39-47), which is a polyolefin.  It would have been obvious to use the materials disclosed in Old Haas in a container to package ground coffee because Old Haas

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
                    DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

teaches these materials as a way to extend the shelf life of an oxygen-sensitive product (column 1, lines 22-31).

    c.  [Melrose v. Goglio + Old Encyclopedia] **Encyclopedia** teaches the use of polyolefins for food packaging applications and applications involving blow molding (page 328, table 20 and page 323). It would have been obvious to use the materials of Old Encyclopedia in a container to package ground coffee because they are widely used, inexpensive and chemically resistant materials and an ordinarily-skilled artisan would have referred to teachings of known plastics in the art such as those in Old Encyclopedia.

    d.  [Newcomb v. Melrose] **Melrose** teaches as stated above in 8.0.b., and additionally as stated above in 9.0.a.

    e.  [Newcomb v. Melrose + Old Encyclopedia] **Encyclopedia** teaches as noted in 9.0.c above, and such a material would be a design choice for the material of the Newcomb container.

    f.  [Newcomb v. Melrose + Old Haas] **Haas** teaches as noted in 9.0.b. above, and such a material would be a design choice for the material of the Newcomb container.

    g.  [Lane v. Goglio] **Lane** teaches a blow-molded container made of PET.

    h.  [Lane v. Goglio + Old Haas] **Haas** teaches as noted in 9.0.b. above.

    i.  [Lane v. Goglio + Old Encyclopedia] **Encyclopedia** teaches as noted in 9.0.c. above.

    j.  [Old Hargraves v. Goglio] **Hargraves** teaches a container made of PET.

    k.  [Old Hargraves v. Goglio + Old Ota + Old Haas] **Haas** teaches as noted in 9.0.b. above.

    l.  [Old Hargraves v. Goglio + Old Ota + Old Encyclopedia] **Encyclopedia** teaches as noted in 9.0.c. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
                    DETAILED EXPLANATION

By Dalton et al.
SN 10/155,338

m.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches a container made of PET/PE, as noted in 8.0.f. above.


**Claim 10** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.  Melrose in view of Goglio;

b.  Newcomb in view of Melrose;

c.  Lane in view of Goglio;

d.  Old Hargraves in view of Goglio;

e.  Old Hargraves in view of Goglio, and further in view of Old Ota; and

f.  Old Vidkjaer in view of Melrose.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.


**Claim 10.**

*10.0    The packaging system as claimed in claim 8 wherein said blow-moldable material is selected from the **group** consisting of polycarbonate, low density polyethylene, high density polyethylene, **polyethylene terephthalate**, polypropylene, polystyrene, polyvinyl chloride, co-polymers thereof, and combinations thereof.*

[Note:  polyethylene terephthalate is commonly abbreviated as PET.]

REQUEST for Reexamination of 7,169,418
Issued:  01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

    a.   [Melrose v. Goglio] **Melrose** teaches a blow molded container made of PET (column 1, lines 17-18).

    b.   [Newcomb v. Melrose] **Melrose** teaches as stated above in 8.0.b., and additionally as stated above in 10.0.a.

    c.   [Lane v. Goglio] **Lane** teaches a blow-molded container made of PET (column 3, lines 38-41).

    d.   [Old Hargraves v. Goglio] **Hargraves** teaches a container made of PET (column 16, lines 45-46).

    e.   [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as noted in 10.0.d. above.

    f.   [Old Vidkjaer v. Melrose] **Vidkjaer** teaches as noted in 8.0.f. and 9.0.k. above.

    **Claims 11-13** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious over the following combinations of references:

    a.  Melrose in view of Goglio, and further in view of Old Vidkjaer;

    b.  Melrose in view of Goglio, and further in view of Old Haas;

    c.  Newcomb in view of Melrose, and further in view of Old Vidkjaer;

    d.  Newcomb in view of Melrose, and further in view of Old Haas;

    e.  Lane in view of Goglio, and further in view of Old Vidkjaer;

    f.  Lane in view of Goglio, and further in view of Old Haas;

    g.  Old Hargraves in view of Goglio, and further in view of Old Vidkjaer;

    h.  Old Hargraves in view of Goglio, and further in view of Old Ota and Old Haas;

    i.  Old Vidkjaer in view of Melrose; and

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

j.   Old Vidkjaer in view of Melrose, and further in view of Old Haas.

Obviousness is shown by the following comparison in which the claim elements are recited in

italics for easier identification, and each prior art combination used for rejection identified by the

same letter and abbreviated identification of the prior art combination as shown above.


**Claim 11.**

11.0   *The packaging system as claimed in claim 1 wherein said material is a **multi-layered***

   *structure.*

a.   [Melrose v. Goglio + Old Vidkjaer] **Vidkjaer** teaches a container made of the multi-

layer PET/PE, which would be an obvious substitute for the PET of Melrose.

b.   [Melrose v. Goglio + Old Haas] **Haas** teaches a container made of a multi-layered

material with an internal (to the container) polyolefin layer made of high density polyethylene

coated by an external oxygen-barrier layer (column 1, line 39 through column 2, line 2).   It

would have been obvious to use the materials disclosed in Old Haas in a container to package

ground coffee as described in 9.0.b. above.

c.   [Newcomb v. Melrose + Old Vidkjaer] **Vidkjaer** teaches as stated above in 11.0.a.

d.   [Newcomb v. Melrose + Old Haas] **Haas** teaches as noted above in 11.0.b., so it

would be obvious to use the materials in the Newcomb container.

e.   [Lane v. Goglio + Old Vidkjaer] **Vidkjaer** teaches a container made of the multi-

layer  PET/PE, which would be an obvious substitute for the PET of Lane.

f.   [Lane v. Goglio + Old Haas] **Haas** teaches as stated above in 11.0.b.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007                                              By Dalton et al.
                                                                SN 10/155,338

DETAILED EXPLANATION

g.  [Old Hargraves v. Goglio + Old Vidkjaer] **Vidkjaer** teaches a container made of the multi-layer PET/PE, which would be an obvious substitute for the PET of Hargraves.

h.  [Old Hargraves v. Goglio + Old Ota + Old Haas] **Haas** teaches as stated above in 11.0.b.

i.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches a container made of the multi-layer PET/PE.

j.  [Old Vidkjaer v. Melrose + Old Haas] **Haas** teaches as stated above in 11.0.b.

**Claim 12.**

12.0    *The packaging system as claimed in claim 11*

12.1    *wherein said multi-layered structure further comprises a **polyolefin layer proximate to said interior volume** and*

a.  [Melrose v. Goglio + Old Vidkjaer] **Vidkjaer** teaches a container made of the multi-layer PET/PE, either of which is a polyolefin.

b.  [Melrose v. Goglio + Old Haas] **Haas** teaches as stated above in 11.0.b.

c.  [Newcomb v. Melrose + Old Vidkjaer] **Vidkjaer** teaches as stated above in 12.1.a.

d.  [Newcomb v. Melrose + Old Haas] **Haas** teaches as noted above in 11.0.d.

e.  [Lane v. Goglio + Old Vidkjaer] **Vidkjaer** teaches as stated above in 12.1.a.

f.  [Lane v. Goglio + Old Haas] **Haas** teaches as stated above in 11.0.b.

g.  [Old Hargraves v. Goglio + Old Vidkjaer] **Vidkjaer** teaches as stated above in 12.1.a.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

    h.   [Old Hargraves v. Goglio + Old Ota + Old Haas] **Haas** teaches as stated above in 11.0.b.

    i.   [Old Vidkjaer v. Melrose] **Vidkjaer** teaches as stated above in 12.1.a.

    j.   [Old Vidkjaer v. Melrose + Old Haas] **Haas** teaches as stated above in 11.0.b.


*12.2   at least one layer that is an* ***oxygen barrier***.

    a.   [Melrose v. Goglio + Old Vidkjaer] **Vidkjaer** teaches a PET/EVOH/PE composite and EVOH is a well-known oxygen barrier (column 2, lines 31-32, and 34-38).

    b.   [Melrose v. Goglio + Old Haas] **Haas** teaches as stated above in 11.0.b.

    c.   [Newcomb v. Melrose + Old Vidkjaer] **Vidkjaer** teaches as stated above in 12.2.a.

    d.   [Newcomb v. Melrose + Old Haas] **Haas** teaches as noted above in 11.0.d.

    e.   [Lane v. Goglio + Old Vidkjaer] **Vidkjaer** teaches as stated above in 12.2.a.

    f.   [Lane v. Goglio + Old Haas] **Haas** teaches as stated above in 11.0.b.

    g.   [Old Hargraves v. Goglio + Old Vidkjaer] **Vidkjaer** teaches as stated above in 12.2.a.

    h.   [Old Hargraves v. Goglio + Old Ota + Old Haas] **Haas** teaches as stated above in 11.0.b.

    i.   [Old Vidkjaer v. Melrose] **Vidkjaer** teaches as stated above in 12.2.a.

    j.   [Old Vidkjaer v. Melrose + Old Haas] **Haas** teaches as stated above in 11.0.b.


**Claim 13.**

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

13.0   *The packaging system as claimed in claim 12 wherein said polyolefin is selected from the* **group** *consisting of low density* **polyethylene**, **high density polyethylene**, *polypropylene, co-polymers thereof, and combinations thereof.*

   a.   [Melrose v. Goglio + Old Vidkjaer] **Vidkjaer** teaches various polyethylenes which could be low or high density as well as PP (polypropylene).

   b.   [Melrose v. Goglio + Old Haas] **Haas** teaches as stated above in 11.0.b.

   c.   [Newcomb v. Melrose + Old Vidkjaer] **Vidkjaer** teaches as stated above in 13.0.a.

   d.   [Newcomb v. Melrose + Old Haas] **Haas** teaches as noted above in 11.0.d.

   e.   [Lane v. Goglio + Old Vidkjaer] **Vidkjaer** teaches as stated above in 13.0.a.

   f.   [Lane v. Goglio + Old Haas] **Haas** teaches as stated above in 11.0.b.

   g.   [Old Hargraves v. Goglio + Old Vidkjaer] **Vidkjaer** teaches as stated above in 13.0.a.

   h.   [Old Hargraves v. Goglio + Old Ota + Old Haas] **Haas** teaches as stated above in 11.0.b.

   i.   [Old Vidkjaer v. Melrose] **Vidkjaer** teaches as stated above in 13.0.a.

   j.   [Old Vidkjaer v. Melrose + Old Haas] **Haas** teaches as stated above in 11.0.b.


**Claim 14** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

   a.   Melrose in view of Goglio;

   b.   Newcomb in view of Melrose;

   c.   Lane in view of Goglio;

   d.   Old Hargraves in view of Goglio;

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    e.  Old Hargraves in view of Goglio, and further in view of Old Ota; and

    f.  Old Vidkjaer in view of Melrose.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 14.**

*14.0*   *The packaging system as claimed in claim 1 wherein said handle is **integral** with said body.*

[Note: for 14.0.b., 14.0.e., and 14.0.f., see 1.4.b., 1.4.e., and 1.4.f. above where the use of a handle as taught in the secondary reference is shown to be obvious on the primary reference.]

    a.  [Melrose v. Goglio] **Melrose** teaches that the finger grip protrusions 132 [or 32] are integral.

    b.  [Newcomb v. Melrose] **Melrose** teaches as stated above in 14.0.a.

    c.  [Lane v. Goglio] **Lane** teaches that the ribbings 28 are integral.

    d.  [Old Hargraves v. Goglio] **Hargraves** teaches that the finger support bead 304 is integral.

    e.  [Old Hargraves v. Goglio + Old Ota] **Ota** teaches as stated in 1.4.e. above.

    f.  [Old Vidkjaer v. Melrose] **Melrose** teaches as stated above in 14.0.a.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007                                                    By Dalton et al.
                                                                     SN 10/155,338

DETAILED EXPLANATION

**Claim 15** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.  Melrose in view of Goglio;

b.  Newcomb in view of Melrose;

c.  Lane in view of Goglio;

d.  Old Hargraves in view of Goglio, and further in view of Melrose;

e.  Old Hargraves in view of Goglio, and further in view of Old Ota; and

f.  Old Vidkjaer in view of Melrose.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 15.**

15.0   *The packaging system as claimed in claim 1 wherein said handle is substantially **parallel to said longitudinal axis** of said container.*

[Note: for 15.0.b., 15.0.e., and 15.0.f., see 1.4.b., 1.4.e., and 1.4.f. above where the use of a handle as taught in the secondary reference is shown to be obvious on the primary reference.]

a.  [Melrose v. Goglio] **Melrose** teaches that the finger grip protrusions 132 [or 32] are in a vertical pattern and hence parallel to the longitudinal axis.

b.  [Newcomb v. Melrose] **Melrose** teaches as stated above in 15.0.a.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

c. [Lane v. Goglio] **Lane** teaches that the ribbings 28 are vertical and hence parallel to the longitudinal axis.

d. [Old Hargraves v. Goglio + Melrose] **Hargraves** teaches that the finger support bead 304 is circumferential, but it would be an obvious substitution to provide the vertical ribbings of **Melrose** (for example) as noted above in 15.0.a.

e. [Old Hargraves v. Goglio + Old Ota] **Ota** teaches a "grip" parallel to the longitudinal axis (Figure 5, element 27 and column 3, lines 29-28).

f. [Old Vidkjaer v. Melrose] **Melrose** teaches as stated above in 15.0.a., and where the longitudinal axis is usually the vertical axis, this limitation would be met.  If longitudinal is taken strictly as the long (in this case a horizontal) axis, it would also be a mere design modification to make the container of Vidkjaer horizontally smaller and vertically taller, so that the longitudinal axis would then be vertical and this limitation would then be met.

**Claims 16-17** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.  Melrose in view of Goglio, and further in view of Old Goglio;

b.  Newcomb in view of Melrose, and further in view of Old Goglio;

c.  Lane in view of Goglio, and further in view of Old Goglio;

d.  Old Hargraves in view of Goglio, and further in view of Old Goglio;

e.  Old Hargraves in view of Goglio, and further in view of Old Ota and Old Goglio; and

f.  Old Vidkjaer in view of Melrose, and further in view of Old Goglio.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 16.**

16.0    *The packaging system as claimed in claim 1 further comprising an **overcap** having a **rib** disposed proximate to and along the perimeter of said overcap, said rib defining an **inner dome portion** and an **outer skirt portion** of said overcap.*

[Note 1: this claim is directed to rib 33 depicted in figures 4-6. ]

[Note 2:  Goglio notes at column 2, lines 22-31, that the flexible closure and one-way valve thereon are usable with a container for coffee "for example of the type described in Italian patent application MI-91A001770"; which IT application is now IT patent No. 01248568, and which is equivalent to Old Goglio which claims priority of this IT application.]

   a.   [Melrose v. Goglio + Old Goglio] **Old Goglio** teaches an overcap or lid 6, as shown in figures 7, 8 and 11, having a rib along its perimeter that defines an inner dome and an outer skirt; and Goglio specifically suggests the use thereof (see Note 2 above), so to that extent such an overcap is already taught in Goglio by itself.

   b.   [Newcomb v. Melrose + Old Goglio]  It would be obvious to replace the (old-1963) lid of Newcomb with the overcap of **Old Goglio** having the features as noted above in 16.0.a. for an easier to use lid.

   c.   [Lane v. Goglio + Old Goglio] **Old Goglio** teaches as noted above in 16.0.a.

   d.   [Old Hargraves v. Goglio + Old Goglio] **Old Goglio** teaches as noted above in 16.0.a.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007                                                    By Dalton et al.
                                                                     SN 10/155,338
                          DETAILED EXPLANATION

e.  [Old Hargraves v. Goglio + Old Ota + Old Goglio] **Old Goglio** teaches as noted above in 16.0.a.

f.  [Old Vidkjaer v. Melrose + Old Goglio] **Old Goglio** teaches an overcap as noted above in 16.0.a. which could be used with the container of Melrose or Vidkjaer if desired, especially for coffee as large openings in general are desired.


**Claim 17.**

*17.0    The packaging system as claimed in claim 16 wherein said rib has a **height** at least equal to the maximum displacement of said dome portion.*

a.  [Melrose v. Goglio + Old Goglio] **Old Goglio** teaches an overcap with a rib height shown in Figures 8 and 11 that is self-evidently sufficient for maximum displacement of the dome, especially where a one-way valve is used so the dome will not displace too far outwards; and if not, this would be a **design choice** made for better appearance.

b.  [Newcomb v. Melrose + Old Goglio] **Old Goglio** teaches as noted above in 17.0.a.

c.  [Lane v. Goglio + Old Goglio] **Old Goglio** teaches as noted above in 17.0.a.

d.  [Old Hargraves v. Goglio + Old Goglio] **Old Goglio** teaches as noted above in 17.0.a.

e.  [Old Hargraves v. Goglio + Old Ota + Old Goglio] **Old Goglio** teaches as noted above in 17.0.a.

f.  [Old Vidkjaer v. Melrose + Old Goglio] **Old Goglio** teaches an overcap as noted above in 17.0.a.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

**Claim 18** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.  Melrose in view of Goglio, and further in view of Old Goglio;

b.  Melrose in view of Goglio, and further in view of Old Goglio and Old Encyclopedia;

c.  Newcomb in view of Melrose, and further in view of Old Goglio;

d.  Newcomb in view of Melrose, and further in view of Old Goglio and Old Encyclopedia;

e.  Lane in view of Goglio, and further in view of Old Goglio;

f.  Lane in view of Goglio, and further in view of Old Goglio and Old Encyclopedia;

g.  Old Hargraves in view of Goglio, and further in view of Old Goglio;

h.  Old Hargraves in view of Goglio, and further in view of Old Ota, Old Goglio and Old Encyclopedia;

i.  Old Vidkjaer in view of Melrose, and further in view of Old Goglio; and

j.  Old Vidkjaer in view of Melrose, and further in view of Old Goglio and Old Encyclopedia.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 18.**

*18.0    The packaging system as claimed in claim 16 wherein said* <u>overcap</u> *is constructed from a*

***material*** *selected from the group consisting of polycarbonate, low density polyethylene,*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
                          DETAILED EXPLANATION

                                                    By Dalton et al.
                                                    SN 10/155,338

*high density polyethylene, polyethylene terephthalate, polypropylene, polystyrene,*

*polyvinyl chloride, co-polymers thereof, and combinations thereof.*

a.   [Melrose v. Goglio + Old Goglio] **Melrose** teaches a container made of PET, so making of an overcap of the same material would be an obvious design choice.

c.   [Melrose v. Goglio + Old Goglio + Old Encyclopedia] **Encyclopedia** teaches use of high density polyethylene for food packaging applications (page 328, table 20 and pages 305, 323).  It would have been obvious to use the high density polyethylene disclosed in Encyclopedia in the overcap of Old Goglio in a ground coffee package because high density polyethylene is a widely used, inexpensive and chemically resistant material and an ordinarily-skilled artisan would have referred to teachings of known plastics in the art such as those in Encyclopedia.

c.   [Newcomb v. Melrose + Old Goglio] **Melrose** teaches as noted above in 18.0.a.

d.   [Newcomb v. Melrose + Old Goglio + Old Encyclopedia] **Encyclopedia** teaches as noted above in 18.0.c.

e.   [Lane v. Goglio + Old Goglio] **Lane** teaches a container made of PET, so making of an overcap of the same material would be an obvious design choice.

f.   [Lane v. Goglio + Old Goglio + Old Encyclopedia] **Encyclopedia** teaches as noted above in 18.0.c.

g.   [Old Hargraves v. Goglio + Old Goglio] **Hargraves** teaches a container made of PET, so making of an overcap of the same material would be an obvious design choice.

h.   [Old Hargraves v. Goglio + Old Ota + Old Goglio + Old Encyclopedia] **Encyclopedia** teaches as noted above in 18.0.c.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    i.   [Old Vidkjaer v. Melrose + Old Goglio] **Vidkjaer** teaches a container made of PET, so making of an overcap of the same material would be an obvious design choice.

    j.   [Old Vidkjaer v. Melrose + Old Goglio + Old Encyclopedia] **Encyclopedia** teaches as noted above in 18.0.c.

    **Claim 19** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

    a.  Melrose in view of Goglio;

    b.  Newcomb in view of Melrose;

    c.  Lane in view of Goglio;

    d.  Old Hargraves in view of Goglio;

    e.  Old Hargraves in view of Goglio, and further in view of Old Ota; and

    f.  Old Vidkjaer in view of Melrose.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 19.**

*19.0*   *The packaging system of claim 1 wherein said at least one region of deflection is responsive to at least one **force** internal or external to said container.*

[Note: this is inherent in any region of deflection.]

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    a.  [Melrose v. Goglio] **Melrose** teaches that "the panels 22 . . . react to the forces created by hot-fill processing" (column 4, lines 4-8).

    b.  [Newcomb v. Melrose] **Melrose** teaches as noted in 19.0.a. above.

    c.  [Lane v. Goglio] **Lane** teaches: "After being filled with a hot product, capped and cooled, the product within the container 10 decreases in volume. This reduction in volume produces a reduction in pressure. The front and rear panels 24 and 26 of the container 10 controllably accommodate this pressure reduction by being capable of pulling inward, under the influence of the reduced pressure, as shown in phantom lines 34 in FIG. 1 and as further shown in FIG. 3*b*" (column 5, lines 52-59).

    d.  [Old Hargraves v. Goglio] **Hargraves** teaches that "the semi-rigid container is allowed to undergo limited, but predetermined deformation when subjected to the internal pressures generated by coffee off gassing prior to initial opening, said changes being confined to predetermined portions of the semi-rigid container" (column 2, lines 34-39).

    e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as stated in 19.0.d. above.

    f.  [Old Vidkjaer v. Melrose] As noted in 1.2.f. above, **Vidkjaer** teaches regions of deflection consisting of panels between reinforcement ribs, so with a pressure build up in the container as taught, such panels will deflect in response to such a force.


**Claims 20-21** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious over the following combinations of references:

    a.  Melrose in view of Goglio, and further in view of Old Vidkjaer;

    b.  Melrose in view of Goglio, and further in view of Old Haas;

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    c.  Melrose in view of Goglio, and further in view of Old Encyclopedia;

    d.  Newcomb in view of Melrose;

    e.  Newcomb in view of Melrose, and further in view of Old Vidkjaer;

    f.  Newcomb in view of Melrose, and further in view of Old Haas;

    g.  Newcomb in view of Melrose, and further in view of Old Encyclopedia;

    h.  Lane in view of Goglio, and further in view of Old Vidkjaer;

    i.  Lane in view of Goglio, and further in view of Old Haas;

    j.  Lane in view of Goglio, and further in view of Old Encyclopedia;

    k.  Old Hargraves in view of Goglio, and further in view of Old Vidkjaer;

    l.  Old Hargraves in view of Goglio, and further in view of Old Ota and Old Haas;

    m.  Old Hargraves in view of Goglio, and further in view of Old Ota and Old Encyclopedia;

    n.  Old Vidkjaer in view of Melrose;

    o.  Old Vidkjaer in view of Melrose, and further in view of Old Haas; and

    p.  Old Vidkjaer in view of Melrose, and further in view of Old Encyclopedia

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 20.**

20.0    *The packaging system as claimed in claim 1 wherein said tensile modulus number **ranges** from at least about 40,000 pounds per square inch (2,721 atm) to at least about 260,000 pounds per square inch (17,692 atm).*

REQUEST for Reexamination of 7,169,418
Issued:  01/30/2007
By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

a.  [Melrose v. Goglio + Old Vidkjaer] While Melrose teaches a container made of PET as noted in 1.6.a. above, **Vidkjaer** teaches that other plastics such as PE could be used instead as a design choice, and PE has a modulus (29,000 to 101,000) that falls with this range.

b.  [Melrose v. Goglio + Old Haas] **Haas** teaches a container made of high density polyethylene (column 1, lines 39-47), which has a tensile modulus of 155,000 psi (*see, e.g.*, Old Marks' Handbook , page 17, line 68, column 3).  It would have been obvious to use the materials of Haas in combination with the Melrose container with the top closure of Goglio to package ground coffee because Haas teaches these materials as a way to extend the shelf life of oxygen-sensitive products (column 1, lines 22-31).

c.  [Melrose v. Goglio + Old Encyclopedia] **Encyclopedia** teaches use of high density polyethylene with a tensile modulus of 60,000-150,000 psi in food packaging applications (page 305 and page 328, table 20).  It would have been obvious to use the disclosed high density polyethylene with the Melrose container with the top closure of Goglio to package ground coffee because high density polyethylene is a widely used, inexpensive and chemically resistant material and an ordinarily-skilled artisan would have referred to teachings of known plastics in the art such as those in Encyclopedia.

d.  [Newcomb in view of Melrose] While Melrose teaches PET as one possible plastic as noted in 1.6.a., it would be obvious to use another known plastic such as PE whose tensile modulus would fall in this range.

e.  [Newcomb v. Melrose + Old Vidkjaer] **Vidkjaer** teaches as stated above in 20.0.a.

f.  [Newcomb v. Melrose + Old Haas] **Haas** teaches as stated above in 20.0.b.; and it would have been obvious to use the material of Haas for the container of Newcomb.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

g. [Newcomb v. Melrose + Old Encyclopedia] **Encyclopedia** teaches as stated above in 20.0.c.; and it would have been obvious to use the material taught therein for the container of Newcomb.

h. [Lane v. Goglio + Old Vidkjaer] While Lane teaches a container made of PET as noted in 1.6.c. above, **Vidkjaer** teaches that other plastics such as PE could be used instead as a design choice, and PE has a modulus (29,000 to 101,000) that falls with this range.

i. [Lane v. Goglio + Old Haas] **Haas** teaches as noted in 20.0.b. above.

j. [Lane v. Goglio + Old Encyclopedia] **Encyclopedia** teaches as stated in 20.0.c. above.

k. [Old Hargraves v. Goglio + Old Vidkjaer] While Hargraves teaches a container made of PET as noted in 1.6.d. above, Vidkjaer teaches that other plastics such as PE could be used instead as a design choice, and PE has a modulus (29,000 to 101,000) that falls with this range.

l. [Old Hargraves v. Goglio + Old Ota + Old Haas] **Haas** teaches as noted in 20.0.b. above.

m. [Old Hargraves v. Goglio + Old Ota + Old Encyclopedia] **Encyclopedia** teaches as stated in 20.0.c. above.

n. [Old Vidkjaer v. Melrose] As noted in 1.6.a. above, **Vidkjaer** also teaches a container made of PE whose modulus (29,000 to 101,000) falls with this range.

o. [Old Vidkjaer v. Melrose + Old Haas] **Haas** teaches as noted in 20.0.b. above.

p. [Old Vidkjaer v. Melrose + Old Encyclopedia] **Encyclopedia** teaches as stated in 20.0.c. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

## Claim 21.

*21.0    The packaging system as claimed in claim 20 wherein said tensile modulus number*

*    ranges from at least about 90,000 pounds per square inch (6,124 atm) to at least about*

*    150,000 pounds per square inch (10,207 atm).*

    a.  [Melrose v. Goglio + Old Vidkjaer] As noted in 20.0.a. above, **Vidkjaer** teaches a container made of PE whose modulus falls with this range.

    b.  [Melrose v. Goglio + Old Haas] **Haas** teaches as noted in 20.0.b. above.

    c.  [Melrose v. Goglio + Old Encyclopedia] **Encyclopedia** teaches as stated in 20.0.c. above.

    d.  [Newcomb in view of Melrose] While Melrose teaches PET as one possible plastic as noted in 1.6.a., it would be obvious to use another known plastic such as PE whose tensile modulus would fall in this range.

    e.  [Newcomb v. Melrose] As noted in 20.0.b. above, **Vidkjaer** teaches a container made of PE whose modulus falls with this range.

    f.  [Newcomb v. Melrose + Old Haas] **Haas** teaches as stated above in 20.0.b

    g.  [Newcomb v. Melrose + Old Encyclopedia] **Encyclopedia** teaches as stated above in 20.0.c.

    h.  [Lane v. Goglio] As noted in 20.0.c. above, **Vidkjaer** teaches a container made of PE whose modulus falls with this range.

    i.  [Lane v. Goglio + Old Haas] **Haas** teaches as noted in 20.0.b. above.

    j.  [Lane v. Goglio + Old Encyclopedia] **Encyclopedia** teaches as stated in 20.0.c. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    k.  [Old Hargraves v. Goglio + Old Vidkjaer] As noted in 20.0.k. above, **Vidkjaer** teaches a container made of PE whose modulus falls with this range.

    l.  [Old Hargraves v. Goglio + Old Ota + Old Haas] **Haas** teaches as noted in 20.0.b. above.

    m.  [Old Hargraves v. Goglio + Old Ota + Old Encyclopedia] **Encyclopedia** teaches as stated in 20.0.c. above.

    n.  [Old Vidkjaer v. Melrose] As noted in 20.0.n. above, above, **Vidkjaer** teaches a container made of PE whose modulus falls with this range.

    o.  [Old Vidkjaer v. Melrose + Old Haas] **Haas** teaches as noted in 20.0.b. above.

    p.  [Old Vidkjaer v. Melrose + Old Encyclopedia] **Encyclopedia** teaches as stated in 20.0.c. above.

**Claims 22-23** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious over the following combinations of references:

    a.  Melrose in view of Goglio;

    b.  Newcomb in view of Melrose;

    c.  Lane in view of Goglio;

    d.  Old Hargraves in view of Goglio;

    e.  Old Hargraves in view of Goglio, and further in view of Old Ota; and

    f.  Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 22.**

*22.0    The packaging system as claimed in claim 1 wherein **coffee** is placed therein.*

a.    [Melrose v. Goglio] **Goglio** teaches filling a container with ground coffee (column 3, lines 59-60), so it would be obvious that the container of Melrose could be used for coffee. Additionally, the use of coffee in a container such as that of Melrose would be an obvious **design choice**.

b.    [Newcomb v. Melrose] **Newcomb** teaches filling a container with ground coffee (column 1, lines 13-14).

c.    [Lane v. Goglio] **Goglio** teaches as noted above in 22.0.a., so it would be obvious that the container of Lane could be used for coffee.  Additionally, the use of coffee in a container such as that of Lane would be an obvious **design choice**.

d.    [Old Hargraves v. Goglio] **Hargraves** teaches a container with roast and "if desired" ground coffee (column 1, lines 14-15).

e.    [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as noted above in 22.0.d.

f.    [Old Vidkjaer v. Melrose + Old Hargraves] **Hargraves** teaches as noted above in 22.0.d., and the use of coffee in a container such as that of Vidkjaer would be an obvious design choice.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

**Claim 23.**

23.0    *The packaging system as claimed in claim 22 wherein said coffee is* **roast and ground***.*

    a.   [Melrose v. Goglio] **Goglio** teaches ground coffee as noted in 22.0.a. above, so also roasting the coffee would be an obvious design choice (as indicated in Hargraves as well).

    b.   [Newcomb v. Melrose] **Newcomb** teaches ground coffee as noted in 22.0.b above, so also roasting the coffee would be an obvious design choice (as indicated in Hargraves as well).

    c.   [Lane v. Goglio] **Goglio** teaches as noted above in 23.0.a.

    d.   [Old Hargraves v. Goglio] **Hargraves** teaches a container with roast and ground coffee as noted in 22.0.d. above.

    e.   [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as noted above in 23.0.d.

    f.   [Old Vidkjaer v. Melrose + Old Hargraves] **Hargraves** teaches as noted above in 23.0.d.

 

**Claims 24-25** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious over the following combinations of references:

    a.   Melrose in view of Goglio, and further in view of Old Hargraves;

    b.   Newcomb in view of Melrose, and further in view of Old Hargraves;

    c.   Lane in view of Goglio, and further in view of Old Hargraves;

    d.   Old Hargraves in view of Goglio;

    e.   Old Hargraves in view of Goglio, and further in view of Old Ota; and

    f.   Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

## Claim 24.

24.0    *The packaging system as claimed in claim 23 wherein said container containing said roast and ground coffee is **flushed** with an inert gas.*

    a.    [Melrose v. Goglio + Old Hargraves] **Hargraves** teaches it is desirable to flush the container filled with roasted and ground coffee with an inert gas such as nitrogen (column 17, lines 59-61).

    b.    [Newcomb v. Melrose + Old Hargraves] **Hargraves** teaches as noted above in 24.0.a.

    c.    [Lane v. Goglio + Old Hargraves] **Hargraves** teaches as noted above in 24.0.a.

    d.    [Old Hargraves v. Goglio] **Hargraves** teaches as noted above in 24.0.a.

    e.    [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as noted above in 24.0.a.

    f.    [Old Vidkjaer v. Melrose + Old Hargraves] **Hargraves** teaches as noted above in 24.0.a.

## Claim 25.

25.0    *The packaging system as claimed in claim 24 wherein said inert gas is selected from the group consisting of **nitrogen**, carbon dioxide, argon, and combinations thereof.*

    a.    [Melrose v. Goglio + Old Hargraves] As noted above in 24.0.a., **Hargraves** teaches nitrogen.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    b.   [Newcomb v. Melrose + Old Hargraves] **Hargraves** teaches as noted above in 25.0.a.

    c.   [Lane v. Goglio + Old Hargraves] **Hargraves** teaches as noted above in 25.0.a.

    d.   [Old Hargraves v. Goglio] **Hargraves** teaches as noted above in 25.0.a.

    e.   [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as noted above in 25.0.a.

    f.   [Old Vidkjaer v. Melrose + Old Hargraves] **Hargraves** teaches as noted above in 25.0.a.

**Claim 26** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

    a.   Melrose in view of Goglio;

    b.   Newcomb in view of Melrose;

    c.   Lane in view of Goglio;

    d.   Old Hargraves in view of Goglio;

    e.   Old Hargraves in view of Goglio, and further in view of Old Ota; and

    f.   Old Vidkjaer in view of Melrose.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 26.**

26.0    *The fresh packaging system as claimed in claim 1 wherein said top load capacity is at least about **48 pounds** (21.8 Kg).*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

a.  [Melrose v. Goglio] **Melrose** teaches as noted in 1.7.a. above.

b.  [Newcomb v. Melrose] **Melrose** teaches as noted in 1.7.a. above.

c.  [Lane v. Goglio] **Lane** teaches as noted in 1.7.c. above.

d.  [Old Hargraves v. Goglio] **Hargraves** teaches as noted in 1.7.d. above.

e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as noted in 1.7.d. above.

f.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches as noted in 1.7.f. above.

**Claim 27** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.  Melrose in view of Goglio, and further in view of Old Hargraves;

b.  Newcomb in view of Melrose, and further in view of Old Hargraves;

c.  Lane in view of Goglio, and further in view of Old Hargraves;

d.  Old Hargraves in view of Goglio;

e.  Old Hargraves in view of Goglio, and further in view of Old Ota; and

f.  Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 27.**

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

27.0    *A method for packing coffee using the fresh packaging system of claim 1 comprising the steps of:* **filling** *said container with roast and ground coffee;* **flushing** *said container with an inert gas; and,* **sealing** *said container with said flexible closure.*

[Note:  these steps recite the same limitations as present in <u>apparatus</u> claim 24 above; as claim 24 claims flushing with an inert gas, and claim 23 from which it depends claims roast and ground coffee.]

a.    [Melrose v. Goglio + Old Hargraves] **Goglio** teaches ground coffee in the container, so also roasting the coffee would be an obvious design choice (as indicated in Hargraves as well). **Hargraves** teaches it is desirable to flush the container filled with roasted and ground coffee with an inert gas such as nitrogen (column 17, lines 59-63) and then to seal it with a closure, which with this prior art combination would be the flexible closure.

b.    [Newcomb v. Melrose + Old Hargraves] **Hargraves** teaches as noted above in 27.0.a.

c.    [Lane v. Goglio + Old Hargraves] **Hargraves** teaches as noted above in 27.0.a.

d.    [Old Hargraves v. Goglio] **Hargraves** teaches as noted above in 27.0.a.

e.    [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as noted above in 27.0.a.

f.    [Old Vidkjaer v. Melrose + Old Hargraves] **Hargraves** teaches as noted above in 27.0.a.

**Claim 28** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.    Melrose in view of Goglio, and further in view of Old Hargraves and Old Goglio;

b.    Newcomb in view of Melrose, and further in view of Old Hargraves and Old Goglio;

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
DETAILED EXPLANATION

By Dalton et al.
SN 10/155,338

    c.   Lane in view of Goglio, and further in view of Old Hargraves and Old Goglio;

    d.   Old Hargraves in view of Goglio, and further in view of Old Goglio;

    e.   Old Hargraves in view of Goglio, and further in view of Old Ota and Old Goglio; and

    f.   Old Vidkjaer in view of Melrose, and further in view of Old Hargraves and Old Goglio.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 28.**

28.0   *The method of claim 27 further comprising the step of: placing an **overcap** over said flexible closure, said overcap having a rib disposed proximate to and along the perimeter of said overcap, said rib defining an inner dome portion and an outer skirt portion of said cap.*

[Note: These steps recite the same limitations as are present in <u>apparatus</u> claim 16 above, which claimed the same overcap features.]

    a.   [Melrose v. Goglio + Old Hargraves + Old Goglio] **Old Goglio** teaches as noted in 16.0.a. above.

    b.   [Newcomb v. Melrose + Old Hargraves + Old Goglio] It would be obvious to replace the (old-1963) lid of Newcomb with the overcap of **Old Goglio** having the features as noted above in 16.0.a. for an easier to use lid.

    c.   [Lane v. Goglio + Old Hargraves + Old Goglio] **Old Goglio** teaches as noted above in 16.0.a.

REQUEST for Reexamination of 7,169,418
Issued:  01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

    d.  [Old Hargraves v. Goglio + Old Goglio] **Old Goglio** teaches as noted above in 16.0.a.

    e.  [Old Hargraves v. Goglio + Old Ota + Old Goglio] **Old Goglio** teaches as noted above in 16.0.a.

    f.  [Old Vidkjaer v. Melrose + Old Hargraves + Old Goglio] **Old Goglio** teaches as noted above in 16.0.a.


    **Claim 29** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

    a.  Melrose in view of Goglio, and further in view of Old Hargraves;

    b.  Newcomb in view of Melrose, and further in view of Old Hargraves;

    c.  Lane in view of Goglio, and further in view of Old Hargraves;

    d.  Old Hargraves in view of Goglio, and further in view of Old Vidkjaer;

    e.  Old Hargraves in view of Goglio, and further in view of Old Ota and Old Vidkjaer; and

    f.  Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.


**Claim 29.**

29.0    *The method of claim 27 further wherein said flexible closure further comprises a valve responsive to internal pressures within said container **exceeding 10 millibars**.*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007                                                    By Dalton et al.
                                                                      SN 10/155,338

DETAILED EXPLANATION

[Note: These steps recite the same limitations as are present in apparatus claim 5 above, which claimed the same valve opening pressure value.]

a.   [Melrose v. Goglio + Old Hargraves]  **Goglio** teaches as noted in 5.0.a. above.

b.   [Newcomb v. Melrose + Old Hargraves]  **Newcomb** teaches that the one-way valve opens at a predetermined pressure (column 1, lines 27-28).  As no value is given for either reference, it is apparent that the amount of "slight" is a mere **design choice**.

c.   [Lane v. Goglio + Old Hargraves] **Goglio** teaches as noted above in 5.0.a.

d.   [Old Hargraves v. Goglio + Old Vidkjaer] **Goglio** and **Vidkjaer** teach as noted above in 5.0.a.

e.   [Old Hargraves v. Goglio + Old Ota + Old Vidkjaer] **Goglio** and **Vidkjaer** teach as noted above in 5.0.a.

f.   [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches as noted above in 5.0.a.


**Claim 30** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.   Melrose in view of Goglio, and further in view of Old Hargraves;

b.   Newcomb in view of Melrose, and further in view of Old Hargraves;

c.   Lane in view of Goglio, and further in view of Old Hargraves;

d.   Old Hargraves in view of Goglio;

e.   Old Hargraves in view of Goglio, and further in view of Old Ota; and

f.   Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 30.**

30.0     *The method of claim 27 wherein said handle is **integral** with said body.*

[Note:  These steps recite the same limitations as are present in <u>apparatus</u> claim 14 above, which claimed the same integral handle.]

    a.  [Melrose v. Goglio + Old Hargraves]  **Melrose** teaches as noted in 14.0.a. above.

    b.  [Newcomb v. Melrose + Old Hargraves] **Melrose** teaches as stated above in 14.0.a.

    c.  [Lane v. Goglio + Old Hargraves] **Lane** teaches as stated above in 14.0.c.

    d.  [Old Hargraves v. Goglio] **Hargraves** teaches as stated above in 14.0.d.

    e.  [Old Hargraves v. Goglio + Old Ota] **Ota** teaches as stated in 1.4.e. above.

    f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Melrose** teaches as stated above in 14.0.a.

**Claims 31-32** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious over the following combinations of references:

    a.  Melrose in view of Goglio;

    b.  Newcomb in view of Melrose;

    c.  Lane in view of Goglio;

    d.  Old Hargraves in view of Goglio, and further in view of Old Vidkjaer;

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

e.  Old Hargraves in view of Goglio, and further in view of Old Ota and Old Vidkjaer; and

f.  Old Vidkjaer in view of Melrose.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.


**Claim 31.**

*31.0   The packaging system of Claim 1, wherein said container further comprises at least one rib parallel to the longitudinal axis, said **rib adding structural stability** to said container with respect to top load capacity.*

a.  [Melrose v. Goglio] **Melrose** teaches that vertical columns 24 that "provide structural reinforcement zones" (see column 4, lines 4-5) which is later noted as being "post strength" (column 5, line 18).  Columns 24 thus meet the definition of "rib," or making columns 24 more rib-like is a mere design choice.

b.  [Newcomb v. Melrose] **Melrose** teaches as stated above in 31.0.a., and it would be obvious if greater top load strength were desired for the container of Newcomb, particularly where Newcomb is made of plastic as suggested, to add such reinforcing ribs.

c.  [Lane v. Goglio] **Lane** teaches "more rigid column portions 30" which meet the definition of a "rib", or the making of column portions 30 more rib-like is a mere design choice.

d.  [Old Hargraves v. Goglio + Old Vidkjaer] **Vidkjaer** discloses the use of reinforcement ribs 3, which could be used to strengthen the bottle of Hargraves, particularly

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
                                                                    By Dalton et al.
                                                                    SN 10/155,338
                        DETAILED EXPLANATION

where a one-way valve is used in the suggested prior art combination so that the Hargraves bottle

would not have the additional internal pressure to reinforce the sidewall.

     e.  [Old Hargraves v. Goglio + Old Ota + Old Vidkjaer]  **Vidkjaer** teaches as noted in

31.0.d. above.

     f.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches as noted in 31.0.d. above.


**Claims 32.**

*32.0*   *The packaging system of Claim 31 wherein said at least one region of deflection is in the*

     *form of a **rectangular panel** and said at least one **rib is proximate thereto**.*

     a.  [Melrose v. Goglio] **Melrose** teaches rectangular flex panels 22 which are proximate

to ribs 24.

     b.  [Newcomb v. Melrose]  **Melrose** teaches as stated above in 32.0.a.

     c.  [Lane v. Goglio]  **Lane** teaches rectangular flex panels 24 and 26 which are

proximate to ribs 30.

     d.  [Old Hargraves v. Goglio + Old Vidkjaer]  **Vidkjaer** teaches rectangular panels

proximate to the reinforcement ribs 3.

     e.  [Old Hargraves v. Goglio +Old Ota +  Old Vidkjaer]  **Vidkjaer** teaches as noted in

32.0.d. above.

     f.  [Old Vidkjaer v. Melrose] **Vidkjaer** teaches as stated above in 32.0.d. above.


     **Claims 33-35** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious

over the following combinations of references:

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

   a.  Melrose in view of Goglio;

   b.  Melrose in view of Goglio, and further in view of Old Haas;

   c.  Melrose in view of Goglio, and further in view of Old Encyclopedia;

   d.  Newcomb in view of Melrose;

   e.  Newcomb in view of Melrose, and further in view of Old Haas;

   f.  Newcomb in view of Melrose, and further in view of Old Encyclopedia;

   g.  Lane in view of Goglio;

   h.  Lane in view of Goglio, and further in view of Old Haas;

   i.  Lane in view of Goglio, and further in view of Old Encyclopedia;

   j.  Old Hargraves in view of Goglio; and

   k.  Old Hargraves in view of Goglio, and further in view of Old Haas;

   l.  Old Hargraves in view of Goglio, and further in view of Old Encyclopedia;

   m.  Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

## INDEPENDENT CLAIM 33.

*33.0    An article of manufacture comprising:*

*33.1    a closed bottom; an open top; a body forming an enclosed perimeter between said bottom and top; wherein said **bottom, top, and body** together define an **interior volume**;*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

[Note: this limitation is somewhat broader than corresponding limitation 1.1 discussed above, but as the same teachings apply, those teachings are merely incorporated by reference hereafter.]

a.  [Melrose v. Goglio] **Melrose** teaches all of these limitations as noted in 1.1.a. above.

b.  [Melrose v. Goglio + Old Haas] **Melrose** teaches all of these limitations as noted in 1.1.a. above.

c.  [Melrose v. Goglio + Old Encyclopedia] **Melrose** teaches all of these limitations as noted in 1.1.a. above.

d.  [Newcomb v. Melrose] **Newcomb** teaches all of these limitations as noted in 1.1.b. above.

e.  [Newcomb v. Melrose + of Old Haas] **Newcomb** teaches all of these limitations as noted in 1.1.b. above.

f.  [Newcomb v. Melrose + Old Encyclopedia] **Newcomb** teaches all of these limitations as noted in 1.1.b. above.

g.  [Lane v. Goglio] **Lane** teaches all of these limitations as noted in 1.1.c. above.

h.  [Lane v. Goglio + Old Haas] **Lane** teaches all of these limitations as noted in 1.1.c. above.

i.  [Lane v. Goglio + Old Encyclopedia] **Lane** teaches all of these limitations as noted in 1.1.c. above.

j.  [Old Hargraves v. Goglio] **Hargraves** teaches all of these limitations as noted in 1.1.d. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

k. [Old Hargraves v. Goglio + Old Haas] **Hargraves** teaches all of these limitations as noted in 1.1.d. above.

l. [Old Hargraves v. Goglio + Old Encyclopedia] **Hargraves** teaches all of these limitations as noted in 1.1.d. above.

m. [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches all of these limitations as noted in 1.1.f. above.


33.2    *wherein said body comprises at least one* **region of deflection** *disposed thereon, and*

*wherein said region of deflection allows flexion and thereby has less resistance to flexing*

*than the body of said container proximate to said region of deflection;*

[Note:  this limitation is identical to the corresponding limitation 1.2 discussed above, so the

same teachings apply and those teachings are merely incorporated by reference

hereafter.]

a. [Melrose v. Goglio] **Melrose** teaches all of these limitations as noted in 1.2.a. above.

b. [Melrose v. Goglio + Old Haas] **Melrose** teaches all of these limitations as noted in 1.2.a. above.

c. [Melrose v. Goglio + Old Encyclopedia] **Melrose** teaches all of these limitations as noted in 1.2.a. above.

d. [Newcomb v. Melrose] **Melrose** teaches all of these limitations as noted in 1.2.b. above.

e. [Newcomb v. Melrose + of Old Haas] **Newcomb** teaches all of these limitations as noted in 1.2.b. above.

REQUEST for Reexamination of 7,169,418
Issued:  01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

f.    [Newcomb v. Melrose + Old Encyclopedia] **Newcomb** teaches all of these limitations as noted in 1.2.b. above.

g.    [Lane v. Goglio] **Lane** teaches all of these limitations as noted in 1.2.c. above.

h.    [Lane v. Goglio + Old Haas] **Lane** teaches all of these limitations as noted in 1.2.c. above.

i.    [Lane v. Goglio + Old Encyclopedia] **Lane** teaches all of these limitations as noted in 1.2.c. above.

j.    [Old Hargraves v. Goglio] **Hargraves** teaches all of these limitations as noted in 1.2.d. above.

k.    [Old Hargraves v. Goglio + Old Haas] **Hargraves** teaches all of these limitations as noted in 1.2.d. above.

l.    [Old Hargraves v. Goglio + Old Encyclopedia] **Hargraves** teaches all of these limitations as noted in 1.2.d. above.

m.    [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches all of these limitations as noted in 1.2.f. above.


*33.3    wherein said body includes a **protuberance** continuously disposed around the perimeter*
*of said body proximate to said top;,*

[Note:  this limitation is broader than corresponding limitation 1.3 discussed above (the

limitation that the protuberance forms a "ridge" is omitted), but as the same teachings

apply, those teachings are merely incorporated by reference hereafter.]

a.    [Melrose v. Goglio] **Goglio** teaches all of these limitations as noted in 1.3.a. above.

REQUEST for Reexamination of 7,169,418
Issued:  01/30/2007                                                                      By Dalton et al.
                                                                                        SN 10/155,338

DETAILED EXPLANATION

b.    [Melrose v. Goglio + Old Haas] **Goglio** teaches all of these limitations as noted in 1.3.a. above.

c.    [Melrose v. Goglio + Old Encyclopedia] **Goglio** teaches all of these limitations as noted in 1.3.a. above.

d.    [Newcomb v. Melrose] **Newcomb** teaches all of these limitations as noted in 1.3.b. above.

e.    [Newcomb v. Melrose + of Old Haas] **Newcomb** teaches all of these limitations as noted in 1.3.b. above.

f.    [Newcomb v. Melrose + Old Encyclopedia] **Newcomb** teaches all of these limitations as noted in 1.3.b. above.

g.    [Lane v. Goglio] **Goglio** teaches all of these limitations as noted in 1.3.c. above.

h.    [Lane v. Goglio + Old Haas] **Goglio** teaches all of these limitations as noted in 1.3.c. above.

i.    [Lane v. Goglio + Old Encyclopedia] **Goglio** teaches all of these limitations as noted in 1.3.c. above.

j.    [Old Hargraves v. Goglio] **Goglio** teaches all of these limitations as noted in 1.3.d. above.

k.    [Old Hargraves v. Goglio + Old Haas] **Goglio** teaches all of these limitations as noted in 1.3.d. above.

l.    [Old Hargraves v. Goglio + Old Encyclopedia] **Goglio** teaches all of these limitations as noted in 1.3.d. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    m. [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches all of these limitations as noted in 1.3.f. above.


*33.4*    *wherein said bottom and body are constructed from a **polyolefin***;

[Note: this limitation is identical to the corresponding limitation 9.0 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

    a. [Melrose v. Goglio] **Melrose** teaches all of these limitations as noted in 9.0.a. above.

    b. [Melrose v. Goglio + Old Haas] **Haas** teaches all of these limitations as noted in 9.0.b. above.

    c. [Melrose v. Goglio + Old Encyclopedia] **Encyclopedia** teaches all of these limitations as noted in 9.0.c. above.

    d. [Newcomb v. Melrose] **Melrose** teaches all of these limitations as noted in 9.0.d. above.

    e. [Newcomb v. Melrose + of Old Haas] **Newcomb** teaches all of these limitations as noted in 9.0.d. above, and Haas does as well as noted in 33.4.b. above.

    f. [Newcomb v. Melrose + Old Encyclopedia] **Newcomb** teaches all of these limitations as noted in 9.0.d. above, and Encyclopedia does as well as noted in 33.4.c. above.

    g. [Lane v. Goglio] **Lane** teaches all of these limitations as noted in 9.0.g. above.

    h. [Lane v. Goglio + Old Haas] **Haas** teaches all of these limitations as noted in 9.0.h. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

DETAILED EXPLANATION

By Dalton et al.
SN 10/155,338

    i.   [Lane v. Goglio + Old Encyclopedia] **Encyclopedia** teaches all of these limitations as noted in 9.0.i. above.

    j.   [Old Hargraves v. Goglio] **Hargraves** teaches all of these limitations as noted in 9.0.j. above.

    k.   [Old Hargraves v. Goglio + Old Haas] **Haas** teaches all of these limitations as noted in 9.0.k. above.

    l.   [Old Hargraves v. Goglio + Old Encyclopedia] **Encyclopedia** teaches all of these limitations as noted in 9.0.l. above.

    m.  [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches all of these limitations as noted in 9.0.m. above.

*33.5*   *a **flexible closure** having a **one-way valve** disposed thereon, the closure removably attached to said protuberance wherein said closure forms a seal with said protuberance;*

[Note: this recitation essentially combines limitations 1.5 "a **flexible closure** removably attached and sealed to said protuberance" and 1.8 "wherein said closure has a **one-way valve** disposed therein", so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

    a.   [Melrose v. Goglio] **Goglio** teaches a flexible closure as noted in 1.5.a. above, and a one-way valve as noted in 1.8.a. above.

    b.   [Melrose v. Goglio + Old Haas] **Goglio** teaches a flexible closure as noted in 1.5.a. above, and a one-way valve as noted in 1.8.a. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
                                                                    By Dalton et al.
                                                                    SN 10/155,338

DETAILED EXPLANATION

c.  [Melrose v. Goglio + Old Encyclopedia] **Goglio** teaches a flexible closure as noted in 1.5.a. above, and a one-way valve as noted in 1.8.a. above.

d.  [Newcomb v. Melrose] **Newcomb** teaches a flexible closure as noted in 1.5.b. above, and a one-way valve as noted in 1.8.b. above.

e.  [Newcomb v. Melrose + of Old Haas] **Newcomb** teaches a flexible closure as noted in 1.5.b. above, and a one-way valve as noted in 1.8.b. above.

f.  [Newcomb v. Melrose + Old Encyclopedia] **Newcomb** teaches a flexible closure as noted in 1.5.b. above, and a one-way valve as noted in 1.8.b. above.

g.  [Lane v. Goglio] **Goglio** teaches a flexible closure as noted in 1.5.c. above, and a one-way valve as noted in 1.8.c. above.

h.  [Lane v. Goglio + Old Haas] **Goglio** teaches a flexible closure as noted in 1.5.c. above, and a one-way valve as noted in 1.8.c. above.

i.  [Lane v. Goglio + Old Encyclopedia] **Goglio** teaches a flexible closure as noted in 1.5.c. above, and a one-way valve as noted in 1.8.c. above.

j.  [Old Hargraves v. Goglio] **Goglio** teaches a flexible closure as noted in 1.5.d. above, and a one-way valve as noted in 1.8.d. above.

k.  [Old Hargraves v. Goglio + Old Haas] **Goglio** teaches a flexible closure as noted in 1.5.d. above, and a one-way valve as noted in 1.8.d. above.

l.  [Old Hargraves v. Goglio + Old Encyclopedia] **Goglio** teaches a flexible closure as noted in 1.5.d. above, and a one-way valve as noted in 1.8.d. above.

m.  [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches a flexible closure as noted in 1.5.f. above, and a one-way valve as noted in 1.8.f. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

33.6   *roast and ground coffee* contained within said interior volume; and,

[Note: this limitation is substantially identical to the corresponding limitation 23.0 discussed

above, so the same teachings apply and those teachings are merely incorporated by

reference hereafter.]

a.   [Melrose v. Goglio] **Goglio** teaches this limitation as noted in 23.0.a. above.

b.   [Melrose v. Goglio + Old Haas] **Goglio** teaches this limitation as noted in 23.0.a.

above.

c.   [Melrose v. Goglio + Old Encyclopedia] **Goglio** teaches this limitation as noted in

23.0.a. above.

d.   [Newcomb v. Melrose] **Newcomb** teaches this limitation as noted in 23.0.b. above.

e.   [Newcomb v. Melrose + of Old Haas] **Newcomb** teaches this limitation as noted in

23.0.b. above.

f.   [Newcomb v. Melrose + Old Encyclopedia] **Newcomb** teaches this limitation as

noted in 23.0.b. above.

g.   [Lane v. Goglio] **Goglio** teaches this limitation as noted in 23.0.c. above.

h.   [Lane v. Goglio + Old Haas] **Goglio** teaches this limitation as noted in 23.0.c. above.

i.   [Lane v. Goglio + Old Encyclopedia] **Goglio** teaches this limitation as noted in

23.0.c. above.

j.   [Old Hargraves v. Goglio] **Hargraves** teaches this limitation as noted in 23.0.d.

above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    k.  [Old Hargraves v. Goglio + Old Haas] **Hargraves** teaches this limitation as noted in 23.0.d. above.

    l.  [Old Hargraves v. Goglio + Old Encyclopedia] **Hargraves** teaches this limitation as noted in 23.0.d. above.

    m.  [Old Vidkjaer v. Melrose + Old Hargraves] **Hargraves** teaches this limitation as noted in 23.0.f. above.


*33.7*   *wherein said article of manufacture has an overall **coffee aroma value** of at least about*

       *5.5.*

[Note: this is the first recitation of this limitation.]

    <u>Inherency</u>.  During prosecution, the examiner stated that such an aroma value would be inherent in any structure meeting the claimed limitations, and such inherency is relied on hereafter.  In addition, it will be noted that Hargraves teaches that:

    The permeable walls of semi-rigid plastic packages of the present invention retain

    a high level of aroma gas chromatograph counts compared to the impermeable

    prior art metal cans.  See column 25, lines 21-24.

As the polyester (PET) material of the Hargraves container is likewise found in the prior art being considered, such a recitation also shows that such materials would likewise inherently have the disclosed aroma values.

    a.  [Melrose v. Goglio] As **Melrose** teaches a polyolefin as noted above in 33.4.a. and the rest of the structural claim limitations are met, the combination would also be expected to have a coffee aroma value as recited.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

b. [Melrose v. Goglio + Old Haas] As **Haas** teaches a polyolefin as noted above in 33.4.b. and the rest of the structural claim limitations are met, the combination would also be expected to have a coffee aroma value as recited.

c. [Melrose v. Goglio + Old Encyclopedia] As **Encyclopedia** teaches a polyolefin as noted above in 33.4.c. and the rest of the structural claim limitations are met, the combination would also be expected to have a coffee aroma value as recited.

d. [Newcomb v. Melrose] As **Melrose** teaches a polyolefin as noted above in 33.4.d. and as the rest of the structural claim limitations are met, the combination would also be expected to have a coffee aroma value as recited.

e. [Newcomb v. Melrose + of Old Haas] **Newcomb** teaches a polyolefin as noted above in 33.4.d., and Haas teaches as well a polyolefin as noted in 33.7.b above, and as the rest of the structural claim limitations are met, the combination would also be expected to have a coffee aroma value as recited.

f. [Newcomb v. Melrose + Old Encyclopedia] **Newcomb** teaches a polyolefin as noted above in 33.4.d., and Encyclopedia teaches as well a polyolefin as noted in 33.7.c. above, and as the rest of the structural claim limitations are met, the combination would also be expected to have a coffee aroma value as recited.

g. [Lane v. Goglio] As **Lane** teaches a polyolefin as noted above in 33.4.g. and the rest of the structural claim limitations are met, the combination would also be expected to have a coffee aroma value as recited.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

h.  [Lane v. Goglio + Old Haas] As **Haas** teaches a polyolefin as noted above in 33.4.h. and the rest of the structural claim limitations are met, the combination would also be expected to have a coffee aroma value as recited.

i.  [Lane v. Goglio + Old Encyclopedia] As **Encyclopedia** teaches a polyolefin as noted above in 33.4.i. and the rest of the structural claim limitations are met, the combination would also be expected to have a coffee aroma value as recited.

j.  [Old Hargraves v. Goglio] As **Hargraves** teaches a polyolefin as noted above in 33.4.j. and the rest of the structural claim limitations are met, the combination would also be expected to have a coffee aroma value as recited.

k.  [Old Hargraves v. Goglio + Old Haas] As **Haas** teaches a polyolefin as noted above in 33.4.k. and the rest of the structural claim limitations are met, the combination would also be expected to have a coffee aroma value as recited.

l.  [Old Hargraves v. Goglio + Old Encyclopedia] As **Encyclopedia** teaches a polyolefin as noted above in 33.4.l. and the rest of the structural claim limitations are met, the combination would also be expected to have a coffee aroma value as recited.

m.  [Old Vidkjaer v. Melrose + Old Hargraves] As **Vidkjaer** teaches a polyolefin as noted above in 33.4.m. and the rest of the structural claim limitations are met, the combination would also be expected to have a coffee aroma value as recited.

## Claim 34.

34.0    *The article of manufacture of claim 33 wherein said overall **coffee aroma value** is at least about 6.5.*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

a.  [Melrose v. Goglio] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.a. above, this larger recited aroma value is also inherent.

b.  [Melrose v. Goglio + Old Haas] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.b. above, this larger recited aroma value is also inherent.

c.  [Melrose v. Goglio + Old Encyclopedia] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.c. above, this larger recited aroma value is also inherent.

d.  [Newcomb v. Melrose] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.d. above, this larger recited aroma value is also inherent.

e.  [Newcomb v. Melrose + of Old Haas] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.d. above, this larger recited aroma value is also inherent.

f.  [Newcomb v. Melrose + Old Encyclopedia] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.d. above, this larger recited aroma value is also inherent.

g.  [Lane v. Goglio] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.g. above, this larger recited aroma value is also inherent.

h.  [Lane v. Goglio + Old Haas] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.h. above, this larger recited aroma value is also inherent.

i.  [Lane v. Goglio + Old Encyclopedia] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.i. above, this larger recited aroma value is also inherent.

j.  [Old Hargraves v. Goglio] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.j. above, this larger recited aroma value is also inherent.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

k.   [Old Hargraves v. Goglio + Old Haas] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.k. above, this larger recited aroma value is also inherent.

l.   [Old Hargraves v. Goglio + Old Encyclopedia] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.l. above, this larger recited aroma value is also inherent.

m.   [Old Vidkjaer v. Melrose + Old Hargraves] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.m. above, this larger recited aroma value is also inherent.

## Claim 35.

35.0   *The article of manufacture of claim 34 wherein said overall coffee aroma value is at least about 7.3.*

a.   [Melrose v. Goglio] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.a. above, this larger recited aroma value is also inherent.

b.   [Melrose v. Goglio + Old Haas] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.b. above, this larger recited aroma value is also inherent.

c.   [Melrose v. Goglio + Old Encyclopedia] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.c. above, this larger recited aroma value is also inherent.

d.   [Newcomb v. Melrose] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.d. above, this larger recited aroma value is also inherent.

e.   [Newcomb v. Melrose + of Old Haas] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.d. above, this larger recited aroma value is also inherent.

REQUEST for Reexamination of 7,169,418
Issued:  01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

f.    [Newcomb v. Melrose + Old Encyclopedia] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.d. above, this larger recited aroma value is also inherent.

g.    [Lane v. Goglio] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.g. above, this larger recited aroma value is also inherent.

h.    [Lane v. Goglio + Old Haas] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.h. above, this larger recited aroma value is also inherent.

i.    [Lane v. Goglio + Old Encyclopedia] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.i. above, this larger recited aroma value is also inherent.

j.    [Old Hargraves v. Goglio] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.j. above, this larger recited aroma value is also inherent.

k.    [Old Hargraves v. Goglio + Old Haas] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.k. above, this larger recited aroma value is also inherent.

l.    [Old Hargraves v. Goglio + Old Encyclopedia] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.l. above, this larger recited aroma value is also inherent.

m.    [Old Vidkjaer v. Melrose + Old Hargraves] Just as this combination teaches an inherent coffee aroma value as recited in 33.7.m. above, this larger recited aroma value is also inherent.

**Claims 36** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the following combinations of references:

REQUEST for Reexamination of 7,169,418
Issued:  01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

a.   Melrose in view of Goglio, and further in view of Old Vidkjaer;

b.   Melrose in view of Goglio, and further in view of Old Haas;

c.   Melrose in view of Goglio, and further in view of Old Encyclopedia;

d.   Newcomb in view of Melrose, and further in view of Old Vidkjaer;

e.   Newcomb in view of Melrose, and further in view of Old Haas;

f.   Newcomb in view of Melrose, and further in view of Old Encyclopedia;

g.   Lane in view of Goglio, and further in view of Old Vidkjaer;

h.   Lane in view of Goglio, and further in view of Old Haas;

i.   Lane in view of Goglio, and further in view of Old Encyclopedia;

j.   Old Hargraves in view of Goglio, and further in view of Old Vidkjaer; and

k.   Old Hargraves in view of Goglio, and further in view of Old Haas; and

l.   Old Hargraves in view of Goglio, and further in view of Old Encyclopedia; and

m.   Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 36.**

*36.0    The article of manufacture of claim 33 wherein said polyolefin is selected from the group*

*consisting of low density polyethylene, high density polyethylene, polypropylene, co-*

*polymers thereof, and combinations thereof.*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

a. [Melrose v. Goglio + Old Vidkjaer] **Vidkjaer** teaches various polyethylenes as recited in 13.0.a. above.

b. [Melrose v. Goglio + Old Haas] **Haas** teaches as recited in 11.0.b. above.

c. [Melrose v. Goglio + Old Encyclopedia] **Encyclopedia** teaches as recited in 20.0.c. above.

d. [Newcomb v. Melrose + Old Vidkjaer] **Vidkjaer** teaches various polyethylenes as recited in 13.0.a. above.

e. [Newcomb v. Melrose + of Old Haas] **Haas** teaches as recited in 11.0.b. above.

f. [Newcomb v. Melrose + Old Encyclopedia] **Encyclopedia** teaches as recited in 20.0.c. above.

g. [Lane v. Goglio + Old Vidkjaer] **Vidkjaer** teaches various polyethylenes as recited in 13.0.a. above.

h. [Lane v. Goglio + Old Haas] **Haas** teaches as recited in 11.0.b. above.

i. [Lane v. Goglio + Old Encyclopedia] **Encyclopedia** teaches as recited in 20.0.c. above.

j. [Old Hargraves v. Goglio + Old Vidkjaer] **Vidkjaer** teaches various polyethylenes as recited in 13.0.a. above.

k. [Old Hargraves v. Goglio + Old Haas] **Haas** teaches as recited in 11.0.b. above.

l. [Old Hargraves v. Goglio + Old Encyclopedia] **Encyclopedia** teaches as recited in 20.0.c. above.

m. [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches various polyethylenes as recited in 13.0.a. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

**Claims 37-39** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.   Melrose in view of Goglio;

b.   Newcomb in view of Melrose;

c.   Lane in view of Goglio;

d.   Old Hargraves in view of Goglio;

e.   Old Hargraves in view of Goglio, and further in view of Old Ota; and

f.   Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

## INDEPENDENT CLAIM 37.

*37.0    A packaging system comprising:*

*37.1    a **container** for holding **coffee** having a longitudinal axis and comprising a closed*

***bottom**, an **open top**, a **handle**, and a **body** having an enclosed perimeter between said*

*bottom and said top;*

*wherein said bottom, top, and body together define an **interior volume**;*

[Note:  this limitation includes the same features for a <u>container</u> as corresponding limitation 1.1

discussed above.  In addition, this limitation broadly recites a <u>handle</u>, similar to the

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

corresponding limitation 1.4; and the functional limitation for holding <u>coffee</u>, similar to corresponding limitation 22.0.  As the same teachings apply as for claim 1 and dependent claim 22, those teachings are merely incorporated by reference hereafter.]

a.  [Melrose v. Goglio] **Melrose** teaches a container 10 as noted in 1.1.a. above and a handle as noted in 1.4.a. above; and **Goglio** teaches filling with ground coffee as noted in 22.0.a. above.

b.  [Newcomb v. Melrose] **Newcomb** teaches a cylindrical container 2 as noted in 1.1.b. above; **Melrose** teaches a handle as noted in 1.4.b. above; and **Newcomb** teaches filling with ground coffee as noted in 22.0.b. above.

c.  [Lane v. Goglio] **Lane** teaches a broadly cylindrical container 10 as noted in 1.1.c. above, and a handle as noted in 1.4.c. above; and **Goglio** teaches filling with ground coffee as noted in 22.0.c. above.

d.  [Old Hargraves v. Goglio] **Hargraves** teaches a cylindrical container 300 as noted in 1.1.d. above, a handle as noted in 1.4.d. above, and a container with coffee as noted in 22.0.d. above.

e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches a cylindrical container 300 as noted in 1.1.e. above; **Ota** teaches a handle as noted in 1.4.e. above, and **Hargraves** teaches a container with coffee as noted in 22.0.e. above.

f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches a container 1 as noted in 1.1.f. above; **Vidkjaer** and **Melrose** teach a handle as noted in 1.4.f. above; and **Hargraves** teaches a container with coffee as noted in 22.0.f. above, if such is not inherent from the container of Vidkjaer.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

37.2    *wherein said body comprises at least one **region of deflection** disposed thereon, and*

*wherein said region of deflection allows flexion and thereby has less resistance to flexing*

*than the body of said container proximate to said region of deflection;*

[Note:  this limitation is identical to the corresponding limitation 1.2 discussed above, so the

same teachings apply and those teachings are merely incorporated by reference

hereafter.]

a.    [Melrose v. Goglio] **Melrose** teaches all of these limitations as noted in 1.2.a. above.

b.    [Newcomb v. Melrose] **Melrose** teaches all of these limitations as noted in 1.2.b.

above.

c.    [Lane v. Goglio] **Lane** teaches all of these limitations as noted in 1.2.c. above.

d.    [Old Hargraves v. Goglio] **Hargraves** teaches all of these limitations as noted in

1.2.d. above.

e.    [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches all of these limitations as

noted in 1.2.e. above.

f.    [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches all of these limitations

as noted in 1.2.f. above.

37.3    *a **protuberance** continuously disposed around the perimeter of said body proximate to*

*said top wherein said protuberance forms a ridge external to said body;*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

[Note: this limitation is identical to the corresponding limitation 1.3 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

    a.  [Melrose v. Goglio] **Goglio** teaches all of these limitations as noted in 1.3.a. above.

    b.  [Newcomb v. Melrose] **Newcomb** teaches all of these limitations as noted in 1.3.b. above.

    c.  [Lane v. Goglio] **Goglio** teaches all of these limitations as noted in 1.3.c. above.

    d.  [Old Hargraves v. Goglio] **Goglio** teaches all of these limitations as noted in 1.3.d. above.

    e.  [Old Hargraves v. Goglio + Old Ota] **Goglio** teaches all of these limitations as noted in 1.3.e. above.

    f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches all of these limitations as noted in 1.3.f. above.

*37.4*   *a **flexible closure** removably attached and sealed to said protuberance; and,*

[Note: this limitation is identical to the corresponding limitation 1.5 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

    a.  [Melrose v. Goglio] **Goglio** teaches a flexible closure as noted in 1.5.a. above.

    b.  [Newcomb v. Melrose] **Newcomb** teaches a flexible closure as noted in 1.5.b. above.

    c.  [Lane v. Goglio] **Goglio** teaches a flexible closure as noted in 1.5.c. above.

    d.  [Old Hargraves v. Goglio] **Goglio** teaches a flexible closure as noted in 1.5.d. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

e.    [Old Hargraves v. Goglio + Old Ota] **Hargraves** and **Goglio** teach all of these

limitations as noted in 1.5.e. above.

f.    [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches a flexible closure as

noted in 1.5.f. above.

37.5    *wherein said bottom and said body are constructed from a material having a **tensile***

*    **modulus number** ranging from at least about 35,000 pounds per square inch (2,381 atm)*

*    to at least about 650,000 pounds per square inch (44,230 atm); and*

[Note:  this limitation is identical to the corresponding limitation 1.6 discussed above, so the

same teachings apply and those teachings are merely incorporated by reference

hereafter.]

a.    [Melrose v. Goglio] **Melrose** teaches as noted in 1.6.a. above.

b.    [Newcomb v. Melrose] **Melrose** teaches as noted in 1.6.b. above.

c.    [Lane v. Goglio] **Lane** teaches as noted in 1.6.c. above.

d.    [Old Hargraves v. Goglio] **Hargraves** teaches as noted in 1.6.d. above.

e.    [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as noted in 1.6.e. above.

f.    [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches as noted in 1.6.f. above.

37.6    *wherein said container has a **top load capacity** of at least about 16 pounds (7.3 kg).*

[Note:  this limitation is identical to the corresponding limitation 1.7 discussed above, so the

same teachings apply and those teachings are merely incorporated by reference

hereafter.]

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

   a.  [Melrose v. Goglio] **Melrose** teaches as noted in 1.7.a. above.

   b.  [Newcomb v. Melrose] **Melrose** teaches as noted in 1.7.b. above.

   c.  [Lane v. Goglio] **Lane** teaches as noted in 1.7.c. above.

   d.  [Old Hargraves v. Goglio] **Hargraves** teaches as noted in 1.7.d. above.

   e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches as noted in 1.7.e. above.

   f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches as noted in 1.7.f. above.

## Claim 38.

38.0   *The packaging system of Claim 37 wherein said handle is **disposed** on said body of said container.*

[Note:  this limitation is identical to the corresponding limitation 1.4 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

   a.  [Melrose v. Goglio] **Melrose** teaches as noted in 1.4.a. above.

   b.  [Newcomb v. Melrose] **Melrose** teaches as noted in 1.4.b. above.

   c.  [Lane v. Goglio] **Lane** teaches as noted in 1.4.c. above.

   d.  [Old Hargraves v. Goglio] **Hargraves** teaches as noted in 1.4.d. above.

   e.  [Old Hargraves v. Goglio + Old Ota] **Ota** teaches as noted in 1.4.e. above.

   f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** and **Melrose** teach as noted in 1.4.f. above.

## Claim 39.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

*39.0    The packaging system of Claim 37 wherein said handle is **integral** with said body.*

[Note:  this limitation is identical to the corresponding limitation 14.0 discussed above, so the

same teachings apply and those teachings are merely incorporated by reference

hereafter.]

    a.    [Melrose v. Goglio] **Melrose** teaches as noted in 14.0.a. above.

    b.    [Newcomb v. Melrose] **Melrose** teaches as noted in 14.0.b. above.

    c.    [Lane v. Goglio] **Lane** teaches as noted in 14.0.c. above.

    d.    [Old Hargraves v. Goglio] **Hargraves** teaches as noted in 14.0.d. above.

    e.    [Old Hargraves v. Goglio + Old Ota] **Ota** teaches as noted in 14.0.e. above.

    f.    [Old Vidkjaer v. Melrose + Old Hargraves] **Melrose** teaches as noted in 14.0.f.

above.


**Claim 40** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the

following combinations of references:

    a.    Melrose in view of Goglio;

    b.    Newcomb in view of Melrose;

    c.    Lane in view of Goglio;

    d.    Old Hargraves in view of Goglio, and further in view of Melrose;

    e.    Old Hargraves in view of Goglio, and further in view of Old Ota; and

    f.    Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 40.**

40.0    *The packaging system of Claim 37 wherein said handle is substantially **parallel to said longitudinal axis** of said container.*

[Note:  this limitation is identical to the corresponding limitation 15.0 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

a.   [Melrose v. Goglio] **Melrose** teaches as noted in 15.0.a. above.

b.   [Newcomb v. Melrose] **Melrose** teaches as noted in 15.0.b. above.

c.   [Lane v. Goglio] **Lane** teaches as noted in 15.0.c. above.

d.   [Old Hargraves v. Goglio + Melrose] **Hargraves** and **Melrose** teach as noted in 15.0.d. above.

e.   [Old Hargraves v. Goglio + Old Ota] **Ota** teaches as noted in 15.0.e. above.

f.   [Old Vidkjaer v. Melrose + Old Hargraves] **Melrose** teaches as noted in 15.0.f. above.

**Claims 41-43** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.   Melrose in view of Goglio;

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

   b.  Newcomb in view of Melrose;

   c.  Lane in view of Goglio;

   d.  Old Hargraves in view of Goglio;

   e.  Old Hargraves in view of Goglio, and further in view of Old Ota; and

   f.  Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

Obviousness is shown by the following comparison in which the claim elements are recited in

italics for easier identification, and each prior art combination used for rejection identified by the

same letter and abbreviated identification of the prior art combination as shown above.


**Claim 41.**

41.0   *The packaging system of Claim 37 wherein said bottom and said body are formed from a*

      *material selected from the **group** consisting of polycarbonate, low density polyethylene,*

      *high density polyethylene, **polyethylene terephthalate**, polypropylene, polystyrene,*

      *polyvinyl chloride, co-polymers thereof and combinations thereof.*

[Note:  this limitation is identical to the corresponding limitation 10.0 discussed above, so the

       same teachings apply and those teachings are merely incorporated by reference

       hereafter.]

   a.  [Melrose v. Goglio] **Melrose** teaches PET as noted in 10.0.a. above.

   b.  [Newcomb v. Melrose] **Melrose** teaches PET as noted in 10.0.b. above.

   c.  [Lane v. Goglio] **Lane** teaches PET as noted in 10.0.c. above.

   d.  [Old Hargraves v. Goglio] **Hargraves** teaches PET as noted in 10.0.d. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

e.   [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches PET as noted in 10.0.e.

above.

f.   [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches PET/PE as noted in

10.0.f. above.


## Claim 42.

*42.0   The packaging system of Claim 37 wherein said container contains **coffee** therein.*

[Note:  this limitation was already shown to be taught in view of the recitation of "for holding

coffee" in independent claim 37, see 37.1.]


## Claim 43.

*43.0   The packaging system of Claim 37 wherein said container contains **roast and ground***

*coffee therein.*

[Note:  this limitation is substantially identical to the corresponding limitation 23.0 discussed

above, so the same teachings apply and those teachings are merely incorporated by

reference hereafter.]

a.   [Melrose v. Goglio] **Goglio** teaches this limitation as noted in 23.0.a. above.

b.   [Newcomb v. Melrose] **Newcomb** teaches this limitation as noted in 23.0.b. above.

c.   [Lane v. Goglio] **Goglio** teaches this limitation as noted in 23.0.c. above.

d.   [Old Hargraves v. Goglio] **Hargraves** teaches this limitation as noted in 23.0.d.

above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches this limitation as noted in 23.0.e. above.

    f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Hargraves** teaches this limitation as noted in 23.0.f. above.

    **Claims 44-46** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious over the following combinations of references:

    a.  Melrose in view of Goglio;

    b.  Newcomb in view of Melrose;

    c.  Lane in view of Goglio;

    d.  Old Hargraves in view of Goglio;

    e.  Old Hargraves in view of Goglio, and further in view of Old Ota; and

    f.  Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

## INDEPENDENT CLAIM 44.

*44.0   A packaging system comprising:*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

44.1    *a **container** for holding **coffee** having a longitudinal axis and comprising a closed*

*   ***bottom**, an **open top**, a **handle**, a **one-way valve** and a **body** having an enclosed*

*   *perimeter between said bottom and said top;*

*   *wherein said bottom, top, and body together define an **interior volume**;*

[Note: this limitation includes the same features as corresponding limitation 37.1 discussed

above, which as noted were incorporated from independent claim 1 and claim 22

dependent therefrom.  In addition, this limitation broadly recites a <u>one-way valve</u>, similar

to the corresponding limitation in 1.8.  As the same teachings apply as for 1.1 and 22.0

(as in 37.1) and for 1.8, those teachings are merely incorporated by reference hereafter.]

a.    [Melrose v. Goglio] **Melrose** teaches a container 10 as noted in 1.1.a. above, and a

handle as noted in 1.4.a. above; and **Goglio** teaches a one-way valve as noted in 1.8.a. above and

filling with ground coffee as noted in 22.0.a. above.

b.    [Newcomb v. Melrose] **Newcomb** teaches a cylindrical container 2 as noted in 1.1.b.

above, a one-way valve as noted in 1.8.b. above, and filling with ground coffee as noted in

22.0.b. above; and **Melrose** teaches a handle as noted in 1.4.b. above.

c.    [Lane v. Goglio] **Lane** teaches a broadly cylindrical container 10 as noted in 1.1.c.

above, and a handle as noted in 1.4.c. above; and **Goglio** teaches a one-way valve as noted in

1.8.c. above and filling with ground coffee as noted in 22.0.c. above.

d.    [Old Hargraves v. Goglio] **Hargraves** teaches a cylindrical container 300 as noted in

1.1.d. above, a handle as noted in 1.4.d. above, and a container with coffee as noted in 22.0.d.

above; and **Goglio** teaches a one-way valve as noted in 1.8.d. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches a cylindrical container 300 as noted in 1.1.e. above; **Ota** teaches a handle as noted in 1.4.e. above, and **Hargraves** teaches a container with coffee as noted in 22.0.e. above; and **Goglio** teaches a one-way valve as noted in 1.8.a.

    f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches a container 1 as noted in 1.1.f. above and a one-way valve as noted in 1.8.f. above; **Vidkjaer** and **Melrose** teach a handle as noted in 1.4.f. above; and **Hargraves** teaches a container with coffee as noted in 22.0.f. above, if such is not inherent from the container of Vidkjaer.


*44.2*    *wherein said body comprises at least one **region of deflection** disposed thereon, and wherein said region of deflection allows flexion and thereby has less resistance to flexing than the body of said container proximate to said region of deflection;*

[Note:  this limitation is identical to the corresponding limitation 1.2 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

    a.  [Melrose v. Goglio] **Melrose** teaches all of these limitations as noted in 1.2.a. above.

    b.  [Newcomb v. Melrose] **Melrose** teaches all of these limitations as noted in 1.2.b. above.

    c.  [Lane v. Goglio] **Lane** teaches all of these limitations as noted in 1.2.c. above.

    d.  [Old Hargraves v. Goglio] **Hargraves** teaches all of these limitations as noted in 1.2.d. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007                                                    By Dalton et al.
                                                                     SN 10/155,338
                          DETAILED EXPLANATION

    e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches all of these limitations as noted in 1.2.e. above.

    f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches all of these limitations as noted in 1.2.f. above.

*44.3*    *a **protuberance** continuously disposed around the perimeter of said body proximate to said top wherein said protuberance forms a ridge external to said body;*

[Note:  this limitation is identical to the corresponding limitation 1.3 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

    a.  [Melrose v. Goglio] **Goglio** teaches all of these limitations as noted in 1.3.a. above.

    b.  [Newcomb v. Melrose] **Newcomb** teaches all of these limitations as noted in 1.3.b. above.

    c.  [Lane v. Goglio] **Goglio** teaches all of these limitations as noted in 1.3.c. above.

    d.  [Old Hargraves v. Goglio] **Goglio** teaches all of these limitations as noted in 1.3.d. above.

    e.  [Old Hargraves v. Goglio + Old Ota] **Goglio** teaches all of these limitations as noted in 1.3.e. above.

    f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches all of these limitations as noted in 1.3.f. above.

*44.4*    *a **flexible closure** removably attached and sealed to said protuberance; and,*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

[Note: this limitation is identical to the corresponding limitation 1.5 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

a. [Melrose v. Goglio] **Goglio** teaches a flexible closure as noted in 1.5.a. above.

b. [Newcomb v. Melrose] **Newcomb** teaches a flexible closure as noted in 1.5.b. above.

c. [Lane v. Goglio] **Goglio** teaches a flexible closure as noted in 1.5.c. above.

d. [Old Hargraves v. Goglio] **Goglio** teaches a flexible closure as noted in 1.5.d. above.

e. [Old Hargraves v. Goglio + Old Ota] **Hargraves** and **Goglio** teach all of these limitations as noted in 1.5.e. above.

f. [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches a flexible closure as noted in 1.5.f. above.

*44.5    wherein said bottom and said body are constructed from a material selected from the* **group** *consisting of polycarbonate, low density polyethylene, high density polyethylene,* **polyethylene terephthalate**, *polypropylene, polystyrene, polyvinyl chloride, co-polymers thereof and combinations thereof.*

[Note: this limitation is substantially identical to the corresponding limitation 10.0 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

a. [Melrose v. Goglio] **Melrose** teaches a container of PET as noted in 10.0.a. above.

b. [Newcomb v. Melrose] **Melrose** teaches a container of PET as noted in 10.0.b. above.

c. [Lane v. Goglio] **Lane** teaches a container of PET as noted in 10.0.c. above.

REQUEST for Reexamination of 7,169,418
Issued:  01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    d.  [Old Hargraves v. Goglio] **Hargraves** teaches a container of PET as noted in 10.0.d. above.

    e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches a container of PET as noted in 10.0.e. above.

    f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches a container made of the multi-layer  PET/PE as noted in 10.0.f. above.


**Claim 45.**

45.0   *The packaging system of Claim 44 wherein said handle is **disposed** on said body of said*

       *container.*

[Note:  this limitation is identical to the corresponding limitation 1.4 discussed above, so the

       same teachings apply and those teachings are merely incorporated by reference

       hereafter.]

    a.  [Melrose v. Goglio] **Melrose** teaches as noted in 1.4.a. above.

    b.  [Newcomb v. Melrose] **Melrose** teaches as noted in 1.4.b. above.

    c.  [Lane v. Goglio] **Lane** teaches as noted in 1.4.c. above.

    d.  [Old Hargraves v. Goglio] **Hargraves** teaches as noted in 1.4.d. above.

    e.  [Old Hargraves v. Goglio + Old Ota] **Ota** teaches as noted in 1.4.e. above.

    f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** and **Melrose** teach as noted in 1.4.f. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

**Claim 46.**

*46.0    The packaging system of Claim 44 wherein said handle is **integral** with said body.*

[Note:  this limitation is identical to the corresponding limitation 14.0 discussed above, so the

same teachings apply and those teachings are merely incorporated by reference

hereafter.]

a.   [Melrose v. Goglio] **Melrose** teaches as noted in 14.0.a. above.

b.   [Newcomb v. Melrose] **Melrose** teaches as noted in 14.0.b. above.

c.   [Lane v. Goglio] **Lane** teaches as noted in 14.0.c. above.

d.   [Old Hargraves v. Goglio] **Hargraves** teaches as noted in 14.0.d. above.

e.   [Old Hargraves v. Goglio + Old Ota] **Ota** teaches as noted in 14.0.e. above.

f.   [Old Vidkjaer v. Melrose + Old Hargraves] **Melrose** teaches as noted in 14.0.f.

above.


**Claim 4**7 of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the

following combinations of references:

a.   Melrose in view of Goglio;

b.   Newcomb in view of Melrose;

c.   Lane in view of Goglio;

d.   Old Hargraves in view of Goglio, and further in view of Melrose;

e.   Old Hargraves in view of Goglio, and further in view of Old Ota; and

f.   Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

## Claim 47.

47.0    *The packaging system of Claim 44 wherein said handle is substantially **parallel** to said longitudinal axis of said container.*

[Note:  this limitation is identical to the corresponding limitation 15.0 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

a.    [Melrose v. Goglio] **Melrose** teaches as noted in 15.0.a. above.

b.    [Newcomb v. Melrose] **Melrose** teaches as noted in 15.0.b. above.

c.    [Lane v. Goglio] **Lane** teaches as noted in 15.0.c. above.

d.    [Old Hargraves v. Goglio + Melrose] **Hargraves** and **Melrose** teach as noted in 15.0.d. above.

e.    [Old Hargraves v. Goglio + Old Ota] **Ota** teaches as noted in 15.0.e. above.

f.    [Old Vidkjaer v. Melrose + Old Hargraves] **Melrose** teaches as noted in 15.0.f. above.

**Claims 48-49** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.    Melrose in view of Goglio;

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    b.  Newcomb in view of Melrose;

    c.  Lane in view of Goglio;

    d.  Old Hargraves in view of Goglio;

    e.  Old Hargraves in view of Goglio, and further in view of Old Ota; and

    f.  Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 48.**

*48.0*   *The packaging system of Claim 44 wherein said container contains **coffee** therein.*

[Note:  this limitation was already shown to be taught in view of the recitation of "for holding coffee" in independent claim 44, see 44.1.]

**Claim 49.**

*49.0*   *The packaging system of Claim 48 wherein said coffee is **roast and ground**.*

[Note:  this limitation is substantially identical to the corresponding limitation 23.0 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

    a.  [Melrose v. Goglio] **Goglio** teaches this limitation as noted in 23.0.a. above.

    b.  [Newcomb v. Melrose] **Newcomb** teaches this limitation as noted in 23.0.b. above.

    c.  [Lane v. Goglio] **Goglio** teaches this limitation as noted in 23.0.c. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

d.  [Old Hargraves v. Goglio] **Hargraves** teaches this limitation as noted in 23.0.d. above.

e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches this limitation as noted in 23.0.e. above.

f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Hargraves** teaches this limitation as noted in 23.0.f. above.


**Claims 50-52** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.  Melrose in view of Goglio;

b.  Newcomb in view of Melrose;

c.  Lane in view of Goglio;

d.  Old Hargraves in view of Goglio;

e.  Old Hargraves in view of Goglio, and further in view of Old Ota; and

f.  Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.


## INDEPENDENT CLAIM 50.

*50.0    A packaging system comprising:*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007                                                      By Dalton et al.
                                                                        SN 10/155,338
                        DETAILED EXPLANATION

50.1    *a **container** for holding **coffee** having a longitudinal axis and comprising a closed*

*        **bottom**, an **open top**, a **handle**, and a **body** having an enclosed perimeter between said*

*        bottom and said top;*

*        wherein said bottom, top, and body together define an **interior volume**;*

[Note:  this limitation includes the same features as corresponding limitation 37.1 discussed

        above, which as noted were incorporated from independent claim 1 and claim 22

        dependent therefrom.  As the same teachings apply as for 1.1 and 22.0 (as in 37.1), those

        teachings of 37.1 are <u>repeated</u> hereafter for convenience (rather than merely referring to

        37.1).]

        a.   [Melrose v. Goglio] **Melrose** teaches a container 10 as noted in 1.1.a. above and a

handle as noted in 1.4.a. above; and **Goglio** teaches filling with ground coffee as noted in 22.0.a.

above.

        b.   [Newcomb v. Melrose] **Newcomb** teaches a cylindrical container 2 as noted in 1.1.b.

above; **Melrose** teaches a handle as noted in 1.4.b. above; and **Newcomb** teaches filling with

ground coffee as noted in 22.0.b. above.

        c.   [Lane v. Goglio] **Lane** teaches a broadly cylindrical container 10 as noted in 1.1.c.

above, and a handle as noted in 1.4.c. above; and **Goglio** teaches filling with ground coffee as

noted in 22.0.c. above.

        d.   [Old Hargraves v. Goglio] **Hargraves** teaches a cylindrical container 300 as noted in

1.1.d. above, a handle as noted in 1.4.d. above, and a container with coffee as noted in 22.0.d.

above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
DETAILED EXPLANATION
By Dalton et al.
SN 10/155,338

e.    [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches a cylindrical container 300 as noted in 1.1.e. above; **Ota** teaches a handle as noted in 1.4.e. above, and **Hargraves** teaches a container with coffee as noted in 22.0.e. above.

f.    [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches a container 1 as noted in 1.1.f. above; **Vidkjaer** and **Melrose** teach a handle as noted in 1.4.f. above; and **Hargraves** teaches a container with coffee as noted in 22.0.f. above, if such is not inherent from the container of Vidkjaer.


*50.2    wherein said body comprises at least **one region of deflection** disposed thereon, and*

*wherein said region of deflection allows flexion and thereby has less resistance to flexing*

*than the body of said container proximate to said region of deflection;*

[Note:  this limitation is identical to the corresponding limitation 1.2 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

a.    [Melrose v. Goglio] **Melrose** teaches all of these limitations as noted in 1.2.a. above.

b.    [Newcomb v. Melrose] **Melrose** teaches all of these limitations as noted in 1.2.b. above.

c.    [Lane v. Goglio] **Lane** teaches all of these limitations as noted in 1.2.c. above.

d.    [Old Hargraves v. Goglio] **Hargraves** teaches all of these limitations as noted in 1.2.d. above.

e.    [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches all of these limitations as noted in 1.2.e. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

    f.   [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches all of these limitations as noted in 1.2.f. above.

50.3    *a **protuberance** continuously disposed around the perimeter of said body proximate to said top wherein said protuberance forms a ridge external to said body;*

[Note: this limitation is identical to the corresponding limitation 1.3 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

    a.   [Melrose v. Goglio] **Goglio** teaches all of these limitations as noted in 1.3.a. above.

    b.   [Newcomb v. Melrose] **Newcomb** teaches all of these limitations as noted in 1.3.b. above.

    c.   [Lane v. Goglio] **Goglio** teaches all of these limitations as noted in 1.3.c. above.

    d.   [Old Hargraves v. Goglio] **Goglio** teaches all of these limitations as noted in 1.3.d. above.

    e.   [Old Hargraves v. Goglio + Old Ota] **Goglio** teaches all of these limitations as noted in 1.3.e. above.

    f.   [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches all of these limitations as noted in 1.3.f. above.

50.4    *a **flexible closure** removably attached and sealed to said protuberance; and,*

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

[Note: this limitation is identical to the corresponding limitation 1.5 discussed above, so the

same teachings apply and those teachings are merely incorporated by reference

hereafter.]

   a.   [Melrose v. Goglio] **Goglio** teaches a flexible closure as noted in 1.5.a. above.

   b.   [Newcomb v. Melrose] **Newcomb** teaches a flexible closure as noted in 1.5.b. above.

   c.   [Lane v. Goglio] **Goglio** teaches a flexible closure as noted in 1.5.c. above.

   d.   [Old Hargraves v. Goglio] **Goglio** teaches a flexible closure as noted in 1.5.d. above.

   e.   [Old Hargraves v. Goglio + Old Ota] **Hargraves** and **Goglio** teach all of these

limitations as noted in 1.5.e. above.

   f.   [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches a flexible closure as

noted in 1.5.f. above.


*50.5    wherein said bottom and said body are constructed from a material selected from the*

   *group consisting of polycarbonate, low density polyethylene, high density polyethylene,*

   *polyethylene terephthalate, polypropylene, polystyrene, polyvinyl chloride, co-polymers*

   *thereof and combinations thereof.*

[Note: this limitation is substantially identical to the corresponding limitation 10.0 discussed

above, so the same teachings apply and those teachings are merely incorporated by

reference hereafter.]

   a.   [Melrose v. Goglio] **Melrose** teaches a container of PET as noted in 10.0.a. above.

   b.   [Newcomb v. Melrose] **Melrose** teaches a container of PET as noted in 10.0.b. above.

   c.   [Lane v. Goglio] **Lane** teaches a container of PET as noted in 10.0.c. above.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007                                    By Dalton et al.
                                                      SN 10/155,338

DETAILED EXPLANATION

    d.  [Old Hargraves v. Goglio] **Hargraves** teaches a container of PET as noted in 10.0.d. above.

    e.  [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches a container of PET as noted in 10.0.e. above.

    f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** teaches a container made of the multi-layer PET/PE as noted in 10.0.f. above.


## Claim 51.

*51.0   The packaging system of Claim 50 wherein said handle is **disposed** on said body of said*

    *container.*

[Note:  this limitation is identical to the corresponding limitation 1.4 discussed above, so the

    same teachings apply and those teachings are merely incorporated by reference

    hereafter.]

    a.  [Melrose v. Goglio] **Melrose** teaches as noted in 1.4.a. above.

    b.  [Newcomb v. Melrose] **Melrose** teaches as noted in 1.4.b. above.

    c.  [Lane v. Goglio] **Lane** teaches as noted in 1.4.c. above.

    d.  [Old Hargraves v. Goglio] **Hargraves** teaches as noted in 1.4.d. above.

    e.  [Old Hargraves v. Goglio + Old Ota] **Ota** teaches as noted in 1.4.e. above.

    f.  [Old Vidkjaer v. Melrose + Old Hargraves] **Vidkjaer** and **Melrose** teach as noted in 1.4.f. above.


## Claim 52.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007

By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

52.0    *The packaging system of Claim 50 wherein said handle is **integral** with said body.*

[Note:  this limitation is identical to the corresponding limitation 14.0 discussed above, so the

same teachings apply and those teachings are merely incorporated by reference

hereafter.]

    a.    [Melrose v. Goglio] **Melrose** teaches as noted in 14.0.a. above.

    b.    [Newcomb v. Melrose] **Melrose** teaches as noted in 14.0.b. above.

    c.    [Lane v. Goglio] **Lane** teaches as noted in 14.0.c. above.

    d.    [Old Hargraves v. Goglio] **Hargraves** teaches as noted in 14.0.d. above.

    e.    [Old Hargraves v. Goglio + Old Ota] **Ota** teaches as noted in 14.0.e. above.

    f.    [Old Vidkjaer v. Melrose + Old Hargraves] **Melrose** teaches as noted in 14.0.f.

above.


    **Claim 53** of USP 7,169,418 is unpatentable under 35 USC 103 as being obvious over the

following combinations of references:

    a.    Melrose in view of Goglio;

    b.    Newcomb in view of Melrose;

    c.    Lane in view of Goglio;

    d.    Old Hargraves in view of Goglio, and further in view of Melrose;

    e.    Old Hargraves in view of Goglio, and further in view of Old Ota; and

    f.    Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

REQUEST for Reexamination of 7,169,418
Issued: 01/30/2007
By Dalton et al.
SN 10/155,338

DETAILED EXPLANATION

Obviousness is shown by the following comparison in which the claim elements are recited in italics for easier identification, and each prior art combination used for rejection identified by the same letter and abbreviated identification of the prior art combination as shown above.

**Claim 53.**

53.0    *The packaging system of Claim 50 wherein said handle is substantially **parallel** to said longitudinal axis of said container.*

[Note:  this limitation is identical to the corresponding limitation 15.0 discussed above, so the same teachings apply and those teachings are merely incorporated by reference hereafter.]

a.    [Melrose v. Goglio] **Melrose** teaches as noted in 15.0.a. above.

b.    [Newcomb v. Melrose] **Melrose** teaches as noted in 15.0.b. above.

c.    [Lane v. Goglio] **Lane** teaches as noted in 15.0.c. above.

d.    [Old Hargraves v. Goglio + Melrose] **Hargraves** and **Melrose** teach as noted in 15.0.d. above.

e.    [Old Hargraves v. Goglio + Old Ota] **Ota** teaches as noted in 15.0.e. above.

f.    [Old Vidkjaer v. Melrose + Old Hargraves] **Melrose** teaches as noted in 15.0.f. above.

**Claims 54-55** of USP 7,169,418 are unpatentable under 35 USC 103 as being obvious over the following combinations of references:

a.    Melrose in view of Goglio;

REQUEST for Reexamination of 7,169,418                    By Dalton et al.
Issued: 01/30/2007                                         SN 10/155,338
DETAILED EXPLANATION

b.   Newcomb in view of Melrose;

c.   Lane in view of Goglio;

d.   Old Hargraves in view of Goglio;

e.   Old Hargraves in view of Goglio, and further in view of Old Ota; and

f.   Old Vidkjaer in view of Melrose, and further in view of Old Hargraves.

Obviousness is shown by the following comparison in which the claim elements are recited in

italics for easier identification, and each prior art combination used for rejection identified by the

same letter and abbreviated identification of the prior art combination as shown above.


## Claim 54.

54.0   *The packaging system of Claim 50 wherein said container contains **coffee** therein.*

[Note:  this limitation was already shown to be taught in view of the recitation of "for holding

        coffee" in independent claim 50, see 50.1.]


## Claim 55.

55.0   *The packaging system of Claim 54 wherein said coffee is **roast and ground**.*

[Note:  this limitation is substantially identical to the corresponding limitation 23.0 discussed

        above, so the same teachings apply and those teachings are merely incorporated by

        reference hereafter.]

a.   [Melrose v. Goglio] **Goglio** teaches this limitation as noted in 23.0.a. above.

b.   [Newcomb v. Melrose] **Newcomb** teaches this limitation as noted in 23.0.b. above.

c.   [Lane v. Goglio] **Goglio** teaches this limitation as noted in 23.0.c. above.

REQUEST for Reexamination of 7,169,418                          By Dalton et al.
Issued: 01/30/2007                                             SN 10/155,338
                          DETAILED EXPLANATION

    d.   [Old Hargraves v. Goglio] **Hargraves** teaches this limitation as noted in 23.0.d.

above.

    e.   [Old Hargraves v. Goglio + Old Ota] **Hargraves** teaches this limitation as noted in

23.0.e. above.

    f.   [Old Vidkjaer v. Melrose + Old Hargraves] **Hargraves** teaches this limitation as

noted in 23.0.f. above.


CONCLUSION

    For the reasons given above, reexamination of claims 1-55 of U.S. Patent 7,169,418 is

requested.


                        Respectfully submitted,

Date:   January 31, 2007

                        By:   Marvin Petry,
                           Attorney for Requestor
                        Registration No.:    22,752

**STITES & HARBISON PLC** ◆ 1199 North Fairfax St. ◆ Suite 900 ◆ Alexandria, VA 22314
TEL: 703-739-4900 ◆ FAX: 703-739-9577 ◆ CUSTOMER No. 000881


123LT:1931:42497:2:ALEXANDRIA           102

# EXHIBIT 2

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Claude M. Stern (Bar No. 96737)
    claudestern@quinnemanuel.com
  Evette D. Pennypacker (Bar No. 203515)
    evettepennypacker@quinnemanuel.com
  Mike D. Powell (Bar No. 202850)
    mikepowell@quinnemanuel.com

555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100

Attorneys for Defendant
KRAFT FOODS GLOBAL, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE PROCTER & GAMBLE COMPANY, a Delaware corporation,<br><br>        Plaintiff,<br><br>   vs.<br><br>KRAFT FOODS GLOBAL, INC, a Delaware Corporation,<br><br>        Defendant. | CASE NO. C 07-4413 PJH<br><br>**NOTICE OF MOTION AND MOTION FOR STAY, OR, IN THE ALTERNATIVE MOTION TO EXPEDITE DISCOVERY AND TO CONTINUE PRELIMINARY INJUNCTION MOTION HEARING DATE**<br><br>Date:  September 26, 2007<br>Time:  9:00 a.m.<br>Place:  Courtroom 3, 17th Floor |

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 26 and Civil Local Rules 6-1, 6-3, and 7-10, and 65-1 on Wednesday, September 26, 2007 at 9:00 a.m. in the U.S. District Court for the Northern District of California, located at 450 Golden Gate Avenue, Courtroom 3, 17th Floor, San Francisco, California 94102, Defendant Kraft Foods Global, Inc. ("Kraft"), will move this Court for an order to stay the present litigation pending the outcome of a currently pending *inter partes* reexamination proceeding involving the patent at issue in this lawsuit or, in the alternative, to continue the hearing date on the Procter & Gamble Company's

NOTICE OF MOTION AND MOTION TO STAY OR FOR EXPEDITED DISCOVERY AND TO CONTINUE HEARING DATE
Case No. C 07-4413 PJH

1  ("P&G") motion for preliminary injunction by 7 weeks to allow Kraft sufficient time to take

2  limited expedited discovery.

3      In this lawsuit, P&G claims that Kraft infringes U.S. Patent Number 7,169,418, entitled

4  "Packaging System to Provide Fresh Packed Coffee." That same patent is currently the subject of

5  an *inter partes* reexamination proceeding before the Patent and Trademark Office. It is proper for

6  this Court to stay the present litigation pending the outcome of the *inter partes* reexamination

7  proceeding that involves the very same patent asserted against Kraft in this case. Among other

8  things, the *inter partes* reexamination may dispose of all or some of the asserted claims and

9  otherwise narrow the issues the Court must determine. A stay of this litigation pending resolution

10  of the *inter partes* reexamination will therefore conserve judicial resources, avoid potentially

11  conflicting decisions, and otherwise promote the efficient resolution of the parties' dispute.

12      If the Court declines to stay these proceedings pending the outcome of the reexamination,

13  Kraft requests, in the alternative, that the Court issue an order continuing the hearing on P&G's

14  motion for preliminary injunction by 7 weeks to December 19, 2007 in order to allow Kraft to take

15  limited expedited discovery concerning the issues raised, and evidence presented, by P&G's

16  motion. Such a continuance and limited discovery are appropriately allowed in this case, where

17  Kraft faces the possibility of taking its 39 ounce Maxwell House brand coffee off the market — an

18  approximately $250 million loss to Kraft (without even considering lost customers or other

19  collateral effects of removing its product from the market) — in the event its use of the plastic

20  container is enjoined.

21      This motion for a stay of this lawsuit, or, in the alternative to continue the hearing date on

22  P&G's motion for preliminary injunction, is supported by the accompanying Memorandum of

23  Points and Authorities, the Complaint filed in this action, and the Declaration of Claude M. Stern,

24  and accompanying exhibits, each filed contemporaneously with this motion.

25  DATED: September ___, 2007          QUINN EMANUEL URQUHART OLIVER &
                                        HEDGES, LLP
26

27                                      By_____
28
                                        2
NOTICE OF MOTION AND MOTION TO STAY OR FOR EXPEDITED DISCOVERY AND TO CONTINUE
HEARING DATE
Case No. C 07-4413 PJH

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

quinn emanuel

Claude M. Stern
Attorneys for Defendant Kraft Foods Global, Inc.

3

**TABLE OF CONTENTS**

**Page**

PRELIMINARY AND FACTUAL STATEMENT ..........................................................................1

I.     A STAY SHOULD BE GRANTED...................................................................................2

       A.     This Court Has Discretion to Grant Kraft's Motion to Stay ....................................2

       B.     A Stay of All Proceedings Is Warranted in this Case .............................................4

              1.     A Stay Will Likely Render the Case Moot or Simplify the Issues................4

              2.     No Discovery Has Been Served, and No Trial Date Has Been Set................6

              3.     A Stay Would Not Prejudice Procter & Gamble...........................................7

II.    IF THIS COURT DECLINES TO GRANT A STAY, THIS COURT SHOULD
       GRANT KRAFT'S ALTERNATIVE REQUEST TO TAKE EXPEDITED
       DISCOVERY AND CONTINUE THE HEARING DATE ON P&G'S
       PRELIMINARY INJUNCTION MOTION ...................................................................10

CONCLUSION ................................................................................................................14

NOTICE OF MOTION AND MOTION TO STAY OR FOR EXPEDITED DISCOVERY AND TO CONTINUE
HEARING DATE
Case No. C 07-4413 PJH

Case 3:07-cv-04413-PJH   Document 4374   Filed 09/06/2008   Page 56 of 212

# TABLE OF AUTHORITIES

**Page**

## Cases

*ASCII Corp. v. STD Entm't USA, Inc.,*
844 F. Supp. 1378 (N.D. Cal. 1994)..................................................................1, 2, 3

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.,*
239 F.3d 1343 (Fed. Cir. 2001)..................................................................2

*American Life Ins. Co. v. Stewart,*
300 U.S. 203 (1937) ..................................................................2

*Brown v. Shimano American Corp., No. CIV 88-6565 WJR,*
1991 WL 133586 (C.D. Cal. 1991)..................................................................3

*Commodity Futures Trading Com'n v. International Financial Services,*
2002 WL 1801723 (S.D.N.Y. 2002)..................................................................4

*Ethicon, Inc. v. Quigg,*
849 F.2d 1422 (Fed. Cir. 1998)..................................................................2

*FTC v. 1268957 Ontario, Inc.,*
2001 WL 34135319 (N.D.Ga. 2001)..................................................................5

*Gould v. Control Laser Corp.,*
705 F.2d 1340 (Fed. Cir. 1983)..................................................................2, 3

*Grayling Indus., Inc. v. GPAC, Inc.,*
1991 WL 236196 (N.D. Ga. March 25, 1991)..................................................................3

*Guthy-Renker,*
48 U.S.P.Q. 2d at 1061 ..................................................................1

*Intel Corp. v. ULSI System Technology,*
995 F.2d 1566 (Fed. Cir. 1993)..................................................................1

*KLA-Tencor Corp. v. Nanometrics, Inc.,*
No. C-05-03116..................................................................2

*KSR v. Teleflex,*
127 S. Ct. 1727 (April 30, 2007)..................................................................1, 2, 4

*Medichem, S.A. v. Rolabo, S.L.,*
353 F.3d 928 (Fed.Cir. 2003)..................................................................3

*Middleton, Inc., v. Minn. Mining and Manufacture Co.,*
No. 4:03-cv-40493 (S.D. IOWA Aug. 24, 2004)..................................................................4

*Nanometrics, Inc. v. Nova Measuring Instruments, Ltd.,*
No. C-06-2252..................................................................3

**quinn emanuel**

1   *Pass & Seymour, Inc. v. Hubbell Inc.*,
        2007 WL. 2172648 (N.D.N.Y. 2007) ..................................................................... 3, 4
2
3   *Patlex Corp. v. Mossinghoff*,
        758 F.2d 594 (Fed.Cir. 1985) ................................................................................... 3
4   *Perricone v. Unimed Nutritional Services, Inc.*,
        2002 WL. 31075868 (D. Conn. 2002) ............................................................... 2, 3, 4
5
6   *Phillips v. AWH*,
        415 F.3d 1303 (Fed. Cir 2005) ................................................................................ 1
7   *RDS Group Ltd. v. Davison*,
        No. 02-8168, 2003 LEXIS 1337 (E.D.Pa. Jan. 17, 2003) ...................................... 4
8
9   *Reebok International, Ltd. v. J. Baker, Inc.*,
        32 F.3d 1552 (Fed. Cir. 1994) ................................................................................. 1
10  *Ricoh Co., Ltd. v. Aeroflex Inc.*,
        2006 WL. 3708069 (N.D. Cal. 2006) ...................................................................... 1
11
12  *Semitool, Inc. v. Tokyo Electron America, Inc.*,
        208 F.R.D. 273 (N.D. Cal. 2002) ............................................................................ 4
13  *TKR Cable Co. v. Cable City Corp.*,
        1996 U.S. Dist. LEXIS 11941 (D.N.J. 1996) .......................................................... 4
14
15  *Target Therapeutics, Inc. v. SciMed Life Sys., Inc.*,
        33 U.S.P.Q. 2d 2022 (N.D. Cal. 1995) .................................................................... 2
16  *Visto Corp. v. Sproqit Technologies, Inc.*,
        413 F. Supp. 2d 1073 (N.D.Cal. 2006) .................................................................... 1
17

18                                              **Statutes**

19  35 U.S.C. §§ 134, 315 ...................................................................................................... 4

20  35 U.S.C. 315(c) ................................................................................................................ 1

21  35 U.S.C. §318 (West 2007) ............................................................................................. 4

22  Federal Rule of Civil Procedure 26 ............................................................................ 1, 4, 6

23  Fed. R. Civ. Proc. 26(f) ..................................................................................................... 4

24  Rule 30(a) ........................................................................................................................ 4

25  Rules 6-1, 6-3 .................................................................................................................... 1

26  Rules 33 ............................................................................................................................ 4

27                                           **Miscellaneous**
28

-iii-

8 Wright & Miller, *Federal Practice and Procedure* § 2104 .......................................................... 4

*Moore's Federal Practice 3d* § 26.121 ............................................................................................. 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

quinn emanuel

-iv-

quinn emanuel

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

<u>**Preliminary and Factual Statement**</u>

Defendant Kraft Food Global, Inc., ("Kraft") respectfully requests that the Court issue and order staying all proceedings in this case (including the Procter & Gamble Company's ("P&G") motion for preliminary injunction) pending resolution of the *inter partes* reexamination of the only asserted patent in this case, U.S. Patent No. 7,169,418 ("'418 patent"). This is precisely the type of case where a stay is appropriate, since no discovery has been conducted, the only patent in suit is currently in reexamination proceedings before the United States Patent and Trademark Office ("PTO"), and P&G will not be able to demonstrate undue prejudice pending a stay.

Alternatively, if no stay is put into place, Kraft requests that the Court continue the hearing on P&G's motion for preliminary injunction by 60 days to allow Kraft to conduct expedited discovery concerning issues raised by P&G's preliminary injunction motion.

Stated simply, this lawsuit involves P&G's claim that Kraft's plastic packaging for its Maxwell House® brand coffee infringes the '418 patent. P&G filed this suit about 3 weeks ago, on or about August 27, 2007. P&G filed a motion for preliminary injunction last week on September 14, 2007. In its preliminary injunction motion, P&G seeks to enjoin Kraft from, among other things, selling coffee in plastic containers. P&G's preliminary injunction motion, and its initiation of this lawsuit, are premature, since Kraft filed with the PTO a petition for *inter partes* reexamination of all 55 claims of the '418 patent on March 8, 2007. In the petition, Kraft asserted that all claims of the '418 patent are invalid as being either anticipated or obvious in light of the prior art. Kraft's reexamination petition was filed before the United States Supreme Court issued its landmark decision in *KSR v. Teleflex*, 127 S.Ct. 1727 (April 30, 2007), which substantially broadened the basis for invalidating patent claims under Section 103 of the Patent Act.

The PTO issued an Action Closing Prosecution ("ACP") on June 7, 2007, which confirmed the 55 reexamined claims. The ACP did not even mention, much less reflect an analysis of the '418 patent, under the new obviousness standards of *KSR v. Teleflex*. Indeed, according to all

-1-

NOTICE OF MOTION AND MOTION TO STAY OR FOR EXPEDITED DISCOVERY AND TO CONTINUE HEARING DATE
Case No. C 07-4413 PJH

1  public information, as of June 7, 2007, the PTO had not yet determined whether or to what extent

2  the *KSR* decision would impact its pending *inter partes* or *ex parte* reexaminations.

3      Kraft has a right to appeal that confirmation to the Board of Patent Appeals and

4  Interference ("BPAI"), which right Kraft intends to exercise as soon as the statutory period allows

5  it to do so.  Thus, the reexamination of the '418 patent is not complete, P&G's initiation of this

6  lawsuit and motion for preliminary injunction are premature, and a stay of this litigation pending

7  the completion of the reexamination proceeding is warranted.

8      Allowing the BPAI to render its decision on the '418 reexamination will very likely

9  narrow the issues necessary for the parties to conduct discovery on and brief to this Court and may

10  even obviate the need for this litigation entirely.  Thus, a stay would conserve judicial resources,

11  avoid potentially conflicting decisions, and otherwise promote the efficient resolution of the

12  parties' dispute.  Moreover, P&G will not be harmed by entry of a stay.  No discovery has been

13  served or otherwise conducted, no claim construction has taken place, and substantial questions of

14  invalidity and non-infringement exist with respect to the '418 patent that would preclude entry of a

15  preliminary injunction.  In light of the facts here, a stay is warranted, and Kraft's motion should be

16  granted.

17  **I.      A STAY SHOULD BE GRANTED**

18      **A.      This Court Has Discretion to Grant Kraft's Motion to Stay**

19      The decision to stay ongoing litigation falls within the sound discretion of the District

20  Court, and this Court has authority to order a stay pending the outcome of the reexamination

21  proceedings.  *See American Life Ins. Co. v. Stewart*, 300 U.S. 203, 215 (1937); *Gould v. Control

22  Laser Corp.*, 705 F.2d 1340, 1341 (Fed. Cir. 1983); *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-

23  27 (Fed. Cir. 1998); *KLA-Tencor Corp. v. Nanometrics, Inc.,* No. C-05-03116 JSW, 2006 WL

24  708661, at *2 (N.D. Cal. Mar. 16, 2006).  In fact, District Courts follow a "liberal policy in favor

25  of granting motions to stay proceedings pending the outcome of USPTO reexamination or reissue

26  proceedings."  *ASCII Corp. v. STD Entm't USA, Inc.,* 844 F. Supp. 1378, 1381 (N.D. Cal. 1994).

27  This liberal policy follows from "[t]he legislative history surrounding the establishment of the

28

-2-

quinn emanuel

1   reexamination proceeding[,] [which] evinces congressional approval of district courts liberally

2   granting stays." *Nanometrics, Inc. v. Nova Measuring Instruments, Ltd.*, No. C-06-2252 SBA,

3   2007 WL 627920, at *1 (N.D. Cal. Feb. 26, 2007) (citation omitted); *see also ASCII*, 844 F. Supp.

4   at 1380 ("Congress enacted the [USPTO] reexamination procedure to provide an inexpensive,

5   expedient means of determining patent validity which, if available and practical, should be

6   deferred to by the courts."). For this reason, courts are generally inclined to stay litigation even

7   pending a decision by the PTO on whether to order reexamination on the patent-in-suit. *See e.g.,*

8   *Brown v. Shimano American Corp.*, No. CIV 88-6565 WJR, 1991 WL 133586, (C.D. Cal. 1991);

9   *Grayling Indus., Inc. v. GPAC, Inc.*, 1991 WL 236196 at *3 (N.D. Ga. March 25, 1991).

10          Although a court is not obligated to stay an infringement case based upon a parallel

11  reexamination, it may opt to do so in order to avoid inconsistent results, narrow the issues, obtain

12  guidance from the PTO, or simply to avoid the needless waste of judicial resources. *See Gould v.*

13  *Control Laser Corp.*, 705 F.2d 1340, 1342 (Fed.Cir. 1983) ("One purpose of the reexamination

14  procedure is to eliminate trial of that issue (when the claim is canceled) or to facilitate trial of that

15  issue by providing the district court with the expert view of the USPTO (when a claim survives the

16  reexamination proceeding)."); *Patlex Corp. v. Mossinghoff*, 758 F.2d 594, 602 (Fed.Cir. 1985)

17  (explaining that PTO reexaminations can "settle validity disputes more quickly and less

18  expensively than the often protracted litigation involved in such cases," can aid the trial court in

19  making informed validity decisions, and will ultimately reinforce investor confidence in the patent

20  system by creating a broader opportunity for the PTO to review doubtful patents); *Medichem, S.A.*

21  *v. Rolabo, S.L.*, 353 F.3d 928, 936 (Fed.Cir. 2003) (recognizing the district court's power to stay

22  proceedings in a patent interference dispute pending the BPAI's ruling as doing so "may permit the

23  district court to avoid a needless duplication of efforts").

24          A stay is particularly compelling for cases in the initial stages of litigation or in which

25  there has been little discovery, which is precisely the case here. *See, e.g., KLA-Tencor*, 2006 WL

26  708661, at *2 (fact that "discovery ha[d] just begun" favored stay pending reexamination). Most

27  relevant here, Courts routinely grant stays pending reexamination of the patent in suit even where

28

-3-

quinn emanuel

1   the plaintiff's preliminary injunction motion is pending *See, e.g., Pass & Seymour, Inc. v. Hubbell*

2   *Inc.*, 2007 WL 2172648 (N.D.N.Y. 2007); *Perricone v. Unimed Nutritional Services, Inc.*, 2002

3   WL 31075868 (D. Conn. 2002).   Indeed, even where the plaintiff claims that the case can be

4   resolved on summary judgment, the Courts are inclined to grant a stay pending reexamination.

5   *See, e.g., Middleton, Inc., v. Minn. Mining and Manufacture Co.*, No. 4:03-cv-40493 (S.D. IOWA

6   Aug. 24, 2004).

7              **B.        A Stay of All Proceedings Is Warranted in this Case**

8              In determining whether to grant a stay pending reexamination courts consider: (1) whether

9   a stay will simplify the issues in question and trial of the case; (2) whether discovery is complete

10  and whether a trial date has been set; and (3) whether a stay would unduly prejudice or present a

11  clear tactical disadvantage to the non-moving party.  *See Nanometrics*, 2007 WL 627920, at *2.

12  For *inter partes* reexaminations, the Patent Act *presumes* that the court case should be stayed,

13  unless "the court...determines that a stay would not serve the interests of justice.  35 U.S.C. §318

14  (West 2007).   Here, each of the factors is met, and the interests of justice would plainly be served

15  by granting a stay.

16             **1.        A Stay Will Likely Render the Case Moot or Simplify the Issues.**

17             Kraft's request for reexamination was granted by the PTO and remains pending before that

18  government agency.  Declaration of Claude M. Stern ("Stern Decl."), ¶6.  While the PTO issued

19  an "Action Closing Prosecution" on June 7, 2007, Kraft will file an appeal, pursuant to 35 U.S.C.

20  §§ 134, 315, once the PTO issues the Right to Appeal Notice.  *Id.*  Indeed, given the fact that the

21  PTO's decision seems to be devoid of any analysis under the new *KSR v .Teleflex* standard, Kraft

22  is confident that its appeal will successfully require the BPAI to view this case through the lens of

23  *KSR v. Teleflex*.  Allowing the reexamination proceeding to run its course before moving forward

24  with the present litigation will simplify the issues for the Court to consider and may even render

25  the entire litigation moot.

26             Plainly, if Kraft is successful on its appeal of the PTO's decision confirming '418 patent

27  claims 1-55, the patent will be rendered invalid as obvious in light of the prior art, and this case

28
                                                            -4-
NOTICE OF MOTION AND MOTION TO STAY OR FOR EXPEDITED DISCOVERY AND TO CONTINUE
HEARING DATE
Case No. C 07-4413 PJH

1  will end, thereby preserving this Court's judicial resources.  However, even if Kraft is only

2  partially successful or unsuccessful on its appeal (of course, it does not believe it will be), it will

3  be more efficient for the Court and the parties to allow the reexamination to be completely

4  resolved before moving forward in the present litigation.  *Inter partes* reexaminations, like the one

5  Kraft filed with the PTO for the '418 patent here, have special rules that estop the petitioner from

6  arguing the grounds of the reexamination petition in the district court.  *See* 35 U.S.C. 315(c) ("A

7  third-party requester whose request for an *inter partes* reexamination...is estopped from asserting

8  at a later time, in any civil action...the invalidity of any claim *finally* determined to be valid and

9  patentable on any ground which the third-party requester raised or could have raised during the

10 *inter partes* reexamination proceedings.") (emphasis added).  In other words, if Kraft is not

11 successful on its reexamination, it will be precluded from citing as invalidating the very same

12 prior art it cited to the PTO again to this Court.  Thus, the issues for discovery, *Markman*, motion

13 practice and trial will all be narrowed by allowing the reexamination to completely resolve before

14 embarking on this litigation.[1]  *See Nanometrics*, 2007 WL 627920, at *3.  ("Waiting for the

15 outcome of the re-examination could eliminate the need for trial if the claims are cancelled or, if

16 the claims survive, facilitate the trial by providing the Court with the opinion of the USPTO and

17 clarifying the scope of the claims."); *KLA-Tencor*, 2006 WL 708661, at *4 (granting stay because

18 it would "simplify the issues and streamline the trial, therefore reducing the burden on, and

19 preserving the resources of both the parties and the Court").

20      In addition, waiting for the reexamination to completely resolve will also avoid the

21 possibility of inconsistent decisions from the PTO and this Court.  *Ricoh Co., Ltd. v. Aeroflex Inc.*,

22 2006 WL 3708069, *5 (N.D. Cal. 2006) (granting stay in part because of the "possib[ility] that this

23 Court and the PTO could reach inconsistent conclusions regarding the same patent").

24

25 _____

26      [1]  Staying the case at this early juncture also might encourage settlement of the case without
   further Court intervention, as an appellate decision by the BPAI might facilitate further
27 negotiations among the parties.  *See ASCII*, 844 F. Supp. at 1380.

28

NOTICE OF MOTION AND MOTION TO STAY OR FOR EXPEDITED DISCOVERY AND TO CONTINUE
HEARING DATE
Case No. C 07-4413 PJH

quinn emanuel

## 2.    No Discovery Has Been Served, and No Trial Date Has Been Set.

The absence of any discovery in this case also favors a stay.  *See, e.g.*, *Nanometrics*, 2007 WL 627920, at *2 (granting stay where "[d]iscovery ha[d] commenced, but it ha[d] not proceeded" significantly); *KLA-Tencor*, 2006 WL 708661, at *2 (granting stay where "discovery ha[d] just begun"); *Target Therapeutics, Inc. v. SciMed Life Sys., Inc.*, 33 U.S.P.Q. 2d 2022, 2023 (N.D. Cal. 1995) (same); *ASCII*, 844 F. Supp. at 1381 (same).  Here, no written discovery has been served and no depositions have been noticed by either party.  Stern Decl. ¶4.  If the Court declines to grant Kraft's requested stay, Kraft has requested that the Court issue an order continuing the hearing date on P&G's preliminary injunction motion to allow Kraft sufficient time to take limited expedited discovery.  P&G has agreed to allow Kraft to take such limited, expedited discovery.  *Id.* at ¶9.  However, that agreement was reached today, and as of the filing of this motion, no discovery has yet been served on P&G.  Thus, as of the filing of the present motion, P&G has not commenced any discovery nor incurred any expenses therefrom.  Furthermore, the parties have not exchanged any proposed claim construction terms or supporting materials under the Patent Local Rules.  *Id.* at ¶4.  Finally, no *Markman* hearing date has been set, and no trial date has been set.  *Id.*  Accordingly, the second factor favors granting Kraft's request for a stay.

Moreover, granting a stay will allow the Court to defer the enormous energies it must expend in considering the pending motion for preliminary injunction.  P&G essentially seeks a shut-down order against Kraft's Maxwell House plastic packaging, a remedy for P&G that will cause Kraft massive irreparable injury.  But to even consider granting an injunction based on a claim of patent infringement, this Court must first engage in an appropriate claim construction analysis.  *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).  Obviously, this Court could not make an interim decision about infringement unless and until it has engaged in this analysis.

Remarkably, here, P&G's preliminary injunction motion asks that this Court ignore this obligation, and instead move forward without any claim construction *at all*.  P&G asserts in a

-6-
NOTICE OF MOTION AND MOTION TO STAY OR FOR EXPEDITED DISCOVERY AND TO CONTINUE HEARING DATE
Case No. C 07-4413 PJH

1  footnote, in derogation of every principle of claim construction identified by the Federal Circuit in

2  *Phillips v. AWH*, 415 F.3d 1303, 1312-19 (Fed. Cir 2005), that this Court should consider granting

3  the requested injunction without going through a claim construction analysis. *See* Docket Item

4  No. 15, at 8 fn 6. (Indeed, P&G has not even attached the patent in suit's file history to its motion,

5  and has not offered a single declaration construing the terms of the patent.)

6    Granting the stay here would preserve this Court's and the parties' resources generally,

7  including those associated with a claim construction.

8           **3.    A Stay Would Not Prejudice Procter & Gamble.**

9    P&G also will not be harmed from a stay. *See Guthy-Renker*, 48 U.S.P.Q.2d at 1061.

10  Importantly, the fact that P&G has moved for a preliminary injunction does not negate the

11  propriety of a stay here. "The Federal Circuit has cautioned that 'a preliminary injunction is a

12  drastic and extraordinary remedy that is not to be routinely granted.'" *Visto Corp. v. Sproqit*

13  *Technologies, Inc.*, 413 F.Supp.2d 1073, 1077 (N.D.Cal. 2006), *quoting Intel Corp. v. ULSI*

14  *System Technology*, 995 F.2d 1566, 1568 (Fed. Cir. 1993). "The burden is always on the movant

15  to show entitlement to a preliminary injunction." *Visto*, 413 F.Supp.2d at 1077, *quoting Reebok*

16  *International, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994). If Kraft raises a

17  substantial question concerning either infringement or validity that P&G cannot prove lacks

18  substantial merit, a preliminary injunction should not issue. *Visto*, 413 F.Supp.2d at 1077.

19    Kraft believes it has compelling invalidity and non-infringement arguments that preclude

20  P&G from obtaining a preliminary injunction in this case. Kraft will present evidence that each

21  and every element of the asserted claims were present in the art before June 4, 2001 — not just in

22  the prior art patent and printed publication art before the PTO on reexamination, but also product

23  packaging art that has never been presented to (and is not properly considered in reexam by) the

24  PTO. Stern Decl. ¶5. Kraft also has substantial non-infringement arguments. *Id.*

25    Furthermore, P&G has not met and will not be able to meet its *evidentiary* burden to show

26  irreparable harm if an injunction does not issue. Having had months to prepare its suit and

27  preliminary injunction motion (and obtaining ten declarations in the process, 9 of which came

28

quinn emanuel

-7-

quinn emanuel

1 from P&G employees throughout the P&G organization), the Court must assume that P&G's

2 preliminary injunction motion consist of the very best evidence that P&G can muster to show

3 irreparable injury from Kraft's alleged infringement.  But not a single one of P&G's supporting

4 declarations points to any evidence -- no expert economist report, no detailed, quantitative

5 economic or market analysis - - which even remotely suggests, much less proves, that Kraft's

6 continued sale of its Maxwell House® brand coffee in plastic containers has caused, or is likely to

7 actually cause, P&G any actual, material injury.  To the contrary, when one views P&G's

8 Huntington, Gemeiner, Roe and Bello declarations, one cannot find any actual proof of real or

9 tangible injury to P&G.  Instead, the most that P&G can do is cite to global market statistics and

10 speculate that Kraft's sales of its coffee in plastic containers means that Kraft is "poised" to cause

11 P&G injury. (See, e.g., Gemeiner Decl., at para. 13).  P&G can only speculate about the

12 "potential" for lost sales and market share due to Kraft's sales of coffee in its 39 ounce plastic

13 Maxwell House containers.  If P&G could prove any alleged financial or other injury, such losses

14 are all compensable through money damages.

15         And, the harm to Kraft in the event an injunction issues is much greater than the harm

16 P&G alleges it will suffer in the event an injunction does not issue.  In its moving papers, P&G

17 argues that Kraft need only switch back to its tin cans if it is enjoined.  P&G's argument ignores

18 the enormous costs Kraft will incur if it is forced to make such a switch.  Kraft estimates that it

19 would take no less than 25 weeks — or half a year — to switch to a tin can package.  Stern Decl.

20 ¶5.  This loss of time on the market will only strengthen P&G's already long-standing lead

21 position in the market and inflict great and likely irreparable harm against Kraft.  Indeed, Kraft

22 stands to immediately lose at least $250 million if an injunction issues, and this figure fails to

23 account for the loss of customers (even putting goodwill aside for the moment) Kraft will certainly

24 suffer in the event it is forced to remove its 39 ounce Maxwell House coffee product from the

25 market.  *Id.*  Kraft will suffer these consequences of an injunction even though the validity of the

26 '418 patent still hangs in the balance before the PTO.  In contrast, no where does P&G even

27 remotely suggest that it has or will suffer damages approaching those that Kraft would incur from

28

-8-

NOTICE OF MOTION AND MOTION TO STAY OR FOR EXPEDITED DISCOVERY AND TO CONTINUE
HEARING DATE
Case No. C 07-4413 PJH

1    issuance of the injunction.  P&G can recoup its alleged losses through a damages award after the

2    PTO completes its analysis of the '418 patent's validity and P&G proves its infringement case

3    against Kraft.  Indeed, nowhere in its moving papers does P&G allege that it will suffer the type of

4    damages Kraft will suffer if an injunction issues.  Rather, P&G's preliminary injunction motion

5    papers merely cite to the *possibility* that Kraft will take market share or erode P&G's price.

6        Other facts similarly support entering a stay in this case.  This is a case involving plastic

7    packaging for coffee.  The technology is neither new, nor short lived.  *See Perricone*, 2002 WL

8    31075868 (D.Conn. 2002).  P&G stands to lose little if a stay is granted in this case.  Other than

9    filing a complaint and a preliminary injunction motion, P&G has not spent any significant time or

10   resources on discovery, motion practice or other activities related to this lawsuit.  *See KLA-*

11   *Tencor*, 2006 WL 708661, at *3 ("Granting a stay does not cause the nonmoving party undue

12   prejudice when that party has not invested substantial expense and time in the litigation.");

13   *Nanometrics*, 2007 WL 627920, at *2 (noting that "the early stage of litigation weighs in favor of

14   a stay").

15       Courts have granted stays in the context of nearly identical facts.  In *Perricone*, 2002 WL

16   31075868, the court reasoned that the harm alleged by plaintiff, including loss of customers and

17   sales as well as erosion of market position, did not amount to undue prejudice.  The court further

18   explained:

19
20       However, in light of the plaintiff's motion for preliminary injunction, a stay
         may continue to deprive the plaintiff, during the pendency of the
21       reexamination, of the right to exclude others from making, using, offering to
         sell, or selling the patented invention. The Court finds, however, that the harm
22       indicated by the plaintiff-the loss of customers and sales of the plaintiff's
         product and the erosion of the plaintiff's position in the market-while serious,
23       does not amount to undue prejudice. . .  Additionally, profits lost by the
         plaintiff by the continued sales of the defendant's product can be compensated
24       by damages. Finally, the patented invention at issue does not appear to be a
         short-lived technology, such as electronics or software, such that a stay of this
25       case will permit the defendant to infringe upon the patented invention for the
         life of that invention.  *Id.*
26
27
28

NOTICE OF MOTION AND MOTION TO STAY OR FOR EXPEDITED DISCOVERY AND TO CONTINUE
HEARING DATE
Case No. C 07-4413 PJH

The court in *Pass & Seymour,* 2007 WL 2172648 reached the same conclusion. Namely, that the expertise of the PTO, the early stage of the proceedings, and the ability for the plaintiff to seek recovery through money damages all evidenced the propriety of granting a stay, even though plaintiff moved for preliminary injunction.

Both *Perricone* and *Pass & Seymour* govern here. Kraft filed its petition for reexam directly after the '418 patent issued. Kraft intends to file its appeal as soon as the PTO issues the Notice of Right to Appeal. Kraft is interested in having these issues resolved as quickly as possible to remove the cloud of P&G's infringement allegations from over its head. However, a process to determine whether or not the '418 patent is even valid has already begun in earnest and is not yet complete. Allowing that process to completely resolve to conserve judicial resources, avoid inconsistent results and narrow the issues in the case makes sense — particularly when the only activity that has taken place thus far in the case is the filing of a complaint and a preliminary injunction motion, and all of the harm P&G alleges is compensable through money damages.

## II. IF THIS COURT DECLINES TO GRANT A STAY, THIS COURT SHOULD GRANT KRAFT'S ALTERNATIVE REQUEST TO TAKE EXPEDITED DISCOVERY AND CONTINUE THE HEARING DATE ON P&G'S PRELIMINARY INJUNCTION MOTION

The Federal Rules generally provide that a party may not initiate discovery before the parties have met and conferred pursuant to Rule 26(f). *See* Fed. R. Civ. Proc. 26(f). However, Federal Rule of Civil Procedure 26(d) provides that the Court may authorize earlier discovery "for the convenience of parties and witnesses and in the interests of justice." Further, under Rule 30(a) the Court can grant plaintiff leave to take a deposition prior to the Rule 26(f) meeting of the parties, and Rules 33 and 34(b) expressly provide that a Court may allow a shorter time than normal for answering interrogatories and producing documents.

A court may grant requests to take discovery prior to the parties' meeting under Rule 26(f) where the requesting party demonstrates good cause. *Semitool, Inc. v. Tokyo Electron America, Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002). "Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Id.* "It should be noted that courts have recognized that good cause is

-10-

quinn emanuel

1   frequently found in cases involving claims of infringement and unfair competition." *Id.* And,

2   expedited discovery will be granted more generally where, as here, the plaintiff seeks injunctive

3   relief. *See, e.g., RDS Group Ltd. v. Davison,* No. 02-8168, 2003 LEXIS 1337 (E.D.Pa. Jan. 17,

4   2003) (granting expedited discovery for pending preliminary injunction hearing); *TKR Cable Co.*

5   *v. Cable City Corp.*, 1996 U.S. Dist. LEXIS 11941, at *27-34 (D.N.J. 1996) (confirming

6   previously ordered expedited discovery in conjunction with preliminary injunctive relief); 6

7   *Moore's Federal Practice 3d* § 26.121, at pp. 26-296 to 26-298 ("expedited discovery is

8   particularly appropriate when a plaintiff seeks injunctive relief"); 8 Wright & Miller, *Federal*

9   *Practice and Procedure* § 2104, at p. 51 (1999) (expedited discovery should be granted when

10  circumstances exist "that would be likely to prejudice the party if he were compelled to wait the

11  required time"); *see also Commodity Futures Trading Com'n v. International Financial Services*,

12  2002 WL 1801723 (S.D.N.Y. 2002); (ordering expedited depositions and document production

13  from third parties); *FTC v. 1268957 Ontario, Inc.*, 2001 WL 34135319 (N.D.Ga. 2001) (ordering

14  expedited depositions of third parties on 24 hours notice).

15      Absent a stay of the proceedings pending reexamination, there is good cause to issue an

16  order allowing Kraft to take expedited discovery and continuing the hearing on P&G's motion for

17  preliminary injunction.  Kraft estimates at this time that it stands to immediately lose at least $250

18  million if P&G's preliminary injunction motion is successful and Kraft is enjoined from selling its

19  Maxwell House® brand coffee in its plastic containers.  Stern Decl. ¶5.  This figure does not

20  account for customers Kraft will likely permanently lose as a result of keeping its product off the

21  shelves, the harm such an injunction would impose upon Kraft's relationships with distributors

22  and retailers and other business partners, or other collateral damages resulting from the injunction

23  P&G seeks.  *Id.* Although Kraft strongly believes that there are substantial questions as to both

24  the validity of the '418 patent and Kraft's lack of infringement thereof, Kraft should be given

25  sufficient opportunity to take discovery on issues of invalidity, unenforceability, non-

26  infringement, and the irreparable harm P&G alleges it will suffer if an injunction does not issue

27  given the sweeping relief P&G seeks.

28

-11-

NOTICE OF MOTION AND MOTION TO STAY OR FOR EXPEDITED DISCOVERY AND TO CONTINUE HEARING DATE
Case No. C 07-4413 PJH

1    Under the current schedule, Kraft's opposition to P&G's preliminary injunction motion is

2    due on October 3, 2007 and the hearing on P&G's motion for preliminary injunction is scheduled

3    for October 24, 2007. Stern Decl. ¶4. Earlier today, Kraft's counsel contacted P&G to see

4    whether P&G would agree to stay this proceeding or allow a motion to stay to be heard on

5    shortened time, continue the hearing date on P&G's motion for preliminary injunction by about 7

6    weeks, and allow Kraft to take limited expedited discovery in connection with preparing its

7    opposition to P&G's preliminary injunction motion. Stern Decl. ¶9. P&G objected to staying this

8    proceeding, objected to having Kraft's Motion to Stay being heard on shortened time, and refused

9    to continue the hearing date on P&G's preliminary injunction motion (and associated briefing

10   schedule). *Id.* P&G did agree in principle to allow Kraft to take discovery from P&G, but insisted

11   that Kraft must complete such discovery by the current deadline for Kraft's opposition to P&G's

12   motion for preliminary injunction, which, again, is October 3, 2007. *Id.* Under the current

13   schedule, and as a practical matter, P&G is not in a position to give to Kraft all the discovery that

14   Kraft will be seeking, and Kraft is not in a position to complete such discovery (including taking

15   all necessary depositions), while at the same time collecting information and analyzing and

16   otherwise responding to P&G's preliminary injunction motion all in a period of just over 2 weeks.

17   *Id.*

18   The expedited discovery Kraft seeks is limited and specifically tailored to the materials

19   P&G submitted with its preliminary injunction motion. As an example only, P&G grounds its

20   claims of infringement on certain "tests" it conducted on Kraft's packaging. Stern Decl. ¶8.

21   Remarkably, although P&G boldly posits the results of these test, it has not included with its

22   motion the tests' documentation or materials. By the same token, although P&G claims

23   conclusorily that it has information that Kraft's packaging "is poised" to cause injury to P&G, it

24   has provided no documentation or economic analyses supporting this conclusion. Given what is at

25   stake in this motion, Kraft is entitled to obtain the foundation of this speculative testimony (if any)

26   and to test its credibility and veracity.

27

28

-12-
NOTICE OF MOTION AND MOTION TO STAY OR FOR EXPEDITED DISCOVERY AND TO CONTINUE
HEARING DATE
Case No. C 07-4413 PJH

quinn emanuel

1    The specific discovery sought is attached as Exhibits 1 through 5 to the Declaration of

2    Claude M. Stern, accompanying the present motion, and includes:

3    • Approximately 33 document requests to P&G concerning the issues raised

4    in the P&G preliminary injunction motion, returnable ten days from the date

5    of service;

6    • Approximately 12 Requests for Admission to P&G concerning the issues

7    raised in the P&G preliminary injunction motion, returnable ten days from

8    the date of service;

9    • Deposition of P&G pursuant to Federal Rule of Civil Procedure 30(b)(6);

10    • Depositions of witnesses who submitted declarations in support of P&G's

11    preliminary injunction motion;

12    • Half day depositions of the named '418 patent inventors;

13    • Depositions of the attorneys who prosecuted the application that matured

14    into the '418 patent; and

15    • Discovery from certain third parties who have evidence relevant to Kraft's

16    invalidity defense.

17    Kraft seeks the above-described discovery specifically to respond to P&G's preliminary

18    injunction motion.  Although Kraft intends to limit its discovery solely to the issues raised in the

19    papers submitted by P&G, in doing so, Kraft in no way waives its ability to take more fulsome

20    discovery of P&G and/or the above-identified witnesses and third parties at a later time in the

21    litigation.  Kraft's goal in seeking discovery at this stage of the litigation is merely to test and

22    gather information regarding P&G's claims of irreparable harm and infringement allegations and

23    to more fully develop its invalidity arguments.

24    P&G agrees that Kraft can take this discovery, however, P&G will not continue the

25    hearing date on its preliminary injunction motion to allow Kraft to do so.  In other words, P&G

26    expects Kraft to take discovery, collect evidence, prepare witness statements, and draft its

27    opposition memorandum to respond to P&G's preliminary injunction motion all in just over 2

28

-13-
NOTICE OF MOTION AND MOTION TO STAY OR FOR EXPEDITED DISCOVERY AND TO CONTINUE
HEARING DATE
Case No. C 07-4413 PJH

1   weeks.  Stern Decl. ¶8.  This amount of time is insufficient to allow Kraft to properly take

2   discovery and prepare its case -- particularly given what is at stake for Kraft's business if it does

3   not successfully oppose P&G's motion.  *Id.*

4          Kraft estimates that it will take approximately 7 weeks to complete the discovery it seeks.

5   Thus, Kraft requests that the Court reset the hearing date for the P&G's preliminary injunction

6   motion from October 24, 2007 to December 19, 2007.

7                                      **Conclusion**

8          For all of the foregoing reasons, Kraft respectfully requests that its application for an order

9   shortening time and motion for stay be granted.  Alternatively, if the Court declines to grant

10  Kraft's request for a stay, Kraft respectfully requests that the Court enter an order allowing it to

11  take limited expedited discovery in concerning matters raised by P&G's preliminary injunction

12  motion and continuing the hearing on P&G's motion for preliminary injunction to December 19,

13  2007.

14

15  DATED:  September  19, 2007          QUINN EMANUEL URQUHART OLIVER &
                                        HEDGES, LLP
16

17                                      By   /s/
                                        _____
18                                         Claude M. Stern
                                           Attorneys for Defendant Kraft Global Foods, Inc.
19

20

21

22

23

24

25

26

27

28
                                        -14-

quinn emanuel

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| KRAFT FOODS HOLDINGS, INC.,<br><br>                             Plaintiff,<br><br>v.<br><br>THE PROCTER & GAMBLE COMPANY,<br><br>                             Defendant<br><br><br><br>THE PROCTER & GAMBLE COMPANY,<br><br>                    Counterclaim Plaintiff,<br><br>v.<br><br>KRAFT FOODS HOLDINGS, INC.<br><br>                    Counterclaim Defendant<br><br>and<br><br>KRAFT FOODS GLOBAL, INC.<br><br>                    Third-Party Defendant | <br><br><br><br><br><br><br><br><br><br><br>Case No. 07C0613S |

## MOTION TO DISMISS, OR IN THE ALTERNATIVE, TRANSFER OR STAY

# TABLE OF CONTENTS

PAGE

I. INTRODUCTION ......................................................................................................... 1

II. FACTUAL AND PROCEDURAL BACKGROUND................................................. 2

III. ARGUMENT............................................................................................................... 7

  A. P&G's '419 Infringement Claim Should Be Dismissed Because It
is Duplicative of P&G's California Lawsuit..................................................... 7

    1. P&G's '419 Infringement Claim Arises From the Same
Transaction or Series of Transactions as P&G's California
Lawsuit.................................................................................................. 8

    2. P&G's '419 Infringement Claim and California Action Are
Duplicative........................................................................................... 10

      a. P&G's California And Wisconsin Actions Concern
The Same Parties and Conduct. ........................................... 10

      b. P&G Seeks Identical Relief Here and In California. ...........11

      c. Judicial Economy Supports Dismissal Here. .......................11

  B. Alternatively, the Court Should Stay P&G's '419 Infringement
Claim............................................................................................................... 12

    1. A Stay Will Likely Simplify The Issues Before The Court.............. 13

    2. Judicial Economy Warrants a Stay Here. ........................................ 14

    3. P&G Will not be Prejudiced by a Stay .............................................. 15

  C. Alternatively, The Court Should Transfer P&G's '419
Infringement Claim........................................................................................ 16

    1. P&G's '419 Infringement Claim "Might Have Been
Brought" in the Northern District of California And Is
Properly Transferred There........................................................... 16

    2. Relevant Factors Favor Transfer to the Northern District of
California. .......................................................................................... 16

      a. P&G's Choice of Forum is Outweighed By Other
Factors................................................................................. 17

b.    The Interests of Justice Favor Transfer.................................................18

IV.    CONCLUSION................................................................................................. 19

# TABLE OF AUTHORITIES

**Page**

### Cases

Abtox, Inc. v. Exitron Corp.,
   131 F.3d 1009 (Fed. Cir. 1997).............................................................................................14

American Stock Exchange, LLC v. Mopex, Inc.,
   215 F.R.D. 87 (S.D.N.Y. 2002)................................................................................................9

Bausch & Lomb Inc. v. Alcon Labs., Inc.,
   914 F. Supp. 951 (W.D.N.Y. 1996).......................................................................................14

Black & Decker, Inc. v. Robert Bosch Tool Corp.,
   500 F. Supp. 2d 864 (N.D. Ill. 2007)....................................................................................12

Broadcom Corp. v. Microtune, Inc.,
   No. 03-C-0676-S, 2004 WL 503942 (W.D. Wis. Mar. 9, 2004)............................................18

Calvert Fire Ins. Co. v. Am. Mut. Reinsurance Co.,
   600 F.2d 1228 (7th Cir. 1979)...............................................................................................10

Castleberg v. Covenant Healthcare, L.L.C.,
   No. 02-C-0147-C, 2002 WL 32345613 (W.D. Wis., Aug. 16, 2002) ....................................17

Chicago, Rock Island & Pac R.R. Co. v. Igoe,
   220 F.2d 299 (7th Cir. 1955).................................................................................................17

Civix-DDI, LLC v. Expedia, Inc.,
   No. 04 C 8031, 2005 WL 112906 (N.D. Ill. May 2, 2005) ...........................................7, 9, 12

Coffey v. Van Dorn Iron Works,
   796 F.2d 217 (7th Cir. 1986)...........................................................................................17, 18

Colonial Penn Life Ins. Co. v. Hallmark Ins. Admins., Inc.,
   31 F.3d 445 (7th Cir. 1994)...............................................................................................8, 10

Colorado River Water Conservation Dist. v. United States,
   424 U.S. 800 (1976)...............................................................................................................10

Datatreasury Corp. v. Wells Fargo & Co.,
   490 F. Supp. 2d 749 (E.D. Tex. 2006)...................................................................................13

Doyle v. Camelot Care Ctrs., Inc.,
   305 F.3d 603 (7th Cir. 2002) ...................................................................................................8

Elkway Mfg. Co. v. Ebco Mfg. Co.,
   192 F.3d 973 (Fed. Cir. 1999)...............................................................................................14

Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.,
   279 F.3d 1022 (Fed. Cir. 2002)..............................................................................................14

First City Nat'l Bank and Trust Co. v. Simmons,
   878 F.2d 76 (2d Cir. 1989)........................................................................................................7

GPAC Inc. v. D. W.W. Enters. Inc.,
   23 U.S.P.Q. 2d 1129 (D.N.J. 1992) .......................................................................................14

Gen. Elec. Capital Corp. v. Lease Resolution Corp.,
   128 F.3d 1074 (7th Cir. 1997) ..................................................................................................2

General Ry. Signal Co. Union Simplex Train Control Co.,
   23 F. Supp. 667 (D. Del. 1938), aff'd, 106 F.2d 1018 (3d Cir. 1939)........................................9

Gould v. Control Laser Corp.,
   705 F.2d 1340 (Fed. Cir. 1983)..............................................................................................13

Herrmann v. Cencom Cable Assoc., Inc.,
   999 F.2d 223 (7th Cir. 1993) .............................................................................................8, 10

Hoganas AB v. Dresser Indus., Inc.,
   9 F.3d 948 (Fed. Cir. 1993)......................................................................................................2

KLA-Tencor Corp., No. C. 05-03116,
   2006 WL 708661 (N.D. Cal. Mar. 16, 2006)...........................................................12, 13, 14, 15

KSR v. Teleflex,
   127 S. Ct. 1727 (2007)..............................................................................................................3

Kearns v. General Motors Corp.,
   94 F.3d 1553 (Fed. Cir. 1996)............................................................................................9, 10

Kim v. Sara Lee Bakery Group, Inc.,
   412 F. Supp. 2d 929 (N.D. Ill. 2006) ...........................................................................7, 10, 11

Liberty Mutual Fire Ins. Co. v. The Nordic Group of Companies, Ltd.,
   No. 01-C-0207-C, 2001 WL 34382016 (W.D. Wisc. Dec. 4, 2001).........................................17

Mars, Inc. v. JCM Am. Corp.,
   No. 05-3165, 2006 WL 3373284 (D.N.J. Nov. 21, 2006) ........................................................15

Mars Inc. v. Nippon Conlux Kabushiki-Kaisha,
   58 F.3d 616 (Fed. Cir. 1995)...............................................................................................7, 10

Medichem, S.A. v. Rolabo, S.L.,
   353 F.3d 928 (Fed. Cir. 2003).................................................................................................13

Middleton, Inc. v. Minn. Mining & Mfg. Co.,
   No. 4:03-CV-40493,  2004 WL 1968669 (S.D. Iowa Aug. 24, 2004) .....................................13

Milwaukee Elec. Tool Corp. v. Black & Decker (N.A.) Inc.,
   392 F. Supp. 2d 1062 (W.D. Wis. 2005) .................................................................................17

Modine Mfg. Co. v. Delphi Automotive Sys., LLC,
    No. 00-C258, 2000 WL 33989247 (E.D. Wis. Dec. 8, 2000)................................................13

Newcomb v. Brennan,
    558 F.2d 825 (7th Cir. 1977) ...................................................................................................8

Norfin, Inc. v. International Business Machines Corp.,
    625 F.2d 357 (10th Cir. 1980) .................................................................................................9

Pacesetter, Inc. v. Cardiac Pacemakers, No. Civ. 02-1337,
    2003 WL 23303473 (D.Minn. Nov. 19, 2003) ............................................................12, 13, 15

Palay v. United States,
    349 F.3d 418 (7th Cir. 2003) ...................................................................................................8

Panoualias v. Nat'l Equip. Co.,
    269 F. 630 (2d Cir. 1920)..........................................................................................................9

Patlex Corp. v. Mossinghoff,
    758 F.2d 594 (Fed. Cir. 1985)................................................................................................13

Pegasus Development Corp. v. Directv, Inc., No. Civ. A. 00-1020-GMS,
    2003 WL 21105073 (D.Del. May 14, 2003)..........................................................................13

Platt v. Minnesota Mining & Manufacturing,
    376 U.S. 240 (1964)................................................................................................................17

Rayco Mfg. Co. v. Chicopee Mfg. Corp.,
    148 F. Supp. 588 (S.D.N.Y. 1957) .........................................................................................18

Republic Steel Corp. v. Pennsylvania Eng'g Corp.,
    785 F.2d 174 (7th Cir. 1986) ...................................................................................................8

Ridge Gold Standard Liquors v. Joseph E. Seagram & Sons, Inc.,
    572 F. Supp. 1210 (N.D. Ill. 1983).........................................................................................10

Roberts & Schaefer Co. v. Merit Contracting, Inc.,
    99 F.3d 248 (7th Cir. 1996) ...................................................................................................17

Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.,
    No. 95 Civ 7900, 2001 WL 38285 (S.D.N.Y. Jan. 16, 2001).................................................9

Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.,
    452 F. Supp. 2d 621 (D. Md. 2006).........................................................................................7

Serlin v. Arthur Andersen & Co.,
    3 F.3d 221 (7th Cir. 1993) ..........................................................................................7, 10, 11

Singer v. Pierce & Assocs., P.C.,
    383 F.3d 596 (7th Cir. 2004) ...................................................................................................8

Single Chip Sys. Corp. v. Intermec IP Corp.,
    495 F. Supp. 2d 1052 (S.D. Cal. 2007)....................................................................................7

Snap-On Inc. v. Hunter Eng'g Co.,
29 F. Supp. 2d 965 (E.D.Wis. 1998)....................................................................................2

Standard Havens Prods., Inc. v. Gencor Indus., Inc.,
897 F.2d 511 (Fed. Cir. 1990)............................................................................................2

Stark v. Starr,
94 U.S. 477 (1876)..............................................................................................................8

Telepharmacy Solutions, Inc. v. Pickpoint Corp.,
238 F. Supp. 2d 741 (E.D. Va. 2003) ..............................................................................19

Thomas & Betts Corp. v. Panduit Corp.,
65 F.3d 654 (7th Cir. 1995) ...............................................................................................2

United States v. Haytian Republic,
154 U.S. 118 (1894)............................................................................................................8

United States v. Payne and Dolan, Inc.,
No. 01-C-0383-C, 2003 WL 23185881 (W.D. Wisc. July 14, 2003)....................................17

Wausau Benefits, Inc. v. Liming,
393 F. Supp. 2d 713 (W.D. Wis. 2005) ........................................................................17, 19

Wilson v. City of Chicago,
120 F.3d 681 (7th Cir. 1997) ........................................................................................7, 10

## Statutes

35 U.S.C. §§ 134, 315.........................................................................................................3

35 U.S.C. § 282....................................................................................................................9

35 U.S.C. §311 et. seq.........................................................................................................4

35 U.S.C. §315(b)(1) ...........................................................................................................4

28 U.S.C. § 1404(a) ...........................................................................................................16

Fed. R. Evid. 201 .................................................................................................................2

Fed. R. Civ. Pro. 12(b)(6) ................................................................................................1, 7

## I.    INTRODUCTION

By this motion, Kraft Foods Global, Inc. ("KFG") and Kraft Foods Holding, Inc.

("KFH") ask this Court to dismiss, stay or transfer the counterclaim and third party complaint for

patent infringement that the Procter & Gamble Company ("P&G") has filed in this case. The

reasons for this motion are simple: P&G's patent infringement claim — predicated on alleged

infringement of U.S. Patent No. 7,169,419 ("419 patent") — is virtually identical to a lawsuit

that was filed just three months ago by P&G against KFG in the Northern District of California.

In that still pending case, P&G alleges KFG's plastic 39-ounce container for Maxwell House

brand coffee infringes U.S. Patent No. 7,169,418 ("'418 patent")[1] — a patent that is virtually

identical to the '419 patent P&G asserts here. Judge Hamilton stayed P&G's California action

pending the outcome of an inter partes reexamination of the '418 patent currently pending in the

U.S. Patent and Trademark Office. In a blatant attempt to circumvent Judge Hamilton's stay,

P&G alleges here that the exact same plastic 39-ounce Maxwell House brand coffee container

infringes the '419 patent. P&G's redundant claim is improper.

This Court has a variety of procedural mechanisms to prevent P&G's improper

counterclaim: (1) The Court may dismiss P&G's counterclaim and third party complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that it is improper claim

splitting and/or redundant to P&G's California lawsuit against KFG; (2) The Court may stay

P&G's counterclaim and third party complaint for the same reasons Judge Hamilton stayed

P&G's California lawsuit against KFG; or (3) The Court may transfer P&G's counterclaim and

third party complaint to the Northern District of California so that it can be heard by Judge

Hamilton. This motion asks the court to grant any of these remedies.

---

[1]    A copy of the '418 patent is attached to the Declaration of Evette D. Pennypacker ("Pennypacker Decl.") as Exhibit 1.

P&G should not be allowed to initiate duplicative, wasteful litigation in this Court to side

step the stay entered against it in the Northern District of California. Any one of these three

options would prevent that improper result. KFG and KFH therefore respectfully request that the

Court either dismiss, stay or transfer P&G's counterclaim and third party complaint.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

**The Parties.** KFG and KFH are Delaware corporations with their principal places of

business in Northfield, Illinois. Kraft's Complaint for Infringement Against P&G ("Complaint")

¶1; Answer, Counterclaims, and Third-Party Complaint of the Procter & Gamble Company

("Counterclaim") ¶¶2-3. KFH is the assignee to U.S. Patent No. 7,074,443 ("'443 patent").

Complaint ¶5. P&G is an Ohio corporation with its principal place of business in Cincinnati,

Ohio. Counterclaim ¶1. P&G is the identified assignee to the '418 and '419 patents. NDCA

Dkt #1, CA Complaint ¶6;[2] Counterclaim ¶17.

**Reexamination of the '418 Patent.** On January 31, 2007, KFG filed with the PTO a

petition for inter partes reexamination of the '418 patent claims, asserting that those claims are

invalid as obvious or anticipated in light of the prior art.[3] The '418 patent essentially claims a

---

[2]    As set forth in KFG's and KFH's accompanying Request for Judicial Notice, the Court may take
judicial notice of the material filed in the California action. See Fed. R. Evid. 201; Gen. Elec. Capital
Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1080-1081 (7th Cir. 1997). A true and correct copy of
the docket sheet from the California action ("NDCA Dkt") is attached to the Pennypacker Declaration as
Exhibit 2. A true and correct copy of P&G's complaint filed against KFG in the California action is
attached to the Pennypacker Declaration as Exhibit 3.

[3]    A true and correct copy of the examiner's reexamination decision is attached to the Pennypacker
Declaration as Exhibit 4. As set forth in KFG's and KFH's accompanying Request for Judicial Notice,
the Court may take judicial notice of patent office materials, including the '418 patent, KFG's '418 patent
reexamination petition, the file history for that petition, and the file histories for the '418 and '419 patents,
because such materials are a matter of public record. Standard Havens Prods., Inc. v. Gencor Indus.,
Inc., 897 F.2d 511, 514 (Fed. Cir. 1990); Hoganas AB v. Dresser Indus., Inc., 9 F.3d 948, 954 n.27 (Fed.
Cir. 1993) see also Thomas & Betts Corp. v. Panduit Corp., 65 F.3d 654, 664 n.12 (7th Cir. 1995); Snap-
On Inc. v. Hunter Eng'g Co., 29 F. Supp. 2d 965, 969 (E.D.Wis. 1998).

2

plastic coffee container having a variety of claimed features.[4] On June 7, 2007, the PTO

simultaneously granted KFG's petition and issued an Action Closing Prosecution ("ACP") that

confirmed the '418 patent claims.[5]

After KFG filed the petition, the United States Supreme Court issued its decision in KSR

v. Teleflex, 127 S.Ct. 1727 (2007). That decision substantially broadened the basis for

invalidating patent claims as obvious. The ACP did not mention or even reflect an analysis of

the '418 patent under the KSR obviousness standards. Indeed, as of June 7, 2007, the PTO had

not yet determined whether or to what extent the KSR decision would impact its pending inter

partes or ex parte reexaminations.[6] It was not until October 10, 2007 that the PTO issued

instructions to its examiners outlining the analysis for rejections on obviousness grounds in light

of the Supreme Court's decision in KSR.[7]

KFG intends to appeal the ACP to the Board of Patent Appeals and Interference

("BPAI") as soon as the statutory period allows it to do so.[8] Thereafter, the parties may further

appeal the BPAI's decision the Federal Circuit Court of Appeals.

**P&G's Retaliatory California Lawsuit Asserting the '418 Patent.** In August 2007,

just three short months ago and after the PTO denied Kraft's request to invalidate the claims of

the '418 patent, P&G filed a lawsuit against KFG in the Northern District of California (the

"California action").[9] In the California action, P&G alleges that KFG's sales of its Maxwell

House coffee in 39-ounce plastic containers infringe the '418 patent, the very patent that was the

---

[4] Pennypacker Decl. Exhibit 1.

[5] Pennypacker Decl. Exhibit 4.

[6] Pennypacker Decl. Exhibit 5.

[7] Id.

[8] The requester in an inter partes reexamination has the right to appeal the examiner's confirmation of claims. 35 U.S.C. §§ 134, 315; Pennypacker Decl., Exhibit 6 at ¶3.

[9] That case is styled *The Procter & Gamble Company v. Kraft Foods Global, Inc.,* Northern District of California Case No. C07-4413.

3

subject of Kraft's inter partes reexamination proceeding. Specifically, P&G's California

complaint states: "Kraft has infringed and continues to infringe the '418 Patent. The infringing

acts include at least manufacturing, using, selling, and/or offering to sell 39-ounce plastic

containers of Maxwell House brand coffee." CA Complaint ¶8.[10]  P&G moved for a preliminary

injunction in the California action, seeking to enjoin KFG from selling Maxwell House coffee in

39-ounce plastic containers. NDCA Dkt #15.[11]  Before KFG's opposition to P&G's motion was

due, KFG moved to stay the California action in light of the pending '418 patent reexamination.

See NDCA Dkt #37.

**Stay of the California Litigation.**  Because the '418 patent is under reexamination,

Judge Hamilton granted KFG's motion to stay. NDCA Dkt #68.[12]  The resulting efficiency for

the Court and the parties ultimately prompted Judge Hamilton to grant KFG's stay motion even

in the face of P&G's preliminary injunction motion. Judge Hamilton's order states:

> Unlike an ex parte reexamination, an inter partes reexamination provides for full
> participation by a third party at all stages of the reexamination proceedings. See
> 35 U.S.C. §311 et. seq.  Inter partes reexamination proceedings differ from ex
> part proceedings in two other critical respects: First, inter partes proceedings
> allow for appeals to the Patent Board of Appeals ("PBA"), and subsequently to
> the Federal Circuit, upon submission of the PTO's reexamination decision. See
> 35 U.S.C. §315(b)(1). Second, inter partes proceedings impose estoppel
> restraints upon third-party requesters, which would prevent the third party
> requester from later re-litigating the same issues that were raised, or could have
> been raised, during the inter partes proceedings. See id. at §315(c).[13]

**KFH's Lawsuit Against P&G and P&G's Retaliatory Counterclaim.**  In this lawsuit

filed on October 26, 2007, KFH alleges that P&G infringes KFH's '443 patent. The '443 patent

is directed to a spacing structure placed in the overcap of a coffee container to prevent the vent

---

[10]  Pennypacker Decl., Exhibit 2.

[11]  Pennypacker Decl., Exhibit 7.

[12]  Pennypacker Decl., Exhibit 8.

[13]  P&G has filed a notice of appeal regarding the stay order. See NDCA Dkt #69.

4

valve from becoming blocked. The '443 patent is not limited to plastic containers. Three days after KFH served its complaint, P&G filed a counterclaim against KFH and a third party complaint against KFG alleging that both KFH and KFG infringe the '419 patent (collectively referred to as the "'419 infringement claim").[14] P&G's '419 infringement claim states: "KFG has infringed and continues to infringe the '419 patent. The infringing acts include at least manufacturing, using, selling, and/or offering to sell 39-ounce plastic containers of Maxwell House brand coffee." Counterclaim ¶17. This is the same allegation P&G made with respect to the '418 patent in the California action. As Judge Hamilton stated in her stay order: "In view of these facts, there is a high likelihood here that final, binding results of the reexamination proceedings at issue -- which contemplate final decisions by both the PBA and the Federal Circuit -- would have a dramatic effect on the issues before the court. This particularly true if some or all of the claims at issue are ultimately found invalid, or narrowed." CA Dkt #68.[15]

**The '418 and '419 Patents.** The '418 patent P&G asserts in the California action is nearly identical to the '419 patent asserted here. Both patents are directed to a plastic package for roast and ground coffee. The '419 patent is a continuation-in-part of the application that led to the '418 patent, and both patents claim to relate back to provisional application No. 60/295,666.[16] Consequently, the specifications of the '418 and '419 patents are nearly identical. The claim language is also virtually identical. The green highlighting below shows literally identical claim language and pink highlighting shows virtually identical claim language:

---

[14] P&G's counterclaim against KFH for infringement of the '419 patent is misplaced as it is based entirely on KFH's having inadvertently filed an incorrect corporate disclosure statement that mistakenly referred to the plaintiff as Kraft Foods Global, Inc. KFH has filed a corrected disclosure statement to accurately reflect that the correct plaintiff in the '443 infringement action is Kraft Foods Holding, Inc.

[15] Pennypacker Decl., Exhibit 8.

[16] Compare '419 patent cover page to '418 patent cover page.

5

| Claim No.'418 | '418 Claim Element | Claim No.'419 | '419 Claim Element |
|---|---|---|---|
| 1 | A packaging system comprising: | 1 | A packaging system comprising: |
| 1a | a container having a longitudinal axis and comprising a closed bottom, an open top, and a body having an enclosed perimeter between said bottom and said top; | 1a | a blow-molded container comprising a longitudinal axis, said blow-molded container further comprising a closed bottom, an open top, and a body having an enclosed perimeter between said bottom and said top; |
| 1b | wherein said bottom, top, and body together define an interior volume; | 1b | wherein said bottom, top, and body together define an interior volume |
| 1c | wherein said body comprises at least one region of deflection disposed thereon, and wherein said region of deflection allows flexion and thereby has less resistance to flexing than the body of said container proximate to said region of deflection; | 1c | wherein said body has at least one region of deflection disposed thereon, and wherein said region of deflection allows flexion and thereby has less resistance to flexing than the body of said container proximate to said region of deflection; |
| 1d | a protuberance continuously disposed around the perimeter of said body proximate to said top wherein said protuberance forms a ridge external to said body; | 1d | an outwardly facing annular protuberance disposed upon said body, said annular protuberance being continuously disposed around said perimeter of said body proximate to said top wherein said protuberance forms a surface external to said body, said surface being substantially perpendicular to said longitudinal axis; |
| 1e | a handle disposed on said body; | 8 | The packaging system of claim 1 wherein said body has a handle disposed thereon. |
| 1f | and a flexible closure removably attached and sealed to said protuberance; | 1e | and, a flexible closure removably attached and sealed to said annular protuberance; |
| 1g | wherein said bottom and said body are constructed from a material having a tensile modulus number ranging from at least about 35,000 pounds per square inch (2,381 atm) to at least about 650,000 pounds per square inch (4,230 atm); | 18 | The packaging system of claim 17 wherein said blow-molded container is manufactured from a material having a tensile modulus ranging from at least about 35,000 pounds per square inch (2,381 atm) to at least about 650,000 pounds per square inch (4,230 atm). |
| 1h | wherein said container has a top load capacity of at least about 16 pounds (7.3 kg); | 17f | wherein said annular protuberance translates the force of a load of at least about 16 pounds disposed upon said packaging system in a direction substantially parallel to said longitudinal axis and wherein coffee is contained within said packaging system. |
| 1i | and wherein said closure has a one-way valve disposed thereon. | 4 | The packaging system of claim 1 wherein said flexible closure has a one-way valve disposed thereon. |

The two patents also share the same primary examiner, the same prosecuting attorneys, and many of the same cited references.[17]  Despite this near identity of the '418 and '419 patents, in its California lawsuit, P&G alleges that KFG's plastic 39-ounce Maxwell House container infringes only the '418 patent.  Now, in this lawsuit, P&G claims that exact same plastic 39-ounce Maxwell House container infringes the '419 patent.

## III.   ARGUMENT

### A.   P&G's '419 Infringement Claim Should Be Dismissed Because It is Duplicative of P&G's California Lawsuit

P&G's '419 infringement claim should be dismissed without prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) because it is duplicative of the California action and violates the rule against claim splitting.  See Serlin v. Arthur Andersen & Co., 3 F.3d 221, 223 (7th Cir. 1993) (affirming dismissal of duplicative action); Kim v. Sara Lee Bakery Group, Inc., 412 F. Supp. 2d 929, 941-944 (N.D. Ill. 2006) (dismissing second patent action on grounds of claim splitting); Civix-DDI, LLC v. Expedia, Inc., No. 04 C 8031, 2005 WL 112906, at *4 (N.D. Ill. May 2, 2005) (same).[18]

It is well recognized that two claims arising from the same set of facts may not be divided into two separate lawsuits.  Wilson v. City of Chicago, 120 F.3d 681, 687 (7th Cir. 1997); see also Mars Inc. v. Nippon Conlux Kabushiki-Kaisha, 58 F.3d 616, 619 (Fed. Cir. 1995).  The reason for the rule is clear: duplicative litigation is economically wasteful and has an adverse effect upon the prompt and efficient administration of justice.  As the Supreme Court stated:

---

[17]  Id.

[18]  See also Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp., 452 F.Supp.2d 621, 626 n.2 (D. Md. 2006) (noting the propriety of dismissing a duplicative later filed action without prejudice to avoid inefficiency and comply with the rule against claim splitting); Single Chip Sys. Corp. v. Intermec IP Corp., 495 F.Supp.2d 1052, 1065 (S.D. Cal. 2007) (dismissing second duplicative action without prejudice on claim splitting grounds); First City Nat'l Bank and Trust Co. v. Simmons, 878 F.2d 76, 80 (2d Cir. 1989) (same).

7

[A] party seeking to enforce a claim legal or equitable must present to the court, either by the pleadings or proofs, all the grounds upon which he expects a judgment in his favor. He is not at liberty to split up his demand and prosecute it by piecemeal, or present only a portion of the grounds upon which special relief is sought, and leave the rest to be presented in a second suit, if the first fails. There would be no end to litigation if such a practice were permissible.

United States v. Haytian Republic, 154 U.S. 118, 125 (1894) (quoting Stark v. Starr, 94 U.S.

477, 485 (1876).

P&G's counterclaim and third party complaint and judicially noticeable documents from

P&G's California action show that P&G's '419 infringement claim arises out of the same set of

facts and the same conduct at issue in P&G's California action. P&G's '419 infringement claim

violates the rule against claim splitting, is duplicative and should be dismissed.[19]

### 1. P&G's '419 Infringement Claim Arises From the Same Transaction or Series of Transactions as P&G's California Lawsuit.

A claim has "identity" with another claim and is subject to dismissal if it emerges from

the same "core of operative facts" as that in the earlier action. Colonial Penn Life Ins. Co. v.

Hallmark Ins. Admins., Inc., 31 F.3d 445, 447 (7th Cir. 1994); Herrmann v. Cencom Cable

Assoc., Inc., 999 F.2d 223, 226 (7th Cir. 1993). Such "identity" is clearly present here: Both

here and in California, P&G alleges that KFG infringes P&G's patent rights by "manufacturing,

using, selling, and/or offering to sell 39-ounce plastic containers of Maxwell House brand

coffee." NDCA Dkt. #1, CA Complaint ¶8; Counterclaim ¶17. These identical allegations are

[19] In considering Kraft's motion to dismiss, the Court must assume all facts alleged in P&G's counterclaim and third party complaint are true and view the allegations in the light most favorable to P&G. See, e.g., Singer v. Pierce & Assocs., P.C., 383 F.3d 596, 597 (7th Cir. 2004). The Court need not accept as true conclusory allegations or legal characterizations, nor need it accept unreasonable inferences or unwarranted deductions of fact. See Doyle v. Camelot Care Ctrs., Inc., 305 F.3d 603, 614 (7th Cir. 2002); Republic Steel Corp. v. Pennsylvania Eng'g Corp., 785 F.2d 174, 178 (7th Cir. 1986). The Court may also consider judicially noticeable matters. Palay v. United States, 349 F.3d 418, 425 n.5 (7th Cir. 2003) ("[I]n resolving a motion to dismiss, the district court is entitled to take judicial notice of matters in the public record."); Newcomb v. Brennan, 558 F.2d 825, 829 (7th Cir. 1977) (A court may take judicial notice of facts of "common knowledge" in ruling on a motion to dismiss).

8

alone sufficient to justify dismissing P&G's '419 infringement claim. "Courts have consistently held that a plaintiff is barred from asserting a patent in a subsequent action against products or processes if that patent could have been asserted in the prior action." American Stock Exchange, LLC v. Mopex, Inc., 215 F.R.D. 87, 92 (S.D.N.Y. 2002).[20]

P&G would be precluded from asserting claims from a single patent in two separate lawsuits against the same accused product. See, e.g., CIVIX-DDI, 2005 WL 1126906, at *4. This is so even though there is considerable precedent holding that each claim in a single patent is a distinct and separate invention that confers a separate legal right upon the patent holder. See, e.g., Norfin, Inc. v. International Business Machines Corp., 625 F.2d 357, 362 (10th Cir. 1980); see also 35 U.S.C. § 282. The rationale behind preventing plaintiffs from dividing claims from a single patent into separate lawsuits is the same: judicial economy.

The logic behind the rule against claim splitting in other contexts is equally applicable to the facts of this case. Here and in California, P&G identifies the same allegedly infringing product and asserts virtually identical patents against KFG. Both asserted patents share common prosecuting attorneys, patent examiners and claim language. In short, all of the evidence related to the accused Maxwell House product and substantially all of the evidence related to the construction of the '419 and '418 patent claims, the validity of the '418 and '419 patents and the infringement of the '419 and '418 patents will be exactly the same — and right now that evidence will be heard by two different judges in two different jurisdictions. This is exactly the type of waste that the rule against claim splitting is intended to prevent, and P&G's '419

---

[20] American Stock Exchange cites several cases in support of this proposition: Panoualias v. Nat'l Equip. Co., 269 F. 630, 632-33 (2d Cir. 1920); Kearns v. General Motors Corp., 94 F.3d 1553, 1555 (Fed. Cir. 1996); Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc., No. 95 Civ 7900, 2001 WL 38285, at *1 (S.D.N.Y. Jan. 16, 2001); General Ry. Signal Co. Union Simplex Train Control Co., 23 F.Supp. 667, 671 (D. Del. 1938), aff'd, 106 F.2d 1018 (3d Cir. 1939).

9

infringement claim should therefore be dismissed.[21]

## 2. P&G's '419 Infringement Claim and California Action Are Duplicative.

P&G's '419 patent infringement claim should be dismissed for the independent reason that it is duplicative of the California action. The Seventh Circuit has held that the filing of a parallel action that is duplicative of an action already pending in another federal court is an independent ground for dismissing the later-filed action. Serlin, 3 F.3d at 223. Again, the rationale is judicial economy: "As a general rule, a federal suit may be dismissed "for reasons of wise judicial administration ... whenever it is duplicative of a parallel action already pending in another federal court." Ridge Gold Standard Liquors v. Joseph E. Seagram & Sons, Inc., 572 F. Supp. 1210, 1213 (N.D. Ill. 1983) (citing Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976); Calvert Fire Ins. Co. v. Am. Mut. Reinsurance Co., 600 F.2d 1228, 1233 (7th Cir. 1979)). "As a general rule, a suit is duplicative if the claims, parties and available relief do not significantly differ between the two actions." Kim, 412 F. Supp. 2d at 941. Each factor weighs in favor of dismissal here.

## a. P&G's California And Wisconsin Actions Concern The Same Parties and Conduct.

P&G's California action alleges infringement against KFG. P&G's counterclaim and third party complaint alleges claims against both KFH and KFG. Both cases obviously involve

---

[21] P&G may argue that it is entitled to bring separate lawsuits based on the '418 and '419 patents under Kearns, which held that each separate patent "establishes an independent and distinct property right" and therefore "each patent asserted raises an independent and distinct cause of action." 94 F.3d at 1555.[21] Kearns is not applicable here. The Federal Circuit has held that regional circuit law applies to the issue of claim splitting. See Mars, 58 F.3d at 618. The Seventh Circuit has consistently held that claims arising from the same facts may not be split into separate suits. Wilson, 120 F.3d at 687; Colonial Penn Life Ins. Co., 31 F.3d at 447; Herrmann, 999 F.2d at 226. And, there was no evidence that the patents at issue in Kearns were nearly identical as the '418 and '419 patents indisputably are here. The Kearns court was also concerned that the plaintiff would have no remedy, since the prior action was involuntarily dismissed on procedural grounds before the second action was filed. Here, P&G's first action is still pending, so no similar considerations are at issue.

10

P&G. Both cases allege (with the same language) that sales of Maxwell House Brand Coffee in 39-ounce plastic containers infringe P&G's patents. Compare CA Complaint ¶8 to Counterclaim ¶17. And, the two asserted patents are very similar in a variety of respects in scope and substance. See, section A.1., supra. This factor weighs in favor of dismissal.

### b. P&G Seeks Identical Relief Here and In California.

P&G seeks relief before this Court that it is already seeking in California. Namely, both here and in California, P&G seeks to enjoin sales of Maxwell House Brand Coffee in 39-ounce plastic containers and money damages for all infringing sales. Compare California Complaint ¶7 to Counterclaim ¶17. This factor also weighs in favor of dismissal.

### c. Judicial Economy Supports Dismissal Here.

The interest of judicial economy is so powerful in the context of analyzing duplicative actions that an action will be dismissed even where the plaintiff will face adverse consequences as a result. In Serlin, for example, the plaintiff's first action was in danger of being dismissed for untimely service, and the statute of limitations would have barred it from being refiled. Nevertheless, the Seventh Circuit, expressly noting this negative consequence, still affirmed the district court's decision to dismiss the second action as duplicative of the first. See Serlin, 3 F.3d at 224; accord Kim, 412 F.Supp.2d at 941 (dismissing duplicative second action where plaintiff's remedies might be limited in the first action).

Here, P&G's California action is pending, and, although Kraft may argue untimeliness and will seek to stay any such action, nothing prevents P&G from seeking to add its '419 infringement claim to that case. In fact, the negative consequence here is if P&G is allowed to pursue its '419 infringement claim in this Court. P&G's decision not to assert the '419 patent in the California action allowed it to hold the '419 patent back for later assertion if, as actually occurred, the California action was stayed pending reexamination of the '418 patent. P&G

11

should not be allowed to circumvent Judge Hamilton's stay by pursuing a duplicative claim
before this Court.

Numerous cases specifically hold that plaintiffs in P&G's position should be precluded
from seeking to avoid an adverse ruling in an earlier filed action by filing a duplicative action in
another forum. See, e.g., Black & Decker, Inc. v. Robert Bosch Tool Corp., 500 F. Supp. 2d
864, 872-73 (N.D. Ill. 2007) (dismissing second filed action involving same patent claims
against new products where new products were precluded from first filed action); Civix, 2005
WL 112906, at *5 (holding plaintiff did not have "the right to assert new patent claims against
Defendants merely because the Court issued its *Markman* ruling"). P&G's '419 infringement
claim is duplicative of its California action, and it should be dismissed.

**B.    Alternatively, the Court Should Stay P&G's '419 Infringement Claim.**

If the Court does not dismiss P&G's duplicative '419 infringement claim, it should at a
minimum stay litigation of that claim pending the outcome of the '418 patent reexamination.
The fact that the '419 patent is not currently subject to a reexamination does not preclude this
Court from issuing a stay of a lawsuit predicated on that patent. To the contrary, when, as is the
case here, a plaintiff's patent is pending PTO reexamination, courts routinely stay independent
infringement litigation based on unexamined but related patents. See, e.g., Pacesetter, Inc. v.
Cardiac Pacemakers, No. Civ. 02-1337, 2003 WL 23303473, at *3 (D.Minn. Nov. 19, 2003)
(entire proceeding stayed where two of four patents in suit underwent reexamination); KLA-
Tencor Corp., No. C. 05-03116, 2006 WL 708661, at *4 (N.D. Cal. Mar. 16, 2006) (stay granted
where reexamination of two patents in suit "may significantly affect the [third patent in suit]");
Pegasus Development Corp. v. Directv, Inc., No. Civ. A. 00-1020-GMS, 2003 WL 21105073, at
*3 (D.Del. May 14, 2003) (stay granted where reexamination of one of two patents in suit "may
materially affect the issues in the case...."); Datatreasury Corp. v. Wells Fargo & Co., 490 F.

12

Supp. 2d 749 (E.D. Tex. 2006) (stay granted where PTO commenced reexamination of some of the patents in suit).

A court may opt to stay litigation pending a reexamination to avoid inconsistent results, narrow the issues, obtain guidance from the PTO, or simply to avoid the needless waste of judicial resources. See Gould v. Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir. 1983); Patlex Corp. v. Mossinghoff, 758 F.2d 594, 602 (Fed. Cir. 1985); Medichem, S.A. v. Rolabo, S.L., 353 F.3d 928, 936 (Fed. Cir. 2003). A stay is particularly appropriate for cases in the initial stages of litigation or in which there has been little discovery. See, e.g., KLA-Tencor, 2006 WL 708661, at *2. When deciding whether to stay an infringement proceeding of one patent in light of a pending reexamination of another patent, courts consider the overlap of accused products, witnesses, technology and evidence as factors favorable to granting a stay. See Pacesetter, 2003 WL 23303473, at *3; KLA-Tencor Corp., 2006 WL 708661, at *4. All of the relevant factors weigh heavily in favor of a stay of P&G's '419 infringement claim.

### 1.    A Stay Will Likely Simplify The Issues Before The Court.

The PTO's reexamination of the '418 patent will simplify the issues this Court needs to resolve relative to the '419 patent. See Modine Mfg. Co. v. Delphi Automotive Sys., LLC, No. 00-C258, 2000 WL 33989247 (E.D. Wis. Dec. 8, 2000) (granting stay because parallel Federal Circuit proceeding would simply issues pending before the court). Courts typically consider the expertise of the Patent Office as an important factor in determining whether to grant a stay. Gould, 705 F.3d at 1342; Middleton, Inc. v. Minn. Mining & Mfg. Co., No. 4:03-CV-40493, 2004 WL 1968669, at *3 (S.D. Iowa Aug. 24, 2004); GPAC Inc. v. D. W.W. Enters. Inc., 23 U.S.P.Q.2d 1129, 1134 (D.N.J. 1992); Bausch & Lomb Inc. v. Alcon Labs., Inc., 914 F.Supp. 951, 953 (W.D.N.Y. 1996).

13

The '418 patent's reexamination proceedings will have a direct impact on the '419 patent's scope and validity. The Federal Circuit has repeatedly held that "the same term[s] and phrase[s] should be interpreted consistently where it appears in claims of common ancestry." Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1030 (Fed. Cir. 2002); see also Elkway Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 980 (Fed. Cir. 1999); Abtox, Inc. v. Exitron Corp., 131 F.3d 1009, 1010 (Fed. Cir. 1997). The '419 is a continuation-in-part of the '418 patent and the patents share a common examiners, prosecuting attorneys, cited references, lineage, specifications and claim language. See, section A.1., above. In examining the '418 patent's validity, the PTO, then the BPAI, and then the Federal Circuit will necessarily determine the scope and meaning of the '418 patent claims terms, including terms common to both patents, such as "protuberance," "region of deflection," and "flexible closure." The meaning of those terms must be the same in both patents, thus, their interpretation in the '418 reexamination is directly relevant to the meaning of the '419 patent. KLA-Tencor Corp., 2006 WL 708661, at *4 (overlap of claim language factor in favor of stay). Accordingly, this Court should stay P&G's '419 infringement claim pending the outcome of the '418 patent reexamination.

## 2.    Judicial Economy Warrants a Stay Here.

The accused product, witnesses, technology and other evidence related to P&G's California action and its '419 infringement claim are virtually identical and further support a stay. The close relationship of the '418 and '419 patents and the fact that P&G alleges infringement by the same plastic 39-ounce Maxwell House coffee container in both actions means that the infringement analysis for the '418 and '419 patents will be nearly identical. Indeed, it is a near certainty, that the "engineering and sales personnel deposed would be the same for [both patents]." KLA-Tencor Corp., 2006 WL 708661, at *4. Because the same accused product is at issue and P&G seeks injunctive and monetary damages in both cases, the

14

damages analysis for the '419 and '418 patents will also be identical. These fact weighs in favor of a stay. Pacesetter, 2003 WL 23303473, at *3 (overlap of accused products a favorable factor in granting stay); KLA-Tencor Corp., 2006 WL 708661, at *4 (same). Both patents are also directed to a plastic package for roast and ground coffee — thus, both involve the exact same article of manufacture. This fact also weighs in favor of a stay. See Pacesetter, 2003 WL 23303473, at *3 (overlap in technology weighs in favor of stay).

### 3. P&G Will not be Prejudiced by a Stay.

P&G also cannot demonstrate that it will suffer any litigation prejudice as a result of a stay. If P&G's infringement allegations are correct, it can seek damages for any such infringement after the validity and scope of the '418 and '419 patents are finally determined. And, while the parties have exchanged discovery requests in the case, as of the date of this motion, no documents or written responses have been exchanged, no depositions have been taken, and no expert reports have been prepared. Thus, P&G cannot claim that a stay of its counterclaim and third party complaint will cause it any loss, and that claim should be stayed.[22]

Without a stay, not only will resources be wasted by having two courts consider the exact same issues, but conflicting outcomes may also result. If this Court moves forward with P&G's '419 infringement claim, this Court's claim construction, validity and infringement determinations could not only conflict with the PTO, the BAPI and/or the Federal Circuit, but also with decisions taken up by Judge Hamilton in California. Going forward with P&G's '419

---

[22] The Court's decision not to stay litigation pending reexamination of a related patent in Mars, Inc. v. JCM Am. Corp., No. 05-3165, 2006 WL 3373284 (D.N.J. Nov. 21, 2006) does not change this result. In that case, the court affirmed a magistrate's denial of defendant's stay petition. Id., at *8. Specifically, the court found that defendant's request for a stay conflicted with its position of continued discovery on identical factual issues in the Nevada action and that such conflict prejudiced plaintiff's "ability to clear its name and to timely develop the record on both [patents in dispute]." Id. at *7. Here, however, there is no concern of such prejudice and judicial economy is served by a stay of P&G's '419 infringement claim.

15

infringement claim would be a waste of this Court's judicial resources, and it should be stayed.

## C. Alternatively, The Court Should Transfer P&G's '419 Infringement Claim

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). If the Court decides not to dismiss or stay P&G's '419 infringement claim, that claim should be transferred to the Northern District of California. The claim could have been brought there, and litigation between the parties, involving the nearly identical '418 patent and the same accused product, is currently pending there. It would therefore be more efficient and avoid the risks of duplicative and inconsistent results, if the Court transfers P&G's '419 infringement claim to the Northern District of California.

### 1. P&G's '419 Infringement Claim "Might Have Been Brought" in the Northern District of California And Is Properly Transferred There.

As required by section 1404(a), this action could have been brought in the Northern District of California. In its answer in the California action, KFG has already admitted that the Northern District of California can exercise personal jurisdiction over it and that venue is proper there. NDCA Dkt #29.[23] P&G's infringement claim against KFH is based entirely on misplaced alter ego allegations, which KFH disputes. However, assuming P&G could succeed on its alter ego allegations, personal jurisdiction and venue over KFH would also have been admitted. The Northern District of California is a proper venue for P&G's '419 infringement claim.

### 2. Relevant Factors Favor Transfer to the Northern District of California.

Once the Court determines that the action could have been brought in the transferee forum, it must consider three principal factors: "the plaintiff's choice of forum, the convenience

---

[23] Pennypacker Decl., Exhibit 9.

16

of the parties and the witnesses, and the interest of justice." Roberts & Schaefer Co. v. Merit

Contracting, Inc., 99 F.3d 248, 254 (7th Cir. 1996); Coffey v. Van Dorn Iron Works, 796 F.2d

217, 219 (7th Cir. 1986); Milwaukee Elec. Tool Corp. v. Black & Decker (N.A.) Inc., 392 F.

Supp. 2d 1062, 1064 (W.D. Wis. 2005). These factors are among a broader set of

considerations, including the situs of material events, ease of access to sources of proof, location

of documents and records likely to be involved, and expense of the parties. Coffey, 796 F.2d at

219 n.3; Platt v. Minnesota Mining & Manufacturing, 376 U.S. 240, 244 (1964). The factors

weigh in favor of transfer to the Northern District of California here.

### a.   P&G's Choice of Forum is Outweighed By Other Factors.

"Although the plaintiff's choice of forum is entitled to deference, it can be overcome by a

showing that other considerations outweigh the choice of forum factor." Wausau Benefits, Inc.

v. Liming, 393 F. Supp. 2d 713, 715 (W.D. Wis. 2005). Indeed, the Seventh Circuit has held that

if the non-moving party's chosen forum is not the situs of material events, that choice has weight

equal to the other factors and should not receive deference. Chicago, Rock Island & Pac R.R.

Co. v. Igoe, 220 F.2d 299, 304 (7th Cir. 1955); United States v. Payne and Dolan, Inc., No. 01-

C-0383-C, 2003 WL 23185881, at *3 (W.D. Wisc. July 14, 2003) (plaintiff's choice "will not

receive deference" absent material events); Castleberg v. Covenant Healthcare, L.L.C., No. 02-

C-0147-C, 2002 WL 32345613, at *2 (W.D. Wis., Aug. 16, 2002). The absence of material

events occurring within this District weighs in favor of transfer. Liberty Mutual Fire Ins. Co. v.

The Nordic Group of Companies, Ltd., No. 01-C-0207-C, 2001 WL 34382016, at *7 (W.D.

Wisc. Dec. 4, 2001).

Here, no material events relevant to P&G's claim occurred in Wisconsin. P&G is located

in Ohio, and there is no evidence that the invention claimed in the '419 patent was created or

developed in Wisconsin. Indeed, the listed '419 patent inventors resided in Ohio and Kentucky

17

at the time of the invention. P&G's judicially noticeable filings from the California action also show that the accused Maxwell House plastic container is not manufactured in Wisconsin.[24] And, P&G has alleged no particular concentration of sales or other facts that would suggest that this District offers any advantage in access to relevant proof. Indeed, the only reason for P&G to bring the '419 patent into this case is to try and side step the stay Judge Hamilton entered in the California action. This is clearly improper. See Rayco Mfg. Co. v. Chicopee Mfg. Corp. 148 F. Supp. 588, 592-94 (S.D.N.Y. 1957) (transfer of a patent case is proper—without regard for the plaintiff's choice of forum—in order to avoid "readily apparent forum shopping.").

### b.    The Interests of Justice Favor Transfer.

The interests of justice plainly favor transfer in this case. This district has no particular interest in this action — none of the parties are citizens of Wisconsin, and P&G's '419 infringement claim involves technical issues of patent infringement under federal law, not Wisconsin law. In contrast, the Northern District of California has already been introduced to the technology at issue and is familiar with the parties. See Coffey, 796 F.2d at 221 (familiarity of judge important); Broadcom Corp. v. Microtune, Inc., No. 03-C-0676-S, 2004 WL 503942, at *4 (W.D. Wis. Mar. 9, 2004) (granting defendant's motion to transfer where the transferee court was already familiar with the technology and parties).

It will also serve the interests of judicial economy to transfer P&G's '419 infringement claim to the Northern District of California. A transfer will ensure that only one trial judge will need to become versed in the substantially overlapping technology in the '418 and '419 patents and prevent conflicting claim constructions, validity and infringement rulings, and damages determinations.

_____

[24]   See, e.g., Pennypacker Decl. Exhibits 3, 6, & 7.

18

And, while this district has a faster moving docket than other jurisdictions, that fact alone

cannot outweigh the substantial justifications for transfer in this case. See Wassau Benefits, 393

F.Supp.2d at 718 (holding that speed of docket alone does not warrant denial of transfer). As

one recent decision explained:

> The interests of justice are not served by such blatant forum shopping. As this court has stated in the past, such docket considerations "'cannot be the primary reason for retaining a case in this district. This Court cannot stand as a willing repository for cases which have no real nexus to this district.'" The 'rocket docket' certainly attracts plaintiffs, but the Court must ensure that this attraction does not dull the ability of this Court to continue to act in an expeditious manner.'"

Telepharmacy Solutions, Inc. v. Pickpoint Corp., 238 F. Supp. 2d 741, 744 (E.D. Va. 2003)

(citation omitted). Accordingly, P&G's '419 infringement claim should be transferred.

## IV.     CONCLUSION

P&G's '419 infringement claim is not properly before this Court. That claim is

duplicative of litigation already pending in the Northern District of California, and it should be

dismissed. Alternatively, this Court should stay P&G's '419 infringement claim pending the

outcome of a pending reexamination proceeding involving a nearly identical patent or transfer

P&G's '419 infringement claim to the Northern District of California.

November 29, 2007                         Respectfully submitted,

By: _Claude M. Stern_ / AMN

Claude M. Stern (pro hac vice)
claudestern@quinnemanuel.com
**QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP**
555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065-2129
650.801.5000
Facsimile: (650) 801-5100

19

ANTHONY A. TOMASELLI
**QUARLES & BRADY LLP**
33 East Main Street
Suite 900
Madison, WI 53703
608.251.5000

*Attorneys for Plaintiff and Counterclaim Defendant*
*Kraft Foods Holding, Inc. and Third-Party*
*Defendant Kraft Foods Global, Inc.*

**EXHIBIT 4**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


THE PROCTER AND GAMBLE         )

COMPANY,                       )

                PLAINTIFF,)

VERSUS                         )   CASE NO. C07-4413 PJH

                       )   OCTOBER 3, 2007

KRAFT FOODS GLOBAL, INC.,      )   SAN FRANCISCO, CALIFORNIA

              DEFENDANT.)

_____)

BEFORE THE HONORABLE PHYLLIS J. HAMILTON

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR PLAINTIFF:      HOWREY

                   BY:  WILLIAM C. ROOKLIDGE, ESQ.

                   2020 MAIN STREET SUITE 1000

                   IRVINE, CALIFORNIA 92614


FOR DEFENDANT:      QUINN EMANUEL

                   BY:  CLAUDE M. STERN, ESQ.

                   555 TWIN DOLPHINE DRIVE STE 560

                   REDWOOD SHORES, CALIFORNIA 94065


REPORTED BY:      JUANITA GONZALEZ, CSR NO. 3003

1          THE CLERK:  CALLING C07-4413, PROCTER AND GAMBLE

2   COMPANY VERSUS KRAFT FOOD GLOBAL.

3          MR. ROOKLIDGE:  WILLIAM ROOKLIDGE FOR PLAINTIFF.

4          MR. STERN:  CLAUDE STERN, QUINN EMANUEL, ON BEHALF OF

5   KRAFT.  WITH ME IS A REPRESENTATIVE FROM OUR CLIENT, CLINTON

6   HOLEMAN (PHONETIC).

7          THE COURT:  GOOD MORNING.  THIS MATTER IS ON FOR

8   HEARING ON THE DEFENSE MOTION TO STAY THIS ACTION.  PLAINTIFF

9   FILED A MOTION -- WELL, FILED THE LAWSUIT NOT LONG AGO, ABOUT A

10  MONTH AGO, AND A FEW WEEKS THEREAFTER FILED A MOTION FOR

11  PRELIMINARY HEARING.  THE MOTION IS SET TO BE HEARD ON OCTOBER

12  24TH.  THE DEFENSE HAS SUBSEQUENTLY FILED A NUMBER OF MOTIONS,

13  INCLUDING A MOTION TO STAY THESE PROCEEDINGS.

14          AS I UNDERSTAND IT, THE MOTION TO STAY IS BASED UPON AN

15  ANTICIPATED OR PENDING APPEAL OF THE RE-EXAMINATION WHICH

16  RESULTED IN CONFIRMATION OF THE VALIDITY OF THE PATENT CLAIMS.

17          CORRECT?

18          MR. STERN:  CORRECT.

19          THE COURT:  ALL RIGHT.  NOW, I HAVE REVIEWED YOUR

20  PAPERS, WITH THE EXCEPTION OF THE BIG STACK OF OBJECTIONS I

21  RECEIVED YESTERDAY, WHICH I HAVE NOT CONSIDERED AND PROBABLY

22  WON'T IN CONJUNCTION WITH THIS MOTION.

23          IS THERE ANYTHING ELSE, MR. STERN, THAT YOU WANTED TO

24  SAY?

25          MR. STERN:  FIRST, IF YOUR HONOR HAS ANY QUESTIONS, I

1  WANT TO MAKE SURE WE ANSWER THEM WITH RESPECT TO THE PAPERS.

2          I THINK THAT WITH RESPECT TO THE MOTION TO STAY, YOUR

3  HONOR, THE ONLY THING THAT RENDERS THIS CASE UNUSUAL FROM THE

4  PLAINTIFF'S PERSPECTIVE IS THE PRELIMINARY INJUNCTION MOTION.

5  IF IT WASN'T FOR THAT, ALL THE AUTHORITY WE CITED, I THINK WOULD

6  DICTATE THE COURT SHOULD STAY THE ACTION.

7          THE PLAINTIFF IS MAKING THE ARGUMENT BECAUSE THERE IS A

8  PRELIMINARY INJUNCTION MOTION PENDING, THAT SHOULD SOMEHOW

9  CHANGE --

10          THE COURT:  I GUESS THE QUESTION FOR ME IS,

11 IRRESPECTIVE OF THE MOTION FOR PRELIMINARY INJUNCTION, WHETHER

12 OR NOT A STAY IS APPROPRIATE, GIVEN THAT THE RE-EXAMINATION HAS

13 ALREADY OCCURRED, AND GIVEN THAT YOU'RE SIMPLY NOW PROCEEDING TO

14 AN APPEAL THE RE-EXAMINATION DECISION.

15          AS I UNDERSTAND, YOU APPEAL FIRST TO THE BOARD OF

16 PATENTS AND THEN, SECOND, THEREAFTER, TO THE FEDERAL CIRCUIT.

17 IS IT FAIR TO THE PLAINTIFF THAT WE INDEED SHOULD PUT THIS

18 LAWSUIT ON HOLD FOR ANY UNDETERMINED AMOUNT OF TIME WHILE YOU

19 EXHAUST ALL OF THESE ADMINISTRATIVE APPEALS THAT ARE AVAILABLE

20 TO YOU BEFORE PROCEEDING?  I MEAN, I TYPICALLY -- RE-EXAMINATION

21 REQUESTS ARE MORE AND MORE POPULAR THESE DAYS THAN EVER, AND I

22 ALMOST ALWAYS GRANT A REQUEST FOR A STAY FOR AN INITIAL

23 RE-EXAMINATION.  THIS IS THE FIRST TIME I HAVE EVER BEEN

24 REQUESTED TO STAY A LITIGATION THAT'S PENDING HERE PENDING

25 EXHAUSTION OF APPEALS AVAILABLE TO THE REQUESTER.

1          MR. STERN:  I THINK WHAT'S IMPORTANT HERE -- YOU

2 PROBABLY RECEIVED MOTIONS TO STAY IN EX PARTE PROCEEDINGS AS

3 OPPOSED TO INTER PARTES PROCEEDINGS.  THAT IS A SPECIAL

4 PROCEEDING BECAUSE OF THE COST AND RISK TO MY CLIENT.

5          THAT IS TO SAY, WHEN THAT PROCEEDING GOES FINAL, IF THE

6 PROCEEDING ENDS UP CONFIRMING THE PATENT OR THE CLAIM FOR THE

7 PATENTS, THOSE CLAIMS THAT ARE BEING ASSERTED HERE, WE ARE

8 ESTOPPED BY STATUTE TO BE ABLE TO ARGUE IN FRONT OF YOUR HONOR

9 THE SAME GROUNDS THAT ARE BEING ARGUED IN FRONT OF THE PTO.

10 THAT IS A VERY SERIOUS IMPACT.  THAT'S WHY INTER RE-EXAMINATION

11 PROCEEDINGS AREN'T ANYWHERE NEAR AS POPULAR AS EX PARTE.

12          THE COURT:  EVEN THOUGH EX PARTE PROCEEDINGS -- EVEN

13 THOUGH THE DEFENDANT ISN'T ESTOPPED FROM ARGUING IT, THERE IS A

14 VERY STRONG PRESUMPTION IN FAVOR OF VALIDITY THAT THE PATENT

15 HOLDER ENJOYS.

16          MR. STERN:  HERE THE POINT IS, ACCORDING TO -- THE REAL

17 QUESTION THAT WE'RE FACING IS THE EXTENT TO WHICH WE ARE GOING

18 TO BE POTENTIALLY WASTING THE COURT'S RESOURCES AND OURS

19 PROCEEDING DOWN THE LINE OF LITIGATING THIS PARTICULAR CASE

20 WHILE IT'S PERFECTLY POSSIBLE ON TWO DIFFERENT APPEALS THE

21 PATENT 418 IS COMPLETELY INVALID.

22          THIS IS VERY IMPORTANT, BECAUSE I THINK FROM OUR

23 HONOR'S QUESTION, I UNDERSTAND THE COURT HAS - WELL, REALLY,

24 SORT OF A FORMALITY OF APPEAL AT THIS POINT, BUT THESE PATENTS

25 HAVE ALREADY BEEN CONFIRMED.  SO, REALLY, THE DAMAGE ALREADY

1  EXISTS.  WE SHOULD MOVE ON.

2        WITH ALL DUE RESPECT, I DON'T THINK THAT IS HOW THE

3  RE-EXAMINATION PROCEEDINGS ON THE INTER-PARTY SIDE WORK AT ALL.

4  THE THEORY IS UNDER THE STATUTE ESTOPPED IS SO SERIOUS IT

5  SPECIFICALLY SAYS UNTIL THERE IS A FINAL DETERMINATION, UNTIL A

6  FINAL DETERMINATION.  DOESN'T MEAN THE PTO MEANS THROUGH THE

7  FEDERAL CIRCUIT UNTIL THERE IS A DETERMINATION THERE IS NO

8  BINDING IMPACT.

9        WE APPRECIATE AND THE COURT APPRECIATES THAT WE THINK

10  THE PTO GOT IT ALL WRONG, AS WE STATED.  THE DECISION OF THE PTO

11  IS BEFORE YOU.  NO MENTION OF KSR, NO MENTION TO THE STANDARD

12  ARTICULATED IN KSR.  I KNOW PLAINTIFF MADE THE ARGUMENT

13  CERTAINLY PTO HAS BEEN AWARE I AM TALKING ABOUT THIS SPECIFIC

14  EXAMINER ON THIS SPECIFIC RECORD.  THERE IS NOTHING THAT

15  INDICATES THAT THEY WERE AWARE OF KSR.  WE MEAN TO APPEAL THAT

16  AS WELL AS THE MERITS OF THIS.

17        AT THAT POINT WE'RE ARGUING ANEW, A FRESH LOOK.  IF WE

18  CAN TAKE THAT TO THE FEDERAL CIRCUIT, WE GET A FRESH LOOK.  FOR

19  THAT REASON, THE FACTS IN THESE THREE --

20        THE COURT:  BUT AREN'T YOU LEFT JUST TO SPECULATE THAT

21  THAT IS LIKELY TO OCCUR?  HOW DO YOU PREDICT?  YOU SAY IN YOUR

22  PAPERS IT'S LIKELY TO BE REVERSED.  HOW DO I MAKE THAT

23  PRESUMPTION?

24        MR. STERN:  LET ME ASK THE COURT THIS:  WHY WOULDN'T

25  THAT BE DIFFERENT IN ANY CASE?  IN ANY CASE THERE IS -- THE

1  PATENT IS ISSUED TO THE PATENTEE, WHETHER EX PARTE OR

2  INTER PARTES.  REALLY, IN ANY OF THOSE CASES, THE PATENTEE, WHEN

3  FACED WITH A MOTION TO STAY, CAN COME TO THE COURT AND SAY,

4  "I'VE GOT THIS PATENT.  DON'T STAY THE CASE.  LET ME GO

5  FORWARD," BECAUSE THE FACT OF THE MATTER IS IN MORE -- ACCORDING

6  TO THE -- IN MORE THAN 75 PERCENT OF THE CASES, SOMETHING IS --

7  COMING OUT.  MAY NOT BE EXACTLY THE SAME PATENT, BUT --

8          THE COURT:  TO ANSWER YOU RHETORICAL QUESTION, MY

9  RESPONSE IS THAT FOR A FIRST ROUND, I ACCEPT THE FACT THAT IT'S

10 WHETHER OR NOT THERE IS LIKELY TO BE A CHANGED RESULT.  I SIMPLY

11 ACCEPT IT FOR A FIRST ROUND.  BUT GIVEN THE AMOUNT OF TIME THAT

12 IT TAKES TO GET THROUGH THE RE-EXAMINATION PROCESS -- THE LAST

13 REQUEST FOR RE-EXAMINATION GRANTED RESULTED IN A 21-MONTH DELAY

14 IN THE LITIGATION.

15         WHAT YOU'RE ASKING FOR IS SOMETHING BEYOND THAT.  I

16 HAVE NO IDEA -- MAYBE YOU CAN SHED SOME LIGHT ON THAT.  HOW LONG

17 IS THE APPEAL PROCESS LIKELY TO TAKE?  IF AFTER THE INTERNAL

18 APPEAL YOU GO TO THE FEDERAL CIRCUIT, THEN I THINK WE CAN ADD

19 ANOTHER YEAR ON THE FEDERAL CIRCUIT APPEAL.

20         SO THE ANSWER TO YOUR QUESTION IS, I'M WILLING TO DO IT

21 FOR THE FIRST ROUND.  I HAVE YET TO BE PERSUADED THAT IT'S A

22 GOOD IDEA TO DO IT FOR THE SECOND AND THIRD ROUND.

23         MR. STERN:  I GUESS, YOUR HONOR, THIS COMES DOWN TO THE

24 ULTIMATE STANDARD OF THE MOTION TO STAY.  THIS IS DISCRETIONARY.

25 ALL THE CASES WE CITED ON THE INTER PARTES -- WE CITED FIVE

1  DIFFERENT CASES --FIVE CASES.  THERE IS NOT A SINGLE CASE WE

2  LOOKED AT WHERE A PARTY FACING

3  INTER PARTES RE-EXAMINATION HAS NOT GOTTEN THE STAY FROM THE

4  DISTRICT COURT.  THEY NORMALLY GRANT THEM.

5          THE QUESTION IS:  WAIT A MINUTE, YOU HAVE THIS FIRST

6  ROUND RESULT.  SHOULDN'T THAT CHANGE THE IMPACT OF THIS?  I

7  THINK WHAT'S IMPORTANT IS THERE ARE TWO DECISIONS CITED BY THE

8  PLAINTIFF, I THINK PROVES OUR POINT.  THEY COME UP WITH SOME

9  SORT OF PRECEDENT FOR DENYING THE CASE AT THIS STAGE.  THERE

10  HAVE BEEN THE ROMAN-HAUS CASES CITED BY THE PLAINTIFF, AS WELL

11  AS THE SKAZI(PHONETIC) CASES.  I THINK NOT ONLY DO THOSE CASES

12  NOT SUPPORT PLAINTIFF, I THINK THE SUPPORT US.  THOSE CASES WERE

13  EX PARTE RE-EXAMINATIONS.

14          WHAT HAPPENED IS EX PARTE DOESN'T HAVE THIS APPEAL

15  PROCESS, DOESN'T HAVE THE ESTOPPEL RESULT.  THE PATENT IS PUT

16  INTO RE-EXAMINATION, WE DON'T KNOW BY WHOM.

17          THE COURT:  IN THE EX PARTE CASES, WHICH IS GENERALLY

18  WHAT I SEE, AFTER THE RE-EXAMINATION, WHETHER OR NOT THE PATENT

19  IS ENLARGED OR NOT, THE ONLY AVENUE LEFT IS TO COME BACK TO

20  COURT.  THERE IS NO FURTHER APPEAL?

21          MR. STERN:  THAT'S RIGHT.  THIS IS THE KEY POINT HERE,

22  EXACTLY THE POINT --  WHAT'S HAPPENING IN THE NORMAL

23  RE-EXAMINATION PROCESS  -- AND THAT'S WHY ROHM AND HAAS IS

24  PERFECT FOR US.  IN THAT CASE THE COURT SAID IT WENT TO THE

25  RE-EXAMINATION, ONE STAGE, AND PTO DID THE FOLLOWING:

1      IT SAID, "WE ARE APPROVING THREE CLAIMS, AND THESE

2  OTHER CLAIMS, WE FIND WE REJECT THEM".

3      IN ROHM AND HAAS THE PATENTEE SAYS, "WE ACCEPT THE

4  DETERMINATION ON THE THREE CLAIMS THAT YOU CONFIRMED.  WE ARE

5  SEEKING RECONSIDERATION OF THOSE YOU REJECTED".  AND THEN ROHM

6  AND HAAS THEN TO THE DISTRICT COURT AND SAYS, "WE ASK TO LIFT

7  THE STAY BECAUSE THERE IS A CERTAINTY OF LITIGATION BECAUSE

8  THERE IS NO QUESTION THE EX PARTE PROCEEDING HAS RESULTED IN A

9  FINAL DETERMINATION THAT CERTAIN CLAIMS ARE ISSUED".  THAT IS

10  EXACTLY WHAT DOESN'T HAPPEN HERE.

11      RIGHT NOW WE HAVE THE MOST PROVISIONAL INTERIM,

12  LITERALLY NON-PRECEDENTIAL DECISION BY THE PTO AT THE FIRST OF

13  THREE STAGES THAT SAYS, " WE HEREBY CONFIRM IT". AND WE EVEN

14  FOUND MISTAKES IN THE KSR ISSUE.  WE DISAGREE ON THE MERITS WITH

15  WHAT THE PTO DID.  THERE IS NO BASIS, NO LEGAL BASIS, FOR

16  PROCTOR AND GAMBLE TO COME TO YOUR HONOR AND SAY, "OH, THIS IS

17  JUST LIKE ROMAN-HAAS, YOU SEE?  YOU SHOULD LIFT THE STAY OR

18  NEVER GRANT THE STAY, BECAUSE THIS CASE IS INEVITABLE".

19      A VERY IMPORTANT POINT IN THE ROMAN HAAS CASES, THERE

20  WAS A PHRASE USED BY THE COURT -- "THE INEVITABILITY OF

21  LITIGATION".  THE COURT HOLDS -- IF I MAY,

22  YOUR HONOR -- THE COURT HOLDS -- THIS IS FROM THE PURELITE

23  VERSUS ROMAN HAAS CASE -- "BASED ON THESE FACTUAL FINDINGS, THE

24  DISTRICT COURT CONCLUDED THAT NONE OF THE ORIGINAL PURPOSES FOR

25  GRANTING STAY STILL EXISTED.  THE COURT CONCLUDED THAT THE

1 INEVITABILITY OF LITIGATION ON THE CLAIMS THAT FIELDED THE COST

2 SAVINGS DISPUTE RESOLUTION PURPOSES OF ALLOWING THE STAY.    THE

3 INEVITABILITY LITIGATION.

4        THESE ARE CASES WHERE THE COURT SAID "I'M LIFTING THE

5 STAY BECAUSE THERE IS CERTAINLY GOING TO BE LITIGATION".  THE

6 PLAINTIFF HAS A LEGITIMATE PATENT, NO QUESTION BOUT IT, AND

7 THERE IS NO EXISTING RE-EXAM PROCEEDING TO PUT THAT IN DOUBT.

8 WE DON'T HAVE THAT HERE.

9        WHAT WE HAVE HERE, YOUR HONOR, IS WE HAVE AN

10 INTER PARTES PROCEEDING THAT'S GOING ON.  IT'S AS ALIVE AND

11 KICKING AS IT WAS WHEN IT WAS FILED ON MARCH 22.  BY THE WAY,

12 JUST A SMALL FOOTNOTE.  WE HAVE INDICATED THAT THE INTER PARTES

13 PROCEEDING WAS FILED ON JANUARY 31.  IT WAS ACTUALLY A TECHNICAL

14 ERROR WITH THAT FILING.  TECHNICALLY, THE PTO HAS SAID THAT THE

15 FILING TOOK PLACE ON MARCH 22.

16        IN ANY EVENT, WHAT IS BEFORE YOUR HONOR RIGHT NOW IS AS

17 ALIVE AND KICKING AS THAT PARTICULAR PROCEEDING.  AND THERE IS A

18 FOOTNOTE THAT I PUT IN --

19        THE COURT:  WAIT. WAIT.  BACK UP.  YOU'RE TALKING WAY

20 TOO FAST.  THE MARCH DATE IS THE DATE FOR FILING THE INITIAL

21 INTER PARTES PROCEEDING, AND YOU RECEIVED A DECISION WITHIN FOUR

22 MONTHS?

23        MR. STERN:  IT'S STATUTORY.  YOU PROCEED WITHIN 90

24 DAYS.

25        THE COURT:  IS THERE SUCH PROVISION SIMILARLY WITH

1  RESPECT TO THE APPEAL?

2          MR. STERN:  I DONT THINK SO, YOUR HONOR.  WE SEE THE

3  STATISTICS THAT HAVE BEEN CITED TO YOUR HONOR.  WE DON'T KNOW

4  HOW QUICKLY THESE THINGS CAN GO.  IT COULD TAKE 20 MONTHS, COULD

5  TAKE 25 MONTHS, IT COULD BE LESS.  I DON'T WANT TO SPECULATE ON

6  THAT.

7          ONE THING I DO KNOW IS --

8          THE COURT:  AND THERE IS NO SIMILAR STATUTORY PROVISION

9  FOR THE EX PARTE.  THAT'S WHY IT TAKES SO LONG.

10         MR. STERN:  AND THIS IS WHY THIS IS SO VITAL TO YOUR

11  HONOR'S DECISION HERE, IS THAT IN THE FOOTNOTE THAT WE PUT IN

12  OUR REPLY BRIEF, BECAUSE THIS IS WHEN WE FIRST SAW THE

13  PLAINTIFF'S IDEA OF, THIS IS DIFFERENT BECAUSE THERE IS THIS

14  INITIAL DECISION.  THINK HOW THAT WOULD WORK.  I MEAN, THERE ARE

15  A VARIETY OF INTERESTING DECISIONS.  LET'S SAY THIS IS AN INTER

16  PARTES.  WE WON AT THE FIRST STAGE.  THE COURT GRANTS THE STAY.

17  THEN ON APPEAL IN FRONT OF THE BOARD OF PATENT APPEALS, THE

18  PLAINTIFF COMES IN AND SAYS, "VACATE THE STAY".  NOW WE'RE

19  GOING UP TO THE FEDERAL CIRCUIT.  DOES THE COURT'S DETERMINATION

20  OF WHAT TO STAY OR WHETHER TO STAY DEPEND ON THE NON-BINDING

21  PROVISIONAL DETERMINATION OF ONE OF THE THREE BODIES THAT IS

22  SUCCESSFULLY REVIEWING DE NOVO THE DETERMINATION OF WHETHER THE

23  PATENT IN FACT IS ALIVE OR NOT?  THIS IS WHY WE THINK JUDGE

24  ARMSTRONG'S DECISION IN THE NANOMETRICS CASE, WHY JUDGE

25  CRAVEN'S (PHONETIC) DECISION IN THE TIVO VERUS ECHOSTAR CASE -- I

1   THINK THEY'RE SO IMPORTANT, BECAUSE -- SORRY, YOUR HONOR -- THE

2   ECHOSTAR CASE WAS AN INTER PARTES PROCEEDING.   THE 3M CASE THAT

3   WE CITED, MIDDLETON VERSUS 3M CASE, WHY THOSE CASES ARE SO

4   IMPORTANT IS THOSE ARE INTER PARTES CASES AND THOSE COURTS

5   BASICALLY SAY, "I'M INVOLVED IN AN INTER PARTES PROCEEDING --

6   BECAUSE OF THE SERIOUS CONSEQUENCES TO THE DEFENDANT, IF THIS

7   PATENT SURVIVES THAT, I'M STOPPING EVERYTHING.   I'M NOT GOING TO

8   CAUSE PEOPLE TO WASTE TIME".   IF IT COMES OUT WE HAVE SATISFIED

9   THE SALUTARY PURPOSES OF A STAY.   THAT'S WHY THERE HAS BEEN NO

10  CASE THAT HAS EVEN RAISED THIS QUESTION ABOUT, "WELL, COME BACK

11  TO ME, LET'S SEE WHAT HAPPENS DURING EACH OF THESE STAGES.   I

12  MAY OR MAY NOT LIFT THE STAY."

13       I THINK, YOUR HONOR, WITH ALL DUE RESPECT, I THINK THAT

14  GENERAL MINDSET OF INTER PARTES PROCEEDING IS WRONG HEADED.   I

15  THINK THE THEORY IS SECTION 314(C) TALKS ABOUT THE FINALITY OF

16  THE RE-EXAMINATION IN THE INTER PARTES PROCEEDING CONTEXT.   YOUR

17  HONOR SHOULD WAIT 'TILL IT BECOMES FINAL.

18       THE DELAY OF 20 MONTHS IS THE SAME DELAY THAT JUDGE

19  ARMSTRONG TALKED ABOUT.   BY THE WAY, EVEN IN THE RE-EXAM PROCESS

20  WHERE IT'S EX PARTE, IT COULD TAKE THREE YEARS.   THE FACT OF THE

21  MATTER IS MULTIPLE DECISIONS, ALL THE CASES THAT WE CITED SAID,

22  "WAIT A MINUTE.   THAT'S NO UNDUE PREJUDICE.   THAT'S THE NORMAL

23  COURSE OF A RE-EXAM.   THAT'S WHY THE SYSTEM IS BUILT TO ACCEPT

24  THAT SORT OF PROCESS.   I HONESTLY THINK THAT AT THIS POINT THE

25  COURT SHOULD SIMPLY STAY IT, AND LET'S SEE WHAT HAPPENS WITH

1  RESPECT TO THE RE-EXAM.

2         ONE THING I WANT ASK YOUR HONOR BEFORE I YIELD IS, IF

3  YOUR HONOR IS ONLY FOCUSING ON THE EXTENT WHICH THERE IS THIS

4  PROVISIONAL DETERMINATION BY THE PTO, THAT'S FINE.  I THINK I

5  ADDRESSED THAT POINT.  IF YOUR HONOR IS FOCUSING AT ALL ON THE

6  ISSUE OF WHETHER OR NOT THE PRELIMINARY INJUNCTION HAS ANY

7  IMPACT ON THIS, I WANT TO MAKE SURE I ADDRESS THOSE CONCERNS AS

8  WELL.  IF NOT --

9         THE COURT:  IT DOESN'T HAVE ANY IMPACT ON WHAT I'M

10  GOING TO DECIDE TODAY.

11         ALL RIGHT.  COUNSEL, YOUR RESPONSE.

12         MR. ROOKLIDGE:  YOUR HONOR, MY COLLEAGUE'S ARGUMENT HAD

13  ONE POINT ON WHICH WE COMPLETELY AGREE.  INTER PARTES AND EX

14  PARTE RE-EXAMS ARE VERY DIFFERENT ANIMALS, BOTH IN HEIR

15  PROCEDURE THEIR BENEFITS, THEIR DETRIMENTS, AND LEGISLATIVE

16  HISTORY, WHICH LEADS TO THE THRESHOLD QUESTION THAT THIS COURT

17  HAS TO ADDRESS; DOES THIS COURT EVEN HAVE THE POWER TO STAY

18  PENDING AN INTER PARTE'S RE-EXAMINATION.

19         IT'S BEEN LONG RECOGNIZED, AND RECOGNIZED IN THE

20  AMERICAN LIFE CASE THAT WAS CITED BY KRAFT, THAT COURTS HAVE AN

21  INHERENT POWER TO STAY THEIR PROCEEDINGS WHERE JUSTICE WOULD BE

22  DONE BY THE STAY.  AND WHERE THE ORIGINAL EX PARTE

23  RE-EXAMINATION STATUTE WAS SILENT ABOUT THE STAY, THE COURT HAS

24  THE INHERENT POWER TO STAY, BUT  IN AN ACTIVE INTER PARTE'S

25  RE-EXAMINATION STATUTE DURING 1999 IN AMERICAN INVENTORS'

1 PROTECTION ACT, CONGRESS DID SOMETHING VERY, VERY DIFFERENT. IT

2 DECIDED TO GIVE THIRD PARTE REQUESTERS CONSIDERABLY MORE

3 PARTICIPATION AND A RIGHT OF APPEAL, BUT THEN TOOK BACK TWO

4 THINGS. IT IMPOSED A MUCH MORE DRACONIAN ESTOPPEL AND IT

5 LIMITED THE RIGHT TO GRANT STAYS TO THE PATENT OWNER, AND THAT'S

6 SECTION 318 OF THE STATUTE.

7          "ONCE AN ORDER FOR INTER PARTES RE-EXAMINATION OF A

8 PATENT THAT'S BEEN AT ISSUE -- THE PATENT OWNER -- MAY OBTAIN A

9 STAY." AND IT WENT ALONG WITH IN REST OF THAT, TO IDENTIFY THE

10 SAME STANDARD THAT THE COURT WOULD APPLY UNDER THE AMERICAN

11 LIFE. AMERICAN LIFE TALKED ABOUT WHERE JUSTICE WOULD BE DONE.

12 SECTION 318 GOES ON TO APPLY THE SAME STANDARD. SO WHY THE

13 CONGRESS LIMITED THE ABILITY TO SEEK STAYS TO PATENT OWNERS FOR

14 LITIGATION PENDING IN

15 INTER PARTE'S RE-EXAMINATION? NO CASE HAS CONSIDERED THIS ISSUE

16 IN A HOLDING. WE CITED, AND KRAFT HAS RELIED UPON, THE

17 MIDDLETON CASE. THAT CASE WAS ABOUT EX PARTE RE-EXAMINATION.

18 FOOTNOTED ONE AND SIX POINT THAT OUT. SO IT WAS DICTA FOR THAT

19 REGARD.

20          WHAT HAPPENED WAS, THE PATENTEE, MIDDLETON, WAIVES

21 SECTION 318 AND SAID, "WAIT A MINUTE. YOU CAN'T STAY THIS CASE,

22 BECAUSE ONLY A PATENT OWNER IN INTER PARTE'S RE-EXAM HAS A RIGHT

23 TO STAY THIS CASE." THE COURT REJECTED THAT ARGUMENT AND SAID,

24 "WELL, MIDDLETON DISREGARDS THE COURT'S INHERENT STAY

25 AUTHORITY". AND THE COURT CITED THE LEGISLATIVE HISTORY OF THE

1  EX PARTE RE-EXAMINATION STATUTE WHERE CONGRESS SAID, "WE

2  RECOGNIZE THIS INHERENT STAY PROVISION OF AUTHORITY, SO WE DON'T

3  NEED TO PUT A PROVISION IN THE EX PARTE RE-EXAM STATUTE ABOUT

4  THAT, BECAUSE COURTS CAN STAY IT INHERENTLY".  BUT THAT

5  LEGISLATIVE HISTORY WAS OF THE EX PARTE RE-EXAMINATION PASSAGE

6  AND HAS NOTHING TO DO WITH THE 1999 AMERICAN INVENTORS'

7  PROTECTION ACT AND THE BALANCE THAT CONGRESS LAID OUT FOR INTER

8  PARTE'S RE -EXAM.

9        WHY DID CONGRESS LIMIT STAYS IN SECTION 318 FOR INTER

10 PARTES RE-EXAM TO THE PATENT OWNER?  THE STANDARD IS THE SAME.

11 SECTION 318 GOES ON TO SAY, "FOR THE INTEREST OF JUSTICE".  THE

12 AMERICAN LIFE STANDARD -- WHETHER JUSTICE WOULD BE DONE.  THE

13 STANDARD IS THE SAME.  THIS STATUTE MUST MEAN SOMETHING, AND

14 THAT'S THE POINT THAT THE MIDDLETON COURT DID NOT ADDRESS.

15        IF IN INTER PARTES RE-EXAM, THE COURT HAS THE INHERENT

16 AUTHORITY TO ORDER A STAY AT THE REQUEST OF EITHER PARTY, WHAT

17 IS THE PURPOSE OF 35 U.S.C. SECTION 318?  THERE WOULD BE

18 ABSOLUTELY NO PURPOSE, AND THIS COURT SHOULD NOT BE ENGAGING IN

19 STATUTORY CONSTRUCTION THAT COMPLETELY READS SECTION 318 OUT OF

20 THE STATUTE.

21        THE COURT:  ARE YOU TAKING THE POSITION THAT THE COURT

22 DOESN'T HAVE THE INHERENT AUTHORITY TO STAY ANY LITIGATION IN

23 THE INTEREST OF JUSTICE?  THE SECOND PART OF MY QUESTION IS, ARE

24 YOU SUGGESTING THAT THIS PARTICULAR PROVISION IS THE ONLY BASIS

25 UPON WHICH THE COURT COULD ENTER A STAY?

1      MR. ROOKLIDGE:  NO, YOUR HONOR.  MY ARGUMENT IS THIS:

2  THIS COURT HAS THE INHERENT AUTHORITY TO STAY LITIGATION IN

3  FRONT OF IT UNLESS CONGRESS LIMITS THAT AUTHORITY.  AND IN

4  SECTION 318 OF THE PATENT STATUTE, CONGRESS HAS LIMITED THAT

5  AUTHORITY.  OTHERWISE, THERE IS ABSOLUTELY NO MEANING OF THAT

6  STATUTE.

7      THE COURT:  ARE YOU AWARE OF ANY CASE THAT HAS REVERSED

8  A DISTRICT COURT FOR IMPOSING A STAY, INTER PARTES STAY IN

9  CONTRAVENTION OF THIS PROVISION?

10      MR. ROOKLIDGE:  NO, YOUR HONOR.  THE CASES THAT WE

11  CITED IN THE FOOTNOTE AND ON WHICH KRAFT RELIES, NONE OF THE

12  CASES ADDRESS THE AUTHORITY TO ENTER A STAY AT THE REQUEST OF AN

13  ACCUSED INFRINGER EXCEPT FOR THE MIDDLETON CASE, WHICH WAS

14  DICTA, AND AS I JUST EXPLAINED, THE ANALYSIS IN THE MIDDLETON

15  CASE SIMPLY GOES TOO FAR.

16      THE COURT:  NOW, THIS STATUTE PERMITS THE PATENT OWNER

17  TO REQUEST A STAY.  ARE YOU SAYING THAT BECAUSE IT OMITS THE

18  OWNER OF THE-- THE ACCUSED -- THERE IS NOTHING THAT PERMITS THE

19  DEFENDANT TO REQUEST A STAY?

20      MR. ROOKLIDGE:  THERE IS NOTHING --

21      THE COURT:  THERE IS NOTHING IN THAT STATUTE.  BUT ARE

22  YOU SAYING BECAUSE THERE IS NOTHING IN THAT STATUTE THE

23  DEFENDANT DOESN'T HAVE A RIGHT TO SIMILARLY REQUEST A STAY?

24      MR. ROOKLIDGE:  THE DEFENDANT DOES NOT HAVE A RIGHT AS

25  A RESULT OF THIS STATUTE TO REQUEST A STAY OF LITIGATION BECAUSE

1  OF AN INTER PARTES RE-EXAM.  THAT'S THE ONLY LOGICAL --

2  THE COURT:  OKAY.  BECAUSE OF THAT STATUTE AND BECAUSE

3  THERE'S NO OTHER STATUTE THAT AUTHORIZES SUCH A STAY, ARE YOU

4  TAKING THE POSITION THAT THE DEFENDANT SIMPLY  HAS NO RIGHT?

5  MR. ROOKLIDGE:  ABSOLUTELY.  THAT'S CORRECT, YOUR

6  HONOR.  THAT'S -- NO OTHER COURT, EXCEPT IN MIDDLETON AND DICTA,

7  HAS ADDRESSED.  YOU HAD A CASE EARLIER THIS MORNING WHERE YOU

8  WERE BASICALLY ADRIFT WITH NO OTHER CASE LAW TO GUIDE YOU.

9  WELL, THIS IS ANOTHER CASE ON THE SAME PANEL THAT PRESENTS THE

10 SAME KIND OF QUESTION.  BECAUSE

11 INTER PARTES RE-EXAMINATION HAS BEEN RELATIVELY RARE, AND

12 BECAUSE THIS ISSUE HAS ONLY BEEN ARGUED IN THE MIDDLETON CASE,

13 WHICH INVOLVED EX PARTE RE-EXAM, THIS IS A CASE OF FIRST

14 IMPRESSION, AS FAR AS WE'RE CONCERNED.

15 BUT EVEN IF WE IGNORE THAT, THERE IS ABSOLUTELY NO

16 REASON THAT THIS COURT SHOULD STAY THIS CASE FOR THE NEXT AND A

17 HALF YEARS CONSIDERING THE EFFECT OF THE PRELIMINARY INJUNCTION

18 MOTION.  IF THIS COURT GRANTS A STAY, IT WILL DENY, IN EFFECT,

19 THE PRELIMINARY INJUNCTION MOTION.  THE FEDERAL CIRCUIT REQUIRES

20 FINDINGS SUFFICIENT FOR APPELLATE REVIEW OF THE PRELIMINARY

21 INJUNCTION MOTION, AND THIS COURT SHOULD CONSIDER THE STAY AND

22 THE PRELIMINARY INJUNCTION MOTIONS TOGETHER, JUST LIKE THE COURT

23 DID IN THE PAST IN THE SEYMOUR CASE, THAT BOTH PARTIES HAVE

24 CITED FACTORS.  WHY SHOULD IT GO TO SUCCESS ON THE MERITS?

25 THERE IS NO CLAIM CONSTRUCTION THAT'S NEED HERE.  WE POINTED

1  THAT OUT.  INFRINGEMENT IS CLEAR.  WE PUT OUT --

2          THE COURT:  THERE IS NO CLAIM CONSTRUCTION NEEDED IN

3  THIS CASE?  IS THAT BECAUSE BOTH SIDES AGREE TO THE MEANING OF

4  ALL TERMS OF THE PATENT?  I'VE NEVER HAD THAT EXPERIENCE.

5          MR. STERN:  LET ME MAKE IT VERY CLEAR.  THERE HAS BEEN

6  ABSOLUTELY NO PROFFERED CLAIM CONSTRUCTION TO US IN THIS CASE,

7  SO THERE IS NOTHING FOR US TO PROPOSE.

8          MR. ROOKLIDGE:  IF I MAY CONTINUE TO ANSWER THE COURT'S

9  QUESTION, WE POINTED OUT THE LANGUAGE IS VERY CLEAR.  THE ONLY

10 THING THAT THE DEFENDANT HAS DONE TO SAY THERE IS AN ISSUE OF

11 CLAIM CONSTRUCTION, THEY'VE GONE BACK INTO THE PROSECUTION

12 HISTORY AND HAVE IDENTIFIED SOME LIMITATIONS THAT THEY BELIEVE

13 SHOULD BE READ INTO ONE LIMITATION OF THE CLAIM, AND TO THE

14 EXTENT THAT RAISES AN ISSUE OF CLAIM CONSTRUCTION, IT'S MERELY A

15 LEGAL ISSUE THAT THIS COURT WILL BE ABLE TO RESOLVE.  THAT'S THE

16 ONLY EXAMPLE THAT'S BEEN CITED SO FAR.

17         WE HAVE PUT TOGETHER AN INFRINGEMENT CHART WHERE WE

18 ACTUALLY COMPARE THE CLAIM ELEMENTS TO THE ACCUSED PRODUCT AND

19 THERE HAS BEEN NO SUGGESTION OF A REBUTTAL FOR THAT. AND THE

20 PATENT WAS GRANTED BY THE PATENT OFFICE AND THE ACTION CLOSING

21 PROSECUTION CONFORMED ALL 55 CLAIMS.  SO WHAT HAS KRAFT DONE?

22 THEY'VE SAID THAT THE PATENT CLAIMS ARE INVALID.  INDEED, THIS

23 IS A CASE ABOUT INVALIDITY.

24         THEY COME IN FRONT OF YOUR HONOR WITH A CLAIM CHART

25 ADDRESSING ONE OF THE CLAIMS, ONE OF NINE CLAIMS THAT WE HAVE

1 ASSERTED AND PRESENTED AN INFRINGEMENT ANALYSIS FOR, AND ALL

2 THEIR CLAIM CHART GOES ON IN VALIDITY IS IDENTIFY THE SAME

3 PRODUCT THAT THEY RELIED ON IN THE RE-EXAM AND SIMPLY LIST WHERE

4 THE ELEMENTS OF THE CLAIM ARE FOUND IN THE PRIORITY.  THAT'S NOT

5 ADEQUATE FOR AN OBVIOUSNESS CASE EITHER UNDER THE OLD FEDERAL

6 CIRCUIT STANDARD OR UNDER THE KSR STANDARD.

7          THE NEXT FACTOR IS IRREPARABLE HARM, AND PROCTER AND

8 GAMBLE HAS GONE INTO IRREPARABLE HARM IN CONSIDERABLE DETAIL IN

9 ITS PRELIMINARY INJUNCTION MOTION PAPERS, INCLUDING WITH

10 SUPPORTING DECLARATIONS, AND WE HAVE IDENTIFIED THOSE

11 DECLARATION IN OUR PAPERS AND PROCTER AND GAMBLE MOVED QUICKLY

12 AND IN FACT HAS MOVED QUICKLY TO BRING THIS LAWSUIT AND

13 QUANTIFIABLE COMPLAINTS WHEN YOU HAVEN'T SHOWN REAL QUANTIFIABLE

14 HARM THAT'S ALREADY OCCURRED.  OUR POSITION IS THAT BY THE TIME

15 THAT WE HAD FILED OUR PAPERS WE SIMPLY HADN'T BEEN ABLE TO

16 IDENTIFY REAL QUANTIFIABLE, NONCOMPENSABLE HARM THAT HAD ALREADY

17 OCCURRED, BUT THAT EVIDENCE, WE BELIEVE, IS NOW FLOWING IN.

18          AND IT WAS EXACERBATED IN THIS CASE BY BOTH KRAFT'S

19 NEGATIVE ADVERTISING ABOUT FOLGERS' PLASTIC CONTAINER.  WHEN IT

20 WAS FIRST INTRODUCED, WE PROVIDED THE COURT WITH THE TEXT OF

21 SOME OF THOSE ADS THAT TALKS ABOUT THE SUPERIORITY THAT MIGHT

22 APPEND TO THIS.  ONCE THEY SAW THEY WERE LOSING A BIG MARKET

23 SHARE, THEY NOT ONLY REDUCED THIS CONTAINER, BUT THEY RECENTLY

24 ANNOUNCED IN THE PRESS THAT THEY'RE GOING TO DOUBLE THEIR MARKET

25 FOR THE LAST QUARTER OF THIS YEAR.  THAT'S THE KIND OF THING

1  THAT CREATES IRREPARABLE HARM VERY, VERY QUICKLY.

2          BALANCE OF THE HARDSHIPS.  IT'S EXTRAORDINARILY

3  IMPORTANT IN THIS CASE --

4          THE COURT:  I DON'T QUITE UNDERSTAND WHY YOU NEED TO

5  ARGUE THE MOTION FOR PRELIMINARY INJUNCTION TODAY.  THIS IS

6  SIMPLY A REQUEST FOR A STAY AND SOME SCHEDULING CONSIDERATIONS

7  IN THE ABSENCE OF THE STAY.  SO LET'S CONCENTRATE ON THAT.  I'LL

8  HEAR YOUR MOTION WHEN I HEAR YOUR MOTION.

9          ONE OF THE THINGS I'M INTERESTED IN IS WHAT HAPPENS,

10 GIVEN THE AMOUNT OF RESOURCES THAT I KNOW THE COURT IS CALLED

11 UPON IN EVERY SINGLE PATENT CASE TO DEVOTE TO A CASE, WHAT

12 HAPPENS IF A YEAR FROM NOW, 18 MONTHS FROM NOW, TWO YEARS FROM

13 NOW, YOUR CASE IS STILL PENDING ON MY DOCKET AND I SPENT THE

14 HOURS IT'S GOING TO TAKE TO PASS ON THE MOTIONS THAT I'M SURE

15 YOU'RE GOING TO PRESENT TO ME - WHAT HAPPENS IF THE INTER PARTES

16 APPEAL IS SUCCESSFUL?  WHAT HAPPENS IF DOWN THE LINE AT THE

17 SECOND LEVEL -- MR. STERN JUST MADE ME THINK ABOUT THIS FOR THE

18 FIRST TIME.  WHAT HAPPENS IF THE BOARD OF APPEALS FINDS IN

19 KRAFT'S FAVOR, AND THEN I WOULD ASSUME YOUR CLIENT HAS THE RIGHT

20 TO APPEAL TO THE FEDERAL CIRCUIT, WHAT HAPPENS AT EACH OF THOSE

21 STEPS ALONG THE WAY TO THE WORK THAT THE COURT IS EXPECTED TO

22 DO?  IS THAT WORK UNDONE?  DOES THE COURT'S FINDING ON CLAIM

23 CONSTRUCTION AND A JURY'S FINDING ON ANY INFRINGEMENTS TRUMP ANY

24 FINDINGS BY THE APPEALS PANEL AND THEN THE FEDERAL CIRCUIT, OR

25 WHAT?

1          MR. ROOKLIDGE:  THE U.S.P.T.O. APPLIES A VERY DIFFERENT

2   STANDARD ON CLAIM CONSTRUCTION FROM THE COURTS.  THE U.S.P.T.O.

3   INTERPRETS CLAIMS WITH THEIR BROADEST REASONABLE CONSTRUCTION.

4   THIS COURT IS CHARGED WITH FINDING THE WIDE CLAIM CONSTRUCTION,

5   SO AS FAR AS CLAIM CONSTRUCTIONS GO, THE PROCESS CAN REALLY GO

6   INDEPENDENTLY.

7          THE ONLY EFFECT THAT IT WOULD HAVE ON THIS CASE IS IF

8   THERE WAS A FINAL DETERMINATION THAT ALL 55 OF THE PATENT CLAIMS

9   WERE HELD TO BE UNPATENTABLE.  THAT'S THE WORD IN THE

10  RE-EXAMINATION CONTEXT, BECAUSE THERE IS NO PRESUMPTION OF

11  VALIDITY LIKE THERE IS IN THE LITIGATION CONTEXT.  SO IF THAT

12  STAGE, IF IT WERE EVER TO OCCUR, WOULD BE APPROXIMATELY

13  TWO-AND-A-HALF YEARS AWAY.  WE'VE PRESENTED THE COURT WITH

14  STATISTICS THAT THE AVERAGE BOARD OF PATENT APPEALS AND

15  INTERFERENCE PROCEEDING TAKES 18 MONTHS.

16         THE COURT:  WHAT HAPPENS IF THAT WERE TO OCCUR?

17         MR. ROOKLIDGE:  WELL, THEN WE WOULD GO TO THE FEDERAL

18  CIRCUIT, AND WE PROVIDED THE COURT WITH A RECENT LETTER FROM

19  JUDGE MICHELLE --

20         THE COURT:  WHICH PART WOULD GO TO THE FEDERAL CIRCUIT?

21         MR. ROOKLIDGE:  THE BOARD OF PATENT APPEALS AND

22  INTERFERENCES CASE WOULD GO TO THE FEDERAL CIRCUIT.

23         THE COURT:  AND THE FEDERAL CIRCUIT WOULD DETERMINE IF

24  INDEED THE CLAIMS WERE UNPATENTABLE?

25         MR. ROOKLIDGE:  THAT'S CORRECT.

1    THE COURT:  AND WHAT HAPPENS IF I HAVE ALREADY

2  DETERMINED THAT THE CLAIMS ARE VALID FOLLOWING SUMMARY JUDGEMENT

3  MOTION HERE?

4    MR. ROOKLIDGE:  WELL, ON SUMMARY JUDGMENT MOTION, IF

5  YOU'VE DETERMINED THAT THE CLAIMS ARE VALID --

6    THE COURT:  THEN THE BOARD OF PATENT APPEALS FINDS TO

7  THE CONTRARY, THEN WHAT GOES TO THE FEDERAL CIRCUIT?

8    MR. ROOKLIDGE:  WELL, WE WOULD HAVE TO HAVE A FINAL

9  JUDGMENT IN THIS CASE, BUT THAT FINAL JUDGMENT COULD VERY WELL

10  HAPPEN BEFORE THE FEDERAL CIRCUIT AFFIRMANCE, AND THE FEDERAL

11  CIRCUIT IN THOSE CASES TRIES TO PUT THOSE CASES TOGETHER,

12  ALTHOUGH WHERE IT IS THE TIME THEY WORK OUT THAT THEY CAN DO

13  THAT AND DECIDE BOTH CASES AT ONCE.

14    IF THE PTO ULTIMATELY DECIDES THAT ALL 55 PATENT CLAIMS

15  ARE UNPATENTABLE, THEN THAT WOULD TAKE AWAY OUR RIGHT TO ASSERT

16  THAT PATENT.  BUT THAT'S WHY COURTS ARE VERY CAREFUL TO LOOK AT

17  WHAT'S GOING ON IN THE RE-EXAMINATION PROCEEDINGS TO MAKE SOME

18  KIND OF DETERMINATION ON WHAT THE LIKELIHOOD OF AN EFFECT IS.

19    WE IDENTIFIED NOT IN ADDITION TO THE PERLITE OR THE

20  ROHM AND HAAS CASE -- THE PUROLITE CASE -- AND THIS IS AN

21  INTERESTING CASE IN THAT WHAT THE COURT DID IS IT LOOKED  AND IT

22  SAID, "WELL, THE INITIAL OFFICE ACTION, THE FIRST OFFICE ACTION,

23  WHICH IS WAY EARLIER THAN WHAT WE'VE GOT HERE --  THE ACTION

24  CLOSING PROSECUTION ON THE MERITS -- THE FIRST OFFICE ACTION --

25  IT LOOKS LIKE SOME CLAIMS ARE GOING TO SURVIVE.  THAT'S A VERY

1  PRELIMINARY DETERMINATION BY THE PATENT AND TRADEMARK OFFICE.

2        THEY SAID, "BECAUSE IT LOOKS LIKE SOME CLAIMS ARE GOING

3  TO SURVIVE, WE'RE NOT GOING TO DELAY THIS CASE FOR ALL THIS TIME

4  BASED ON -- WHICH IS A HOPE THAT ALL OF THEM WOULD BE

5  INVALIDATED".  AND THIS IS WHAT EXACTLY WHAT THIS COURT HAS TO

6  DO.  THIS COURT HAS TO BALANCE THE EFFECT OF A TWO-AND-A-HALF

7  YEAR DELAY, BECAUSE THAT'S WHAT THE STATISTICS SHOW.  A

8  TWO-AND-A-HALF YEAR DELAY THAT WOULD BASICALLY PUT PROCTER AND

9  GAMBLE OUT OF COURT FOR TWO AND A HALF YEARS BASED ON THE

10  LIKELIHOOD THAT EVERY SINGLE ONE OF PROCTER AND GAMBLE'S 55

11  CLAIMS IS GOING TO BE WIPED OUT; AND THE ONLY DATA POINT THAT

12  THIS COURT HAS TO BE ABLE TO GAUGE THAT LIKELIHOOD IS THE FACT

13  THAT THE UNITED STATES PATENT TRADEMARK OFFICE HAS CLOSED

14  PROSECUTION, HAS REJECTED ALL 48 ARGUMENTS THAT KRAFT MADE FOR

15  THE UNPATENTABILITY OF THOSE CLAIMS, HAS CONSIDERED 160 PATENTS

16  AND PRINTED PUBLICATIONS, AND HAS CONFIRMED THE VALIDITY OR THE

17  PATENTABILITY OF ALL 55 OF THOSE PATENT CLAIMS.  AND IN CASES

18  LIKE PURELITE, ROHM AND HAAS, AND THIS CASE, WHEN THE COURT GETS

19  AN INDICATION THAT PATENT CLAIMS ARE GOING TO SURVIVE, LIKE THIS

20  COURT HAS RECEIVED FROM THE PTO, THAT'S ENOUGH FOR THE COURT TO

21  SAY, EITHER DENY A STAY OR LIFT A STAY THAT'S BEEN IMPOSED.  AND

22  THAT'S PARTICULARLY TRUE, BECAUSE IF YOU LOOK AT THE STAY

23  FACTORS THAT ARE INVOLVED HERE, ONE OF THE ISSUES -- THE SECOND

24  STAY FACTOR IS WHETHER THE STAY WOULD SIMPLIFY THE ISSUES.

25  ABSOLUTELY NOT IN THIS CASE.  KRAFT HAS ALREADY LOST ALL 48 OF

1    ITS ARGUMENTS.  THE ARGUMENT THAT IT IDENTIFIED TO THIS COURT IN

2    ITS CLAIM CHART THAT WAS ATTACHED ARE JUST SIMPLY REGURGITATING

3    THOSE ARGUMENTS.

4         NOW, IT WOULD BE VERY DIFFERENT IF THE KSR CASE

5    SUGGESTED A DIFFERENT RESULT.  BUT THERE IS TWO REASONS WHY THIS

6    COURT CAN SAY WITH CONFIDENCE THAT IT DOESN'T.  AND THE FIRST IS

7    BECAUSE -- TAKE A LOOK AT THE CLAIM CHART THAT KRAFT PROVIDED.

8    THERE IS NO MENTION OF KSR, THERE IS NO IDENTIFICATION OF

9    ANYWHERE IN THE PTO'S ACTION CLOSING PROSECUTION THAT THEY DID

10   ANYTHING INCONSISTENT WITH KSR, AND THAT'S LIKELY BECAUSE IN

11   FACT THE U.S.P.T.O KNEW FULL WELL OF THE KSR DECISION, AND A

12   MONTH BEFORE --

13        THE COURT:  AND YOU KNOW THAT?

14        MR. ROOKLIDGE:  WELL, IF YOU LOOK AT THE MEMO THAT WE

15   PROVIDED TO THE COURT ATTACHED TO DECLARATION REGARDING

16   ADMINISTRATIVE RELIEF, WE KNOW THAT ON MAY 3, 2007 PEGGY

17   FOCARINO, THE DEPUTY COMMISSIONER OF PATENT OPERATIONS SENT A

18   MEMO AROUND TO THE TECHNOLOGY CENTER DIRECTORS THAT LAID OUT THE

19   U.S.P.T.O'S RESPONSE IDENTIFIED HOW KSR WOULD EFFECT THE

20   U.S.P.T.O., AND SHE CONCLUDED BY SAYING, "THEREFORE, IN

21   FORMULATING A REJECTION UNDER 35 U.S.C. SECTION 103(A) --"

22   THAT'S AN OBVIOUSNESS REJECTION -- THEY TOOK ON A COMBINATION OF

23   PRIOR ART ELEMENTS -- "IT REMAINS NECESSARY TO IDENTIFY THE

24   REASON WHY A PERSON OF ORDINARY SKILL IN THE ART WOULD HAVE

25   COMBINED THE PRIOR ART ELEMENTS IN THE MANNER CLAIMED".

1    THIS TWO-PAGE MEMO FROM PEGGY FOCARINO WHICH ENDS UP

2 BEING REFLECTED ALSO IN THE OTHER DOCUMENT THAT WE ATTACHED TO

3 THE SAME DECLARATION, WHICH WAS A PRECEDENTAL DECISION OF THE

4 BOARD OF PATENT APPEALS OF THE PTO THAT APPLIED KSR, THAT DID IT

5 WEEKS BEFORE THE ACTION CLOSING PROSECUTION WAS ISSUED IN THIS

6 CASE.

7    WHAT THIS SHOWS IS THAT THE PROCEDURE AND THE ANALYSIS

8 OF THE PATENT TRADEMARK OFFICE ARE NOT ANY DIFFERENT THAN THEY

9 WERE BEFORE KSR.  THEY STRESS THAT THE FACTORS OF GRAHAM VERSUS

10 JOHN DEERE(PHONETIC) CONTROL.  THEY STRESS THAT THE EXAMINERS

11 STILL NEED TO GO ON AND LOOK FOR THE REASON THAT A PERSON OF

12 ORDINARY SKILL IN THE ART WOULD HAVE COMBINED THE PRIOR ART

13 ELEMENTS IN THE MANNER CLAIMED.  THERE IS NOTHING AT ALL IN THE

14 ACTION CLOSING PROSECUTION THAT WOULD SUGGEST THAT THE THREE

15 EXAMINER PANEL IN THAT CASE WAS COMPLETELY UNAWARE OF KSR OR

16 THIS STANDARD, BECAUSE THEY DIDN'T DO ANYTHING INCONSISTENT WITH

17 KSR, THEY DIDN'T DO ANYTHING INCONSISTENT WITH PEGGY FOCARINO'S

18 INSTRUCTIONS, AND THEY DIDN'T DO ANYTHING INCONSISTENT WITH THE

19 BOARD OF PATENT APPEALS' DECISION IN KUBIN.

20    THE COURT:  OKAY.

21    NOW, I STILL DON'T HAVE A CLEAR UNDERSTANDING AS TO HOW

22 A DECISION BY THE BOARD OR THE FEDERAL CIRCUIT WOULD AFFECT WORK

23 THAT IS GOING TO BE UNDERTAKEN HERE.  YOU MUST UNDERSTAND, I AM

24 CONCERNED ABOUT HAVING TO DO WORK THAT IS GOING TO BE UNDONE OR

25 NOT GOING TO COUNT FOR SOMETHING, OR THAT'S GOING TO BE

1 UNNECESSARY.  I HAVE 400 CIVIL CASES I HAVE A LOT OF CASES THAT

2 NEED MY TIME AND ATTENTION, AND IF THIS ONE IS SIMPLY GOING TO

3 BE THE DECISIONS MADE IN THIS CASE ARE GOING TO BE UNDERMINED BY

4 THEIR APPEAL PROCESS.  I'M A LITTLE RELUCTANT GOING FORWARD AND

5 TO UNDERTAKE THAT WORK.  SO YOU NEED TO DO A BETTER JOB OF

6 EXPLAINING TO ME` EXACTLY HOW THESE VARIOUS DIFFERENT PARALLEL

7 PROCEEDINGS ARE GOING TO WORK.

8          MR. ROOKLIDGE:  THE EFFECT THAT THAT WOULD

9 HAVE -- WELL, THERE BE WOULD BE TWO.  ONE, THE EFFECT WOULD BE

10 IF ON APPEAL EITHER -- EVENTUALLY THE FEDERAL CIRCUIT SAYS EVERY

11 SINGLE ONE OF THOSE 55 PATENT CLAIMS IS INVALID.  IF THAT

12 DECISION COMES BEFORE THIS COURT ENTERS FINAL JUDGMENT, THEN IN

13 FACT THE WORK OF THIS COURT WOULD BE LIKELY WASTED.  BUT THIS

14 COURT HAS TO DECIDE WHAT IS THE BALANCE, WHAT IS THE LIKELIHOOD

15 THAT THE FEDERAL CIRCUIT WILL ULTIMATELY HOLD ALL 55 OF THOSE

16 CLAIMS INVALID.

17          THE MORE LIKELY EFFECT IS THAT AT THE END OF THAT

18 TWO-AND-A-HALF YEAR PROCESS, THERE WILL BE AT LEAST SOME, AND

19 ALL WE NEED IS ONE OF THESE CLAIMS AFFIRMED, AND THEN THAT IS

20 COMPLETELY INCONSISTENT WITH ANY JUDGMENT THAT THIS COURT WOULD

21 MAKE OF INFRINGEMENT AND VALIDITY.

22          THE COURT:  EXCEPT THAT THERE ARE 55 CLAIMS.

23          MR. ROOKLIDGE:  THERE ARE 55 CLAIMS IN THE PATENT.  WE

24 HAVE ASSERTED FOR PURPOSES OF THE PRELIMINARY INJUNCTION, NINE

25 CLAIMS.

```
 1          THE COURT:  SO IT'S ONLY THOSE NINE I'M CONCERNED
 2  WITH?
 3          MR. ROOKLIDGE:  TODAY, ONLY THOSE NINE.
 4          THE COURT:  ULTIMATELY THOSE ARE THE ONLY ONES ASSERTED
 5  IN THIS LITIGATION.  IS WHAT WHAT YOU'RE SAYING? ARE THERE ONLY
 6  NINE THAT ARE GOING TO HAVE TO BE CONSTRUED IF THERE ARE
 7  DISPUTED MEANINGS OF THOSE CLAIMS?
 8          MR. ROOKLIDGE:  WE HAVEN'T SELECTED THE CLAIMS TO GO
 9  FORWARD IN THE LITIGATION.  WE FOCUSED ON NINE FOR THE PURPOSE
10  OF THE PRELIMINARY INJUNCTION.
11          THE COURT:  I AM CONCERNED ABOUT THE OVERALL
12  LITIGATION.  ASSUMING THERE -- WHATEVER NUMBER ARE ASSERTED IN
13  THE LITIGATION OR THE NUMBER OF THE 55 I'M CONCERN ABOUT, AND
14  SAY IT'S ONLY HALF -- SAY THERE ARE 27 THAT ARE ASSERTED IN THIS
15  LITIGATION AND THEY GO OFF AND SAY -- THE BOARD OF APPEAL OR
16  FEDERAL CIRCUIT ULTIMATELY FINDS UNPATENTABLE HALF OF THOSE,
17  DON'T THEY STILL UNDO THE WORK THAT I PUT IN ON THE REMAINING 35
18  OR --
19          MR. ROOKLIDGE:  NOT REALLY, BECAUSE THE LANGUAGE IN THE
20  CLAIMS IS USED A LOT, IS VERY SIMILAR, BECAUSE THE CLAIMS
21  CONSTRUCTION OF THE PATENT OFFICE, WHICH IS THE SAME CLAIM
22  CONSTRUCTION THAT WILL BE USED IN THE PROCEEDING BY THE BOARD,
23  WHICH IS THE SAME USED IN THAT PROCEEDING BY THE FEDERAL CIRCUIT
24  IS VERY -- I MEAN -- THERE IS POLICY REASONS BECAUSE THE CLAIM
25  CONSTRUCTION IS VERY DIFFERENT.  THE CLAIM CONSTRUCTION WON'T
```

1  REQUIRE YOU TO CHANGE ANYTHING IN YOUR CLAIM CONSTRUCTION.  THE

2  ISSUE WILL BE ULTIMATELY THE PATENTABILITY OF THOSE CLAIMS WOULD

3  MERGE, AND AS OPPOSED TO THE VALIDITY OF CLAIMS IN THIS

4  LITIGATION.

5         THE COURT:  SO THE CLAIM CONSTRUCTION THAT THE COURT

6  UNDERTAKES WILL NOT -- SHE HAVE TO BE -- WILL AUTOMATICALLY BE

7  ACCEPTED BY THE FEDERAL CIRCUIT?

8         MR. ROOKLIDGE:  THE CLAIM CONSTRUCTION THAT THIS COURT

9  DOES IS IRRELEVANT TO THE CLAIM CONSTRUCTION THAT WILL BE --

10  THAT WAS APPLIED BY THE PTO THAT WOULD BE APPLIED BY THE BOARD

11  AND APPLIED BY THE FEDERAL CIRCUIT IN AN APPEAL OF THE RE-CLAIM.

12         THE COURT:  THEY WON'T EVEN LOOK AT IT.

13         MR. ROOKLIDGE:  YES.  THOSE ARE IRRELEVANT, AND SO FOR

14  THAT REASON THAT'S WHY IT'S A VERY SLIM READ TO SUGGEST THAT

15  WORK IN THE RE-EXAMINATION OR APPEAL OF THE RE-CLAIM WOULD

16  AFFECT ANYTHING THAT IS GOING ON HERE, UNLESS WE GET TO THE

17  DECISION WHERE ALL THE CLAIMS ARE HELD UNPATENTABLE OR A

18  DECISION CONFIRMING CLAIMS THAT ARE ASSERTED IN THIS AND THAT

19  WOULD WIPE OUT THE PLAINTIFF'S INVALIDITY ARGUMENT BY ESTOPPEL.

20  BUT THAT IS ASSUMING THAT THAT IS DONE BEFORE THIS COURT REACHES

21  FINAL JUDGMENT.

22         THE COURT:  SO LET'S LOOK AT THE ESTOPPEL QUESTION AND

23  WHETHER THAT CONFLICTS WITH FINDINGS THE COURT MAKES.  WHAT

24  HAPPENS?

25         MR. ROOKLIDGE:  WELL, THEY WOULD BE ESTOPPED FROM THOSE

1  ARGUMENT, AND TO THE EXTENT  --

2         THE COURT:  TO THE EXTENT THE COURT HAS ALREADY FOUND

3  THE CONTRARY TO THAT, WHAT HAPPENS?

4         MR. ROOKLIDGE:  I DON'T KNOW HOW THAT ESTOPPEL WOULD

5  WORK, BECAUSE WE HAVEN'T GOTTEN THAT FAR IN A CASE WITH INTER

6  PARTES RE-CLAIM.  I DON'T HAVE AN ANSWER FOR THAT.  SORRY.  BUT,

7  ONCE AGAIN, STATISTICALLY, IF IT'S GOING TO TAKE TWO-AND-A-HALF

8  YEARS FOR THAT TO HAPPEN, THIS CASE WILL BE LONG OVER BY THEN.

9         THE COURT:  THAT'S WHAT I AM CONCERNED ABOUT -- LONG

10  OVER -- AND I WOULD HAVE PUT IN A LOT OF WORK FOR NOTHING.

11         MR. ROOKLIDGE:  IF THIS CASE IS LONG OVER AND WOULD

12  HAVE GONE TO FINAL JUDGMENT, THAT IS THE END.

13         THE COURT:  OKAY.  YOU NEED TO WRAP IT UP.

14         MR. ROOKLIDGE:  THE OTHER STAY FACTORS EITHER DON'T

15  SUPPORT THE STAY, OR NEUTRAL.

16         I WANT TO TALK BRIEFLY ABOUT THE ALTERNATIVE REQUEST

17  THAT KRAFT HAS MADE FOR EXPEDITED DISCOVERY.

18         THE COURT:  NOT YET.  DECIDE THE STAY QUESTION FIRST.

19         MR. STERN:  THERE WERE A COUPLE -- A LOT OF POINTS MADE

20  THAT I SHOULD RESPOND TO; BUT, NUMBER ONE, A STATEMENT WAS MADE

21  THAT YOU SHOULD CONSIDER THE MOTION TO STAY AND THE PRELIMINARY

22  INJUNCTION TOGETHER.  YOU DON'T HAVE TO.  COUNSEL STATED THE

23  SEYMOUR CASE, BUT THE PERATON(PHONETIC) CASE HAS A PRELIMINARY

24  INJUNCTION AND STAY MOTION AT THE SAME TIME.  THE COURT SAID,

25  NOT LOOKING AT THE PRELIMINARY INJUNCTION MOTION, I'M GRANTING

1 THE STAY.  SO YOUR HONOR HAS THE AUTHORITY TO DO THAT.  AN

2 IMPORTANT POINT THEY ARE ASKING FOR.  THEY WANT YOUR HONOR TO

3 RULE ON THE PRELIMINARY INJUNCTION SO THEY HAVE A BASIS FOR

4 APPEAL, BECAUSE AUTOMATIC RIGHT TO APPEAL.  THERE IS NO WAY TO

5 APPEAL ON A STAY, ZERO.  IF YOUR HONOR DECIDED, "I'M NOT GOING

6 TO RULE ON THE PRELIMINARY INJUNCTION MOTION, JUST GOING TO RULE

7 ON THE STAY," YOU CAN DO THAT.

8         THE SECOND POINT IS, COUNSEL MADE AN ERRONEOUS

9 STATEMENT.  IT'S NOT A MERELY BINDERY DECISION ABOUT UP OR DOWN

10 ON THE PATTERNS CLAIMS.  RATHER, THERE ARE A VARIETY OF THINGS

11 THAT CAN HAPPEN.  JUST TO GIVE EXAMPLES; ALL THE CLAIMS COULD BE

12 REJECTED, ALL THE CLAIMS COULD BE CONFIRMED.  SOME OF THE CLAIMS

13 COULD BE REJECTED, SOME OF THE CLAIMS COULD BE NARROWED.

14         THIS IS VERY IMPORTANT.  WHEN THE COURT IS TRYING

15 TO -- WHEN THE BOARD OF PATENT APPEALS OR THE FEDERAL CIRCUIT

16 DETERMINES WHETHER OR NOT CLAIMS SURVIVE, THEY WILL BE LOOKING

17 AT PRIOR ART AND DISTINGUISHING OR NOT DISTINGUISHING THE CLAIMS

18 FROM THE IDENTIFIED ART.  IN DOING THAT, THEY ARE SAYING WHAT

19 THE CLAIM SCOPE IS AND WHAT IT ISN'T.

20         EVERY CASE WE CITED HAS POINTED OUT THE SAME THING;

21 IT'S NOT JUST WHETHER THE CLAIMS SURVIVE OR DON'T SURVIVE, BUT

22 HOW THE CLAIM READS, WHAT IT MEANS, WHICH MEANS, IN ANSWER TO

23 YOUR QUESTION, COULD YOU HAVE SPENT AN ENORMOUS AMOUNT OF TIME

24 AT CLAIM CONSTRUCTION THROUGH SUMMARY JUDGMENT QUESTIONS BASED

25 ON A QUESTION OF WHAT THESE CLAIMS MEAN, IGNORING THE UP OR DOWN

1  ASPECT WHETHER IT EXISTS, AND ACTUALLY WASTING MY TIME.  THE

2  ANSWER IS, ABSOLUTELY.   THAT IS TO SAY, IF THE BOARD OF PATENT

3  APPEALS -- EVEN ASSUMING THE BOARD OF PATENT APPEALS -- AND THEY

4  APPEAL THROUGH THE FEDERAL CIRCUIT -- FIND SOME CLAIMS SURVIVE,

5  WHAT THOSE CLAIMS MEAN, AND THEIR SCOPE, COULD BE DRAMATICALLY

6  DIFFERENT -- WHETHER YOUR HONOR FINDS -- AND NOT JUST UP OR DOWN

7  ASPECT.   THAT IS WHY IN THE CASES WE CITE, THE COURTS SAY,

8  "WE'RE NOT GOING TO SPEND TIME.  WE'LL WAIT TO SEE WHAT HAPPENS

9  IN THIS PROCESS SO WE DON'T WASTE THE COURT OR PARTIES'

10  RESOURCES.

11          IMAGINE ALL OF US GEARING UP TALKING ABOUT PRIOR ART

12  AND CLAIM CONSTRUCTION AND AT THE END OF THE DAY THERE ARE NO

13  PATENTS OR NO CLAIMS -- AND EVEN IF THERE ARE CLAIMS, THEY'RE

14  DIFFERENTLY SCOPED THAN WHAT ALL OF US WERE TALKING ABOUT TO

15  BEGIN WITH.   THAT IS THE SENSE OF GRANTING THE STAY.

16          THE COURT:  WHAT IS YOUR RESPONSE TO COUNSEL'S 'S

17  RELIANCE UPON THE STATUTE THAT PERMITS ONLY THE PATENT OWNER TO

18  OBTAIN --

19          MR. STERN:  WE CITED MIDDLETON.  YOU KNOW, IF YOU STEP

20  BACK A SECOND, THEY ISSUE STAYS IN PATENT CASES TRANSCENDING

21  INTER PARTES CASES.  YOUR HONOR,THERE ARE --

22          THE COURT:  THE NEXT CASE IS A REQUEST FOR A STAY OF

23  THE PATENT CASE.

24          MR. STERN:  YOU CAN STAY CASES BASED ON HARDSHIP ON A

25  VARIETY OF EQUITABLE FACTORS POST JUDGMENT.  POST JUDGMENT HAS

1   THE AUTHORITY TO STAY INJUNCTIONS OR STAY VARIOUS ASPECTS OF THE

2   CASE PENDING APPEAL OR PENDING OTHER FEDERAL ACTIONS.  THIS

3   CONCEPT THAT -- MAY I, BRIEFLY?

4        THIS CONCEPT THAT SECTION 318 HAS SOMEHOW GUTTED THIS

5   COURT'S INHERENT AUTHORITY TO CONTROL AND MANAGE THIS DOCKET AND

6   STAY POWERLESS, IS COMPLETELY UNPRECEDENTED.  AGAIN, COUNSEL

7   ARGUES THAT THOSE FIVE DECISIONS WE CITED, ALL OF WHICH INTER

8   PARTES CONTEXT, HAVE GRANTED STAYS, NOT ONE OF WHICH HASN'T THE

9   ARGUMENT THAT ONLY ONE OF THOSE HAS ADDRESSED IT THAT WAS EX

10  PARTE CASE.  THE FACT OF THE MATTER IS THE COURTS ROUTINELY DO.

11  I DON'T THINK ANYBODY CAN CREDIBLY OR SERIOUSLY SUGGEST THAT

12  SECTION 318 SOMEHOW LIMITS OR NARROWS YOUR POWERS TO STAY CASES

13  BASED ON THE AUTHORITY YOUR HONOR HAS.

14       THE COURT:  OKAY.  I ROUTINELY GRANT THEM IN

15  EX PARTE.

16       MR. ROOKLIDGE:  IF I MIGHT JUST ON THAT.  THAT CASE

17  DIDN'T GO FOR A FORMAL CONSIDERATION OF THE FOUR FACTORS OF THE

18  PRELIMINARY INJUNCTION CASE, BUT SPENT A LOT OF TIME CONSIDERING

19  THE PREJUDICE AND PART OF THE HARDSHIPS, AND EFFECTIVELY DECIDED

20  THOSE AGAINST THE PATENTEE IN THAT CASE.  THE FACT THAT SOME

21  CLAIMS COULD BE NARROWED AND THE PTO OR COURTS SAY WHAT THE

22  CLAIM MEANS UNDER THE BROADEST REASONABLE CONSTRUCT IS

23  IRRELEVANT TO THIS COURT'S CLAIM CONSTRUCTION.  COUNSEL DID NOT

24  ANSWER THE QUESTION I POSED.  I THINK THIS COURT NEED TO

25  STRUGGLE WITH ITS CONSIDERING GRANTING A STAY.  IF IT'S NOT

```
 1   PROVIDING A LIMIT ON THE COURT, WHAT DOES SECTION 318 OF THE
 2   STATUTE MEAN?
 3        THE COURT:  WELL, AS IT'S WRITTEN, I MEAN, IT SIMPLY
 4   PERMITS THE PATENT OWNER TO OBTAIN A STAY ON THAT GROUNDS.  IT
 5   DOESN'T ACTUALLY ORDER THE COURT NOT TO -- FIRST OF ALL, IT
 6   DOESN'T ORDER THE COURT TO GRANT A STAY ON THAT REQUEST.  IT
 7   SIMPLY ENABLES THE PATTERN OWNER TO APPLY FOR ONE.  I DON'T READ
 8   THAT AS REQUIRING THAT.  IF YOU WERE THE ONE STANDING HERE FOR
 9   STAY, APPLY FOR THE STAY, I WOULD THEN BE COMPELLED TO BALANCE
10   THE INTERESTS AS I WOULD ANY OTHER REQUEST FOR A STAY.
11        MR. ROOKLIDGE:  SO THE QUESTION IS, ONCE AGAIN, WHAT
12   DOES 318 MEAN.
13        THE COURT:  I DON'T KNOW.  IT'S NOT MY JOB TO ANSWER
14   THAT PARTICULAR QUESTION FOR YOU TODAY.  I OBVIOUSLY WILL HAVE
15   TO FIND THE AUTHORITY THAT ENABLES ME TO IMPOSE THE STAY, IF
16   THAT'S WHAT I WANT TO DO.  IT CLEARLY WOULDN'T BE SECTION 318.
17        I THINK I HEARD ENOUGH ON THIS.  I HAVE TO SAY IT WAS
18   MY INTENTION TO DENY THE REQUEST FOR A STAY.  HOWEVER, NOW THAT
19   I UNDERSTAND MORE ABOUT THE INTER PARTES PROCESS AS OPPOSED TO
20   THE EX PARTE PROCESS, IT'S VERY CLEAR TO ME ALL OF MY PATENT
21   EXPERIENCE HAS BEEN WITH THE EX PARTE.  IT HAS ALWAYS TAKEN TWO
22   YEARS, AND ONLY ONE LEVEL, AT LEAST 21 POST, AND ONLY ONE LEVEL
23   OF APPEALING.
24        I THINK MR. STERN HAS RAISED SOME VERY, VERY IMPORTANT
25   CONSIDERATIONS IN TERMS OF MANAGING MY OWN DOCKETS AND THE
```

33

1  INTEREST OF JUSTICE AS IT PERTAINS TO ALL OF THE LITIGANTS ON

2  CASES BEFORE ME, BECAUSE THESE CASES TAKE AN INORDINATE AMOUNT

3  OF THE COURT'S RESOURCES.  BUT I HAVE TO BE CONCERNED ABOUT

4  UNNECESSARILY ENGAGING IN WORK THAT IS NOT ESSENTIALLY GOING TO

5  HAVE ANY REAL EFFECT AT THE END OF THE DAY.  I AM ALWAYS

6  CONCERNED WHEN THERE ARE PARALLEL PROCEEDING GOING ON WITH

7  ACTUAL LITIGATION, NOT JUST IN PATENT CASES.  I AM ALWAYS

8  CONCERNED IN TERMS OF UTILIZATION OF THE RESOURCES.

9           I AM MORE INCLINED AFTER ARGUMENT TO GRANT THE STAY,

10 BUT I WOULD LIKE TO TAKE ANOTHER LOOK AT THE CASES YOU ALL HAVE

11 CITED WITH THE CLEAR UNDERSTANDING I HAVE ABOUT THE TWO

12 PROCEDURES BEFORE MAKING AN ULTIMATE DETERMINATION.  I WOULD

13 LIKE TO TELL YOU, I AM INCLINED TO GRANT THE STAY.  I'LL MAKE

14 THE DECISION OVER THE NEXT COUPLE OF DAYS AND LET YOU ALL KNOW,

15 AND IF I DO THAT, THEN THE CASE GOES OFF CALENDAR AND I'LL

16 SIMPLY WANT STATUS EVERY SIX MONTHS 'TILL IT'S BACK ON CALENDAR.

17          IF I DON'T GRANT THE STAY, WHICH STILL MIGHT NOT DO,

18 BUT I AM GOING TO SIMPLY SET A DATE FOR CASE MANAGEMENT

19 CONFERENCE, YOU HAVE ONE SET UP IN DECEMBER.  THAT'S TOO FAR

20 AWAY.  I'M GOING TO SET ONE IN THE NEXT WEEK OR TWO IF I DENY

21 THEIR REQUEST FOR A STAY, BECAUSE I'D LIKE YOU TO COME IN AND

22 TALK ABOUT THE EXPEDITED -- OR WHETHER -- AND WHAT DISCOVERY IS

23 NECESSARY FOR THE PRELIMINARY INJUNCTION HEARING.  I'LL SIMPLY

24 TELL YOU, THIS MIGHT BECOME TOTALLY UNNECESSARY; BUT I HAVE

25 NEVER GRANTED A MOTION FOR A PRELIMINARY INJUNCTION WITHOUT

1  CONSTRUING THE CLAIMS AND DISPUTED TERMS FIRST.  I HAVE YET TO

2  HAVE A PATENT CASE IN WHICH THERE WEREN'T SOME DISPUTES.  IF YOU

3  ALL CAN SUBMIT A JOINT CLAIM CONSTRUCTION STATEMENT AND THERE IS

4  NOTHING DISPUTED, WE CAN GO AHEAD WITH THE MOTIONS, BUT THERE IS

5  NO WAY I WOULD HOLD A MOTION -- A HEARING ON A MOTION FOR

6  PRELIMINARY INJUNCTION -- THREE WEEKS FROM NOW.  NO WAY THAT

7  WOULD HAPPEN.

8          I HAVE ALWAYS IN THE PAST GRANTED WHATEVER PERIOD OF

9  TIME THE PARTIES BELIEVE JOINTLY NECESSARY TO PURSUE DISCOVERY

10 AND THEN GO INTO CLAIMS CONSTRUCT.  SOMETIMES THAT OCCURS

11 EARLIER THAN IT WOULD UNDER NORMAL PATENT RULES SO WE CAN GET TO

12 THE MOTIONS.  ON CASES ON MY DOCKET AFTER THE CLAIMS HAVE BEEN

13 CONSTRUED, I HAVE NOT GOTTEN MOTIONS FOR PRELIMINARY INJUNCTION

14 RE-FILED BECAUSE THE CLAIM CONSTRUCTION HAS BEEN DETERMINATIVE

15 IN THOSE INSTANCES, BUT I WOULD CERTAINLY BE WILLING TO

16 ENTERTAIN A MOTION.  I COULD NOT SEE THAT I COULD FIND THE

17 LIKELIHOOD OF SUCCESS WITHOUT UNDERSTANDING AND CONSTRUING THE

18 CLAIMS BEFORE BEING PRESENTED WITH THOSE ARGUMENTS.

19         YOU MADE SOME OF THE ARGUMENTS THAT YOU PLANNED ON

20 MAKING TODAY AND YOU INCLUDED THEM IN YOUR PAPERS, AND I DON'T

21 UNDERSTAND THE PATENT WELL ENOUGH AT THIS JUNCTURE TO FIND IT'S

22 LIKELY FOR YOU TO SUCCEED, AND I RARELY RULE IN FAVOR OF THE

23 PARTY WHOSE ARGUMENT I DON'T UNDERSTAND.  WE WOULD DO THIS IN A

24 MORE METHODICAL FASHION.  EVEN IF I DO ULTIMATELY DENY THEIR

25 REQUEST FOR A STAY, I WANT YOU ALL TO MEET AND CONFER AND TO

1 GIVE ME A JOINT SCHEDULE FOR GETTING THROUGH EXPEDITED CLAIMS

2 CONSTRUCTION, IF THAT'S WHAT YOU WANT, AND THEN GET TO THE

3 MOTION FOR PRELIMINARY INJUNCTION.  I AM VACATING THE DATE FOR

4 THE PRELIMINARY INJUNCTION, AND WHEN IT WILL BE SCHEDULED WILL

5 DEPEND UPON WHETHER I GRANT THE STAY; AND, SECONDLY, ON WHAT THE

6 NEEDS OF BOTH PARTIES ARE.  SO IN THE ORDER THAT WE ISSUE, I

7 WILL EITHER TELL YOU THE STAY IS GRANTED AND SUBMIT SIX-MONTH

8 PROGRESS REPORTS, OR THE STAY IS DENIED AND COME IN AFTER A MEET

9 AND CONFER SESSION, FIRST CMC WITHIN A WEEK OR TWO.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

36



1

2

3

4

5

6

7

8          I CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

9   TRANSCRIPT OF THE PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER.

10

11

12

13

14

15

16

17

18  JUANITA GONZALEZ

19  CSR NO. 3003

20

21

22

23

24

25

**EXHIBIT 5**

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

The Procter & Gamble Company                                    (For Patent Owner)
Intellectual Property Division – West Bldg.
Winton Hill Business Center – Box 412
6250 Center Hill Avenue
Cincinnati, OH 45224

Stites & Harbison PLLC                                (For Third Party Requester)
1199 North Fairfax Street
Suite 900                                                                    MAILED
Alexandria, VA 22314

                                                                             DEC 18 2007

In re The Procter & Gamble Company          :                    CENTRAL REEXAMINATION UNIT
   *Inter Partes* Reexamination Proceeding      : **DECISION**
Control No. 95/000,219                          : **DISMISSING**
Filed:    March 8, 2007                         : **PETITION**
For: U.S. Patent No. 7,169,418 B2               :

This is a decision on the October 31, 2007 third party requester petition requesting entry of a
concurrently filed declaration of Mr. Samuel Belcher and associated exhibits (hereinafter "the
Belcher declaration") following an Action Closing Prosecution. The petition requests entry
under 37 CFR 1.116(e) or under 37 CFR 1.182 or 37 CFR 1.182 for purposes of the record to be
considered on appeal.

The petition and the 95/000,219 *inter partes* reexamination proceeding are before the Office of
Patent Legal Administration for consideration.

The patent owner's petition is <u>dismissed</u> for the reasons set forth below.

## FEES

A single $400.00 petition fee (37 CFR 1.17(f) as required for a petition filed under 37 CFR
1.182 or 37 CFR 1.183 will be charged to Deposit Account No 12-0555 as authorized by third
party requester.

## REVIEW OF SALIENT FACTS

1.   U.S Patent number 7,169,418 ("the '418 patent") issued to David Andrew Dalton *et al* on
     January 30, 2007, and is assigned The Procter and Gamble Company.

2.   On January 31, 2007, a request for *inter partes* reexamination of the '863 patent was
     deposited by a third party requester, Marvin Petry, in which the third party requester
     identified Kraft Foods Global, Inc. as being "the real party in interest," pursuant to 37
     CFR 1.915(b) and 35 U.S.C. 311(b).

3.  The papers deposited on January 31, 2007 were assigned *inter partes* reexamination control number 95/000,219 ("the '219 *inter partes* reexamination proceeding") but were not accorded a filing date, and notification to that effect was mailed to both the patent owner and the third party requester on March 5, 2007.

4.  On March 8, 2007, the third party requester filed a corrected request for the '219 inter partes reexamination proceeding, which was accepted by the Office.

5.  On March 22, 2007, the patent owner and the third party requester were notified that the corrected request for the '219 *inter partes* reexamination proceeding had been accorded a filing date of March 8, 2007.

6.  On June 7, 2007, the Office mailed an Order granting *inter partes* reexamination for claims 1-55 (*i.e., all claims*) of the '418 patent.

7.  Also on June 7, 2007, the Office mailed an Action Closing Prosecution (ACP) in which all of the claims for which *inter partes* reexamination was ordered were confirmed as being patentable. The ACP set a one month period for the patent owner to file a submission under 37 CFR 1.951(a) in response to the to the ACP and a non-extendable thirty day period from the date of service of the patent owner's submission on the third party requester in which the third party requester could submit responsive comments thereto under 37 CFR 1.951(b), provided that the patent owner had filed a response.

8.  The patent owner did not timely file a response to the ACP.

9.  On October 31, 2007, the third party requester filed the present petition and the Belcher declaration.

## DISCUSSION

I.  Relevant Authority and Examining Procedure

35 U.S.C. § 314(b) & (c) provide:

"(b) Each time that the patent owner files a response to an action on the merits from the Patent and Trademark Office, the third-party requester shall have one opportunity to file written comments addressing issues raised by the action of the Office or the patent owner's response thereto, if those written comments are received by the Office within 30 days after the date of service of the patent owner's response."

(c) SPECIAL DISPATCH. — Unless otherwise provided by the Director for good cause, all inter partes reexamination proceedings under this section, including any appeal to the Board of Patent Appeals and Interferences, shall be conducted with special dispatch within the Office.

35 U.S.C. § 317 provides:

(a) ORDER FOR REEXAMINATION. — Notwithstanding any provision of this chapter, once an order for inter partes reexamination of a patent has been issued under section 313, neither the third-party requester nor its privies may file a subsequent request for inter partes reexamination

of the patent until an inter partes reexamination certificate is issued and published under section 316, unless authorized by the Director.

(b) FINAL DECISION.— Once a final decision has been entered against a party in a civil action arising in whole or in part under section 1338 of title 28, that the party has not sustained its burden of proving the invalidity of any patent claim in suit or if a final decision in an inter partes reexamination proceeding instituted by a third-party requester is favorable to the patentability of any original or proposed amended or new claim of the patent, then neither that party nor its privies may thereafter request an inter partes reexamination of any such patent claim on the basis of issues which that party or its privies raised or could have raised in such civil action or inter partes reexamination proceeding, and an inter partes reexamination requested by that party or its privies on the basis of such issues may not thereafter be maintained by the Office, notwithstanding any other provision of this chapter. This subsection does not prevent the assertion of invalidity based on newly discovered prior art unavailable to the third-party requester and the Patent and Trademark Office at the time of the inter partes reexamination proceedings."

37 CFR 1.116(e) provides, in pertinent part:

"An affidavit or other evidence submitted after ... an action closing prosecution (§ 1.949) in an *inter partes* reexamination filed under § 1.913 but before or on the same date of filing an appeal (§ 41.31 or § 41.61 of this title), may be admitted upon a showing of good and sufficient reasons why the affidavit or other evidence is necessary and was not earlier presented."

37 CFR 1.181 provides, in pertinent part:

"(a) Petition may be taken to the Director:
    (1) <u>From any action or requirement of any examiner</u> in ... *ex parte or inter partes* prosecution of a reexamination proceeding which is not subject to appeal to the Board of Patent Appeals and Interferences or to the court; ...
    (3) To invoke the supervisory authority of the Director in appropriate circumstances.
        ...
  (f) The mere filing of a petition will not stay any period for reply that may be running against the application, nor act as a stay of other proceedings. Any petition <u>under this part</u> not filed within two months of the mailing date of the action or notice from which relief is requested may be dismissed as untimely, except as otherwise provided. This two-month period is not extendable." [Emphasis added.]

37 CFR 1.182 provides:

"All situations not specifically provided for in the regulations of this part will be decided in accordance with the merits of each situation by or under the authority of the Director, subject to such other requirements as may be imposed, and such decision will be communicated to the interested parties in writing. Any petition seeking a decision under this section must be accompanied by the petition fee set forth in § 1.17(f)."

37 CFR 1.183 provides:

"In an extraordinary situation, when justice requires, any requirement of the regulations in this part which is not a requirement of the statutes may be suspended or waived by the Director or the Director's designee, *sua sponte*, or on petition of the interested party, subject to such other requirements as may be imposed. Any petition under this section must be accompanied by the petition fee set forth in § 1.17(f)."

37 CFR 1.937(b) provides:

"The *inter partes* reexamination proceeding will be conducted in accordance with §§ 1.104 through 1.116, the sections governing the application examination process, and will result in the issuance of an *inter partes* reexamination certificate under § 1.997, except as otherwise provided."

37 CFR 1.947 provides:

"Each time the patent owner files a response to an Office action on the merits pursuant to § 1.945, a third party requester may once file written comments within a period of 30 days from the date of service of the patent owner's response. These comments shall be limited to issues raised by the Office action or the patent owner's response. The time for submitting comments by the third party requester may not be extended. For the purpose of filing the written comments by the third party requester, the comments will be considered as having been received in the Office as of the date of deposit specified in the certificate under § 1.8."

37 CFR 1.951 provides:

"(a) After an Office action closing prosecution in an *inter partes* reexamination, the patent owner may once file comments limited to the issues raised in the Office action closing prosecution. The comments can include a proposed amendment to the claims, which amendment will be subject to the criteria of § 1.116 as to whether or not it shall be admitted. The comments must be filed within the time set for response in the Office action closing prosecution.
(b) When the patent owner does file comments, a third party requester may once file comments responsive to the patent owner's comments within 30 days from the date of service of patent owner's comments on the third party requester."

MPEP § 2617 – Statement in the Request Applying Prior Art – provides in pertinent part:

"Subsection I. EXPLANATION MUST BE COMPLETE

The mere citation of new patents or printed publications without an explanation does not comply with 37 CFR 1.915(b)(3). Requester should present an explanation of how the cited patents or printed publications are applied to all claims which the requester considers to merit reexamination based on patents or printed publications. This not only sets forth the requester's position to the Office, but also to the patent owner."

Subsection II. AFFIDAVITS/DECLARATIONS/OTHER WRITTEN EVIDENCE

Affidavits or declarations or other written evidence which explain the contents or pertinent dates of prior art patents or printed publications in more detail may be considered in any reexamination. See MPEP § 2258."

MPEP § 2642 - Criteria for Deciding Request – provides in pertinent part:

"Subsection II. POLICY IN SPECIFIC SITUATIONS

In a decision to order reexamination made on or after November 2, 2002, reliance on old art does not necessarily preclude the existence of a substantial new question of patentability (SNQ) that is based exclusively on that old art. See Public Law 107-273, 116 Stat. 1758, 1899-1906 (2002), which expanded the scope of what qualifies for a substantial new question of patentability upon which a reexamination may be based. Determinations on whether a SNQ exists in such an instance shall be

based upon a fact-specific inquiry done on a case-by-case basis. For example, a SNQ may be based solely on old art where the old art is being presented/viewed in a new light, or in a different way, as compared with its use in the earlier concluded examination(s), in view of a material new argument or interpretation presented in the request."

## II. Third Party Requester's Position

The relevant section of the *inter partes* reexamination statute (35 U.S.C. § 314 (b)) and the corresponding implementing regulation (37 CFR 1.951) do not provide an opportunity for the third party requester to file a response to an ACP unless the patent owner first files comments to the ACP.  In the '219 *inter partes* reexamination proceeding, the ACP accompanied the Order granting *inter partes* reexamination. The patent owner exercised the option provided by 37 CFR 1.951(a) and filed no comments to the ACP.

The third party requester argues that requester had no opportunity to respond to any of the examiner's arguments that are set forth in the ACP, and no opportunity to provide the examiner with additional information in light of the Supreme Court's decision in *KSR International Co. v Teleflex*, 127 S. Ct. 1727, 167 L. Ed. 2d 705, 82 USPQ2D 1385 (2007).  The third party requester indicates that a declaration after an ACP is permitted to be entered pursuant to 37 CFR 1.116(e) upon a showing of good and sufficient reasons, and that such reasons exist because:

(1) The Belcher declaration could not have been submitted before the ACP; and

(2) There was no procedural mechanism by which the third party requester could explain to the examiner that according to one of ordinary skill in the art, the alleged improvements in the '418 was no more than the predictable use of the prior art elements according to their established functions.  The third party requester argues that under the Guidelines issued by the Office on October 10, 2007 in light of the *KSR* decision, the examiner is required to articulate certain grounds when making a 35 U.S.C. § 103 rejection, and the Guidelines require a Section 103 rejection for obviousness when a combination of known elements does no more than yield predictable results.

## III. Analysis and Findings

A. Entry of the Belcher Declaration as a Matter of Right Pursuant to 37 CFR 1.116(e)

Although 37 CFR 1.116(e) provides for the <u>entry</u> of declaration evidence after an ACP in the appropriate circumstances, the regulation must be read in a manner consistent with the requirements and limitations on the filing of party papers after an ACP that are imposed 37 CFR 1.951.  37 CFR 1.951(b) places a limitation on the filing of papers after an ACP that precludes the filing of such papers by a third party requester unless the patent owner has first filed a response to the ACP.  Thus, while 37 CFR 1.116(e) *per se* establishes that the parties in an *inter partes* reexamination proceeding may <u>file</u> declaration evidence after an ACP, and that declaration evidence <u>may</u> <u>admitted</u> into the record upon the proper showing of cause, the rule does not override the requirement that a third party requester is permitted to <u>file</u> any response to an ACP, including declaration evidence, <u>only</u> in response to a patent owner paper filed after an ACP.  Stated differently, 37 CFR 1.116(e) cannot be invoked to

admit declaration evidence after an ACP where 37 CFR 1.951(b) precludes a third party requester from even filing such evidence.

B.  Consideration under 37 CFR 1.182 - No Regulation Will Afford Relief

As discussed in Section III(C) below, the relief requested by the third party requester would be available upon a showing that the circumstances presented by the third party requester establish an extraordinary situation such that waiver of certain of the regulations of this part pursuant to 37 CFR 1.183 should be granted in the interest of justice. Hence, granting relief under 37 CFR 1.183 would not require the USPTO Director, or his delegate, to decide the present petition pursuant to 37 CFR 1.182. However, for the reasons discussed in Section III(C), it does not appear that the third party requester has demonstrated that the present circumstances establish the requisite extraordinary situation. Accordingly, a discussion of relief under 37 CFR 1.182 is warranted.

It appears that if relief pursuant to the present petition is not granted, the third party requester has alternative means whereby the Belcher declaration could be presented to the Office in the context of a reexamination proceeding.

First, it appears that the third party requester may make the appropriate arguments on appeal to the Board of Patent Appeals and Interferences. That the Belcher declaration is not entered into the record would not appear to preclude the presentation of arguments by the third party requester explaining why the claimed invention would have been obvious to one of ordinary skill in the art under 35 U.S.C. § 103, as the third party requester believes that the statute should be construed in light of the *KSR* decisions.

Second, to the extent that the information contained in the Belcher declaration was unavailable to the third party requester as of the filing date of the '219 *inter partes* reexamination proceeding, the third party requester (and the real party in interest) <u>may</u> have the ability to file a grantable request for *inter partes* reexamination that includes the Belcher declaration since doing so might not be precluded by 35 U.S.C. § 317(b). Note should be taken of the discussion in MPEP § 2641 of the availability of *inter partes* reexamination based on prior patents and printed publications that have previously been considered by the Office in a proceeding involving the patent, if the request for reexamination presents such documents "in a new light." Thus, the third party requester <u>may</u> have an avenue to file a request for *inter partes* reexamination in which the Belcher declaration evidence casts the documents considered in the '219 *inter partes* reexamination proceeding in a new light.

Third, the 35 U.S.C. § 317 estoppel provisions do not preclude the filing of a request for *ex parte* reexamination of a patent by a third party requester (or real party in interest) who has previously filed a request for *inter partes* reexamination of the same patent. It is to be noted that MPEP § 2241 contains the same language as MPEP § 2641 with respect to a party's ability to obtain reexamination of a patent based upon prior patents and printed publications if such are presented "in a new light." Thus, the third party requester <u>may</u> have the ability to obtain *ex parte* reexamination of the '418 patent.

Fourth, it is to be noted that 37 CFR 1.181(f) provides that any petition for relief "under this part," (*i.e.*, Part 1 of Chapter I of Title 37 of the Code of Federal Regulations) not filed within

two months of the mailing date of the action or notice from which relief is requested may be dismissed as untimely, except as otherwise provided. In the '219 *inter partes* reexamination proceeding, a timely filed patent owner response to the ACP would have due on or before July 7, 2007. Therefore, had the patent owner filed a response to the ACP, any responsive comments by the third party requester would have been timely filed only if filed not later than 30 days after the date of service of patent owner's response on the third party requester. Therefore, the due date for the third party requester's comments would ordinarily not have been later than August 7, 2007. Even allowing for the failure of the patent owner to properly serve post-ACP comments on the third party requester, the third party requester could have diligently inquired of the patent owner, or the Office, or both, whether the patent owner had filed a response to the ACP, or intended not to do so. Thus, even assuming that the third party requester would have made a diligent inquiry no later than August 15, 2007, the present third party petition was filed more than two months after the third party requester should have known that the patent owner had elected not to file a response to the ACP. The petition is therefore considered to have been untimely filed. Granting relief on the untimely filed petition resulting in admission of the Belcher declaration at this point in the proceeding would run counter to the statutory mandate that *inter partes* reexamination proceedings are to be handled with special dispatch within the Office

Finally, assuming, *arguendo*, that the present petition is timely filed, or that the Office would grant relief thereon in its discretion, it remains the case that *inter partes* reexamination proceedings are required to be addressed with special dispatch in the Office. The relief requested in the present third party requester petition would operate against the special dispatch requirement. The present petition does not establish any basis for concluding that the third party requester could not have made seasonable inquiry into the matter of the patent owner's filing of a response to the ACP, and therefore would have been well placed to timely file the present petition in accordance with 37 CFR 1.181(f). Further, entry of the Belcher declaration into the record at this juncture has the potential to significantly increase the pendency of the '219 *inter partes* reexamination proceeding by returning the proceeding to a pre-ACP status, and/or creating the potential for the patent owner to file an additional paper directed to the Belcher declaration, (since the patent owner might have elected to comment thereon had the paper been submitted with the request for reexamination as discussed in Section III(C) below).

For each of the above reasons, petitioner third party requester has not established a basis for granting the requested relief pursuant to 37 CFR 1.182.

C. Consideration under 37 CFR 1.183 – Waiver of 37 CFR 1.951(b) and 37 CFR 1.116(e)

As set forth in MPEP § 2141 (EXAMINATION GUIDELINES FOR DETERMINING OBVIOUSNESS UNDER 35 U.S.C. 103):

"These guidelines do not constitute substantive rule making and hence do not have the force and effect of law. They have been developed as a matter of internal Office management <u>and are not intended to create any right or benefit, substantive or procedural, enforceable by any party against the Office</u>." [Emphasis added.]

As further noted in subsection I of MPEP § 2141:

"The Supreme Court in KSR reaffirmed the familiar framework for determining obviousness as set forth in Graham v. John Deere Co. (383 U.S. 1, 148 USPQ 459 (1966)), but stated that the Federal Circuit had erred by applying the teaching-suggestion-motivation (TSM) test in an overly rigid and formalistic way. KSR, 550 U.S. at ___, 82 USPQ2d at 1391. Specifically, the Supreme Court stated that the Federal Circuit had erred in four ways: (1) "by holding that courts and patent examiners should look only to the problem the patentee was trying to solve " (Id. at ___, 82 USPQ2d at 1397); (2) by assuming "that a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem" (Id.); (3) by concluding "that a patent claim cannot be proved obvious merely by showing that the combination of elements was 'obvious to try'" (Id.); and (4) by overemphasizing "the risk of courts and patent examiners falling prey to hindsight bias" and as a result applying "[r]igid preventative rules that deny factfinders recourse to common sense" (Id.).

"In KSR, the Supreme Court particularly emphasized "the need for caution in granting a patent based on the combination of elements found in the prior art," Id. at ___, 82 USPQ2d at 1395, and discussed circumstances in which a patent might be determined to be obvious. Importantly, the Supreme Court reaffirmed principles **based on its precedent** that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." Id. at ___, 82 USPQ2d at 1395. The Supreme Court stated that there are "[t]hree cases decided after Graham [that] illustrate this doctrine." Id. at __, 82 USPQ2d at 1395. (1) "In United States v. Adams, . . . [t]he Court recognized that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." Id. at ___, 82 USPQ2d at 1395. (2) "In Anderson's-Black Rock, Inc. v. Pavement Salvage Co., . . . [t]he two [pre-existing elements] in combination did no more than they would in separate, sequential operation." Id. at ___, 82 USPQ2d at 1395. (3) "[I]n Sakraida v. AG Pro, Inc., the Court derived . . . the conclusion that when a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious." Id. at ___, 82 USPQ2d at 1395-96 (Internal quotations omitted.). The principles underlining these cases are instructive when the question is whether a patent application claiming the combination of elements of prior art would have been obvious."

Thus, the KSR Guidelines are viewed by the Office as re-affirming certain principles of law that apply to obviousness determinations under 35 U.S.C. 103. One such principle is that which provides guidance to all patent practitioners, including patent examiners and other Office personnel, with respect to combination inventions involving arrangements of old elements wherein each element performs the same function that it had been known to perform and which combination yields no more than one would expect from such an arrangement. Therefore, to the extent that the third party requester's arguments state or imply that there exists an extraordinary situation that would justify waiving the provisions of 37 CFR 1.951(b) to permit the filing and entry into the record of the Belcher declaration because the KSR decision issued in April, 2007, (i.e., after the filing of the '219 inter partes reexamination request), such position is not persuasive because the third party requester

has not explained why the Belcher declaration evidence was not filed with the request for *inter partes* reexamination. To the extent that the third party requester indicates that the Belcher declaration addresses the general state of the relevant art with respect to known elements and the manner in which they would be expected to perform in combinations of such elements, it is clear that the Belcher declaration could have been filed with the request for *inter partes* reexamination as an aid to an understanding of the proposed Section 103 obviousness rejections advanced in the request.

The absence of an opportunity to submit such evidence in the '219 *inter partes* reexamination proceeding due to the early confirmation of the patent claims having resulted in the issuance of the ACP, coupled with the fact that patent owner did not respond to the ACP, does not excuse the failure of the third party requester to file the Belcher declaration as part of the request for *inter partes* reexamination. Indeed, the question of establishing the level of skill in the art, which includes the manner in which "conventional components" would be expected to function when combined in a certain way, has been a long standing necessary part of the analysis required to resolve patentability under 35 U.S.C. 103. Moreover, it is to be noted that pursuant to MPEP § 2617, a request for filing an *inter partes* reexamination should be complete when filed. It is further to be noted that MPEP § 2617 specifically states that affidavit (*i.e.*, declaration) evidence that explains the content of prior patents and printed publications can, and will, be considered in *inter partes* reexamination. It is additionally to be noted that the originally filed request for *inter partes* reexamination was accepted after receipt of the corrected request for *inter partes* reexamination. The originally filed request for *inter partes* reexamination contains a number of proposed obviousness rejections, and also contains a section entitled "Knowledge of those of Ordinary Skill" (at pages 1-3 of the 102-page paper dated January 31, 2007) in which the third party requester endeavored to explain the state of the prior art, including an explanation of the existence of certain old elements in the art and their functionality.

Accordingly, it appears that to the extent that the third party requester considers the information in the Belcher declaration to be important information to place before an examiner, when considering and evaluating evidence that would bear on resolution of the question of the obviousness of the '418 patent claims, the request for *inter partes* reexamination as filed could have included the Belcher declaration for the purposes of explaining the state of the art, and the implications thereof on patentability under 35 U.S.C. 103. The absence of the Belcher declaration in the record of the '219 *inter partes* reexamination results from third party requester's failure to provide it when filing the original request for *inter partes* reexamination. Moreover, the regulations regarding a third party requester's ability to introduce additional evidence regarding the prior art during the patentability determination phase of an *inter partes* reexamination proceeding (37 CFR 1.947 with respect to the filing of a third party requester response to Office actions prior to an ACP and 37 CFR 1.951(b) with respect to the filing of a third party requester response to Office actions after an ACP) were available to the third party requester, and are quite clear. Petitioner third party requester has not established that the absence of the Belcher declaration in the record is the result of an extraordinary circumstance that warrants waiver of the provisions of 37 CFR 1.951(b) so as to permit the filing of the Belcher declaration after an ACP and the waiver of the "good and sufficient reasons" provision of 37 CFR 1.116(e) so as to mandate entry of the Belcher declaration into the record.

Further, as discussed in Section III(B) above with respect to the filing and entry of the Belcher declaration pursuant to 37 CFR 1.182, the fact that the declaration is now being offered by the third party requester beyond the period set in 37 CFR 1.181(f), when it could have been seasonably filed had the third party requester made diligent inquiry in the issue of the filing of a patent owner response to the ACP, also weighs against exercising discretion to accept the untimely filed petition and then to grant the requested relief of waiving the regulations to permit filing and entry into the record. To enter the Belcher declaration at this stage of the prosecution would, in essence, require reopening of the prosecution to an earlier stage of prosecution, and operate against the special dispatch requirements of the *inter partes* reexamination statute and the implementing regulations. The patent owner might well assert a right to comment on the Belcher declaration, since, had it been filed with the request for *inter partes* reexamination, the patent owner could have elected to do so. Not only has the third party requester failed to establish that waiver of the rules is not necessary in the interest of justice from the third party requester's perspective, (inasmuch as the third party requester may well have other options to bring the information in the Belcher declaration before the Office in a reexamination proceeding), granting of the requested relief would also adversely effect that segment of the public that has an interest in the speedy resolution of the '219 *inter partes* reexamination proceeding. For all of the foregoing reasons, the third party requester is not deemed to have established a basis for waiving the provisions of 37 CFR 1.951(b) regarding the filing of a post-ACP comment paper and the provisions of 37 CFR 1.116(e) that would govern the entry of such paper into the record.

## CONCLUSION

1.  The petition to enter the Belcher declaration in the '219 *inter partes* reexamination proceeding  pursuant to 37 CFR 1.116(e), or in the alternative to enter the Belcher declaration under 37 CFR 1.182 and/or 37 CFR 1.183, is dismissed.

2.  The Belcher declaration is not entered into the active Image File Wrapper record, and will therefore be sealed by being marked "closed" and non-public" because it cannot be physically expunged.

3.  The proceeding is being forwarded to the Central Reexamination Unit for appropriate action.

4.  Telephone inquiries related to this decision should be directed to Stephen Marcus, Legal Advisor, at (571) 272-7726, or in his absence, the undersigned at (571) 272-7710.

*Kenneth M. Schor*

---

Kenneth M. Schor
Senior Legal Advisor
Office of Patent Legal Administration

sm
December 18, 2007

**EXHIBIT 6**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

KRAFT FOODS HOLDINGS INC.,

 Plaintiff,

 v.

THE PROCTOR & GAMBLE COMPANY,

 Defendant/Third-Party Plaintiff,

 v.

KRAFT FOODS GLOBAL, INC.

 Third-Party Defendant.

_____

PRELIMINARY PRE-TRIAL
CONFERENCE ORDER

07-C-613-S

 Preliminary pre-trial conference came on to be heard by telephone in the above entitled matter on November 27, 2007, the plaintiff/third-party defendant having appeared by Quarles & Brady by Anthony A. Tomaselli and Quinn, Emanuel, Urquhart, Olver & Hedges by Claude M. Stern and Evette Pennypacker; defendant/third-party plaintiff by Michael Best & Friedrich by Paul F. Linn, Howry LLP by William C. Rooklidge and in house counsel, Roddy Bullock and Patrick Lane.  Honorable John C. Shabaz, District Judge, presided.

ORDER

 IT IS ORDERED that as determined by this Court, Rule 11, Federal Rules of Civil Procedure, requires an attorney who files a patent infringement action to compare the accused device with the construed patent claims.  Plaintiff's counsel must make a

reasonable effort to determine whether the accused device satisfies each of the claim limitations and provide those determinations to the defendant as initial disclosures under Rule 26(a)(1), all pursuant to Antonious v. Spalding & Evenflo Companies, Inc., 275 F.3d 1066 (Fed. Cir. 2002).

IT IS FURTHER ORDERED that pending any protective order which the parties may seek, an interim protective order is provided for "eyes only" of counsel designated to pursue this litigation.

IT IS ORDERED that pleadings may be amended and parties added not later than December 27, 2007 without further order of the Court, thereafter Rule 15, Federal Rules of Civil Procedure, to be followed.

IT IS FURTHER ORDERED that all dispositive motions to be filed during the pendency of this matter, to include motions for summary judgment, shall be accompanied by memoranda of law; opposing party being given 20 days from receipt thereof to respond; and the moving party 10 days from receipt of response to reply.

IT IS FURTHER ORDERED that all motions for summary judgment and other dispositive motions shall be served and filed not later than May 1, 2008; motions for summary judgment in accordance with local rule, a copy of which is enclosed.

IT IS FURTHER ORDERED that nondispositive motions, to include procedural motions, may be heard upon five days notice on any Wednesday morning by telephone at 8:00 A.M. or earlier, moving party to initiate the telephone conference to 608-264-5504.

2

IT IS FURTHER ORDERED that discovery shall be completed and all depositions taken not later than August 1, 2008.

IT IS FURTHER ORDERED that the following discovery materials will not be filed with the Court unless they concern a motion or other matter under consideration by the Court: interrogatories; responses to interrogatories; requests for documents; responses to requests for documents; requests for admission; and responses to requests for admission.

IT IS FURTHER ORDERED that final pre-trial conference is scheduled for August 6, 2008 at 1:00 P.M., pursuant to the provisions of Order Prior to Final Pre-trial Conference, a copy of which is also enclosed.

IT IS FURTHER ORDERED that jury selection and bifurcated trial to a seven-person jury, where the issue of liability is to be determined prior to the determination of any damage, are scheduled for September 8, 2008 at 9:00 A.M., counsel to meet with the Court at 8:30 A.M. on said day to discuss voir dire and other issues related to trial.

Entered this 20th day of November, 2007.

BY THE COURT:

/s/

_____
JOHN C. SHABAZ
District Judge

3

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

---

PROCEDURE TO BE FOLLOWED ON MOTIONS FOR SUMMARY JUDGMENT

---

I.    A motion for summary judgment made pursuant to Rule 56 of the Federal Rules of Civil procedure shall be served and filed in the following form:

    A.    The motion itself together with such materials permitted by Rule 56(e) as the movant may elect to serve and file; and

    B.    Either (1) <u>a stipulation of facts</u> between or among all the parties to the action, or (2) <u>a statement of the findings of fact proposed by movant</u>, or (3) <u>a combination of (1) and (2).</u>

        1.    Whether a movant elects a stipulation or a statement of proposed findings, or both, it is movant's obligation to present no more and no less than the set of factual propositions which movant considers necessary to judgment in movant's favor, and as to which movant considers there is no genuine issue.[1]

        2.    Such factual propositions shall be set forth in numbered paragraphs, the contents of each of which shall be limited as far as practicable to the statement of a single factual proposition.

        3.    At the close of each numbered paragraph shall be set forth one or more references to the PLEADINGS, DEPOSITION TRANSCRIPTS, ANSWERS TO INTERROGATORIES, ADMISSIONS on file or AFFIDAVITS[2] supporting movant's contention there is no genuine issue as to that factual proposition.

        4.    References to the record shall include:

            a.    in the case of a pleading, the numbered paragraph of that pleading;

---

[1]    The factual propositions should include all of the "basic" facts necessary to a decision on the motion, including those going to jurisdiction, to the identity of the parties, and to the background of the dispute.

[2]    Affidavits must be made on personal knowledge setting forth such facts as would be admissible in evidence, and showing affirmatively the affiant is competent to testify to the matters stated therein.

b.    in the case of a deposition transcript, the name of the witness and the page of the transcript;

c.    in the case of an answer to an interrogatory, the number of that interrogatory and the identity of the party to whom it was directed;

d.    in the case of an admission in response to, or resulting from a failure to respond to, a request for admission made pursuant to Rule 36, Federal Rules of Civil Procedure, the number of the requested admission and the identity of the party to whom it was directed;

e.    in the case of an admission on file which is not in response to, or resulting from a failure to respond to, a request for admission made pursuant to Rule 36, the form such admission takes and the page or paragraph of the document in which that admission is made.  Admissions made solely for the purpose of the motion for summary judgment should be so designated.

C.    A statement of the conclusions of law proposed by movant, in numbered paragraphs.

D.    A motion for summary judgment in the form required by I., above, shall be served and filed together with a <u>supporting brief</u>.

II.    When a motion and supporting brief have been served and filed in compliance with I., above, the court shall issue a schedule for the procedures described in III. and IV., below, unless a briefing schedule has already been established by the court.

III.    RESPONSE:  On or before the date specified in the schedule issued by the court, any party who elects to oppose the motion for summary judgment shall serve and file the following:

A.    Such materials permitted by Rule 56(e) which said party may elect to serve and file in opposition to said motion.

B.    A response to the movant's statement of proposed findings of fact.

1.    With respect to each numbered paragraph of the movant's proposed findings of fact, the said response shall state clearly whether there is a genuine issue as to the whole or a part of the said factual proposition; if it is contended that there is a genuine issue only as to a part of the said factual proposition, the response shall identify precisely the said part of the numbered paragraph.

5

2. With respect to any paragraph or part of a paragraph of the movant's proposed findings of fact as to which it is contended that a genuine issue exists, the response shall refer to the PLEADINGS, DEPOSITION TRANSCRIPTS, ANSWERS TO INTERROGATORIES, ADMISSIONS on file, or AFFIDAVITS complying with Rule 56(e), which respondent believes give rise to said genuine issue.

3. The said references to the record shall be made with that specificity required by I.B.4., above.

4. If an opposing party believes the motion for summary judgment must fail because of material facts not stated by the movant and as to which it is considered there is no genuine issued, the said opposing party may present such other factual propositions either by means of:

    a. a stipulation of facts between or among all of the parties to the action; or

    b. a statement of the findings of fact proposed by said opposing party; or

    c. a combination of "a" and "b."

5. With respect to such presentation of factual propositions not stated by the movant, the said opposing party shall comply with the requirements set forth in I.B., above.

C. A response to the movant's statement of proposed conclusions of law.

1. With respect to each such numbered proposed conclusions, the said response shall state clearly whether the said conclusion is agreed to or disputed in whole or in part; if the dispute is partial, the response shall state precisely which portion of the proposed conclusion is disputed.

2. If an opposing party believes the motion for summary judgment must fail because of conclusions of law not stated by movant, that party may state such other conclusions of law.

D. The response in the form required by III., above, shall be served and filed together with a brief in opposition to the motion for summary judgment.

IV. REPLY: On or before the date specified in the schedule issued by the court, the movant may, but is not required to, serve and file in rebuttal any or all of the following items:

6

A.      Such materials permitted by Rule 56(e) which movant may elect to serve and file in rebuttal.

B.      A statement in rebuttal to the response or responses to any numbered paragraph of movant's initially proposed findings of fact, and a statement in rebuttal to any numbered paragraphs of findings of fact initially proposed in the response or responses.  To the extent that said statement in rebuttal requires record references not earlier made by movant, the said references shall be made with that specificity required by I.B.4., above.

C.      A statement in rebuttal to the response or responses to any numbered conclusion of law initially proposed by the movant, and a statement in rebuttal to any numbered conclusion of law initially proposed in the response or responses.

D.      With the rebuttal described in IV., above, the movant may, but is not required to, serve and file a rebuttal brief.

NOTE PARTICULARLY:

V.      In deciding the motion for summary judgment:

A.      The court will conclude that there is no genuine issue as to any proposed finding of fact initially proposed by the movant, except to the extent an opposing party's response asserts that a genuine issue exists; and

B.      The court will conclude there is no genuine issue as to any finding of fact initially proposed in a response, except to the extent that movant's rebuttal asserts a genuine issue exists.

C.      As to any finding of fact, whether initially proposed by the movant or in a response, as to which it is asserted a genuine issue exists, the court will make a determination as to the existence or non-existence of such genuine issue.

D.      The court is not required to give any weight to a piece of evidence unless it is set forth in the manner described.

E.      The court does not consider it is under any obligation to search the record for factual matters that might support either the grant or the denial of the motion. It is the duty of the parties to bring to the court's attention by specific reference to the record as outlined in paragraphs I.B., III.B., and IV.B., all factual and legal matters material to the resolution of the issues in dispute.

VI.     All motions for summary judgment shall be considered as submitted for ruling without oral argument, unless the court otherwise directs.

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

JUDGE JOHN C. SHABAZ
ORDER PRIOR TO FINAL PRE-TRIAL CONFERENCE

_____

IT IS ORDERED that in preparation for trial counsel for the parties shall:

1.     Confer not later than ten days before the date of the final pre-trial conference scheduled in the action to which this order refers.

2.     Prepare a <u>joint</u> final pre-trial report to be filed with the Court not later than <u>three</u> days before the final pre-trial conference.  The principal burden for the composition of the report shall be on counsel for the plaintiff.  The report must be signed by counsel for all parties and must contain the following:

   (a)     Date of the pre-trial conference and appearances for the parties.

   (b)     An agreed statement of all uncontested facts.  In the absence of objection to the admissibility of any uncontested facts the statement will become part of the record.  No proof will be received at trail on the matters covered by the statement.

   (c)     An agreed statement of major factual issues.

   (d)     The names and addresses of all prospective witnesses for each party.  It is contemplated that witnesses not listed will not be permitted to be called except upon a showing of good cause.

   (e)     The names and addresses of all prospective expert witnesses for each party, together with a narrative statement of each expert's background and experience.  If the case is to be tried to a jury, the statement will be read to them and no proof will be received on the matters covered unless objectiojn to the narrative statement is noted in the report.

   (f)     An itemized statement of special damages if such special damages are an element of a claim.

   (g)     A schedule of all exhibits to be offered at trial, designating those to which objection will be made, with a brief statement as to the grounds for objection. Objections based on relevancy need not be noted.

   (h)     A list of depositions, or portions thereof, to be offered at trial.  Extensive (i.e. more than 5 pages) reading from depositions will not be permitted.  Rather, the proponent of a deposition must prepare a written narrative summary of a

deposition the party intends to offer.  Any other parties desiring to make use of the same deposition must also prepare a narrative summary.  Summaries not filed at least ten days prior to trial (seven days for a responsive summary) may not be used during the trial absent a showing of good cause.

3.      Mark and number all exhibits prior to the final pre-trial conference.  Exhibits should be numbered serially without designating the offering party; plaintiffs to begin numbering with 1, defendants with 201.

   (a)   File all formal discovery documents, to include depositions and contested exhibits at final pre-trial conference.

4.      **If trial to the Court, as follows:**

Counsel for parties will submit to the Court by noon of the Thursday before trial the following:

   (a)   Trial briefs on all contentions of parties filing the brief, including references to special evidentiary problems.

   (b)   Proposed findings of fact, conclusions of law and order of judgment.

   **If trial by jury, as follows:**

Counsel for parties will submit to the Court not later than noon ten days before trial or as otherwise directed the following:

   (a)   Trial briefs on all contentions of parties filing the brief, including references to special evidentiary problems.

   (b)   Proposed voir dire questions.

   (c)   Proposed jury instructions, with citations or references of authority; instruction conference to be held the Friday prior to trial.

   (d)   Proposed verdict forms, special verdict forms and proposed special interrogatories to jury, if applicable.

   (e)   Instruction conference to be held the Friday prior to trial.

5.      Submit separate reports or partial separate reports at time of final pre-trial conference if counsel cannot agree on the contents of a joint report, and certify that after making diligent effort agreement could not be reached on joint report.

6.      The following paragraph shall be included in each pre-trial order:

   Hereafter this order will control the course of the trial and may not be amended except by consent of the parties and the Court to prevent

manifest injustice.  In the event of ambiguity in any provisions of this order, references may be made to the records of this conference to the extent recorded by notes and to the pleadings.

7.      Estimated trial time and other items which may be pertinent thereto.

# EXHIBIT 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

KRAFT FOODS HOLDINGS, INC.,

        Plaintiff

v.

THE PROCTER & GAMBLE COMPANY,

        Defendant              Case No. 07-C-0613-S



THE PROCTER & GAMBLE COMPANY,

        Counterclaim Plaintiff

v.

KRAFT FOODS HOLDINGS, INC.

        Counterclaim Defendant

and

KRAFT FOODS GLOBAL, INC.

        Third-Party Defendant

---

### STIPULATED PROTECTIVE ORDER

---

Upon stipulation of counsel for Plaintiff and Counterclaim Defendant Kraft Foods Holdings, Inc. ("KFH"), Defendant and Counterclaim Plaintiff Procter & Gamble Company ("P&G") and Third-Party Defendant Kraft Foods Global, Inc. ("KFG"), it appearing to the Court that a Protective Order under Rule 26(c) of the Federal Rules of Civil Procedure is

necessary and appropriate and will facilitate discovery,

IT IS HEREBY ORDERED THAT:

1.     Any Party or non-party producing material or information in this litigation ("Producing Party") may designate such material or information as "Confidential" or "Attorney's Eyes Only" in which case such material or information shall be treated in accordance with the terms of this Protective Order.

2.     The term "Confidential" may be applied only to material or information not known to the general public that is produced in this litigation by a Producing Party to any other Party ("Receiving Party"), ~~that the Producing Party in good faith considers to~~ constitute*s and* ~~or~~ contain*s* trade secrets or other confidential research and development, know-how, proprietary data, financial results, other non-publicly available information, or commercial information within the meaning of Federal Rule of Civil Procedure 26(c)(7) or that the Producing Party is under an obligation to a third party to maintain as confidential.

3.     The term "Attorney's Eyes Only" may be applied only to such highly confidential materials or information that consist of or contain particularly sensitive information relating to, e.g., product or packaging research and development, marketing, pricing, manufacturing, customer data, financial information, and any pending or abandoned patent applications, foreign or domestic; as well as such other documents, information or materials that relate to other proprietary information within the meaning of Federal Rule of Civil Procedure 26(c)(7) that ~~the Producing Party reasonably believes~~ is of such nature and character that disclosure of such information would be harmful to the Producing Party or may cause the Producing Party to violate federal laws and/or regulations.

4.     Any document or portion thereof that a Producing Party believes to contain Confidential or Attorney's Eyes Only information shall be so designated by stamping or otherwise applying on each page containing Confidential or Attorney's Eyes Only information the designation

2

"Confidential" or "Attorney's Eyes Only," in which case such designated document and the information contained therein shall be treated in accordance with the terms of this Protective Order. Nothing in this Protective Order constitutes an admission of a Party that any information designated as "Confidential" or "Attorney's Eyes Only" by a Producing Party does in fact constitute a trade secret or proprietary information or constitutes an agreement or admission with respect to the competency, relevance, or materiality of any such information.

5.    All Confidential or Attorney's Eyes Only information not reduced to documentary, tangible, or physical form or which cannot be conveniently designated pursuant to Paragraph 4 shall be designated by the Producing Party by informing all Receiving Parties in writing.

6.    "Qualified Person," as used herein, is limited to the following categories of persons provided that such persons are not currently, during the course of this litigation, and will not be for a period of one (1) year following the entry of a final non-appealable judgment or order or the complete settlement of all claims against all parties in this action, (i) drafting, or providing substantive input into the drafting of, any patent application and/or engaging in correspondence with the PTO or any other patent-issuing body, domestic or foreign  of any patent application (or portion thereof), whether design or utility, and either in the United States or abroad, relating to coffee product packaging; or (ii) having knowledge of and providing advice, counsel or suggestions regarding  specific claim scope and/or language, embodiment(s) for specific claim coverage, specific claim(s) for prosecution, or products or processes for coverage by specific claim(s) relating to coffee product packaging.  Notwithstanding the above, the prohibitions of this paragraph shall not apply to:  (1) a person employed by Kraft or P&G to review Attorney's Eyes Only information if that person's role in the patent review process within Kraft or P&G  is limited to general knowledge of his or her employer's pending patent application(s) covering the subject of coffee packaging, without specific knowledge of the content of any claims of such application, and having

3

input as to whether such application should be filed with any patent-issuing body, domestic or foreign; or (2) Mr. Clinton Hallman, representing Kraft, and Mr. Roddy Bullock, representing P&G. The parties agree that, in the event the duties of Mr. Hallman are reassigned to another attorney for Kraft, or in the event that the duties of Mr. Bullock are reassigned to another attorney for P&G, the parties will not unreasonably withhold their consent to the new attorney having access to Attorneys' Eyes Only information.

a.  any attorney appearing of record or of counsel in this case, other than in-house counsel, together with other attorneys at the firm(s) of counsel of record, and their employees including paralegal, secretarial, photocopying, document imaging, data entry, data processing, drafting, graphics, stenographic reporting, or clerical personnel;

b.  subject to the conditions set forth in paragraphs 10 and 11, any independent technical or financial expert, independent consultant, or independent testing personnel and their employees serving any attorneys identified in Paragraph 6(a) for the purposes of this case, who shall first have executed the UNDERTAKING annexed hereto as Exhibit A;

c.  any independent paralegal, secretarial, photocopying, document imaging, data entry, data processing, drafting, graphics, stenographic reporting or clerical personnel serving such attorneys identified in Paragraph 6(a) for the purposes of this case;

d.  any court reporter or videographer employed or retained by a party for the purposes of transcribing and/or recording a deposition or inspection of premises;

e.  the Court and its personnel;

f.  any person indicated on the face of a document as having written or received such document during the course of his or her employment or consultancy; and, at trial or deposition, any current or former employee of the Producing Party ("Witness"), provided that the Producing Party's document was written or received prior to or during the Witness's period of employment;

g.  non-technical jury or trial consulting services retained by outside counsel, who shall first have executed the UNDERTAKING annexed hereto as Exhibit A ; and

h.  Up to) two (2) in-house party counsel for P&G and one (1) in-house party counsel each for KFH and KFG, in addition to Mr. Hallman and Mr. Bullock, (and such in-house counsel's clerical staff), to be designated by each party by

written notice and provided that such party in-house counsel has executed the UNDERTAKING annexed hereto as Exhibit A.

i.     Employees of KFG, KFH, and P&G.

7.     No other person shall become a Qualified Person without prior leave of Court or prior written consent of the Producing Party. Documents, testimony or information designated by a Producing Party as "Confidential information" may be disclosed and copies may be provided by the Receiving Party only to Qualified Persons as specified in paragraph 6(a) through (i), shall be retained by them in strictest confidence, shall only be used for this action (including appeals) or any other proceeding involving P&G and KFG or KFH, and P&G's United States Patent Nos. 7,169,418 or 7,169,419, provided that a protective order is provided in that proceeding to protect the confidentiality of that information. Confidential information shall not be disclosed to any person not specified in paragraph 6 without the prior written consent of the Producing Party or of the Court. All Confidential information obtained by a Qualified Person shall be carefully maintained so as to preclude access by anyone who is not a Qualified Person.

8.     Documents, testimony or information designated by a Producing Party as "Attorney's Eyes Only" may be disclosed and copies may be provided by the Receiving Party only to Qualified Persons as specified in paragraph 6(a) through (h), shall be retained by them in strictest confidence, shall only be used for the purpose of this action (including appeals) or any other proceeding involving P&G and KFG or KFH, and P&G's United States Patent Nos. 7,169,418 or 7,169,419, provided that a protective order is provided in that proceeding to protect the confidentiality of that information. Attorneys' Eyes Only information shall not be disclosed to any person not specified in paragraph 6(a) through (h) without the prior written consent of the Producing Party or of the Court. All Attorney's Eyes Only information obtained by a Qualified Person under paragraph 6(a) through (h) shall be carefully maintained so as to preclude access by anyone who is not a Qualified Person under paragraph 6(a) through (h).

9.    Except as otherwise agreed to by the parties, Confidential or Attorney's Eyes Only

information may not be used in, or to form the basis for, any other proceeding or litigation.

However, such information may be used for any reason in any future proceeding or litigation or any

other proceeding involving P&G and KFG or KFH, and P&G's United States Patent Nos.

7,169,418 or 7,169,419, provided that a protective order is provided in that proceeding to protect

the confidentiality of that information.  Confidential or Attorney's Eyes Only information may be

disclosed in response to a lawful subpoena issued in connection with grand jury proceedings, other

criminal proceedings, or in civil proceedings, but only if notice and a copy of the subpoena are

provided to the Producing Party by facsimile transmission or overnight mail at least five (5)

business days in advance of such anticipated disclosure or, if the subpoena requires production of

such documents in less than five days, as soon as reasonably possible.  Should the person seeking

access to Confidential or Attorney's Eyes Only information take action against the Receiving Party

or anyone else covered by this Protective Order to enforce such a subpoena, demand or other legal

process, the Receiving Party shall respond, at a minimum, by setting forth the existence of this

Protective Order.  Nothing herein shall be construed as requiring the Receiving Party or anyone else

covered by this Protective Order to challenge or appeal any order requiring production of

Confidential or Attorney's Eyes Only information covered by this Protective Order, or to subject

itself to any penalties for noncompliance with any legal process or order, or to seek any relief from

this Court.

10.    All Qualified Persons, other than those designated in paragraphs 6(a), (c), (d), (e), and

(f), shall be given a copy of this Protective Order prior to being shown any Confidential or

Attorney's Eyes Only information.  Each such person, prior to having access to said Confidential or

Attorney's Eyes Only information, shall execute the UNDERTAKING annexed hereto as EXHIBIT

A and thereby agree not to disclose any Confidential or Attorney's Eyes Only information to

anyone who is not a Qualified Person, shall agree not to make use of any such Confidential or

Attorney's Eyes Only information other than for the purposes of this litigation, and shall agree to be

subject to the jurisdiction of the United States District Court for the Western District of Wisconsin

with respect to any issue arising out of this Protective Order.

11.    Before Confidential or Attorney's Eyes Only information is disclosed to any proposed

Qualified Person identified in Paragraphs 6(b) , the Party seeking to disclose that information shall

notify all Producing Parties in writing of the identity of the proposed Qualified Person and provide

the proposed Qualified Person's executed UNDERTAKING and curriculum vitae by facsimile.  No

Confidential or Attorney's Eyes Only information may be shown to any proposed Qualified Person

under 6(b) so identified for four (4) business days following receipt by all Producing Parties of such

notice.  If a Producing Party objects to disclosure of Confidential or Attorney's Eyes Only

information to that proposed Qualified Person within that four (4) business day period, for

reasonable cause set forth in writing, the parties shall thereafter attempt in good faith to resolve the

objection.  Should the parties be unable to resolve the objection, the objecting party shall file a

motion for an Order that access to Confidential or Attorney's Eyes Only information be denied to

such proposed Qualified Person.  Failure to file a motion within five (5) business days after such

Producing Party's receipt of the notification of the objection shall be deemed approval, and such

proposed Qualified Person shall thereafter be qualified to have access to the Confidential or

Attorney's Eyes Only information pursuant to the terms and conditions of this Protective Order.

The proposing party shall not disclose any Confidential or Attorney's Eyes Only information to

proposed Qualified Persons during the period for objection nor during the pendency of any motion

filed in accordance with this paragraph.  No Party shall use its right to object to a proposed

Qualified Person to interfere with the ability of the other Party to reasonably prepare for trial, and

consent to the disclosure of information to proposed Qualified Persons shall not unreasonably be withheld.

12.    In the event that counsel for a Party deems it necessary to disclose any Confidential or Attorney's Eyes Only information of a Producing Party to any person not specified as a Qualified Person, said counsel shall notify counsel for the Producing Party in writing of (a) the information or documents to be disclosed, (b) the person(s) to whom such disclosure is to be made, and (c) the reason(s) for such disclosure, and shall attempt to reach agreement regarding such disclosure. If agreement cannot be reached, the Party wishing to make such disclosure shall file an appropriate motion with the Court. In the event of such motion, the Court shall rule as to whether such disclosure may be made at all and, if so, whether any restriction or limitation shall be placed on such disclosure.

13.    Should any Confidential or Attorney's Eyes Only information be disclosed, through inadvertence or otherwise, to any person not authorized pursuant to the terms of this Protective Order, the disclosing party shall (a) use its best efforts to obtain the return of any such Confidential or Attorney's Eyes Only information; (b) promptly inform such person of all provisions of this Protective Order; (c) identify such person immediately in writing to the Party or third party that designated the Confidential or Attorney's Eyes Only information; and (d) request such person to sign an UNDERTAKING in the form attached hereto as EXHIBIT A. The executed UNDERTAKING shall promptly be served upon counsel of record for the Party or upon the third party that designated the Confidential or Attorney's Eyes Only information. Execution of an UNDERTAKING under such circumstances shall in no way serve to convert the person signing such UNDERTAKING into a Qualified Person.

14.    Counsel for a Producing Party may redact specific material which the Producing Party believes, in good faith, is subject to the attorney-client privilege, work product immunity, or other

legally cognizable privilege or immunity. Counsel for a Producing Party may also redact information which would qualify for protection as Attorneys Eyes Only confidential, but which is irrelevant to any issue in this case and not reasonably calculated to lead to the discovery of relevant evidence. The deletion of all material redacted shall be clearly indicated by visibly marking the document with the word "REDACTED" or with a solid black line where material has been deleted. Both parties reserve the right to challenge any redactions made by the Producing Party. All documents of any nature that are filed with the Court for any purpose and that contain Confidential or Attorney's Eyes Only information shall be filed in sealed envelopes or other sealed containers that are marked with the caption of the litigation, that identify each document and thing contained therein and that bear a statement substantially in the following form:

<div align="center">

FILED UNDER SEAL
CONTAINS CONFIDENTIAL INFORMATION
SUBJECT TO A PROTECTIVE ORDER
This envelope contains Confidential information
and is not to be opened, nor the contents thereof
displayed or revealed, except by order of the Court.

or

FILED UNDER SEAL
CONTAINS CONFIDENTIAL INFORMATION – ATTORNEY'S EYES ONLY
SUBJECT TO A PROTECTIVE ORDER
This envelope contains Confidential information
and is not to be opened, nor the contents thereof
displayed or revealed, except by order of the Court.

</div>

15. All deposition testimony automatically shall be treated as Attorney's Eyes Only for a period of five (5) calendar days from the receipt of the final official transcript thereof. After five (5) calendar days, the information revealed during the deposition shall cease to be treated as Attorney's Eyes Only unless orally, on the record at the deposition, or in writing before the five (5) days have expired, the witness or the witness' employer or counsel informs the deposing party that Confidential or Attorney's Eyes Only information of the witness or the witness' employer is set

<div align="center">9</div>

forth in the transcript and identifies the portions of the transcript that disclose such information. In the case of non-party witnesses, any Party or non-party witness may designate information revealed as Confidential or Attorney's Eyes Only information within five (5) calendar days of receipt of the final official deposition transcript by counsel. Upon receipt of such notice that all or a portion of the deposition testimony is Confidential or Attorney's Eyes Only information, each party shall mark all copies of the transcript of the deposition within its possession, custody or control by placing the appropriate designation upon the cover of the transcript; however, failure to so mark transcript copies shall not be an actionable violation of this Protective Order. Thereafter, deposition testimony designated as Confidential or Attorney's Eyes Only information on the record or in writing shall continue to be treated as Confidential or Attorney's Eyes Only information in accordance with the terms of this Protective Order.

16.    Nothing in this Protective Order shall preclude any party representative(s), including but not limited to persons identified under Paragraph 6 of this Protective Order, from either side from attending a deposition. If and when any Confidential and/or Attorneys Eyes Only information is disclosed in deposition, and provided that such party representative(s) do not have authority to view such information under this protective order, the party representative shall leave the deposition for as long as the Confidential and/or Attorneys Eyes Only information is being discussed.

17.    If Confidential or Attorney's Eyes Only information is to be the subject of examination in deposition of a non-party witness who is not a Qualified Person, the following procedures shall apply. Confidential or Attorney's Eyes Only information shall not be provided to any such person without the Producing Party's prior written consent or oral consent during a deposition on the record, or without permission by the Court upon motion and notice. Confidential

or Attorneys Eyes Only information shall not be disclosed unless and until the non-party witness

has signed the UNDERTAKING attached as Exhibit A.

18. Nothing herein shall be construed (a) as preventing any Party from using or continuing

to use any information that, at the time of the disclosure, is publicly known through no

unauthorized act of such Party, or (b) as preventing a Party from using or continuing to use any

information known or used by it if such information was lawfully obtained by the Party other than

through discovery of the Producing Party. Should a dispute arise as to any specific information or

material, the burden shall be upon the Party claiming that such information or material is or was

publicly known or was lawfully obtained other than through discovery of the Producing Party.

19. Nothing herein shall prevent any Party from contending, during the progress of this

litigation, that any or all material or information designated "Confidential" or "Attorney's Eyes

Only" is not, in fact, confidential. Grounds for such a contention may include that such designated

Confidential or Attorney's Eyes Only information is or was publicly known at or prior to disclosure

thereof in this litigation, that such designated Confidential or Attorney's Eyes Only information,

after disclosure thereof, has become public knowledge as a result of lawful publication by an

independent source who obtained the information lawfully, that such designated Confidential or

Attorney's Eyes Only information was previously known by the Receiving Party, or that such

designated Confidential or Attorney's Eyes Only information was later obtained in good faith by

the Receiving Party from an independent source who obtained the information lawfully. Any Party

may request any Producing Party that designated information as Confidential or Attorney's Eyes

Only information to remove that designation. Such a request shall be in writing, stating the grounds

therefor, and shall be served on counsel for the Producing Party who designated the information as

Confidential or Attorney's Eyes Only information. The requested change shall occur unless, within

ten (10) calendar days after service of such notice, an objection for good cause is served on the

Party requesting removal of the Confidential or Attorney's Eyes Only information designation. That objection may thereafter be resolved by agreement or by the Court. The Producing Party shall have the burden of establishing the need for maintaining the "Confidential" or "Attorney's Eyes Only" designation.

20.    Nothing in this Protective Order shall require a Party to challenge the propriety of any "Confidential" or "Attorney's Eyes Only" designation at the time such designation is made, and failure to do so shall not preclude a subsequent challenge thereto.

21.    Notwithstanding the parties' designation of "Confidential" or "Attorney's Eyes Only" documents, testimony or information, any Court hearing that refers to or describes "Confidential" or "Attorney's Eyes Only" documents, testimony or information may be held in open court with records unsealed, provided the Producing Party is afforded reasonable notice of the Receiving Party's intent to disclose such documents, testimony or information in open court, so that the confidentiality of such documents, testimony or information can be protected. However, any party may request or the Court may order that the portion of such proceeding where use thereof is to be made be held *in camera* with access thereto limited to Qualified Persons under this Protective Order. To the extent that the Court grants any such request, such Confidential or Attorney's Eyes Only information shall continue to be treated in accordance with the terms of this Protective Order.

22.    (a)    The inadvertent or unintentional failure by a Producing Party to designate specific documents or information as containing Confidential or Attorney's Eyes Only information shall not be deemed a waiver in whole or in part of the Producing Party's claim of confidentiality as to such documents or information. Upon notice of such failure to designate, all Receiving Parties shall cooperate to restore the confidentiality of the inadvertently disclosed documents or information, without prejudice.

(b)     Per Fed. R. Civ. P. 26(b)(5), if a Producing Party produces any document or information that it believes is immune from discovery pursuant to any attorney-client privilege, attorney work product immunity or any other privilege or immunity from production, such production shall not be deemed a waiver, and the Producing Party may give written notice to all Receiving Parties that the document or information so produced is deemed privileged and that return of the document or information is requested. Upon receipt of such written notice, all Receiving Parties shall immediately undertake to gather the original and all copies of the document or information and shall immediately return the original and all such copies to the Producing Party or certify in writing the destruction thereof. Return of such documents or information to the Producing Party shall not preclude any Receiving Party from later moving to compel production of the returned documents or information.

23.    When a Party produces files and records for inspection, no marking need be made in advance of the inspection. For purposes of the initial inspection, all documents in any produced files shall be considered marked as Attorney's Eyes Only. Thereafter, upon selection of specified documents for copying and by the inspecting party, the Producing Party shall mark the copies of such documents with the appropriate confidentiality marking at the time that the copies are produced to the Receiving Party.

24.    Making documents or other information available for inspection shall not, by itself, constitute a waiver by the Producing Party of any claim of confidentiality, but delivery of documents and things to a Receiving Party without designating such as Confidential or Attorney's Eyes Only information shall not constitute waiver of any claim of confidentiality if such inadvertence or mistake is thereafter brought to the attention of the Receiving Party promptly after discovery by the Producing Party. Upon such notice, the Receiving Party shall, at the election of the Producing Party, re-mark the documents and things with the appropriate level of confidentiality

13

or return said documents and things and not retain copies thereof for replacement by appropriately marked documents and things. Any summaries or notes of the inadvertently produced documents or things shall be treated as Confidential or Attorney's Eyes Only information, as designated by the Producing Party.

25.   The terms of this Protective Order shall be applicable to any third party that produces information that is designated by such third party or by a party hereto as Confidential or Attorney's Eyes Only information.

26.   On final determination of this litigation, each Party and other person subject to the terms hereof shall, within sixty (60) calendar days, assemble and, at its option, destroy or return to the Producing Party all materials, documents and things constituting Confidential or Attorney's Eyes Only information, all copies, summaries and abstracts thereof and all other materials, memoranda or documents constituting or containing Confidential or Attorney's Eyes Only information. If destroyed, such party or person shall certify to the Producing Party, within sixty (60) calendar days, the destruction of all such materials. Outside counsel for each Party may retain archive copies of pleadings, motion papers, written discovery responses, in addition to one set of documents produced by any Party or non-party and correspondence that include Confidential or Attorney's Eyes Only information.

27.   This Protective Order shall survive the termination of this litigation.

28.   Nothing in this Protective Order shall prevent any Party from applying to the Court for additional protection, for example, for particularly highly sensitive materials or information, such as technical, planning, manufacturing, marketing, and research and development materials and information relating to product development, that the Producing Party believes require such protection.

29.    Nothing in this Protective Order shall be construed as a waiver by any Party of its right to object to the subject matter of any request for production of documents in this action, nor as a waiver by any other Party of the first Party's obligation to make proper response to discovery requests.

30.    Nothing in this Protective Order shall be construed as a waiver by any Party of any objections that might be raised as to admissibility at trial of any evidentiary materials.

31.    Except as may be set forth in paragraph 6, above, it is not the intent of the Parties, nor of the Court, that an attorney or law firm that acquires knowledge of, or is given access to, Confidential or Attorney's Eyes Only information pursuant to this Protective Order should thereby be disqualified from other representations adverse to the Producing Party solely because of such knowledge or access.

32.    Any Party may, on motion for good cause shown, seek a modification of this Protective Order. No modification of this Protective Order that adversely affects the protection of any document produced or given by a non-party in this case shall be made without giving to that non-party appropriate notice and opportunity to be heard by the Court.


SIGNED and ENTERED this ____ day of _____, 2007


_____
Hon. John C. Shabaz
UNITED STATES DISTRICT JUDGE

APPROVED AS TO CONTENT AND FORM:

February _15_, 2008                          February ___, 2008

By: _[signature]_                            By: _____

Anthony A. Tomaselli                         Paul F. Linn
Quarles & Brady LLP                          Charles J. Crueger
33 East Main Street, Suite 900               Michael Best & Friedrich LLP
Madison, WI 53703                            100 East Wisconsin Avenue
                                             Suite 3300
                                             Milwaukee, WI 53202-4108
Of Counsel:
Claude M. Stern
Evette D. Pennypacker                        Of Counsel:
QUINN EMANUEL URQUHART
  OLIVER & HEDGES, LLP                        Mark D. Wegener
555 Twin Dolphin Drive, Suite 560            HOWREY LLP
Redwood Shores, California 94065-2129        1299 Pennsylvania Ave., N.W.
Telephone: (650) 801-5000                    Washington, DC 20004
Facsimile: (650) 801-5100                    Telephone: (202) 383-0800
                                             Facsimile: (202) 383-6610

Attorneys for Plaintiff                      William C. Rooklidge
Kraft Foods Holdings, Inc. and   Third-Party Gregory S. Cordrey
Defendant Kraft Foods Global, Inc.           Ben M. Davidson

                                             HOWREY LLP
                                             2020 Main Street, Suite 1000
                                             Irvine, CA 92614
                                             Telephone: (949) 721-6900
                                             Facsimile: (949) 721-6910

                                             Attorneys for Defendant The Procter &
                                             Gamble Company

**EXHIBIT A**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

KRAFT FOODS HOLDINGS, INC.,

        Plaintiff

v.

THE PROCTER & GAMBLE COMPANY,

        Defendant                Case No. 07-C-0613-S

THE PROCTER & GAMBLE COMPANY,

        Counterclaim Plaintiff

v.

KRAFT FOODS HOLDINGS, INC.

        Counterclaim Defendant
and

KRAFT FOODS GLOBAL, INC.

        Third-Party Defendant

**UNDERTAKING**

I, _____ declare that

my address is _____.

My current employer is _____.

My current occupation is _____.

17

1.    I have received a copy of the Stipulated Protective Order in this action. I have carefully read and understand the provisions of the Stipulated Protective Order.

2.    I will comply with all of the provisions of the Stipulated Protective Order. I will hold in confidence, will not disclose to anyone not qualified under the Stipulated Protective Order, and will use only for purposes of this action any Confidential or Attorney's Eyes Only information that is disclosed to me.

3.    Promptly upon termination of this action, I will return all Confidential and Attorney's Eyes Only materials that came into my possession, and all documents and things that I have prepared relating thereto, to the outside attorney for the party by whom I am employed or retained, or who noticed my deposition.

4.    I hereby submit to the jurisdiction of this Court for the purpose of enforcement of the Stipulated Protective Order in this action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _____    Signed: _____

X:\CLIENTB\076012\0267\A2354811.1

**EXHIBIT 8**

Page 1

1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF WISCONSIN

3

4   ----------------------------------------x

5   KRAFT FOODS HOLDINGS, INC.,

6           Plaintiff and Counterclaim

7           Defendant

8               vs.

9   THE PROCTER & GAMBLE COMPANY,

10                  Defendant.

11  ----------------------------------------x

12

13                  April 22, 2008

14                  9:20 a.m.

15

16      Videotaped Deposition of METE BRUNCAJ,

17  held at the offices of Howrey, LLP, 153

18  East 53rd Street, New York, New York,

    before David Henry, a Certified Shorthand

19  Reporter and Notary Public of the State of

    New York.

20  ----------------------------------------

            DIGITAL EVIDENCE GROUP

21      1111 16th Street, NW Suite 410

            Washington, DC  20036

22              (202) 232-0646

Kraft Foods Holdings v. The Proctor & Gamble Company

1          MS. PENNYPACKER:    Asked and

2      answered.

3      A.    As I said before, it's just a

4  filling machine vendor, so they provide

5  machines to fill the coffee or the product

6  in the can.  They're that type of industry.

7      Q.    So is it fair to say that there

8  are now two vendors that are identified so

9  far in this e-mail that you've either talked

10  to or been asked about, Dell and Nalbach, is

11  that right?

12          MS. PENNYPACKER:    Objection,

13      vague and compound.

14      A.    Asked about what?

15      Q.    Yeah, let me break it down for

16  you.

17      A.    Okay.

18      Q.    You talked to somebody at Dell

19  about the plastic container, right?

20          MS. PENNYPACKER:    Misstates

21      testimony.

22      A.    No, someone told me this

Page 152

```
 1     statement here and I recapped it basically

 2     and informed the team.  It sounds like

 3     you're saying I had conversations about it.

 4     I can't say that's true.

 5          Q.    Well, you did have a conversation

 6     with this person from Dell Capper on July 1,

 7     2002, didn't you, sir?

 8          A.    Depends what you mean about that.

 9     I mean, I'm just divulging some information

10     that someone said.

11          Q.    Right, you talked to the guy,

12     right?

13          A.    Yeah, I must have talked to him,

14     otherwise there is no communication.

15          Q.    Right, you had a conversation.

16          A.    I assume so.  I don't know.  I

17     don't remember.

18          Q.    Well, in this e-mail --

19          A.    Based on this e-mail, there was

20     conversation.

21          Q.    So why are you saying I don't

22     know if I had a conversation?
```

Page 153

```
 1        A.     Because I don't recall.

 2        Q.     But this e-mail talks about a

 3   number of things that this person from Dell

 4   Capper told you, right sir?

 5        A.     Well, I agree with that, but I

 6   don't recall the conversation, but I see the

 7   e-mail.

 8        Q.     You don't recall at all having

 9   this conversation?

10        A.     No.

11        Q.     It's just a complete blank in

12   your memory?

13        A.     Yes.

14        Q.     But you do recall meeting with

15   Mr. Thomas about the overcap, right?

16        A.     Yes.

17        Q.     Same year?

18        A.     I would assume so, yes.

19        Q.     Now, when you heard Mr. Bruscino

20   say keep your ears open, you understood that

21   to mean you were to report to him if you

22   heard anything else from any other vendor
```

Page 154

```
 1     regarding the Folgers plastic container,

 2     right?

 3               MS. PENNYPACKER:    Objection,

 4          foundation.

 5     A.    I would interpret that as if you

 6     know something else, let me know, or if you

 7     hear something, let me know.  But --

 8     Q.    You see, sir, how this is

 9     intelligence regarding the Folgers plastic

10     container?

11               MS. PENNYPACKER:    Objection,

12          vague.

13     A.    I didn't seek out anything, I

14     just -- I don't know what you mean by

15     intelligence.

16     Q.    Well, this is information -- I

17     asked you before whether you were helping to

18     provide intelligence about the Folgers

19     plastic container and you said no.

20     A.    No.

21     Q.    I asked that you several

22     different ways, right sir?
```

Page 155

```
 1        A.    Yes.

 2        Q.    And you said every time I was

 3   never involved with it, right sir?

 4        A.    Correct.

 5        Q.    And now we see this e-mail, you

 6   were involved in providing information about

 7   the Folgers plastic container from Dell to a

 8   number of people on July 1, 2002, right sir?

 9        A.    No, this is different.  This is

10   divulging something I heard, and before it

11   sounded like an active pursuit of getting

12   information, and that was not my aim.  That

13   was not my objective, that was not my role

14   or responsibility.

15        Q.    But you spoke to additional

16   vendors about whether Folgers is installing

17   a new line.

18        A.    No.

19        Q.    Look at the e-mail right above,

20   July 3, 2002, in Exhibit 1024.

21        A.    Which one?

22        Q.    July 3, 2002, 9:33 a.m.
```

Page 156

```
 1        A.    I'm sorry, I --

 2        Q.    It's Exhibit 1024.

 3        A.    1024, yes.

 4        Q.    July, 3, 2002, do you see that?

 5        A.    Yes.

 6        Q.    You see Barry and Julio did not

 7   hear anything else from Nalbach, you said

 8   that?

 9        A.    It appears, yes.

10        Q.    And then you said I have spoken

11   to additional vendors and it appears that

12   Folgers will install a new line.  Do you see

13   that?

14        A.    Yes.

15        Q.    So you did talk to additional

16   vendors about Folgers, right?

17        A.    I don't recall.

18        Q.    Sir, but this e-mail says you

19   did, right sir?

20        A.    This e-mail says that, but I

21   don't recall.

22        Q.    And you said you did that, right
```

Page 157

```
 1    sir?

 2             MS. PENNYPACKER:    Objection,

 3        vague.

 4        A.    The e-mail says that.

 5        Q.    Right, your e-mail.

 6        A.    My e-mail says that, yes.

 7        Q.    And you actually talked to one of

 8    the service techs about the Folgers plastic

 9    container, right sir?

10        A.    What service techs are you

11    referring to.

12        Q.    In that same e-mail.

13        A.    It could be the same service

14    tech, Dell.

15        Q.    So somebody who is servicing

16    plastic lines for Procter & Gamble, right

17    sir?

18             MS. PENNYPACKER:    Objection,

19        vague, foundation.

20        A.    I don't know that, but one of the

21    service techs which could be the same Dell

22    service tech.
```

```
 1        Q.    Or it could be somebody else,

 2   right sir?

 3        A.    I don't know.

 4        Q.    I mean, there are a number of

 5   additional vendors you've talked to, so it's

 6   not possible to say which service tech you

 7   are referring to here in this other e-mail?

 8             MS. PENNYPACKER:    Vague and

 9        misstates testimony.

10        A.    I don't know.

11        Q.    Is that right?  Well, how many --

12   when you say -- how many additional vendors

13   did you talk to about the Folgers plastic

14   container?

15        A.    None that I recall.

16        Q.    Well, you say you don't recall

17   having talked to any, but --

18        A.    I didn't name anybody hear, so I

19   don't really know.

20        Q.    I'm sorry?

21        A.    I didn't name anyone here, so I

22   don't remember and I don't know.
```

Page 159

```
 1          Q.    You don't remember talking to any
 2    of these additional vendors you talked to
 3    Mr. Bruscino about?
 4          A.    No, I don't.  Actually I don't
 5    remember talking to the Dell guy either.
 6          Q.    Now, who is Mr. Halgren, Charles
 7    Halgren?
 8          A.    He's a packaging engineer.
 9          Q.    Did he supervise anyone?
10          A.    No.
11          Q.    Why was this e-mail sent to him?
12          A.    I don't know.  I don't see a date
13    on it.
14          Q.    Did he work on the plastic
15    container for Kraft?
16                MS. PENNYPACKER:    Foundation.
17          A.    Which plastic container?
18          Q.    Any plastic container.
19                MS. PENNYPACKER:    Foundation.
20          A.    I don't know.
21          Q.    Your e-mail was then sent on to a
22    number of people again at the very top of
```

1    this e-mail chain, right sir?

2            MS. PENNYPACKER:    Foundation.

3        A.    It looks like that.

4        Q.    Some additional input from Mete,

5    right sir?

6            MS. PENNYPACKER:    Foundation.

7        A.    Yes.

8        Q.    So you are providing additional

9    information about the Folgers plastic

10   container, right sir?

11           MS. PENNYPACKER:    Vague.

12       A.    No, and what do you mean by

13   additional information?

14       Q.    Just what it says here in this

15   e-mail.

16       A.    But I don't know what he's

17   saying.

18       Q.    Your e-mail.

19       A.    What he's referring to.

20       Q.    Your e-mail.

21       A.    The bottom e-mail?

22       Q.    You have two e-mails here that

Page 161

1    were forwarded on to other people, right

2    sir?  At the bottom?

3        A.    Yes.

4        Q.    And the second e-mail from the

5    top.

6        A.    Yes.

7        Q.    And in both of those you are

8    writing to people about the Folgers plastic

9    container.

10        A.    Yes.

11        Q.    Based on what you heard from

12    vendors.

13        A.    It seems that way, yes.

14    (Luncheon adjournment:    12:12 p.m.)

15

16

17

18

19

20

21

22

Page 162

```
 1          A F T E R N O O N    S E S S I O N

 2              (Time noted:  1:22 p.m.)

 3   M E T E   B R U N C A J ,   resumed and

 4          testified as follows:

 5   CONTINUED EXAMINATION BY MR. DAVIDSON:

 6       Q.    Mr. Bruncaj, before the

 7   deposition I showed you Exhibit 1024, do you

 8   see that?

 9       A.    Before when?

10       Q.    I'm sorry, before the break.

11       A.    Yes.

12       Q.    And this shows you were in fact

13   involved in talking to vendors to find out

14   about the Procter & Gamble plastic canister

15   that Procter & Gamble was developing,

16   correct?

17          MS. PENNYPACKER:    Objection,

18       vague, misstates testimony.

19       A.    It shows that I communicated what

20   I heard from I guess Dell Capper and

21   communication between me and coworkers.

22       Q.    I'm not sure you answered my
```

Page 163

```
 1    question.  My question is it shows you did

 2    in fact talk to vendors about the Procter &

 3    Gamble plastic canister that Procter &

 4    Gamble was developing, right sir?

 5            MS. PENNYPACKER:    Same

 6        objections.

 7        A.    It showed that in fact I --

 8        Q.    You talked to vendors?

 9        A.    Yes, I talked to vendors.

10        Q.    About Procter & Gamble's plastic

11    canister.

12        A.    I guess you could say that.

13        Q.    Well, that's what the document

14    shows, correct?

15        A.    Talked to vendors implies in my

16    interpretation that I sought out some

17    information and I had conversational

18    meetings with them about it and in that case

19    I would say no, if it is just simply that

20    someone revealed some information to me and

21    I communicated to him, that means yes.

22        Q.    You're not saying people just
```

1    spontaneously came up to you on the street

2    and said I've heard something about Procter

3    & Gamble, are you?

4        A.    Not on the street, but in a

5    setting perhaps that I was at a vendor which

6    I'm not sure if I was at a vendor in this

7    case or not, it could be under casual

8    conversations, they could just spill it out

9    without me even asking basically, oh, yeah,

10   Folgers is doing this.

11       Q.    Well, I'm not asking what they

12   could have done, I'm asking you today

13   whether your testimony is you just happened

14   to be told information, or whether you had

15   conversations with people where you would

16   ask them about the Folgers plastic

17   container.

18       A.    I don't recall asking them.  I

19   think it's the first case, which is they

20   voluntarily gave information.  I didn't seek

21   it out.

22       Q.    You testified you didn't recall

Page 165

1    this entire e-mail, right sir, Exhibit 1024?

2        A.    Correct.

3        Q.    You testified you never sought

4    information about the plastic container that

5    Folgers was making.

6        A.    Yes.

7        Q.    And that wasn't true because this

8    e-mail shows that you did seek information

9    about the plastic container, right sir?

10              MS. PENNYPACKER:    Objection.

11       A.    I don't know if that proofs that.

12       Q.    Well, when you said on July 3,

13   2002 to Mr. Bruscino, I have spoken to

14   additional vendors and it appears that

15   Folgers will install a new line, fifth line

16   to run and prove out the new package, do you

17   see that, sir?

18       A.    Yes.

19       Q.    That shows you were speaking to

20   other vendors besides the ones that are

21   mentioned below in the e-mail, and it

22   appeared to you from those conversations

Page 166

```
 1    that Folgers will install a new line, a

 2    fifth line, to run and to prove out Folgers

 3    new package, correct?

 4            MS. PENNYPACKER:     Objection,

 5        vague and compound.

 6        A.    That's what it says.

 7        Q.    And you also learned from talking

 8    to those additional vendors that the

 9    conversion of the rest of the lines "may be

10    dependent on the success (marketing,

11    operations, et cetera) of the new

12    package/product and will be decided later."

13            MS. PENNYPACKER:     Vague and

14        compound.

15        A.    That would be my interpretation.

16        Q.    That's actually what your e-mail

17    says.

18        A.    That's what I mean.  Perhaps

19    based on what I wrote there, it's an

20    additional information of my interpretation.

21        Q.    Of what you learned from talking

22    to vendors?
```

1      A.    No, of the first sentence.  To be

2  more explicit, it would be to explain what

3  that first sentence would be, I would write

4  the second sentence, which would be

5  depending on how things go, they may decide

6  different things.

7      Q.    You learned from talking to

8  vendors that the conversion of the rest of

9  the Folgers lines of plastic may be

10  dependent on the success of the new

11  package/product.

12      A.    No, I wouldn't say that, I would

13  say that's an additional comment.  Not that

14  I learned it from some vendors, but I would

15  say that's an additional comment that I

16  would place to clarify, to add more

17  information on the first sentence.  Do you

18  follow what I'm saying?

19      Q.    You're saying you interpreted

20  based on your conversations with the

21  different vendors that Folgers may convert

22  the other lines depending on the success of

Page 168

```
 1     this one line?

 2          A.     Not based on the conversation,

 3     but based on how I think things generally

 4     develop.

 5          Q.     And when you said in this e-mail

 6     one of the service techs told me that the

 7     new plastic line may be started within a

 8     month, fourth quarter product on the shelf,

 9     you are also referring to something you

10     learned from somebody about the Folgers

11     plastic container, correct?

12               MS. PENNYPACKER:     Objection,

13          vague.

14          A.     It sounds like I got some

15     information from the service tech stating

16     that.

17          Q.     This is the kind of information

18     that Mr. Bruscino had told you to keep your

19     ears open and report back to him on,

20     correct?

21               MS. PENNYPACKER:     Objection,

22          foundation.
```

1        A.      That's like one day later.   I

2    don't think I had that much time to even

3    seek out or to get anything, it's just my,

4    perhaps my opinion of what I wrote.

5        Q.      But you understood when he said

6    keep your ears open, he meant keep your ears

7    open for this kind of information about what

8    Folgers was doing before it had come out

9    with a commercial plastic container,

10   correct?

11             MS. PENNYPACKER:    Foundation.

12       A.      Repeat that, please.

13       Q.      Sure.  When he told you,

14   Mr. Bruscino told you on July 2, 2002, "keep

15   your ears open", you understood he meant

16   keep your ears open for information about

17   the Folgers plastic container.

18             MS. PENNYPACKER:    Foundation.

19       A.      In this context I would say so.

20       Q.      And you did keep your ears open

21   for information about the Folgers plastic

22   container.

Page 170

1          MS. PENNYPACKER:     Vague.

2          A.    Well, it's the next day, so I

3    basically added some additional information

4    to his comment, and I think that's all I can

5    say.  It's the next day, and I don't think,

6    if I sent the e-mail on the second, it's

7    like three days, two days after.  I don't

8    think I had even the time to what you are

9    suggesting.

10         Q.    Did you keep your ears open for

11   additional information?

12         A.    Not in this case.

13         Q.    Did you think it was -- did you

14   send him an e-mail and tell him I'm not

15   going to keep my ears open for additional

16   information about the Procter & Gamble

17   plastic container?

18         A.    I don't know if I sent an e-mail

19   like that.

20         Q.    You don't see that e-mail in

21   response to the e-mail he sent to you,

22   right?

Page 171

1       A.    It's not here, no.

2       Q.    In fact when he said keep your

3  ears open, you sent an e-mail back to him

4  with information that you had learned from

5  additional vendors, correct?

6            MS. PENNYPACKER:    Objection,

7       vague.

8       A.    No, I'm saying, in this e-mail

9  I'm saying that I think based on Barry and

10  Julio, did not hear anything from Nalbach.

11  And I added additional comments to what I

12  knew.  That's how I interpret this.

13      Q.    Listen to my question.

14      A.    Yes.

15      Q.    After you saw his e-mail to you,

16  keep your ears open, you sent an e-mail to

17  him in which you provided additional

18  information from additional vendors.  True

19  or false?

20            MS. PENNYPACKER:    Objection,

21      vague.

22      A.    Yes.

Page 172

1      Q.    True?

2      A.    Yes.

3      Q.    And you did not say to him, I

4  will not have conversations with people

5  about the Procter & Gamble container.

6      A.    I didn't -- it doesn't show this

7  here and I don't know if I did or not.

8      Q.    By the way, you see on the top of

9  this page the e-mail from Mr. Bruscino in

10  which he copies you regarding the Folgers

11  info, he is saying, some additional input

12  from Mete.  This seems to be consistent with

13  a go-slow approach as well as the fact that

14  we are only aware of one filler that has

15  been set up for this capability to date.  Do

16  you see that?

17      A.    Yes.

18      Q.    He also says, we should consider

19  that this info, meaning the info from you,

20  right sir?

21      A.    Yes.

22      Q.    Is from vendors who are only

Page 173

```
 1    seeing pieces of what Folgers is doing, but

 2    it should be directionally accurate.  Do you

 3    see that, sir?

 4         A.    Yes.

 5         Q.    And so that suggests that you

 6    were one of several people who was providing

 7    information to your team about the Folgers

 8    plastic container before it was publicized,

 9    correct?

10              MS. PENNYPACKER:    Objection,

11         vague and foundation.

12         A.    I'm not sure what you mean by

13    that.  If you could you more specific.

14         Q.    Well, were you the only person

15    who was providing information to

16    Mr. Bruscino and the rest of the people on

17    these e-mails regarding the Folgers plastic

18    container?

19              MS. PENNYPACKER:    Objection,

20         foundation.

21         A.    I don't know.

22         Q.    You don't know.  As far as you
```

1    know, you may have been the only person

2    before Procter & Gamble started selling its

3    product to the public in 2003 that was

4    providing this kind of intelligence on what

5    Procter & Gamble was doing, correct?

6            MS. PENNYPACKER:    Misstates

7        testimony and vague.

8        A.    I don't know who provided

9    information or if they provided information.

10       Q.    All you know is that you did

11   provide information.

12       A.    All I know is I communicated what

13   the service tech told me.

14       Q.    You provided information?

15       A.    I provided this information here.

16       Q.    You provided this information

17   that we can see now from this e-mail?

18       A.    Yes.

19       Q.    There may be other e-mails that

20   you sent that also provide that information,

21   correct?

22            MS. PENNYPACKER:    Vague.

Page 175

```
 1        A.    I don't know if there are other

 2   e-mails.

 3        Q.    Did you save your e-mails from

 4   July, 2002?

 5        A.    I saved almost all my e-mails and

 6   I handed all the e-mails that I had for this

 7   purpose.

 8        Q.    Did you delete any e-mails in

 9   July, 2002?  Or let me ask you this.  All

10   right, you didn't save all your e-mails in

11   2002, right sir?

12        A.    I don't know.

13        Q.    You think you did?

14        A.    I probably didn't.

15        Q.    And so there are probably other

16   e-mails that reflect work that you were

17   doing at the same time that you deleted,

18   right sir?

19            MS. PENNYPACKER:    Calls for

20        speculation and vague.

21        A.    What types of work are you

22   referring to?  I don't know.  General work,
```

Page 176

```
 1    yes.

 2         Q.    General work.

 3         A.    Yes.

 4         Q.    And there very well could be

 5    other e-mails, it's possible there are other

 6    e-mails regarding your attempts to find out

 7    information about the Folgers plastic

 8    container?

 9         A.    No.

10         Q.    It's impossible there are any

11    other e-mails, sir?

12         A.    Not that I know of.

13         Q.    I'm not asking whether you know

14    of them.  You said you didn't know about

15    these e-mails in Exhibit 1024, right sir?

16         A.    Yes.

17         Q.    So how could you know that there

18    were no other e-mails if you didn't remember

19    today that you had contacted these

20    vendors and talked to them?

21         A.    Well, I can't say I don't know if

22    I don't know.  I don't know.
```

Page 177

1        Q.    All right, sitting here today --

2        A.    I don't know if there is any

3    other e-mails, but I know that I didn't

4    actively pursue intelligence about Folgers.

5        Q.    When you say you didn't actively

6    pursue intelligence --

7        A.    It means I was not part of a task

8    force to put something like this in an

9    action plan as you suggested, and I was part

10   of the team to get information and find out

11   what's going on.

12       Q.    So you just volunteered?

13       A.    I just volunteered information

14   that I heard and I communicated to my team.

15       Q.    And you did that because you knew

16   that they wanted to know about the Folgers

17   plastic container?

18            MS. PENNYPACKER:    Foundation.

19       A.    I assumed they wanted to know.

20       Q.    Why didn't you call Procter &

21   Gamble and ask them about this particular

22   product instead of talking to a number of

```
 1    vendors about what pieces they could tell

 2    you about?

 3              MS. PENNYPACKER:    Misstates

 4         testimony.

 5         A.    I wasn't interested to call them.

 6         Q.    You were not interested?

 7         A.    For what purpose?  It was not my

 8    task.

 9         Q.    Well, you were certainly talking

10    to a number of different vendors and you

11    were told to keep your ears open, right?

12              MS. PENNYPACKER:    Misstates

13         testimony.

14         A.    I don't know what -- that's what

15    Joe had said.  It doesn't mean I have to

16    listen to what he's saying and it doesn't

17    mean I'm part of a team assessing or even

18    getting information.  All this says is that

19    I ran into information and I communicated

20    the information.  And there is no other

21    recollection that I have that I remember

22    that I wrote anything or communicated
```

Page 179

1    anything about other intelligence about

2    plastic can.

3        Q.    So when you say you don't

4    remember anything written about other

5    intelligence about the plastic can, you are

6    saying all that you remember --

7        A.    I don't even remember writing

8    this note.

9        Q.    Okay, so is it fair to say since

10    you don't remember writing this note, that

11    you don't remember the extent to which you

12    were involved in providing intelligence

13    regarding the Folgers plastic container?

14        MS. PENNYPACKER:    Misstates

15        testimony, vague.

16        A.    No, because if I had a specific

17    project to assess something or to deliver

18    something or to develop something, most

19    likely I would remember, if there was a

20    project of that sort.

21        Q.    How many of Procter & Gamble's

22    vendors did you talk to to find what

Page 180

```
 1      Mr. Bruscino calls here "pieces of what

 2      Folgers is doing"?

 3           A.    I don't remember.  I really

 4      don't.

 5           Q.    Could it have been ten vendors

 6      that you talked to?

 7           A.    It could be just Dell or it could

 8      be more, I don't know.

 9           Q.    It couldn't just be Dell, because

10      you also say you have spoken to additional

11      vendors in this e-mail, correct?

12           A.    Could be.  Logical.  It could be

13      one more, it could be -

14           Q.    So why are you saying it could

15      have been just Dell?  You know you spoke to

16      additional vendors, right?

17              MS. PENNYPACKER:    Objection,

18         misstates testimony.

19           Q.    Right?

20           A.    I don't know if I spoke

21      with additional -- what it says here.  I

22      don't remember.
```

Page 181

```
 1        Q.    I'm trying to understand --

 2        A.    I know what you're saying, but I

 3   don't -- I can't remember.

 4        Q.    Sir, listen to my question before

 5   you answer.

 6        A.    Okay.

 7        Q.    I'm trying to understand your

 8   approach to reviewing documents and giving

 9   testimony here.

10        A.    Okay.

11        Q.    You just said it could have been

12   just Dell, correct?  You just said that.

13        A.    It could have been.

14        Q.    But this document shows that you

15   told your colleagues in this e-mail, "I have

16   spoken to additional vendors", correct?

17        A.    Correct.

18        Q.    So I'm trying to understand why

19   you're saying it could have been that I just

20   talked to Dell.  Can you please explain

21   that?

22        A.    Because this is a document that I
```

Page 182

1    don't remember and I don't know how valid it

2    is, and I don't remember, because I don't

3    remember that I spoke to more than one, I

4    don't know if that's true or not.

5         Q.   Why would you say something in

6    this e-mail to Mr. Bruscino on July 3, 2002,

7    "I have spoken to additional vendors", if

8    that wasn't true?

9         MS. PENNYPACKER:    Speculation.

10        A.   Typically I wouldn't, but I don't

11   remember if I spoke to additional vendors.

12        Q.   Typically you wouldn't?

13        A.   Typically if you say I have

14   spoken to additional vendors it means you

15   have.  But I can't remember, so I can't say

16   I remember, yes, I did.

17        Q.   Well, I take it you have a

18   practice at Kraft of writing e-mails

19   truthfully, correct?

20        MS. PENNYPACKER:    Objection,

21        vague.

22        A.   Generally I would say yes.

Page 183

```
1        Q.    Is one plausible interpretation

2   of why you are saying it could have been I

3   just talked to one vendor at Dell that you

4   are trying to minimize your role in finding

5   out about the Folgers plastic container at

6   that time in 2002?

7        MS. PENNYPACKER:   Objection,

8      vague.

9        A.    No, I'm just trying to say that

10  because I don't remember additional vendors,

11  I can't say that I did, and it says here

12  that I did talk to additional vendors but I

13  can't remember that I did.

14       Q.    Who were the additional vendors

15  of Procter & Gamble that you would have

16  known about at that time?

17       A.    Ferrum here is an additional

18  vendor, you see it at the bottom.

19       Q.    Who is that?

20       A.    Ferrum Seamers.

21       Q.    And what do they do?

22       A.    They provide vacuum closers.
```

Page 492

1                   C E R T I F I C A T E

2      STATE OF NEW YORK        )

3                               ) ss.:

4      COUNTY OF NEW YORK       )

5          I, DAVID HENRY, a Notary Public within

6      and for the State of New York, do hereby

7      certify:

8          That METE BRUNCAJ, the witness whose

9      deposition is hereinbefore set forth, was

10     duly sworn by me and that such deposition

11     is a true record of the testimony given by

12     such witness.

13         I further certify that I am not

14     related to any of the parties to this

15     action by blood or marriage; and that I am

16     in no way interested in the outcome of this

17     matter.

18         IN WITNESS WHEREOF, I have hereunto

19     set my hand this 27th day of April, 2008.

20

21              -------------------------

22              DAVID HENRY

**EXHIBIT 9**

| | | |
|---|---|---|
| | | *Infringement of the '443 Patent, Of Invalidity Of The '443 Patent Due to Prior Invention, Of Invalidity Due to Obviousness, And To Limit Damages* filed by The Procter & Gamble Company *Related to Motion for Summary Judgment of Non-Infringement and Memorandum in Support* (Sealed Document) (Davidson, Ben) (Entered: 05/27/2008) |
| 05/27/2008 | 184 | Corrected AFFIDAVIT of Nancy A. Lakes filed by Defendant The Procter & Gamble Company re: 147 MOTION for Summary Judgment *of Non-Infringement of the '443 Patent, Of Invalidity Of The '443 Patent Due to Prior Invention, Of Invalidity Due to Obviousness, And To Limit Damages* filed by The Procter & Gamble Company (Sealed Document) (Davidson, Ben) (Entered: 05/27/2008) |
| 05/29/2008 | 185 | STIPULATION of Dismissal by ThirdParty Defendant KRAFT FOODS GLOBAL, INC., OSCAR MAYER FOODS DIVISION, Plaintiff Kraft Foods Holdings Inc. (Stern, Claude) (Entered: 05/29/2008) |
| 05/30/2008 | 186 | ** TEXT ONLY ORDER ** Order Granting Stipulation of Dismissal by Third party defendant Kraft Foods Global, Inc.,OSCAR MAYER FOODS DIVISION, Plaintiff Kraft Foods Holdings Inc. Signed by Judge Barbara B Crabb on 5/30/08. (vob) (Entered: 05/30/2008) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/06/2008 19:15:09 | | |
| **PACER Login:** | hs0346 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:07-cv-00613-bbc |
| **Billable Pages:** | 22 | **Cost:** | 1.76 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

KRAFT FOODS HOLDINGS, INC.,

      Plaintiff,

v.

THE PROCTER & GAMBLE
COMPANY,

      Defendant.

Case No. 07-C-0613C

THE PROCTER & GAMBLE
COMPANY,

      Counterclaim Plaintiff

v.

KRAFT FOODS HOLDINGS, INC.

      Counterclaim Defendant
and

KRAFT FOODS GLOBAL, INC.

      Third-Party Defendant

**Rule 41 Stipulated Dismissal**

Pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) and (c), it is hereby stipulated by and between the parties hereto, through their respective counsel of record, that:

Kraft Foods Holding Inc.'s claim for infringement of U.S. Patent No. 7,074,443 ("the '443 Patent") is hereby dismissed with prejudice;

The counterclaim of The Procter & Gamble Company ("P&G") for declaratory relief of non-infringement of the '443 Patent is hereby dismissed with prejudice; and

The counterclaim of P&G for declaratory relief of invalidity of the '443 Patent is dismissed without prejudice.

Each party will bear its own fees and costs.

DATED: May 29, 2008

By  /s/ Claude M. Stern
   Claude M. Stern (pro hac vice)
   Evette Pennypacker (pro hac vice)
   Melissa J. Baily (pro hac vice)
   Thomas E. Wallerstein (pro hac vice)
   Gabriel S. Gross

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
   555 Twin Dolphin Drive, Suite 560
   Redwood Shores, CA 94065-2129
   Telephone: (650) 801-5000
   Facsimile: (650) 801-5100

Anthony A. Tomaselli
QUARLES & BRADY LLP
333 East Main Street, Suite 900
Madison, WI 53703
Telephone: (608) 251-5000
Facsimile: (608) 251-9166

***Attorneys for Kraft Foods Holding, Inc.
and Kraft Foods Global, Inc.***

DATED: May 29, 2008

By  /s/ William C. Rooklidge
   Paul F. Linn
   Charles J. Crueger
   Michael Best & Friedrich, LLP
   100 East Wisconsin Avenue
   Suite 3300
   Milwaukee, WI 53202-4108

Of Counsel:
Mark D. Wegener
HOWREY LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004
Telephone: (202) 383-0800
Facsimile: (202) 383-6610

William C. Rooklidge
Greg S. Cordrey
HOWREY LLP
2020 Main Street, Suite 1000
Irvine, CA 92614
Telephone: (949) 721-6900
Facsimile: (949) 721-6910

Ben M. Davidson
HOWREY LLP
550 South Hope Street, Suite 1100
Los Angeles, CA 90071
Telephone: (213) 892-1800
Facsimile: (213) 892-2300

***Attorneys for The Procter & Gamble Company***

2

# EXHIBIT 10



INSTITUTE *for* PROGRESS

*The rational voice on Intellectual Property*

# Reexamining
# Inter Partes Reexam

## April 2008

# Data Source and Method of Analysis



- All data was taken directly from the USPTO PAIR system
- Includes all Inter Partes Reexam cases and transactions listed through April 16, 2008
  - Includes 95/000,001 through 95/000,362 and 95/001,001 through 95/001,037 except for cases 95/001,007 and 95/001,025 for which there is no data in PAIR
  - Case 95/000,350 is excluded from timeline analysis since no date is recorded for "Receipt of Original Inter Partes Reexam Request"
- All transactions were downloaded from the Electronic File Wrapper, and were augmented with additional transactions from the Transaction History wherever missing elements were identified
- Obvious anomalies were corrected manually
  - For example:
    - "Receipt of Original Inter Partes Reexam Request" identified where missing
    - Many erroneous references to "Ex Parte Reexams" were reviewed and eliminated
    - Duplicate transactions (same case number, same transaction, same date) were eliminated
- Key milestones for each case were extracted along with their dates, and the analysis was performed on these transactions

2

# Requests for Inter Partes Reexams have been Rising Rapidly





Request for Inter Partes Reexams by Year of Request

In 2007, there were ~6 times as many
inter partes reexam requests as in 2003

(1)    Actual through 4/16/2008, Forecast equals (108 days/365 days) X 44 reexam requests to date
Note:  Reexam requests are based on calendar years rather than fiscal years as generally reported by the USPTO
Source:  USPTO PAIR Database; Institute for Progress analysis

3

# Virtually all Requests for Inter Partes Reexamination are Granted





Decisions on Request for Inter Partes Reexam

Among those rejected, several are for the same invention, and several others are design patents

4

Source:  USPTO PAIR Database; Institute for Progress analysis

# Most Cases Follow the Main Sequence through the USPTO Inter Partes Reexamination Process

All Inter Partes Reexams through April 16, 2008

INSTITUTE for PROGRESS

## The Normal Sequence of Inter Partes Reexam Steps

Source: USPTO PAIR Database; Institute for Progress analysis

# Some Cases Skip Steps…
## Generally Due to Patent Holder Non Responsiveness
### All Inter Partes Reexams through April 16, 2008



## Inter Partes Reexam Process Including Skipped Steps



Note: Three other paths are not included on chart – A to F - 1,0%; A to G - 1,0%; B to G - 1,1%
Source: USPTO PAIR Database; Institute for Progress analysis

6

# …Other Cases Repeat Steps Multiple Times

All Inter Partes Reexams through April 16, 2008

INSTITUTE for PROGRESS

## Inter Partes Reexam Including Repeated Steps

Source: USPTO PAIR Database; Institute for Progress analysis

# Flow of Cases through the
# USPTO Inter Partes Reexamination Process
### All Inter Partes Reexams through April 16, 2008

INSTITUTE
*for*
PROGRESS

## Overview of Inter Partes Reexam Process



Note:  Three other paths are not included on chart – A to F - 1,0%; A to G - 1,0%; B to G - 1,1%
Source:  USPTO PAIR Database; Institute for Progress analysis

8

# Correction of Inter Partes Reexam Requests Jumped in 2006,and has Subsided Since



## Percent of Inter Partes Reexam Requests Requiring Correction



9

Source: USPTO PAIR Database; Institute for Progress analysis

# Seventy Percent of IPREs receive a 1st Office Action on the Same Day as the Reexam is Ordered



**Distribution of IPRE Cases: Days between Reexam Order and 1st Office Action**



The patent holder is precluded from providing information to the examiner prior to the 1st Office Action

Source:  USPTO PAIR Database; Institute for Progress analysis

10

# The USPTO Reports an Average Pendency of 28.5 Months; This Estimate is Skewed by Cases that have Skipped Steps

INSTITUTE for PROGRESS



## Path taken by I-P Reexams that have received a Reexam Certificate

The 16 Inter Partes Reexams that have received a final certificate made it through the case because they skipped steps
- In 10 of 16 cases, the patent holder did not respond to an office action
- None of the patent holders appealed the decision
The low average pendency that the USPTO reports is driven by the cases that skipped steps
- Pendency for the 10 cases that skipped steps was ~24 months
- Pendency for the 6 cases that went through ACP and Right of Appeal was ~39 months

Note:    The 16 cases here include all cases receiving a Reexam Certificate through April 16, 2008. The most recent data published by the USPTO includes only 12 cases through the end of their fiscal year (9/30/2007). The average pendency of these 16 cases is slightly longer (30.1 months) than the USPTO's statistic based on 12 cases.

Source:  USPTO PAIR Database; Institute for Progress analysis



11

# The Normal IPRE Process Takes Much Longer than the USPTO's 28.5 Months – even without an appeal





### Timeline of Inter Partes Reexams Without Appeal

- Request - Decision: 2.4 ± 0.1
- Decision - 1st Office Action: 1.7 ± 0.5
- 1st Office Action - 1st ACP: 15.8 ± 1.8
- 1st ACP - Right of Appeal: 9.8 ± 1.6
- Right of Appeal - Intent to Issue: 7.7 ± 3.7
- Intent to Issue - Certificate Issued: 6.2 ± 1.7
- **Total: 43.5 ± 9.4**

95% Confidence Interval
Lower Bound — Upper Bound
Mean

Months

Without an appeal, the average expected pendancy period for inter partes reexams is between 34 and 53 months

12

Source:  USPTO PAIR Database; Institute for Progress analysis

# With an Appeal, the IPRE Process Takes at least Five to Eight Years

### This Estimate Dos Not Include "Rework" and Secondary Appeals

**I**NSTITUTE *for* **P**ROGRES**S**

## Timeline of Inter Partes Reexams With Appeal



**95% Confidence Interval**

Lower Bound    Upper Bound

Mean

| Stage | Months |
|---|---|
| Request - Decision | 2.4 ± 0.1 |
| Decision - 1st Office Action | 1.7 ± 0.5 |
| 1st Office Action - 1st ACP | 15.8 ± 1.8 |
| 1st ACP - Right of Appeal | 9.8 ± 1.6 |
| Right of Appeal - Appeal Docketed | 28.9 ± 6.4 |
| Appeal Docketed - BPAI Decision | 6.0 ± 2.3 |

*Nobody knows how long a case may spend in "rework" or secondary appeal"*
*No IPRE case has ever reached this stage*

| Stage | Months |
|---|---|
| BPAI Decision - Intent to Issue [1] | 7.7 ± 3.7 |
| Intent to Issue - Certificate Issued | 6.2 ± 1.7 |
| Total | 78.4 ± 18.1 plus ? |

0    20    40    60    80    100 Months

With an appeal, the pendancy period for inter partes reexams is AT LEAST 60 to 97 months (5-8 years!)
…and that doesn't include "rework" after an appeal or secondary appeals

(1)  Assumes the same time from BPAI Decision – Intent to Issue as for Right of Appeal – Intent to Issue
Source:  USPTO PAIR Database; Institute for Progress analysis

# How Far Have the Inter Partes Reexams Gotten?
# Where Does the Work-In-Process Sit?
### All Inter Partes Reexams through April 16, 2008


INSTITUTE
*for*
PROGRESS

## IPRE Cases by Year of Original Request and Last Step COMPLETED

| Appeal Docketed |
|---|
| '03 – 2 |
| Tot – 2 |

| BPAI Decision |
|---|
| '02 – 1 |
| '03 – 2 |
| Tot – 3 |

| Court of Appeals |
|---|

'03 – 2
'04 – 10
'05 – 11
'06 – 40
'07 – 72
'08 – 12
Tot – 147

'02 – 1
'03 – 2
'04 – 6
'05 – 10
'06 – 22
'07 – 9
Tot – 50

'05 – 2
'06 – 12
'07 – 34
'08 – 4
Tot – 52

'07 – 5
'08 – 23
Tot – 28

| Original Request for Inter Partes Rexam | | Reexam Ordered | | Non-Final Action | | Action Closing Prosecution |
|---|---|---|---|---|---|---|

| Right of Appeal Notice |
|---|
| '02 – 3 |
| '03 – 8 |
| '04 – 14 |
| '05 – 13 |
| '06 – 7 |
| '07 – 2 |
| Tot – 47 |

| Intent to Issue Certificate |
|---|
| '03 – 4 |
| '04 – 2 |
| '05 – 3 |
| '06 – 4 |
| '07 – 3 |
| Tot – 16 |

| Reexam Certificate Issued |
|---|
| '01 – 2 |
| '02 – 1 |
| '03 – 2 |
| '04 – 5 |
| '05 – 3 |
| '06 – 3 |
| Tot – 16 |

| Corrected Request for Inter Partes Reexam |
|---|

'05 – 3
'07 – 6
Tot – 9

'03 – 2
'07 – 1
Tot – 3

'05 – 3
'06 – 4
'07 – 3
Tot – 10

'07 – 7
'08 – 5
Tot – 12

| Reexam Denied | | Reexam Order Vacated | | Reexam Terminated |
|---|---|---|---|---|

Source: USPTO PAIR Database; Institute for Progress analysis



**Reexamining *Inter partes* Reexam**

Beginning in 1981, U.S. patent law set up patent reexamination as an administrative alternative to litigation for addressing patent validity concerns. The idea was to create a less expensive and speedier alternative to decide questions of patent validity. Although the level of scrutiny of the U.S. patent system has risen dramatically in light of the ongoing debate over patent reform, reexamination has received relatively little attention. Recently however, we have observed a number of trends that suggest that it might be time to carefully reexamine patent reexamination, particularly *inter partes* reexamination.

In doing so, we have discovered the following:
- *Inter partes* reexaminations requests are rising rapidly – a 6X increase between 2003 and 2007
- Reexamination, particularly *inter partes* reexamination is not simply used as an alternative to litigation, but an integral part of litigation strategy – more than half (52%) of patents in *inter partes* reexams are known to be in litigation during their reexamination
- Virtually all requests for *inter partes* reexamination are granted – 95% of *inter partes* reexam requests are granted, and this statistic may actually understate the effective grant rate
- To date, there has never been a single *inter partes* reexamination that has gone through the entire reexamination process (including appeal) and made it to completion – only three have ever received a decision by the Board of Patent Appeals and Interferences
- Despite a mandate for "special dispatch", the time required to complete an *inter partes* reexamination is much longer than commonly believed
  - Without appeal, the average pendency period for *inter partes* reexam is 43.5 months, much longer than the 28.5 months reported by the USPTO – a 95% confidence interval would put the pendency between 34 and 53 months
  - Although no *inter partes* reexam has ever been completed after being appealed, the average pendency for appealed *inter partes* reexams is 78.4 months (assuming no rework by the patent office or secondary appeal) - a 95% confidence interval would put the pendency between 5 and 8 years

**Why reexamine *inter partes* reexams?**
Over the last several years, the number of reexamination requests at the USPTO has been rising rapidly. This is particularly true for *inter partes* reexams. The number of requests for *inter partes* reexam had increased 6X from 24 in calendar 2003 to 142 in calendar 2007. (Note: Our analysis is based on calendar years rather than the USPTO's fiscal year.) This increase appears to be a result of the increasing use of reexamination as an integral part of litigation strategy by defendants or potential defendants in patent



litigation.  According to USPTO statistics, more than half (52%) of all patents subject to *inter partes* reexamination are known to be in litigation during the reexamination process.

The story of Microsoft and Avistar is a particularly telling example.  After six months of licensing negotiation, Microsoft has requested reexamination of 24 of Avistar's 29 U.S. patents.  Although Avistar's key patents have previously survived two significant litigations, Microsoft's actions have delayed its licensing program and placed the company into financial distress resulting in a 25% reduction in its U.S. and European workforce.

Although the reexamination statute in the U.S. may have been intended to provide an alternative to litigation, the actual use of reexamination appears to be an augmentation of litigation strategy rather than an alternative.  In many cases, patent litigation in U.S. courts and 337 actions at the International Trade Commission (investigations of unfair trade practices related to IP infringement) run simultaneously with reexamination at the Patent Office.  Simultaneous litigation and reexamination raise serious questions for U.S. courts about whether to wait for the results of a pending reexamination or continue with their court proceedings.

The conclusions so far have been mixed.  In some cases, patent litigation has been stayed pending the results of reexam, while in others, the cases have continued.  Many people will remember for example that Judge Spencer who presided over the contentious patent battle between NTP and RIM over the "Blackberry patents" famously refused to stay the litigation proceedings despite the fact that the PTO had issued an initial rejection of the claims at issue.

These difficult and often critical decisions by circuit court judges and administrative law judges depend heavily on their understanding and expectations of what will happen in the reexamination process at the PTO.  How reliable are initial office actions as a predictor of final results in a reexamination?  How long will the process take?  How often are the patent examiner's finding upheld on appeal?  For judges, these questions are critical in determining whether a request for a stay should be granted.  For litigants, these questions can strongly influence litigation strategy.

*Ex parte* reexamination was established by statute in 1981, and more than 9,000 reexamination requests have been filed with more than 6,000 reexamination certificates issued (signaling the completion of the process).  The *ex parte* reexamination process is well established.  Much less is known about *inter partes* reexams.  Established by statute in November of 1999, the first *inter partes* reexamination was not requested until 2001.  Through mid-April of 2008, there have been 396 requests for *inter partes* reexamination at the USPTO, and only 16 of those have received reexamination certificates.



Given the rising importance of reexaminations in general, and the relative scarcity of information about *inter partes* reexam specifically, we decided to take a closer look to discover what can be learned about this relatively little understood process.

**What did we do?**

To examine the *inter partes* reexamination process, we copied transaction level data for every *inter partes* reexamination from the USPTO's PAIR database. These transactions reveal both the sequence and the timing of each step through the process. The database we created all cases and transactions through April 16, 2008.

We noted and corrected a number of anomalies in the PTO data including:
-  Several reexaminations appeared to proceed without the initial "Request for *Inter partes* Reexamination" transaction in the PTO data – we investigated and manually filled in this missing data
-  Several reexaminations included references to "*ex parte*" reexamination despite the fact that they were "*inter partes*" reexams – we manually reviewed and resolved each discrepancy
-  Duplicate transactions (same reexam number, same transaction, same date) were eliminated – these were generally not errors, but represent instances where the documents were uploaded into the PAIR system in multiple parts

We then extracted the key milestone transactions in the reexamination process and mapped the process and timeline for every *inter partes* reexamination to discover what path each case had taken through the process, and how long each step in the process takes. The results of our analysis are briefly described below, and more fully captured in the attached presentation slides.

**What did we find?**

<u>Requests for *inter partes* reexamination are rising rapidly</u>

As described above, the number of *inter partes* reexamination requests is rising rapidly. In 2007, there were 142 requests for *inter partes* reexams, three times as many as in 2005, and nearly six times as many as in 2003. *Inter partes* reexam requests have risen nearly 90% per year (CAGR) over the last five years.

<u>Nearly all *inter partes* reexamination request are granted</u>

Granting a request for reexamination is not automatic. The standard for granting a reexamination request requires that a "significant new question" of patentability must be presented by the requestor. Since their inception in 2001, there have been 396 requests for *inter partes* reexamination requested at the USPTO. Of these, 354 have reached a decision about whether the reexamination request will be granted. Over this period, ninety-five percent of all *inter partes* reexam requests have been granted. With so few requests being denied (19), we reviewed each case where a reexamination was denied, and found that the effective denial rate may actually be overstated. A number of the



nineteen requests for reexamination that were denied are from a small number of inventions where multiple patent reexams were requested. Still others were not for utility patents, but were request for reexamination of design patents. It is fair to say that virtually all requests for *inter partes* reexamination are granted. Whatever threshold has been established by the Patent Office for determining a "significant new question" of patentability, few requestors have been unable to clear it.

The *inter partes* reexamination process is not linear

By tracing every single *inter partes* reexamination through the process, we were able to discover the path through reexamination that is actually followed by real patents in process. While the majority of patents follow the main sequence (Request → Grant → Non-final Office Action → ACP → Reexam Certificate), some cases skip steps, and others repeat steps multiple times. For example, some reexams skip over multiple steps and proceed quickly to a Reexam Certificate. This happens most often when the patent holder fails to respond to the Patent Office within the statutory timeframe, and the PTO proceeds to issue a certificate. Still other times, patents repeat steps multiple times. About one-quarter of the time *inter partes* reexams include multiple "Non-final Office Actions", and about one-tenth of the time they receive multiple "Actions Closing Prosecution".

One-quarter of all *inter partes* reexam decisions are appealed, but none has ever proceeded through appeal to the end of the process

One of the major challenges in examining the *inter partes* reexam process is that very few cases have proceeded all the way through the process. Through mid-April 2008, only nineteen cases have ever proceeded past the Notice of Right to Appeal. Of these, approximately one-quarter (5 cases - 26%) have been appealed to the Board of Patent Appeals and Interferences (BPAI), one case (~5%) went back for another Action Closing Prosecution, and the remaining 13 cases (68%) moved on to "Intent to Issue a Reexam Certificate".

Of the cases that have gone on to appeal, only three have received a decision by the BPAI. None of the three decisions represents a final decision by the BPAI that can be appealed to the Federal Circuit as in each case, the Board added new grounds for rejection and remanded the cases to the Patent Office for further action. None of the three cases has reached a final Reexamination Certificate, and it has taken 4, 4, and 5 years for the cases to get to the initial BPAI decision.

The average pendency of 28.5 months reported by the USPTO is highly skewed

The USPTO regularly publishes statistics about *inter partes* reexaminations. According to their latest publication (December 31, 2007), the average pendency (Filing date to certificate issue date) is 28.5 months. This calculation is based on only 12 *inter partes* reexaminations that had reached a final certificate by that date. In our analysis which is up to date as of April 16, 2008, we found 16 reexaminations that had reached a final



certificate. Our calculation of average pendency for those cases was only slightly longer at 30.1 months.

However, in carefully examining the 16 cases that have received final certificates, we note that 10 of the completed reexams skipped directly from the "First Non-final Action" to the "Intent to Issue a Reexam Certificate". Upon closer inspection, each of these cases skipped multiple steps because the patent owner failed to respond to the office action. The average pendency of these cases was 24 months, while the average for the remaining six cases that followed the basic process (Non-final Action → ACP → Right of Appeal → Notice of Intent to Issue a Reexam Certificate → Reexam Certificate) was ~39 months. It should be noted that NONE of the cases that have received a final Reexam Certificate have gone to appeal.

While mathematically accurate, the pendency statistic provided by the USPTO is highly misleading. An appropriate reading of the statistic is that the Patent Office takes two years to dispose of a patent through *inter partes* reexam if the patent holder doesn't care to defend its rights. It takes significantly longer to get to a resolution if the patent holder participates in the process.

<u>Average pendency for an un-appealed *inter partes* reexam is more than 3.5 years</u>
Given the small number of cases that have proceeded through the *inter partes* reexam process, a more appropriate way to estimate average pendency is to calculate the time required for cases to proceed through each step in the process and sum them up. We calculated an average time and a 95% confidence interval for each step in the main sequence. Based on our calculations, it takes more than 3 ½ years (43.5 months) for the average case to proceed through the basic reexam process to a final conclusion – this assumes that the case is not appealed to the BPAI or beyond. A 95% confidence interval suggests a range of between 34 and 53 months for average pendency for an un-appealed *inter partes* reexam.

<u>Expected pendency for appealed *inter partes* reexams is at least 6.5 years</u>
*Inter partes* cases that go through the appeal process can be expected to take much longer than the 3 ½ years described above. Calculating average pendency for appealed cases is difficult because as we have noted, there has never been an appealed *inter partes* case that has completed the process. However, if we make a conservative assumption that all cases that go through the appeal process will receive a decision by the BPAI and immediately move to "Intent to Issue a Reexam Certificate", then we can calculate an average expected pendency. The result of this calculation is that average pendency (assuming no "rework" by the patent office and no secondary appeals to the BPAI, the Federal Circuit, or the Supreme Court) is 78.4 months – slightly longer than 6.5 years. A 95% confidence interval suggests an average pendency for appealed cases (again, assuming no rework) is between 5 and 8 years (60-97 months)! Given that the only three *inter partes* reexam cases that have received a BPAI decision all require further "rework" and are subject to further appeal, these estimates may be highly conservative.



According to statute, reexam cases are to be handled with "special dispatch". This means that reexam cases are to receive priority over all other cases. The Patent Office has reportedly set a target of 24 months to complete the reexam process, but so far, the actual time to conclude an *inter partes* reexam is far beyond this target. This can not help but raise significant concern to anyone who is interested in the efficient administration of justice in the U.S. patent system.

**Conclusion**

The *inter partes* reexam process requires special attention by the U.S. Patent Office. At present, the time to complete these cases far exceeds the expectation of "special dispatch" embodied in the patent statute. Federal judges, administrative law judges, and litigants should take special note of these facts as they can significantly impact the progress of patent litigation.