1  QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
     Claude M. Stern (Bar No. 96737)
2    claudestern@quinnemanuel.com
     Evette D. Pennypacker (Bar No. 203515)
3    evettepennypacker@quinnemanuel.com
     Thomas E. Wallerstein (Bar No. 232086)
4    tomwallerstein@quinnemanuel.com
     Gabriel S. Gross (Bar No. 254672)
5    gabegross@quinnemanuel.com
   555 Twin Dolphin Drive, Suite 560
6  Redwood Shores, California  94065-213
   Telephone:    (650) 801-5000
7  Facsimile:    (650) 801-5100

8  Attorneys for Kraft Foods Global, Inc.

9

10                  UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13  THE PROCTER & GAMBLE COMPANY,          CASE NO. 3:08-cv-00930 PJH

14              Plaintiff,                  DECLARATION OF CLAUDE M. STERN
                                            IN SUPPORT OF KRAFT FOODS GLOBAL,
15         vs.                              INC.'S REPLY IN SUPPORT OF MOTION
                                            FOR STAY
16  KRAFT FOODS GLOBAL, INC.,

17              Defendant.

18

19

20

21

22

23

24

25

26

27

28

I, Claude M. Stern, declare as follows:

1.     I am a partner with the law firm Quinn Emanuel Urquhart Oliver & Hedges LL, counsel to defendant Kraft Foods Global, Inc. ("Kraft"), defendant in the above-referenced action.

2.     Each of the following statements is made of my own personal knowledge and, if called upon to testify about any of these matters, I could and would competently do so.

3.     On October 3, 2007, I argued to this Court in favor of Kraft's motion to stay the '418 litigation. I made absolutely no suggestion that granting the stay would forever end all litigation between the parties. I did not know at that time that Kraft would later sue P&G for infringement of the '443 patent. When I stated to this Court that a stay of the '418 patent's litigation could eliminate "this" (*i.e.*, the '418 patent) litigation, that statement was absolutely true. As of that date, P&G had not asserted the '419 patent against Kraft, either informally (by letter demand) or formally (but suit). I certainly did not intend to imply, and did not understand this Court to infer, that a stay of the '418 litigation would forever preclude any and all litigation between the parties, even as to unrelated patents.

4.     Attached hereto as Exhibit A is a true and correct copy of correspondence from the United States Patent and Trademark Office (the "PTO") granting Kraft's request for *ex parte* reexamination of United States Patent Number 7,169,418. ("the '418 patent").

5.     In the Wisconsin Action, after the '419 infringement claims were transferred to this Court, I took on behalf of Kraft the depositions of two inventors named on United States Patent Number 7,169,419 ("the '419 patent"). During both depositions, I diligently refrained from asking questions designed to elicit discovery relating to the '419 and '418 infringement actions. Kraft's '443 patent relates to a spacing structure on the underside of an overcap to a package, which prevents a vent valve on a membrane (which is attached to the package) from being blocked by the overcap. P&G had defended against the '443 infringement claim by arguing, among other things, that P&G had invented the '443 patent inventions before Kraft, and that the '419 patent specification reflected this prior invention. The only questions I asked that related to the '419 and '418 patents related to this P&G defense of the '443 patent infringement claim. I did not ask any questions that related or pertained directly to P&G's claim of infringement against Kraft. In fact,

1   during the depositions, I do not recall that the P&G lawyer ever objected on the ground that I was

2   asking any questions that related to P&G's infringement claims against Kraft.

3       6.      Attached hereto as Exhibit B is a true and correct copy of Judge Crocker's March

4   20, 2008 Order on P&G's motion to compel.

5       7.      P&G filed an appeal from this Court's order granting the stay on the '418 patent

6   case on or about November 9, 2007.  At no time did P&G seek any sort of expedited treatment of

7   that appeal.  To the best of my knowledge, P&G did not file a motion with the Federal Circuit to

8   expedite the appeal or ask for expedited briefing of the appeal or ask for an early argument on the

9   appeal.  On or about March 16, 2008, Kraft and P&G participated in a mediation to settle the suits

10  between them.  I understood that, because of the March 2008 mediation, the Federal Circuit's

11  mediation center had chosen to defer any action on P&G's appeal until after the mediation had

12  been completed.  That mediation completed on March 16, 2008, and by agreement, the parties

13  engaged in another neutral-based settlement conference.  Following the mediation efforts, I

14  assumed that P&G would seek to have the Federal Circuit move its appeal forward to disposition.

15  In fact, I learned from the Federal Circuit mediation department about two weeks ago this was not

16  the case, and that P&G had not contacted anyone at the Federal Circuit to move its appeal of this

17  Court's '418 stay order to disposition (i.e. to obtain a date where the matter would be argued before

18  the Federal Circuit).  Hence, to the best of my knowledge, as of this date, P&G has done nothing

19  to expedite the disposition of its appeal of this Court's order staying the '418 litigation.

20      8.      Attached hereto as Exhibit C is a true and correct copy of  my declaration, along

21  with Exhibits A through D of said declaration, filed in the '418 litigation in support of Kraft's

22  reply in support of its Motion To Stay, Or In The Alternative, To Expedite Discovery And

23  Reschedule Preliminary Injunction Hearing.

24  //

25  //

26  //

27

28

-2-                Case No. 3:08-cv-00930 PJH

STERN DECL. ISO KRAFT FOODS GLOBAL, INC.'S REPLY IN SUPPORT OF MOTION FOR STAY

1    I declare under penalty of perjury under the laws of the United States that the above

2   statements are true and correct.  Executed this 16th day of June, 2008, in the City of Redwood

3   Shores, California.

4

5   DATED:  June 16, 2008

6
                                    By  /s// Claude M. Stern
7                                         Claude M. Stern

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Marvin Petry, Esq.
Stites & Harbison PLLC
1199 North Fairfax Street
Suite 900
Alexandria, VA 22314

**RECEIVED**

MAR 2 0 2008

STITES & HARBISON, PLLC

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/010,090*.

PATENT NO. *7169418*.

ART UNIT *3991*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/010,090 | 01/18/2008 | 7169418 | X0000000011 | 4702 |

27752        7590        03/18/2008

THE PROCTER & GAMBLE COMPANY
INTELLECTUAL PROPERTY DIVISION – WEST BLDG.
WINTON HILL BUSINESS CENTER – BOX 412
6250 CENTER HILL AVENUE
CINCINNATI, OH  45224

| EXAMINER |
|---|
|   |

| ART UNIT | PAPER NUMBER |
|---|---|
|   |   |

DATE MAILED: 03/18/2008

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. 90/010,090 | Patent Under Reexamination 7169418 | |
|---|---|---|---|
| | Examiner Krisanne Jastrzab | Art Unit 3991 | |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>18 January 2008</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892,    b)☒ PTO/SB/08,    c)☐ Other: _____

1. ☒    The request for *ex parte* reexamination is GRANTED.

### RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐    The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)). Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a) ☐ by Treasury check or,

b) ☐ by credit to Deposit Account No. _____ , or

c) ☐ by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

/Krisanne Jastrzab/
Primary Examiner
Art Unit: 3991

cc:Requester ( if third party requester )

U.S. Patent and Trademark Office
PTOL-471 (Rev. 08-06)                    Office Action in *Ex Parte* Reexamination                    Part of Paper No. 20080317

Application/Control Number: 90/010,090                                    Page 2
Art Unit: 3991

*Reexamination*

### Decision on Reexamination Request

A substantial new question of patentability affecting claims 1-55 of United

States Patent Number 7,169,418 (hereinafter referred to as "the '418 patent") is raised

by the request for *ex parte* reexamination.

### Extensions of Time

Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and

not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that

*ex parte* reexamination proceedings "will be conducted with special dispatch" (37

CFR 1.550(a)).  Extensions of time in *ex parte* reexamination proceedings are provided

for in 37 CFR 1.550(c).

### Substantial New Question of Patentability

The request indicates that the Requestor considers Porteus, Melrose, Lane,

Goglio and the Dijk Deformation article as forming a basis for raising a

substantial new question of patentability for claims 1-55 of the '418 patent.

Melrose, Lane and Goglio were cited by the requestor in copending

reexamination 95/000,219 as raising a substantial new question of patentability as to

Application/Control Number: 90/010,090                                    Page 3
Art Unit: 3991

claims 1-55.  The reexamination was granted however, the Examiner held that one of

ordinary skill in the art would not have been motivated to use the top closure of Goglio

on the containers of either Melrose or Lane because the containers of Melrose and

Lane are designed to flex inwardly in response to a reduction in internal volume,

whereas the top closure of Goglio is designed to address the opposing condition by

functioning to relieve an increase in pressure within a container.  The requestor

indicates that the teachings provided in the Dijk Deformation article, as well as, the

evidence provided in the accompanying Belcher declaration, address the lack of

motivation asserted by the Examiner in reexamination 95/000,219 by providing further

support of the knowledge of one of ordinary skill in the art regarding the construction of

containers for containment and shipping of food-related products.  It is agreed that

consideration of Porteus, Melrose, Lane, Goglio and the Dijk Deformation article along

with the evidence presented in the Belcher declaration, raises an SNQ as to claims 1-55

of the '418 patent.  There is substantial likelihood that a reasonable examiner would

consider these teachings important in deciding whether or not these claims are

patentable.  Accordingly, Porteus, Melrose, Lane, Goglio and the Dijk Deformation

article raise a substantial new question of patentability as to claims 1-55, which question

has not been decided in previous examination of the '418 patent.

Application/Control Number: 90/010,090                                    Page 4
Art Unit: 3991

### *Duty of Disclosure*

The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 7,169,418 throughout the course of this reexamination

proceeding. The third party requester is also reminded of the ability to similarly apprise

the Office of any such activity or proceeding throughout the course of this reexamination

proceeding. See MPEP §§ 2207, 2282 and 2286.

### *Service of Papers*

After the filing of a request for reexamination by a third party requester, any

document filed by either the patent owner or the third party requester must be served on

the other party (or parties where two or more third party requester proceedings are

merged) in the reexamination proceeding in the manner provided in 37 CFR 1.248. See

37 CFR 1.550(f).

### *Waiver of Right to File Patent Owner Statement*

In a reexamination proceeding, Patent Owner may waive the right under 37

C.F.R. 1.530 to file a Patent Owner Statement. The document needs to contain a

statement that Patent Owner waives the right under 37 C.F.R. 1.530 to file a Patent

Owner Statement and proof of service in the manner provided by 37 C.F.R. 1.248, if the

request for reexamination was made by a third party requester, see 37 C.F.R 1.550(f).

Application/Control Number: 90/010,090                                    Page 5
Art Unit: 3991

## Correspondence

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Krisanne Jastrzab whose telephone number is 571-272-

1279. The examiner can normally be reached on Mon.-Thurs. 6:00am-4:30pm.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Deborah Jones can be reached on 571-272-1535

Information regarding the status of an application may be obtained from the

Patent Application Information Retrieval (PAIR) system. Status information for

published applications may be obtained from either Private PAIR or Public PAIR.

Status information for unpublished applications is available through Private PAIR only.

For more information about the PAIR system, see http://pair-direct.uspto.gov. Should

you have questions on access to the Private PAIR system, contact the Electronic

Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a

USPTO Customer Service Representative or access to the automated information

system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

## Notice Re Patent Owner's Correspondence Address

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that:

Application/Control Number: 90/010,090                                    Page 6
Art Unit: 3991

The patent owner's correspondence address for all communications in an *ex parte* reexamination or an *inter partes* reexamination is designated as the correspondence address of the patent.

> *Revisions and Technical Corrections Affecting Requirements for Ex Parte and Inter Partes Reexamination,* 72 FR 18892 (April 16, 2007)(Final Rule)

**The correspondence address for any pending reexamination proceeding not having the same correspondence address as that of the patent is, by way of this revision to 37 CFR 1.33(c), <u>automatically changed to that of the patent file</u> as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the Office as of May 16, 2007, <u>including the present reexamination proceeding</u>, and to any reexamination proceeding which is filed after that date.
Parties are to take this change into account when filing papers, and direct communications accordingly.

In the event the patent owner's correspondence address listed in the papers (record) for the present proceeding is different from the correspondence address of the patent, it is strongly encouraged that the patent owner affirmatively file a Notification of Change of Correspondence Address in the reexamination proceeding and/or the patent (depending on which address patent owner desires), to conform the address of the proceeding with that of the patent and to clarify the record as to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:

Reexamination and Amendment Practice         (571) 272-7703
Central Reexam Unit (CRU)                     (571) 272-7705
Reexamination Facsimile Transmission No.      (571) 273-9900

Please mail any communications to:

    Mail Stop *Ex Parte* Reexam
    ATTN: Central Reexamination Unit
    Commissioner for Patents
    P.O. Box 1450
    Alexandria, VA  22313-1450

Please FAX to:
        (571) 273-9900

Application/Control Number: 90/010,090                                      Page 7
Art Unit: 3991

Central Reexamination Unit


Please hand-deliver to:
      Customer Service Window
      Randolph Building
      401 Dulany St.
      Alexandria, VA  22314


/Krisanne Jastrzab/                         /Jerry D. Johnson/
Primary Examiner                            Primary Examiner, AU 3991

Central Reexamination Unit
Art unit 3991
(571) 272-1279

DEBORAH D. JONES
CRU SPE-AU 3991

Customized PTO/SB/08a+b (09-06)

| Substitute for Form 1449A/PTO | Reexam Control # | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** | Patent No. # | 7,169,418 |
| | Confirmation # | |
| | 1st Request Date | |
| | Art Unit | 3991 |
| | Examiner | |
| Sheet 1 of 1 | Requestor Docket # | X-011/MP |

### U.S. PATENT DOCUMENTS

| Exam. Initial* | Document No. Number - Kind | Publ. Date MM-DD-YYYY | Name Patentee or Applicant | Relevance Passages/Figs. |
|---|---|---|---|---|
| ✓ | US-Des. 284,941 | 08-05-1986 | Porteous | |
| | US-3,082,904 | 03-26-1963 | Newcomb et al. | |
| | US-3,944,127 | 03-16-1976 | Bruke et al. | |
| | US-4,966,780 | 10-30-1990 | Hargraves et al. | |
| | US-5,085,034 | 02-04-1992 | Haas | |
| | US-5,285,954 | 02-15-1994 | Goglio | |
| | US-5,515,994 | 05-14-1996 | Goglio | |
| ✓ | US-6,733,803 | 05-11-2004 | Vidkjaer | |
| ✓ | US-6,763,969 | 07-20-2004 | Melrose et al. | |
| ✓ | US-6,837,390 | 01-04-2005 | Lane et al. | |

### FOREIGN PATENT DOCUMENTS

| Exam. Initial* | Country-Number-Kind | Publ. Date MM-DD-YYYY | Name Patentee or Applicant | Relevance Passages/Figs. | Trans-lation |
|---|---|---|---|---|---|
| | | | | | |

### NON PATENT LITERATURE DOCUMENTS

| Exam. Initial* | Include NAME of the author (in CAPS), Title of Article/Item, Date, Page(s), Volume-Issue No., Publisher, City and/or Country where published | Trans-lation |
|---|---|---|
| ✓ | R. VAN DIJK ET AL., "Lateral Deformation of Plastic Bottles: Experiments, Simulations and Prevention", 1998, Volume 11, Pages 91-117, <u>Packaging Technology and Science</u> | |
| ✓ | C. MANNHEIM AND N. PASSY, "Interaction Between Packaging Materials and Foods," 1990, Volume 3, Pages 127-132, <u>Packaging Technology and Science</u> | |

| Examiner Signature | *[signature]* | Date Considered | 3/14/2008 |
|---|---|---|---|

*\* Examiner: Initial if considered, whether or not citation is in conformance with MPEP §609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to the applicant.*

123LT:20157:56865:1:ALEXANDRIA

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KRAFT FOODS HOLDINGS, INC.,

     Plaintiff,

    v.

THE PROCTOR & GAMBLE COMPANY,

     Defendant/Counterclaim Plaintiff,

    v.

KRAFT FOODS HOLDINGS, INC.,

     Counterclaim Defendant,

and

KRAFT FOODS GLOBAL, INC.,

     Third-Party Defendant.

ORDER

07-cv-613-bbc

---

On March 18, 2008, this court held a hearing on defendant's motion to compel discovery (dkt. 37) and the collateral motion to strike the reply brief (dkt. 46). Both sides were represented by counsel.

Having read the parties' submissions before the hearing, having entertained further argument and having had my questions answered, I granted the motion to compel and granted the motion to strike for reasons stated on the record. Plaintiff must provide the ordered discovery not later than March 28, 2008. Defendant shall not use any matters discovered as a result of this court's order in any other lawsuit, administrative action, or other proceeding without first obtaining this court's written permission or written permission from plaintiff. Absent plaintiff's consent, defendant shall not seek or obtain additional discovery in the instant lawsuit that is directly and primarily derived from the information obtained in response to this

court's order compelling responses to requests for production 189-200. These limitations are intended to allay plaintiff's concerns that defendant is trying to backdoor discovery for the parties' California lawsuit and that allowing the instant discovery will exponentially expand discovery in the instant lawsuit. The court expects both sides to honor its intent in letter and spirit during further discovery in this case. Each side will bear its own costs on the motion to compel.

Entered this 20th day of March, 2008.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

2

Exhibit C

QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP
  Claude M. Stern (Bar No. 96737)
    claudestern@quinnemanuel.com
  Evette D. Pennypacker (Bar No. 203515)
    evettepennypacker@quinnemanuel.com
  Mike D. Powell (Bar No. 202850)
    mikepowell@quinnemanuel.com

555 Twin Dolphin Drive, Suite 560
Redwood Shores, California 94065
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100

Attorneys for Defendant
KRAFT FOODS GLOBAL, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE PROCTER & GAMBLE COMPANY, a Delaware corporation, <br><br> Plaintiff, <br><br> vs. <br><br> KRAFT FOODS GLOBAL, INC, a Delaware Corporation, <br><br> Defendant. | CASE NO. C 07-4413 PJH <br><br> **DECLARATION OF CLAUDE STERN IN SUPPORT OF KRAFT FOODS GLOBAL, INC.'S REPLY IN SUPPORT OF MOTION TO STAY, OR IN THE ALTERNATIVE, TO EXPEDITE DISCOVERY AND RESCHEDULE PRELIMINARY INJUNCTION HEARING** <br><br> Date: October 3, 2007 <br> Time: 9:00 AM <br> Place: Courtroom 3, 17th Floor |

quinn emanuel

51282/2235985.1

DECLARATION OF CLAUDE STERN
CASE NO. C 07-4413 PJH

1  I, Claude M. Stern, declare as follows:

2      1.      I am a partner with the law firm of Quinn Emanuel Urquhart Oliver &Hedges LL,

3  counsel to defendant Kraft Foods Global, Inc. ("Kraft"), defendant in the above-referenced action.

4      2.      Each of the following statements is made of my own personal knowledge and, if

5  called upon to testify about any of these matters, I could and would competently do so.

6      3.      Attached hereto as Exhibit A is a true and correct copy of a J.P. Morgan North

7  American Equity Research Report, issued last week, and dated September 18, 2007, which

8  addresses the extent to which Kraft is likely to cause Procter & Gamble ("P&G") injury or damage

9  as a result of Kraft's sale of *Maxwell House*® brand coffee in the new plastic container.  In the

10  very introduction of the report, the author states:

11      The PG lawsuit against Maxwell House's new packaging led
        us to take a detailed look at KFT's [Kraft's]coffee business.
12      There is little evidence that the KFT coffee business has
        started to turnaround.  **So for now PG may see the new**
13      **format as a threat but the damage so far** *(if there is any)*
        **is not evident.** *(Emphasis added.)*
14

15      4.      Attached hereto as Exhibit B is a true and correct copy of a P&G Form 8-K which

16  P&G filed with the Securities & Exchange Commission on or about September 25, 2007 (2 days

17  ago). This report can be obtained from the P&G website under the "SEC Filings" headline (at

18  http://www.pginvestor.com/phoenix.zhtml?c=104574&p=irol-sec), and indicates on the last page

19  the net sales and net earnings that P&G received for, among other things, the "Snacks, Coffee and

20  Pet Care" product lines, for each of the last three fiscal years (2005, 2006, 2007).  According to

21  this document, the annual sales and earnings for P&G, that presumably would include sales of the

22  *Folgers* brand coffee products, were as follows:

| Fiscal year | Snacks, Coffee and Pet Care Net Sales | Snacks, Coffee and Pet Care Net Earnings |
|---|---|---|
| 2005 | $4,314,000,000 | $444,000,000 |
| 2006 | $4,383,000,000 | $385,000,000 |
| 2007 | $4,537,000,000 | $477,000,000 |

28

DECLARATION OF CLAUDE STERN
CASE NO. C 07-4413 PJH

quinn emanuel

5.    Attached hereto as Exhibit C is a true and correct copy of a press release issued by P&G last week on September 18, 2007, which I obtained from the P&G website ( at http://www.pginvestor.com/phoenix.zhtml?c=104574&p=irol-newsArticleMain&ID=1036344). In the press release, P&G represents that:

> The Procter & Gamble Company (NYSE: PG) confirmed previously announced sales and earnings guidance for the July to September quarter of fiscal year 2007/08. **The company continues to expect sales growth for the quarter of six percent to eight percent, organic sales growth in line with previous guidance and diluted earnings per share of $0.88 to $0.90.** (Emphasis added.)

6.    Attached hereto as Exhibit D is a true and correct copy of a press release issued by P&G about three (3) months ago, on June 5, 2007, which I obtained from the P&G website ( at http://www.pginvestor.com/phoenix.zhtml?c=104574&p=irol-newsArticle&ID=1011230&highlight=44). In the press release, P&G represents that:

> The Procter & Gamble Company (NYSE: PG) confirmed previously announced sales and earnings guidance for the April to June quarter of fiscal year 2006/07. **The company continues to expect sales growth for the quarter of six percent to seven percent, organic sales growth in line with previous guidance and diluted earnings per share of $0.64 to $0.66.** (Emphasis added.)

7.    I have searched the P&G website and Google generally to find any press release or other securities filings where P&G states that P&G expected its Folgers brand earnings or sales in the coming quarter or two quarters to be adversely affected (whether materially or not) by Kraft's release in July 2007 of its *Maxwell House* brand coffee in plastic containers, or by the continued sale of Kraft's product. I could find no such press release, filing or report.

8.    In filing the Preliminary Injunction in this case and in filing its opposition to this Motion to Stay, P&G has never submitted to this Court the file history for the '418. Attached hereto as Exhibit E is a true and correct copy of just the last office action excerpt of this file history. As an example only, this excerpt reveals that, in trying to convince the PTO to issue the '418 patent, P&G sought to distinguish certain prior art relied on and cited by the PTO. In seeking to distinguish this prior art, P&G made the claim to the PTO that the claims of the '418

DECLARATION OF CLAUDE STERN
CASE NO. C 07-4413 PJH

1 patent, unlike the specific prior art cited, incorporate something referred to as "region of
2 deflection." In its explanation to the PTO, P&G sought to define the specific characteristics of a
3 "region of deflection." Nowhere in its preliminary injunction papers or in its opposition to this
4 Motion to Stay has P&G made any reference to this file history segment (or any other portion of
5 the file history).

6      9.     In the short time my firm has been involved in this case, we have gathered various
7 forms of prior art (both printed publication and actual inventions) that I believe render the asserted
8 claims of the '418 patent invalid, or, at a minimum, reflect a good faith belief that the asserted
9 claims of the '418 patent are invalid. We have also prepared various charts (all of which are work
10 product) that reflect how prior art packaging art maps onto the asserted claims of the '418 patent,
11 and establish that the claims of the '418 patent are, at a minimum, obvious under the _KSR v._
12 _Teleflex_ standard, and therefore invalid under Section 103 of the Patent Act. As an example only,
13 I attach hereto as Exhibit F a true and correct copy of one of these charts in draft form (applied to
14 a representative asserted claim).

15      10.     P&G argues in Opposition to the Motion to Stay that some or most of the document
16 requests, interrogatories or requests for admissions that we served on P&G last week as part of our
17 Motion to Stay seek irrelevant information or are otherwise overbroad. Attached hereto as Exhibit
18 G is a true and correct copy of a chart that I have assembled (portions were assembled at my
19 instruction) that identifies in general how each of the discovery requests we have provided to P&G
20 is relevant to the claim asserted or defenses thereto in this case. As of this date, I have received no
21 communication from P&G or its lawyers indicating that P&G cannot locate the requested
22 documents or information, or that it is not feasible for P&G to obtain the documents or
23 information, or that it is overly burdensome for P&G to obtain the documents or information.

24     ///
25     ///
26     ///
27     ///
28

quinn emanuel

51282/2235985.1

DECLARATION OF CLAUDE STERN
CASE NO. C 07-4413 PJH

1        I declare under penalty of perjury of the laws of the United States that the foregoing is true

2   and correct.  Executed on September 27, 2007, at Redwood Shores, California.

3

4

5   CLAUDE M. STERN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

51282/2235985.1

DECLARATION OF CLAUDE STERN
CASE NO. C 07-4413 PJH

quinn emanuel

# EXHIBIT A



**North America Equity Research**
19 September 2007

**JPMorgan** ●

# Kraft Foods

## A Closer Look at Kraft's Coffee Business

The PG law suit against Maxwell House's new packaging led us to take a detailed look at KFT's coffee business. There is little evidence that the KFT coffee business has started to turnaround. So for now PG may see the new format as a threat but the damage so far (if there is any) is not evident.

- **When looking at 52-week trailing data, KFT has lost R&G coffee share since 2004.** In the last 52 weeks ending 8/11 KFT had 30.5% market in coffee in the FDM+WMT channel compared with PG's 38.9%; while PG gained 1.2pt of share during that period, KFT lost 1.3pt. KFT's share has dropped consistently since 2004 (KFT's R&G coffee share was 32.8% in 2004, 31.8% in 2005, and 30.9% in 2006), but during the same period PG managed to recover market share lost to smaller brands on the back of improved innovation and marketing, and revamped packaging (PG's coffee share was 39.3% in 2004, 37.7% in 2005 and 38.9% in 2006). Importantly, during this period KFT lost ground at WMT and share losses at the flagship Maxwell House were steeper than the share loss in the whole KFT portfolio.

- **KFT has become increasingly reliant on the sale of Starbuck's branded coffee.** In 2004 22.2pt of KFT's 32.8% market share in FDM+WMT was generated by Maxwell House and KFT's retail sales of Starbuck's coffee accounted for 5.8pt (Yuban and other brands also contributed), but in the last 12 measured weeks Maxwell House's market share was 17.7pt and Starbuck's was 8.2pt (total KFT 30%). In other words, KFT maintained its Starbuck's share but lost almost 5pt in its flagship Maxwell House brand. The data shows KFT has done poorly with Starbuck's at WMT; we estimate Starbuck's accounts for 30% of KFT's coffee sales at FDM but only for 12% at WMT (and for 27% in the combined FDM+WMT channel).

### Overweight

**$34.39**

18 September 2007

**Food & Food Manufacture**

**Pablo Zuanic**[AC]
(1-212) 622-6744
pablo.zuanic@jpmorgan.com

**Akshay Jagdale**
(1-212) 622-6280
akshay.x.jagdale@jpmchase.com

**Renato Basanta**
(1-212) 622-5331
renato.x.basanta@jpmchase.com

**Price Performance**



| | YTD | -1M | -3M | -12M |
|---|---|---|---|---|
| Absolute | -5.1% | 8.2% | -4.0% | -0.6% |

Source: RIMES, Reuters.

### Kraft Foods (KFT;KFT US)

| EPS ($) | 2006A | 2007E | 2008E |
|---|---|---|---|
| Q1 (Mar) | 0.45 | 0.44A | 0.47 |
| Q2 (Jun) | 0.51 | 0.50A | 0.55 |
| Q3 (Sep) | 0.46 | 0.42 | 0.48 |
| Q4 (Dec) | 0.52 | 0.47 | 0.55 |
| FY | 1.94 | 1.83 | 2.05 |
| P/E FY | 17.7 | 18.8 | 16.8 |
| Consensus EPS FY ($) | | 1.80 | 1.94 |
| EV/EBITDA FY | 10.70 | 11.60 | 10.70 |

Note: Estimates above are before restructuring charges, and do not factor DA deal. Source: Reuters, JPMorgan estimates.

| Company Data | |
|---|---|
| Price ($) | 34.39 |
| Date Of Price | 18 Sep 07 |
| 52-week Range ($) | 37.19 - 29.95 |
| Mkt Cap ($ mn) | 55,230.34 |
| Fiscal Year End | Dec |
| Shares O/S (mn) | 1,606 |
| Price Target ($) | 40.00 |
| Price Target End Date | 30 Jun 08 |

www.morganmarkets.com

J.P. Morgan Securities Inc.

**See page 4 for analyst certification and important disclosures, including investment banking relationships.**
JPMorgan does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision. Customers of JPMorgan in the United States can receive independent, third-party research on the company or companies covered in this report, at no cost to them, where such research is available. Customers can access this independent research at www.morganmarkets.com or call 1-800-477-0406 toll free to request a copy of this research.

Pablo Zuanic
(1-212) 622-6744
pablo.zuanic@jpmorgan.com

North America Equity Research
19 September 2007

JPMorgan

- **KFT is under-indexed at WMT while PG is over-indexed.** In the last 12 weeks ending 8/11 KFT had FDM coffee share of 31.8% vs. 34.2% for PG; in that same period PG had 37.8% in FDM+WMT compared with 30% for KFT (we estimate PG's coffee share at WMT is 52% compared with 23% for KFT). Notably, KFT does poorly with Starbuck's at WMT (19pt from Maxwell House and 3pt from Starbuck's of KFT's total 23pt share at WMT). We doubt that WMT will change its stance on Starbuck's coffee, but assume the new Maxwell House (new packaging; and new coffee made from Arabica beans) will be more actively featured at WMT. Still, for now the data points to minimal evidence of a turnaround; in the last 12 weeks both Maxwell House and Starbuck's lost 0.5 of market share on a yoy basis in the FDM+WMT channel.

- **Are there any signs of improvement in KFT's coffee business?** Since January in the FDM+WMT channel PG has consistently realized better price/mix gains than KFT and has continued to grow consistently ahead of KFT in $ sales (looking at 12-week moving data). Moreover, while the category has become slightly less promotional (in part due to higher costs), KFT's % of sales under promotion remains above PG and this ratio at KFT has dropped less than at PG. Interestingly, however, in the FDM ex WMT channel KFT seems to be making more of an impact; since April looking at 4-week data, KFT has outgrown PG in 4 out of the last 5 4-week periods measured in terms of $ sales growth, but we note this has been in part because KFT has lagged the PG price/mix gains (so for now it remains unclear whether the KFT $ sales outperformance at FDM ex WMT will be sustainable). So while KFT highlights Beverages as one of the divisions making faster progress (than other units) with the company's overall turnaround efforts, the progress vs. competitors is hard to note at this stage.

- **At the category level it would seem retail prices have not entirely followed the rise in Robusta coffee costs.** Retail coffee prices were flat yoy in 2004 (comparing annual averages), increased 24% in 2005, were flat in 2006, and so far in 1H07 they are up 11%. Taking costs for Robusta coffee, we note costs were down 3% in 2004, increased 44% in 2005, were up 32% in 2006, and are up another 30% yoy in the 1H07. The steep rise in Robusta coffee beans (85c/pound now compared with 35c in 2004) has led producers to increase the mix of Arabica beans in the blend (the move has also been explained by KFT as a way to better fit the taste with consumers desires). But we would be concerned about potential margin pressures in coffee for all industry participants. Moreover, we note Private Label market share tends to move up and down with cost inflation. At times of generally higher coffee prices, PL share increases and then drops as lower costs are passed on to lower retail prices; for example, PL share was 9.8% in 2004, 10.7% in 2005, and 9.7% in 2006 (and 10.8% in the 12 weeks ending 8/11).

2

Pablo Zuanic
(1-212) 622-6744
pablo.zuanic@jpmorgan.com

North America Equity Research
19 September 2007

JPMorgan

## Valuation, Rating and Price Target Analysis

**We rate KFT OW** as we believe the stock represents greater earnings upside than other restructuring stories in the group (a more unlevered BS; a stronger brand portfolio with 73% of US sales in categories where KFT is #1; below group average margins in both US retail and in Western Europe), and it trades at a discount (8% on PE and FV/EBITDA) to the group. A potential EPS beat in 2007 (low bar) combined with improving sentiment and the lifting of the spin-off overhang (higher PE), should drive above-average returns in the next 12 months. Consolidated gross margins of 36% are below K (44%) and CPB (42%); and even adjusting for mix, the KFT franchise strength is not reflected in the gross margins. In US retail KFT has 17% EBIT margins compared with 23-24% for HNZ and GIS, which only derive 35% of sales from products with #1 market share positions, compared with 73% for KFT. In Western Europe KFT with a concentrated franchise (fewer products than in the US) makes 10% EBIT margins, compared with 17-18% for HNZ and K. Over time, we believe the multiple will better reflect the company's global franchise, leadership positions in several key categories, and potential for higher margins (significant mix improvement, deeper cost cuts, recouping premiums) and improved top line trends.

**We have set a target price of $40 by 6/08.** KFT trades at 16.8x our FY08 EPS estimate of $2.05 (4.8% OCF/FV, 10.3x FV/EBITDA) and pays a 3% dividend yield. Given the margin upside potential (we estimate as much as 500bp over time), room for more buybacks, and positive organic $ sales growth trends, we believe KFT should trade at a slight premium to the group (for the valuation to account for the opportunity). We have conservatively set a target price of $40 by 6/08; we estimate at that point NTM EPS of $2.16 and would put an 18x multiple on it, and to this we would add the $1.02 dividend. But see further upside beyond mid June 08. We have argued in previous notes that if we take the consensus EPS estimate for FY08 ($1.94) plus the potential for 500 bps margin expansion (equivalent to +70c to EPS), a $10B share buyback program as opposed to $5B (+10c), and apply a 4% CAGR over a three-year period to the resulting number, the EPS could be as high as $3.00; and this could go up to $3.20 if we use a 33% tax rate instead of guidance of 37% (with one third of sales overseas KFT should be able to have a lower tax rate). Putting an 18-19x PE multiple on that number would imply significant upside on KFT. We believe our $40 target price is conservative as it reflects only a portion of the medium term upside potential, in our view.

## Risks to Our Rating and Price Target

We believe Kraft could underperform if 1) the company's marketing investment program does not improve profit margin and market share trends, 2) new products prove cannibalistic and not accretive to margins, 3) the company is forced to increase marketing spend considerably in 2007-2009, 4) commodity costs, especially in dairy and meats, increase and are not passed on to prices, or the current lower costs are entirely offset as competitors (including private label) cut prices; and 5) management is forced to cut guidance during 2007.

3

Pablo Zuanic
(1-212) 622-6744
pablo.zuanic@jpmorgan.com

North America Equity Research
19 September 2007

**JPMorgan**

**Analyst Certification:**

The research analyst(s) denoted by an "AC" on the cover of this report certifies (or, where multiple research analysts are primarily responsible for this report, the research analyst denoted by an "AC" on the cover or within the document individually certifies, with respect to each security or issuer that the research analyst covers in this research) that: (1) all of the views expressed in this report accurately reflect his or her personal views about any and all of the subject securities or issuers; and (2) no part of any of the research analyst's compensation was, is, or will be directly or indirectly related to the specific recommendations or views expressed by the research analyst(s) in this report.

**Important Disclosures**

- **Lead or Co-manager:** JPMSI or its affiliates acted as lead or co-manager in a public offering of equity and/or debt securities for Kraft Foods within the past 12 months.
- **Client of the Firm:** Kraft Foods is or was in the past 12 months a client of JPMSI; during the past 12 months, JPMSI provided to the company investment banking services, non-investment banking securities-related service and non-securities-related services.
- **Investment Banking (past 12 months):** JPMSI or its affiliates received in the past 12 months compensation for investment banking services from Kraft Foods.
- **Investment Banking (next 3 months):** JPMSI or its affiliates expect to receive, or intend to seek, compensation for investment banking services in the next three months from Kraft Foods.
- **Non-Investment Banking Compensation:** JPMSI has received compensation in the past 12 months for products or services other than investment banking from Kraft Foods. An affiliate of JPMSI has received compensation in the past 12 months for products or services other than investment banking from Kraft Foods.
- JPMorgan and/or its affiliates is acting as a financial advisor to Groupe Danone (GD) on the sale of their global biscuit business to Kraft Foods Inc. (KFT) which announced on July 3, 2007. The transaction is subject to customary closing conditions, including regulatory clearances.

**Kraft Foods (KFT) Price Chart**



| Date | Rating | Share Price ($) | Price Target ($) |
|------|--------|-----------------|------------------|
| 25-Jul-06 | OW | 30.50 | - |
| 02-Apr-07 | OW | 30.85 | 40.00 |

Source: Reuters and JPMorgan; price data adjusted for stock splits and dividends.
This chart shows JPMorgan's continuing coverage of this stock; the current analyst may or may not have covered it over the entire period.
JPMorgan ratings: OW = Overweight, N = Neutral, UW = Underweight.

**Explanation of Equity Research Ratings and Analyst(s) Coverage Universe:**

JPMorgan uses the following rating system: **Overweight** [Over the next six to twelve months, we expect this stock will outperform the average total return of the stocks in the analyst's (or the analyst's team's) coverage universe.] **Neutral** [Over the next six to twelve months, we expect this stock will perform in line with the average total return of the stocks in the analyst's (or the analyst's team's) coverage universe.] **Underweight** [Over the next six to twelve months, we expect this stock will underperform the average total return of the stocks in the analyst's (or the analyst's team's) coverage universe.] The analyst or analyst's team's coverage universe is the sector and/or country shown on the cover of each publication. See below for the specific stocks in the certifying analyst(s) coverage universe.

**Coverage Universe: Pablo Zuanic:** Archer-Daniels-Midland (ADM), Bunge Limited (BG), Campbell Soup (CPB), ConAgra Foods (CAG), Dean Foods Company (DF), Flowers Foods Inc (FLO), General Mills (GIS), HJ Heinz (HNZ),

Hain Celestial (HAIN), Hormel Foods Corporation (HRL), Kellogg (K), Kraft Foods (KFT), Pilgrim's Pride (PPC), Ralcorp Holdings Inc (RAH), Sanderson Farms, Inc. (SAFM), Sara Lee Corporation (SLE), Smithfield Foods, Inc (SFD), The Hershey Company (HSY), Treehouse Foods (THS), Tyson Foods (TSN), WM Wrigley Jr (WWY)

**JPMorgan Equity Research Ratings Distribution, as of June 29, 2007**

|  | Overweight (buy) | Neutral (hold) | Underweight (sell) |
|---|---|---|---|
| JPM Global Equity Research Coverage | 44% | 41% | 16% |
| IB clients* | 50% | 50% | 38% |
| JPMSI Equity Research Coverage | 40% | 47% | 13% |
| IB clients* | 69% | 62% | 48% |

*Percentage of investment banking clients in each rating category.
For purposes only of NASD/NYSE ratings distribution rules, our Overweight rating falls into a buy rating category; our Neutral rating falls into a hold rating category; and our Underweight rating falls into a sell rating category.

**Valuation and Risks:** Please see the most recent company-specific research report for an analysis of valuation methodology and risks on any securities recommended herein. Research is available at http://www.morganmarkets.com , or you can contact the analyst named on the front of this note or your JPMorgan representative.

**Analysts' Compensation:** The equity research analysts responsible for the preparation of this report receive compensation based upon various factors, including the quality and accuracy of research, client feedback, competitive factors, and overall firm revenues, which include revenues from, among other business units, Institutional Equities and Investment Banking.

## Other Disclosures

**Options related research:** If the information contained herein regards options related research, such information is available only to persons who have received the proper option risk disclosure documents. For a copy of the Option Clearing Corporation's Characteristics and Risks of Standardized Options, please contact your JPMorgan Representative or visit the OCC's website at http://www.optionsclearing.com/publications/risks/riskstoc.pdf.

**Legal Entities Disclosures**
U.S.: JPMSI is a member of NYSE, FINRA and SIPC. J.P. Morgan Futures Inc. is a member of the NFA. JPMorgan Chase Bank, N.A. is a member of FDIC and is authorized and regulated in the UK by the Financial Services Authority. U.K.: J.P. Morgan Securities Ltd. (JPMSL) is a member of the London Stock Exchange and is authorised and regulated by the Financial Services Authority. Registered in England & Wales No. 2711006. Registered Office 125 London Wall, London EC2Y 5AJ. South Africa: J.P. Morgan Equities Limited is a member of the Johannesburg Securities Exchange and is regulated by the FSB. Hong Kong: J.P. Morgan Securities (Asia Pacific) Limited (CE number AAJ321) is regulated by the Hong Kong Monetary Authority and the Securities and Futures Commission in Hong Kong. Korea: J.P. Morgan Securities (Far East) Ltd, Seoul branch, is regulated by the Korea Financial Supervisory Service. Australia: J.P. Morgan Australia Limited (ABN 52 002 888 011/AFS Licence No: 238188) is regulated by ASIC and J.P. Morgan Securities Australia Limited (ABN 61 003 245 234/AFS Licence No: 238066) is a Market Participant with the ASX and regulated by ASIC. Taiwan: J.P.Morgan Securities (Taiwan) Limited is a participant of the Taiwan Stock Exchange (company-type) and regulated by the Taiwan Securities and Futures Commission. India: J.P. Morgan India Private Limited is a member of the National Stock Exchange of India Limited and The Stock Exchange, Mumbai and is regulated by the Securities and Exchange Board of India. Thailand: JPMorgan Securities (Thailand) Limited is a member of the Stock Exchange of Thailand and is regulated by the Ministry of Finance and the Securities and Exchange Commission. Indonesia: PT J.P. Morgan Securities Indonesia is a member of the Jakarta Stock Exchange and Surabaya Stock Exchange and is regulated by the BAPEPAM. Philippines: J.P. Morgan Securities Philippines Inc. is a member of the Philippine Stock Exchange and is regulated by the Securities and Exchange Commission. Brazil: Banco J.P. Morgan S.A. is regulated by the Comissao de Valores Mobiliarios (CVM) and by the Central Bank of Brazil. Mexico: J.P. Morgan Casa de Bolsa, S.A. de C.V., J.P. Morgan Grupo Financiero is a member of the Mexican Stock Exchange and authorized to act as a broker dealer by the National Banking and Securities Exchange Commission. Japan: This material is distributed in Japan by JPMorgan Securities Japan Co., Ltd., which is regulated by the Japan Financial Services Agency (FSA). Singapore: This material is issued and distributed in Singapore by J.P. Morgan Securities Singapore Private Limited (JPMSS) [mica (p) 030/09/2007 and Co. Reg. No.: 199405335R] which is a member of the Singapore Exchange Securities Trading Limited and is regulated by the Monetary Authority of Singapore (MAS) and/or JPMorgan Chase Bank, N.A., Singapore branch (JPMCB Singapore) which is regulated by the MAS. Malaysia: This material is issued and distributed in Malaysia by JPMorgan Securities (Malaysia) Sdn Bhd (18146-x) which is a Participating Organization of Bursa Malaysia Securities Bhd and is licensed as a dealer by the Securities Commission in Malaysia. Pakistan: J. P. Morgan Pakistan Broking (Pvt.) Ltd is a member of the Karachi Stock Exchange and regulated by the Securities and Exchange Commission of Pakistan.

**Country and Region Specific Disclosures**
U.K. and European Economic Area (EEA): Issued and approved for distribution in the U.K. and the EEA by JPMSL. Investment research issued by JPMSL has been prepared in accordance with JPMSL's Policies for Managing Conflicts of Interest in Connection with Investment

Pablo Zuanic
(1-212) 622-6744
pablo.zuanic@jpmorgan.com

North America Equity Research
19 September 2007

**JPMorgan** ⬡

Research which can be found at http://www.jpmorgan.com/pdfdoc/research/ConflictManagementPolicy.pdf. This report has been issued in the U.K. only to persons of a kind described in Article 19 (5), 38, 47 and 49 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 (all such persons being referred to as "relevant persons"). This document must not be acted on or relied on by persons who are not relevant persons. Any investment or investment activity to which this document relates is only available to relevant persons and will be engaged in only with relevant persons. In other EEA countries, the report has been issued to persons regarded as professional investors (or equivalent) in their home jurisdiction Germany: This material is distributed in Germany by J.P. Morgan Securities Ltd. Frankfurt Branch and JPMorgan Chase Bank, N.A., Frankfurt Branch who are regulated by the Bundesanstalt für Finanzdienstleistungsaufsicht. Australia: This material is issued and distributed by JPMSAL in Australia to "wholesale clients" only. JPMSAL does not issue or distribute this material to "retail clients." The recipient of this material must not distribute it to any third party or outside Australia without the prior written consent of JPMSAL. For the purposes of this paragraph the terms "wholesale client" and "retail client" have the meanings given to them in section 761G of the Corporations Act 2001. Hong Kong: The 1% ownership disclosure as of the previous month end satisfies the requirements under Paragraph 16.5(a) of the Hong Kong Code of Conduct for persons licensed by or registered with the Securities and Futures Commission. (For research published within the first ten days of the month, the disclosure may be based on the month end data from two months' prior.) J.P. Morgan Broking (Hong Kong) Limited is the liquidity provider for derivative warrants issued by J.P. Morgan International Derivatives Ltd and listed on The Stock Exchange of Hong Kong Limited. An updated list can be found on HKEx website: http://www.hkex.com.hk/prod/dw/Lp.htm. Korea: This report may have been edited or contributed to from time to time by affiliates of J.P. Morgan Securities (Far East) Ltd, Seoul branch. Singapore: JPMSI and/or its affiliates may have a holding in any of the securities discussed in this report; for securities where the holding is 1% or greater, the specific holding is disclosed in the Legal Disclosures section above. India: For private circulation only not for sale. Pakistan: For private circulation only not for sale. New Zealand: This material is issued and distributed by JPMSAL in New Zealand only to persons whose principal business is the investment of money or who, in the course of and for the purposes of their business, habitually invest money. JPMSAL does not issue or distribute this material to members of "the public" as determined in accordance with section 3 of the Securities Act 1978. The recipient of this material must not distribute it to any third party or outside New Zealand without the prior written consent of JPMSAL.

General: Additional information is available upon request. Information has been obtained from sources believed to be reliable but JPMorgan Chase & Co. or its affiliates and/or subsidiaries (collectively JPMorgan) do not warrant its completeness or accuracy except with respect to any disclosures relative to JPMSI and/or its affiliates and the analyst's involvement with the issuer that is the subject of the research. All pricing is as of the close of market for the securities discussed, unless otherwise stated. Opinions and estimates constitute our judgment as of the date of this material and are subject to change without notice. Past performance is not indicative of future results. This material is not intended as an offer or solicitation for the purchase or sale of any financial instrument. The opinions and recommendations herein do not take into account individual client circumstances, objectives, or needs and are not intended as recommendations of particular securities, financial instruments or strategies to particular clients. The recipient of this report must make its own independent decisions regarding any securities or financial instruments mentioned herein. JPMSI distributes in the U.S. research published by non-U.S. affiliates and accepts responsibility for its contents. Periodic updates may be provided on companies/industries based on company specific developments or announcements, market conditions or any other publicly available information. Clients should contact analysts and execute transactions through a JPMorgan subsidiary or affiliate in their home jurisdiction unless governing law permits otherwise.

Revised September 17, 2007.

Copyright 2007 JPMorgan Chase & Co. All rights reserved. This report or any portion hereof may not be reprinted, sold or redistributed without the written consent of JPMorgan.

Pablo Zuanic
(1-212) 622-6744
pablo.zuanic@jpmorgan.com

North America Equity Research
19 September 2007



# EXHIBIT B



# FORM 8-K

## PROCTER GAMBLE CO - pg

Exhibit:

**Filed: September 25, 2007 (period: September 25, 2007)**

Report of unscheduled material events or corporate changes.

ITEM 8.01  OTHER EVENTS:

SIGNATURE
EX-99.1 (QUARTERLY SEGMENT
FINANCIAL INFORMATION)
EX-99.2 (ANNUAL SEGMENT FINANCIAL
INFORMATION)

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### FORM 8-K

CURRENT REPORT
Pursuant to Section 13 OR 15(d) of The Securities Exchange Act Of 1934

Date of Report (Date of earliest event reported)                              September 25, 2007

## THE PROCTER & GAMBLE COMPANY
(Exact name of registrant as specified in its charter)

### P&G

| Ohio | 1-434 | 31-0411980 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

| One Procter & Gamble Plaza, Cincinnati, Ohio | 45202 |
|---|---|
| (Address of principal executive offices) | Zip Code |

| (513) 983-1100 | 45202 |
|---|---|
| (Registrant's telephone number, including area code) | Zip Code |

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## ITEM 8.01    OTHER EVENTS;

This Form 8-K provides information on the change in the reporting structure of The Procter & Gamble Company (the "Company") and a summary of the effects of this change on the Company's historical segment results. The change in segment reporting will be reflected retrospectively, but in no way revises or restates the Consolidated Statements of Earnings, Consolidated Balance Sheets, Consolidated Statements of Shareholders' Equity or Consolidated Statements of Cash Flows for the Company and consolidated subsidiaries for any period.

### Fiscal Year 2008 Changes to Global Business Unit (GBU) Structure
In May 2007, the Company announced a number of changes to our organization structure and certain of our key leadership positions that became effective on July 1, 2007. These resulted in changes to our GBU and segment structure. Specifically, our new structure is comprised of three GBUs with a total of six reportable segments:

Source: PROCTER & GAMBLE CO, 8-K, September 25, 2007

| Global Business Unit (GBU) | Reportable Segment |
|---|---|
| Beauty | • Beauty<br>• Grooming |
| Health and Well-Being | • Health Care<br>• Snacks, Coffee and Pet Care |
| Household Care | • Fabric Care and Home Care<br>• Baby Care and Family Care |

Prior to July 1, 2007, the Company consisted of three Global Business Units: Beauty and Health; Household Care; and Gillette GBU. The businesses that previously comprised the Gillette GBU are now included within the Beauty and Household Care GBUs. As a result of these moves, the Duracell and Braun business will no longer comprise a separate reportable segment. The Braun business has been combined and is being managed with the Blades and Razors business to form the Grooming reportable segment within the Beauty GBU. The Grooming reportable segment also includes all face and shave prep products, previously reported within the Beauty reportable segment. The Duracell business has been moved to our Household Care GBU and will be reported as part of our Fabric Care and Home Care reportable segment. Finally, our feminine care business, which previously was part of our Beauty GBU and reportable segment, is now being managed within our Health and Well-Being GBU and will be reported as part of the Health Care reportable segment.

These changes were effective as of July 1, 2007. All financial statements, beginning in the quarter ending September 30, 2007, will reflect the new segment reporting structure. This change in segment reporting will be reflected on a retrospective basis, with prior years also adjusted to reflect the new segment reporting structure. The Company is issuing this Form 8-K in order to provide investors with summary financial information and historical data that is on a basis consistent with the Company's new segment reporting structure. Exhibit 99.1 provides quarterly financial summary information by reportable segment for the fiscal year ended June 30, 2007. Exhibit 99.2 provides fiscal year financial summary information by reportable segment for the fiscal years ended June 30, 2005, 2006 and 2007.

### SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the Registrant has duly caused this Report to be signed on its behalf by the undersigned hereunto duly authorized.

### THE PROCTER & GAMBLE COMPANY

BY: /s/ E. J. WUNSCH

E. J. Wunsch
Assistant Secretary
September 25, 2007

### EXHIBIT(S)

99.1.   Quarterly Segment Financial Summary Information- Fiscal Year Ended June 30, 2007
99.2.   Annual Segment Financial Summary Information (Fiscal Years Ended June 30, 2005 - 2007)

Source: PROCTER & GAMBLE CO, 8-K, September 25, 2007

EX-99.1

# THE PROCTER & GAMBLE COMPANY AND SUBSIDIARIES
## Quarterly Segment Financial Summary Information- Fiscal Year Ended June 30, 2007
### (Amounts in Millions)

| | | | Three Months Ended | | | | Fiscal Year 2007 |
|---|---|---|---|---|---|---|---|
| | | | 9/30/2006 | 12/31/2006 | 3/31/2007 | 6/30/2007 | |
| Beauty | Beauty | Net Sales | $4,324 | $4,656 | $4,365 | $4,544 | $17,889 |
| | | Earnings Before Income Taxes | 835 | 1,027 | 792 | 786 | 3,440 |
| | | Net Earnings | 634 | 804 | 603 | 570 | 2,611 |
| | Grooming | Net Sales | 1,845 | 1,976 | 1,744 | 1,872 | 7,437 |
| | | Earnings Before Income Taxes | 527 | 530 | 429 | 409 | 1,895 |
| | | Net Earnings | 385 | 386 | 510 | 302 | 1,583 |
| Health and Well-Being | Health Care | Net Sales | 3,536 | 3,407 | 3,291 | 3,347 | 13,581 |
| | | Earnings Before Income Taxes | 878 | 960 | 827 | 700 | 3,365 |
| | | Net Earnings | 593 | 648 | 556 | 456 | 2,253 |
| | Snacks, Coffee and Pet Care | Net Sales | 1,063 | 1,253 | 1,090 | 1,131 | 4,537 |
| | | Earnings Before Income Taxes | 144 | 232 | 191 | 192 | 759 |
| | | Net Earnings | 87 | 150 | 116 | 124 | 477 |
| Household Care | Fabric Care and Home Care | Net Sales | 5,252 | 5,511 | 5,220 | 5,386 | 21,369 |
| | | Earnings Before Income Taxes | 1,225 | 1,234 | 1,058 | 1,133 | 4,650 |
| | | Net Earnings | 831 | 834 | 700 | 762 | 3,127 |
| | Baby Care and Family Care | Net Sales | 3,099 | 3,119 | 3,268 | 3,240 | 12,726 |
| | | Earnings Before Income Taxes | 600 | 548 | 606 | 537 | 2,291 |
| | | Net Earnings | 383 | 341 | 382 | 334 | 1,440 |
| Corporate | | Net Sales | (234) | (197) | (284) | (248) | (963) |
| | | Earnings Before Income Taxes | (333) | (441) | (367) | (549) | (1,690) |
| | | Net Earnings | (215) | (301) | (135) | (280) | (931) |
| Total Company | | Net Sales | 18,785 | 19,725 | 18,694 | 19,272 | 76,476 |
| | | Earnings Before Income Taxes | 3,876 | 4,090 | 3,536 | 3,208 | 14,710 |
| | | Net Earnings | 2,698 | 2,862 | 2,512 | 2,268 | 10,340 |

EX-99.2

## THE PROCTER & GAMBLE COMPANY AND SUBSIDIARIES
### Annual Segment Financial Summary Information (Fiscal Years Ended June 30, 2005 – 2007)
### (Amounts in Millions)

| | | | Net Sales | Earnings Before Income Taxes | Net Earnings |
|---|---|---|---|---|---|
| **Beauty** | Beauty | 2007 | 17,889 | 3,740 | 2,811 |
| | | 2006 | 16,687 | 3,262 | 2,412 |
| | | 2005 | 15,909 | 3,051 | 2,184 |
| | Grooming | 2007 | 7,437 | 1,825 | 1,383 |
| | | 2006 | 5,114 | 1,176 | 846 |
| | | 2005 | 10 | | |
| **Health and Well-Being** | Health Care | 2007 | 13,381 | 3,165 | 2,233 |
| | | 2006 | 11,831 | 2,785 | 1,829 |
| | | 2005 | 9,880 | 2,182 | 1,376 |
| | Snacks, Coffee and Pet Care | 2007 | 4,537 | 769 | 477 |
| | | 2006 | 4,383 | 627 | 385 |
| | | 2005 | 4,314 | 714 | 444 |
| **Household Care** | Fabric Care and Home Care | 2007 | 21,469 | 4,650 | 3,127 |
| | | 2006 | 18,918 | 3,905 | 2,609 |
| | | 2005 | 15,796 | 3,186 | 2,129 |
| | Baby Care and Family Care | 2007 | 12,726 | 2,291 | 1,440 |
| | | 2006 | 11,972 | 2,071 | 1,299 |
| | | 2005 | 11,652 | 1,924 | 1,197 |
| **Corporate** | | 2007 | (963) | (1,690) | (931) |
| | | 2006 | (683) | (1,413) | (696) |
| | | 2005 | (820) | (1,030) | (410) |
| **Total Company** | | 2007 | 76,476 | 14,710 | 10,340 |
| | | 2006 | 68,222 | 12,413 | 8,684 |
| | | 2005 | 56,741 | 9,981 | 6,923 |

Created by 10K Wizard   www.10KWizard.com

Source: PROCTER & GAMBLE CO, 8-K, September 25, 2007

# EXHIBIT C

## Procter & Gamble Confirms Prior Sales and Earnings Guidance for First Quarter 2007/08

CINCINNATI, Sept. 18 2007 /PRNewswire-FirstCall/ -- The Procter & Gamble Company (NYSE: PG) confirmed previously announced sales and earnings guidance for the July to September quarter of fiscal year 2007/08. The company continues to expect sales growth for the quarter of six percent to eight percent, organic sales growth in line with previous guidance and diluted earnings per share of $0.88 to $0.90.

In addition, P&G announced that the release date of final results for the July to September quarter is scheduled for October 30, 2007.

Forward Looking Statements

All statements, other than statements of historical fact included in this release, are forward-looking statements, as that term is defined in the Private Securities Litigation Reform Act of 1995. Such statements are based on financial data, market assumptions and business plans available only as of the time the statements are made, which may become out of date or incomplete. We assume no obligation to update any forward-looking statement as a result of new information, future events or other factors. Forward-looking statements are inherently uncertain, and investors must recognize that events could differ significantly from our expectations. In addition to the risks and uncertainties noted in this release, there are certain factors that could cause actual results to differ materially from those anticipated by some of the statements made. These include: (1) the ability to achieve business plans, including with respect to lower income consumers and growing existing sales and volume profitably despite high levels of competitive activity, especially with respect to the product categories and geographical markets (including developing markets) in which the Company has chosen to focus; (2) the ability to successfully execute, manage and integrate key acquisitions and mergers, including (i) the Domination and Profit Transfer Agreement with Wella, and (ii) the Company's merger with The Gillette Company, and to achieve the cost and growth synergies in accordance with the stated goals of these transactions; (3) the ability to manage and maintain key customer relationships; (4) the ability to maintain key manufacturing and supply sources (including sole supplier and plant manufacturing sources); (5) the ability to successfully manage regulatory, tax and legal matters (including product liability, patent, and intellectual property matters as well as those related to the integration of Gillette and its subsidiaries), and to resolve pending matters within current estimates; (6) the ability to successfully implement, achieve and sustain cost improvement plans in manufacturing and overhead areas, including the Company's outsourcing projects; (7) the ability to successfully manage currency (including currency issues in volatile countries), debt, interest rate and commodity cost exposures; (8) the ability to manage continued global political and/or economic uncertainty and disruptions, especially in the Company's significant geographical markets, as well as any political and/or economic uncertainty and disruptions due to terrorist activities; (9) the ability to successfully manage competitive factors, including prices, promotional incentives and trade terms for products; (10) the ability to obtain patents and respond to technological advances attained by competitors and patents granted to competitors; (11) the ability to successfully manage increases in the prices of raw materials used to make the Company's products; (12) the ability to stay close to consumers in an era of increased media fragmentation; and (13) the ability to stay on the leading edge of innovation and maintain a positive reputation on our brands. For additional information concerning factors that could cause actual results to materially differ from those projected herein, please refer to our most recent 10-K, 10-Q and 8-K reports.

About Procter & Gamble (NYSE: PG)

Three billion times a day, P&G brands touch the lives of people around the world. The company has one of the strongest portfolios of trusted, quality, leadership brands, including Pampers(R), Tide(R), Ariel(R), Always(R), Whisper(R), Pantene(R), Mach3(R), Bounty(R), Dawn(R), Gain(R), Pringles(R), Folgers(R), Charmin(R), Downy(R), Lenor(R), Iams(R), Crest(R), Oral-B(R), Actonel(R), Duracell(R), Olay(R), Head & Shoulders(R), Wella(R), Gillette(R), and Braun(R). The P&G community consists of 138,000 employees working in over 80 countries worldwide. Please visit http://www.pg.com for the latest news and in-depth information about P&G and its brands.

SOURCE Procter & Gamble
- 09/18/2007

CONTACT: media, Doug Shelton, +1-513-983-7893; investors, Chris Peterson, +1-513-983-2414, both of Procter & Gamble

1489 09/18/2007 08:00 EDT http://www.prnewswire.com

# EXHIBIT D

## Procter & Gamble Confirms Prior Sales and Earnings Guidance for Fourth Quarter 2006/07

CINCINNATI, June 5, 2007 /PRNewswire-FirstCall/ – The Procter & Gamble Company (NYSE: PG) confirmed previously announced sales and earnings guidance for the April to June quarter of fiscal year 2006/07. The company continues to expect sales growth for the quarter of six percent to seven percent, organic sales growth in line with previous guidance and diluted earnings per share of $0.64 to $0.66.

In addition, P&G announced that the release date of final results for the April to June quarter and for fiscal year 2006/07 is scheduled for August 3, 2007.

### Forward Looking Statements

All statements, other than statements of historical fact included in this release, are forward-looking statements, as that term is defined in the Private Securities Litigation Reform Act of 1995. Such statements are based on financial data, market assumptions and business plans available only as of the time the statements are made, which may become out of date or incomplete. We assume no obligation to update any forward-looking statement as a result of new information, future events or other factors. Forward-looking statements are inherently uncertain, and investors must recognize that events could differ significantly from our expectations. In addition to the risks and uncertainties noted in this release, there are certain factors that could cause actual results to differ materially from those anticipated by some of the statements made. These include: (1) the ability to achieve business plans, including with respect to lower income consumers and growing existing sales and volume profitably despite high levels of competitive activity, especially with respect to the product categories and geographical markets (including developing markets) in which the Company has chosen to focus; (2) the ability to successfully execute, manage and integrate key acquisitions and mergers, including (i) the Domination and Profit Transfer Agreement with Wella, and (ii) the Company's merger with The Gillette Company, and to achieve the cost and growth synergies in accordance with the stated goals of these transactions; (3) the ability to manage and maintain key customer relationships; (4) the ability to maintain key manufacturing and supply sources (including sole supplier and plant manufacturing sources); (5) the ability to successfully manage regulatory, tax and legal matters (including product liability, patent, and intellectual property matters as well as those related to the integration of Gillette and its subsidiaries), and to resolve pending matters within current estimates; (6) the ability to successfully implement, achieve and sustain cost improvement plans in manufacturing and overhead areas, including the Company's outsourcing projects; (7) the ability to successfully manage currency (including currency issues in volatile countries), debt, interest rate and commodity cost exposures; (8) the ability to manage continued global political and/or economic uncertainty and disruptions, especially in the Company's significant geographical markets, as well as any political and/or economic uncertainty and disruptions due to terrorist activities; (9) the ability to successfully manage competitive factors, including prices, promotional incentives and trade terms for products; (10) the ability to obtain patents and respond to technological advances attained by competitors and patents granted to competitors; (11) the ability to successfully manage increases in the prices of raw materials used to make the Company's products; (12) the ability to stay close to consumers in an era of increased media fragmentation; and (13) the ability to stay on the leading edge of innovation. For additional information concerning factors that could cause actual results to materially differ from those projected herein, please refer to our most recent 10-K, 10-Q and 8-K reports.

### About P&G

Three billion times a day, P&G brands touch the lives of people around the world. The company has one of the strongest portfolios of trusted, quality, leadership brands, including Pampers(R), Tide(R), Ariel(R), Always(R), Whisper(R), Pantene(R), Mach3(R), Bounty(R), Dawn(R), Pringles(R), Folgers(R), Charmin(R), Downy(R), Lenor(R), Iams(R), Crest(R), Oral-B(R), Actonel(R), Duracell(R), Olay(R), Head & Shoulders(R), Wella(R), Gillette(R), and Braun(R). The P&G community consists of over 135,000 employees working in over 80 countries worldwide. Please visit http://www.pg.com for the latest news and in-depth information about P&G and its brands.

SOURCE The Procter & Gamble Company
06/05/2007

CONTACT: Media - Terry Loftus, +1-513-983-9736, or Investor Relations - Chris Peterson, +1-513-983-2414, both for The Procter & Gamble Company

4929 06/05/2007 08:30 EDT http://www.prnewswire.com